## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| Commodity Futures Trading Commission, | ) | **Complaint for Injunctive Relief, Civil Monetary Penalties, and Other Equitable Relief** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Jury Trial Demanded** |
| | ) | |
| Traders Global Group Inc., a New Jersey corporation, d/b/a "My Forex Funds"; Traders Global Group Inc., a Canadian business organization; and Murtuza Kazmi, | ) | Civil Action No. _____ |
| Defendants. | ) | |
| | ) | |

| | |
|---|---|
| Commodity Futures Trading Commission, Plaintiff 77 West Jackson Blvd., Suite 800 Chicago, IL 60604 Tel.   (312) 596-0700 Fax.   (312) 596-0716 | Traders Global Group Inc., Defendant 90 E. Halsey Rd., Ste. 333, No. 1596 Parsippany, NJ 07054 |
| | Traders Global Group Inc., Defendant 9131 Keele St., Unit A4 Vaughan, ON, Canada L4K2N1 |
| Ashley J. Burden Senior Trial Attorney Division of Enforcement Office: (312) 596-0693 Cell: (312) 995-0779 aburden@cftc.gov | Murtuza Kazmi, Defendant 65 Westwood Lane Richmond Hill, ON, Canada L4C6X6 |
| Katherine S. Paulson Trial Attorney Division of Enforcement Office: (312) 554-4559 kpaulson@cft.gov | |
| Elizabeth M. Streit Chief Trial Attorney Division of Enforcement Office: (312) 596-0537 estreit@cftc.gov | |

## I.   SUMMARY

1.   During the period starting in at least November 2021 and continuing through the present ("Relevant Period"), Defendants Traders Global Group Inc., a New Jersey corporation ("Traders Global US"), Traders Global Group Inc., a Canadian business organization ("Traders Global Canada") (together, "Traders Global"), and Murtuza Kazmi (collectively, "Defendants"), engaged and continue to engage in a large-scale fraud scheme involving leveraged, margined, or financed retail foreign exchange ("retail forex") and retail commodity transactions in violation of the Commodity Exchange Act ("Act"), 7 U.S.C §§ 1-26, and accompanying Commission Regulations ("Regulations"), 17 C.F.R. pts. 1-190 (2022).

2.   Traders Global, doing business as "My Forex Funds," and acting through its principals, agents, and employees, including Defendant Kazmi, offers retail customers the opportunity to become "professional traders," using Traders Global's money to trade against third-party "liquidity providers" and sharing in any trading profits.  In return for the opportunity, customers pay certain fees to Traders Global, and are required by Traders Global to maintain a certain minimum amount of account equity, referred to as a "drawdown limit."  Traders Global assures customers that "your success is our business," and "we only make money when you do."  Traders Global's pitch has proven appealing to customers; more than 135,000 of them signed up during the relevant period, paying at least $310 million in fees.

3.   Traders Global is a fraud.  In reality, Traders Global—not a third-party "liquidity provider"—is the counterparty to substantially all customer trades.

2

Traders Global does not, therefore, make money when customers make money. Traders Global loses money when customers make money.

4.    Traders Global pays customers who trade successfully. But substantially all of the payments come from fees paid by other customers, in a manner similar to a Ponzi scheme, and not from the proceeds of profitable trading against "liquidity providers."

5.    In order for Traders Global to generate a profit, Traders Global has to collect more in fees that it pays to successful customers. In order to do this, Traders Global uses various devices to minimize the likelihood of profitable trading by customers and reduce the amount of "profits" Traders Global has to pay successful customers. These devices include:

    a.    using a "drawdown limit" as a bad-faith pretext to terminate customer accounts;

    b.    misleadingly assessing Traders Global's own commissions to reduce customer account equity;

    c.    secretly using specialized software to stack the odds against customers by (i) delaying execution of customer orders, or (ii) executing the orders at worse prices than appeared to the customer at the time an order was sent (referred to as "slippage"); and

    d.    sending orders from an extremely small number of successful customers to an overseas counterparty, then using specialized software to artificially increase the distance between the best bid or offer

(referred to as the "spread") to create the false appearance of decreased customer profits and increased customer losses.

6.      Defendants' scheme is a profitable one.  During the Relevant Period, Traders Global had net income of approximately $172 million.  Kazmi used proceeds from the fraud to purchase luxury homes and automobiles, and make tens of millions of dollars in transfers to his personal accounts.

7.      Defendants' fraud scheme violates Regulation 5.2(b)(1), (3), 17 C.F.R. § 5.2(b)(1), (3) (2022), which prohibits fraud in connection with leveraged retail forex transactions, and Section 4b(a)(2)(A), (C) of the Act, 7 U.S.C. § 6b(a)(2)(A), (C), which prohibits fraud in connection with leveraged retail forex transactions or off-exchange leveraged retail commodity transactions.

8.      By acting as counterparty to its customers' trades, Traders Global is violating Regulation 5.3(a)(6)(i), 17 C.F.R. § 5.3(a)(6)(i) (2022), which requires registration by dealers of retail leveraged forex contracts (referred to as "retail foreign exchange dealers," or "RFEDs"), and Section 4(a) of the Act, 7 U.S.C. § 6(a), which prohibits off-exchange trading in leveraged retail commodity transactions.

9.      By soliciting orders from retail forex customers without registration as an associated person of an RFED, Kazmi is violating Section 2(c)(2)(C)(iii)(I)(aa) of the Act, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa), and Regulation 5.3(a)(6)(ii), 17 C.F.R. § 5.3(a)(6)(ii) (2022).

10.     Defendant Kazmi is liable for Traders Global's violations as a controlling person, under Section 13(b) of the Act, 7 U.S.C. § 13c(b).

11.     Defendants Traders Global US and Traders Global Canada are liable as principals for Kazmi's violations of the Act and Regulations, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2022).

12.     Traders Global US and Traders Global Canada are liable for one another's violations by virtue of their involvement in a common enterprise.

## II.     JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), provides that U.S. district courts have jurisdiction to hear actions brought by the Commission for injunctive and other relief or to enforce compliance with the Act whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

14.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants transacted business in this District, and certain of the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District, among other places.

### III.    PARTIES

15.    Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission") is an independent federal regulatory agency charged by Congress with administering and enforcing the Act and accompanying Regulations.

16.    Defendant **Traders Global Group Inc.** ("Traders Global US") is a New Jersey corporation with a registered office address in Phillipsburg, New Jersey.  Traders Global US's principal places of business during the Relevant Period include Parsippany, New Jersey; Somerset, New Jersey; and Ontario, Canada.  Traders Global US is not, and has never been, registered with the Commission in any capacity.

17.    Defendant **Traders Global Group Inc.** ("Traders Global Canada") is a Canadian business organization with a registered office address in Vaughan, Ontario.  Traders Global Canada's principal places of business during the Relevant Period include Parsippany, New Jersey; Somerset, New Jersey; and Ontario, Canada.  Traders Global Canada is not, and has never been, registered with the Commission in any capacity.

18.    During the Relevant Period, Traders Global US and Traders Global Canada operated as a common enterprise, with common officers and employees, common control, and common marketing.  Traders Global US and Traders Global Canada throughout the Relevant Period commingled funds, and do not conduct business at arm's length.  For example, accounts in the name of Traders Global US pay expenses incurred by Traders Global Canada, and vice versa.  There is no meaningful distinction between the two companies.

19.     Defendant **Murtuza Kazmi** is the CEO and sole shareholder of Traders Global US and Traders Global Canada.  During certain portions of the Relevant Period, Kazmi resided in Phillipsburg, New Jersey.  Kazmi is not, and has never been, registered with the Commission in any capacity.

## IV.     FACTS

### A.     "EARN AS A PROFESSIONAL TRADER"

20.     During the Relevant Period, Traders Global, doing business as "My Forex Funds," and acting through its principals, employees, and agents, including Kazmi, offered, and continues to offer, retail customers in the U.S. and around the world the opportunity to "earn as a professional trader," trading leveraged contracts in forex and commodities including precious metals, digital asset commodities, broad-based stock indices, and oil.  These contracts meet the requirements of Sections 2(c)(2)(C) or 2(c)(2)(D) of the Act, 7 U.S.C. § 2(c)(2)(C), (D), which confer upon Commission jurisdiction over these products.

21.     According to Traders Global, a customer can use Traders Global's own "live trading funds" to trade these contracts against third-party "liquidity providers" (i.e., counterparties).  Traders Global represents that if a customer's trading is profitable, the customer is entitled to receive as much as 85% of those profits.

22.     In order for a customer to take advantage of this opportunity, a customer is required to sign up for an "account" with Traders Global and pay a "registration fee" of between $49 and $4,900, depending on the type of account the customer signs up for.  The customer is also required by Traders Global to maintain

a certain minimum amount of equity in his or her account, referred to as a "drawdown limit."

1. **"You can trade Forex, Metals, Indices and Cryptocurrencies"**

23.     Traders Global purports to offer trading in leveraged commodity contracts in forex, precious metals, digital asset commodities, broad-based stock indices, and oil.  Most of the offered trading is in forex contracts; these include substantially every major currency pair, including EURUSD and EURGBP.  The precious metals contracts are for gold and silver.  The digital asset commodities contracts are for Bitcoin and Ethereum.  The contracts for broad-based stock indices include, *inter alia*, the S&P 500 and the NASDAQ 100.  The oil contracts are for Brent Crude and West Texas Intermediate.

24.     These contracts do not result in actual delivery of the underlying commodity; rather, they are financially settled.  The contracts are typically leveraged at a ratio of 1:100, meaning that when a customer enters into a contract to buy or sell the subject commodity, the customer does so for one one-hundredth of the notional value of the contract.

2. **Trade "live funds" against third-party "liquidity providers"**

25.     On its website, available at https://myforexfunds.com, Traders Global solicits members of the public to become "funded traders."  According to Traders Global's website, customers can trade against multiple third-party "liquidity providers" using "live trading funds" provided by Traders Global.

26.     On its website, Traders Global proclaims that it is a "proprietary firm" and thus does not "require regulation." "It is our company money," Traders Global claims, "that is being used in all of our accounts."

27.     Customers trading accounts with "live trading funds" are subject to commissions, which the website lists as $3 "per lot" (i.e., per contract).

### 3.     "Up to 85% profit split"

28.     On its website, Traders Global says that customers are entitled to "earn bonuses and profit-splits" of between 12% and 85% from successful trading. The percentage of profits the customer is entitled to receive depends on the type of account the customer signs up for.

29.     Some account types require a customer to generate simulated profits in a "demo" account before receiving access to so-called "live" trading funds. Once the customer has generated sufficient simulated profits, the customer graduates to the "funded account stage," in which the customer will "[g]et paid up to 85% of profits that you earn." Customers are entitled to receive payments on a bi-weekly or monthly basis.

30.     Other account types allow a customer to "skip the line" and "jump right into trading real funds." For these accounts, "You are paid 50% of the total profit generated on your account every week."

### 4.     "Low-cost entry into professional trading"

31.     The amount of the registration fee a customer has to pay Traders Global depends on the type and size of the account the customer wants to trade.

32.     For example, a customer can pay a registration fee of $49 to trade an account worth $5,000.  According to Traders Global's website, the lower-priced accounts offer a "low-cost entry into professional trading."

33.     On the other end of the spectrum, a customer can pay $4,900 to trade an account worth $50,000.  A larger account allows the customer to place larger trades and thus (at least in theory) generate larger profits.

### 5.    "Enforce good trading behavior"

34.     A customer who signs up for an account is required to stay within a "drawdown limit" imposed by Traders Global.  The drawdown limit requires a customer to maintain a certain minimum amount of equity in his or her trading account.  The amount varies with the size of account.

35.     On its website, Traders Global explains that the drawdown limit exists to "enforce good trading behavior."

36.     In a December 11, 2021, YouTube video, Kazmi explained that the drawdown is designed "to force traders to get into that habit of locking in some of the profits . . . ."  "If you lose all that money," Kazmi explained, "it's not only you that's losing, it's us as well right.  Because we want to make you profitable so we can be profitable . . . ."

37.     If a customer exceeds the drawdown limit, Traders Global will "disable" (i.e., terminate) the customer's account.  If the customer wishes to continue with Traders Global, the customer is required to re-start their account and pay another fee.

38.     Every account is subject to a drawdown limit, regardless of the account's size or type.  Accounts that require periods of "demo" trading have drawdown limits; the same drawdown limits apply if the customer graduates to trading "live" funds.  Accounts where customers pay more to trade so-called "live funds" right away are likewise subject to drawdown limits.

### 6.     "Your Success is Our Business"

39.     "Your success is our business," Traders Global proclaims on its website.  "[W]e only make money if you make money," Traders Global writes; "if you grow we grow."

40.     Traders Global's website explains:

> If you lose, we lose, so choose carefully the program that fits your FOREX and Prop Firm trading experience.  We will do the rest when it comes to support and trading conditions to ensure your success when trading FOREX with a Prop Firm.
>
> ****
>
> Our company is interested in assisting traders, helping them grow so that we can grow with them.  We strive to provide programs, services and information that assists people interest[ed] in the FOREX, CFD's or commodities markets to become more profitable, self-sustainable and efficient when trading.
>
> ****
>
> At My Forex Funds our goal is to encourage you, the trader to remain consistent and hopefully profitable so that you can earn from your talent . . . .  Our goal as a company is to find profitable, successful traders and encourage up and comers to become more consistent and profitable and form a long-term partnership.

41.     Kazmi made similar statements in an October 26, 2022, video on Traders Global's "My Forex Funds" YouTube channel.  In the video, Kazmi

explained, "it's traders that make us at the end of the day; it's traders trading that make us money . . . ."

42.     The foregoing statements on Traders Global's website referenced in paragraphs 18 through 38 were present on the website throughout the Relevant Period.

43.     The statements made by Kazmi in YouTube videos referenced in paragraphs 34 and 39 were available for viewing by the public from the date each video was posted through the present.

**7.     Traders Global's Sales Pitch Attracted More than a Hundred Thousand Customers**

44.     Traders Global's sales pitch has been extremely appealing to customers.  During the Relevant Period, more than 135,000 customers signed up for accounts with Traders Global.  More than 111,000 of these customers had "demo" accounts, and more than 24,000 had "live" accounts with Traders Global during the Relevant Period.  In aggregate, these more than 135,000 customers paid Traders Global more than $310 million in fees during the Relevant Period.

45.     Traders Global solicits and accepts customers from the U.S. and around the world.

46.     Traders Global directs its solicitations to the public at large, and in particular to retail customers.  A retail customer is a person who is not an "eligible contract participant" ("ECP") within the meaning of Section 1a(18) of the Act, 7 U.S.C. § 1a(18).

47.     Traders Global's customers are retail traders.

**B.    TRADERS GLOBAL IS A FRAUD**

48.    Traders Global is a fraud.  In reality, Traders Global is the counterparty to substantially all customer trades.  When customers make money, it means that Traders Global loses money.  Traders Global utilizes various devices to reduce the likelihood, or amount, of profitable trading by customers.  Those devices include:  Traders Global's bad-faith use of the drawdown limits; the assessment of commissions against customer accounts; the use of specialized software to handicap customer trading; and the sending of orders to a non-U.S. dealer and the artificial widening of price spreads for certain successful customers.

### 1.    When customers win, Traders Global loses

49.    Traders Global is, and has been through the Relevant Period, counterparty to substantially all customer trades.  Customers do not trade "live funds" against "multiple liquidity providers" nor do customers share in "trading profits," as Traders Global claims.  In reality, customers trade against Traders Global in an electronic trading environment that Traders Global controls.

50.    Because Traders Global is the counterparty, when a customer's trading is successful, any "profits" to which the customer may be entitled come out of Traders Global's pocket.  Indeed, substantially all of these so-called profits come from fees that Traders Global collected from other customers, in a manner similar to a Ponzi scheme.  When customers win, Traders Global loses.

### 2.      The drawdown rule is designed to cheat customers

51.      The drawdown rule is not intended, as Traders Global claims, to enforce good trading habits or "lock in" profits.  The purpose of the drawdown rule is to provide Traders Global with a bad-faith pretext to disable customer accounts.

52.      If a customer's trading is unsuccessful—i.e., if the trading results in a loss—that loss does not adversely affect Traders Global.  That is because customers are not really trading Traders Global's "live funds" against third-party "liquidity providers."

53.      If a customer's trading losses cause his or her account to fall below the drawdown limit, Traders Global disables the customer's account.  This allows Traders Global to vitiate the risk of any subsequent profitable trading by the customer.

54.      Disabling a customer's account also allows Traders Global to collect additional fees if the customer signs up again, which they often do.  When customers lose, Traders Global wins.

### 3.      Traders Global assesses commissions to reduce customer equity

55.      Traders Global claims on its website that customer trades are subject to "commissions" of $3 per lot.  Because Traders Global tells its customers that they are using Traders Global's funds to trade, the customer is led by Traders Global to believe that the commissions are those being charged to Traders Global by a liquidity provider, exchange, or other third party.

14

56.     In fact, Traders Global is not charged commissions by any third party on "trades" for which it acts as counterparty.  Traders Global fails to disclose, however, that it—not some third party—assesses these commissions.  The so-called "commissions" are simply a charge against customer account equity imposed by Traders Global.

57.     By assessing these commissions, Traders Global is able to reduce the profitability of a successful customer's trades, as well as the amount of money Traders Global has to pay the customer in "profits."  For unsuccessful customers, the commissions move them closer to, and in some cases over, the drawdown limit, which allows Trades Global to disable the account.

58.     During the Relevant Period, Traders Global assessed more than $7 million in commissions against customer accounts.

**4.     Traders Global uses software to stack the odds against customers**

59.     Traders Global uses specialized software to automatically add "delay" or "slippage" to customer orders.  Traders Global does this in order to reduce the likelihood, or amount, of a customer's profitable trading.

60.     "Delay" is a configuration parameter in the software that Traders Global uses to create and administer the electronic trading environment into which customers send orders.  The "delay" parameter allows Traders Global to delay execution of the customer's order for a specified period of time.  Traders Global does this to prevent customers from taking advantage of arbitrage opportunities arising from pricing differences among related markets.

61.    "Slippage" is another configuration parameter that Traders Global uses to cheat customers.  By dialing the "slippage" up, Traders Global sets the software to automatically execute a customer's market order at a worse price than the best bid or offer displayed at the time the customer entered the order.  For example, if a customer entered an order to buy a leveraged contract for Euros when the offer price displayed on the customer's computer screen was $1.759, imposition of slippage would result in the order being executed at a higher price, e.g., $1.800.

62.    Traders Global subjects most of its customers to some amount of delay or slippage.  Customers whose trading generates consistent profits, however, are subjected to longer delays and increased slippage, implemented by Traders Global.

63.    Traders Global does not disclose to customers that it uses the specialized software to impose delay or slippage on their trading.

**5.    For the most successful customers, Traders Global sends their orders to an overseas dealer and imposes an additional spread**

64.    A very small number of customers trading "live" accounts manage to trade profitably despite Traders Global's attempts to handicap them.  After identifying such customers, Traders Global may route some or all of these customers' orders to an off-exchange leveraged forex and commodities dealer outside the U.S. (hereinafter, the "Dealer").  Traders Global refers to this as "STP'ing" a customer's account; "STP" stands for "straight-through processing."

65.    STP'ing a customer is very rare.  Of 24,000 customers with "live" accounts during the Relevant Period, fewer than 100 of them had a single trade STP'd.

16

66.     In one respect, the STP'd customers get what they were promised—the opportunity to trade against a liquidity provider using Traders Global's money, which Traders Global has on deposit with the Dealer, in a margin account.  In every other respect, "STP'ing" is just another aspect of Defendants' fraud.

67.     Traders Global does not expect customers "on STP" to trade profitably. Indeed, they do not.  Customers on STP do substantially worse than when Traders Global was their counterparty.  More than 70% of the customers on STP made less money than before, when they were trading (unbeknownst to them) against Traders Global.  Many of these customers went profitable against Traders Global to unprofitable on STP.

68.     "STP'ing" nonetheless benefits Traders Global.  If a customer trades profitably against Traders Global (i.e., not on STP), Traders Global's potential losses are unlimited.  When a customer trades profitably against the Dealer via STP, customer profits come out of the Dealer's pocket.

69.     When a customer loses money on STP, Traders Global loses money to the Dealer.  But those losses are limited by Trader's Global's drawdown limit, which automatically disables the customer's account when the limit is reached.

70.     For customers on STP, Traders Global uses its specialized software to impose an additional "spread" on the price feed visible to STP'd customers.  This spread results in a customer seeing—and believing himself or herself to be executed at—a worse price than what Traders Global got from the Dealer.  It allows Traders Global to give less money to a winning customer and, for a losing customer,

17

terminate the account before the losses reach the drawdown limit.  (Though it will appear to the customer that he or she exceeded the drawdown limit.)

71.     Traders Global does not disclose the foregoing to customers.

### 6.     Defendants' Scheme is Profitable

72.     Defendants' scheme is a profitable one.  During the Relevant Period, Traders Global took in approximately $310 million in customer registration fees. During the same period, Traders Global paid out approximately $137 million, mostly to customers in the form of purported trading profits.  Traders Global has thus achieved net income of $172 million from its fraud during the Relevant Period.

73.     Kazmi has used the proceeds from the Traders Global fraud to fund a luxury lifestyle.

74.     In April 2022, Kazmi paid $1.6 million to purchase a Lamborghini Aventador at auction.   In December 2022, Kazmi paid $3.3 million for a Bugatti racecar.

75.     In April and May 2022, Kazmi paid more than CAD 4.9 million towards the purchase of a CAD 12.6 million estate in Richmond Hill, Ontario.  In June 2022, Kazmi paid almost $1.03 million to purchase a five-bedroom home in Somerset, New Jersey.

## C.    COMMUNICATIONS REVEAL THE FRAUDULENT NATURE OF DEFENDANTS' SCHEME

76.     Traders Global utilizes a third-party advisor ("Advisor") to help with the specialized software it uses to control the electronic environment in which its customers trade.  The Advisor helps Traders Global assess commissions, impose

18

delay and slippage on customer orders, STP customers, and artificially widen spreads on STP'd customers.

77.     The primary point-person for communications between Traders Global and the Advisor is the "Head of Risk and Trading" at Traders Global ("Traders Global Employee A").  Traders Global Employee A has a "stake" in Traders Global, in the form of a profit-sharing or other similar arrangement.

78.     The communications between Traders Global Employee A, on behalf of Traders Global, and the Advisor, made via email and instant message, provide a view into the inner workings of Defendants' fraudulent scheme.

### 1.  "I need something to stop that money going out"

79.     The communications between Traders Global Employee A and the Advisor demonstrate how Traders Global loses money when customers make money.

80.     On January 31, 2022, Traders Global Employee A lamented that a particular customer account "appears to be some how beating our system with arb [arbitrage] . . . ."  Traders Global Employee A complained: "if the strategy works for a month, we will lose more than a million dollars.  although his latest account broke the rules thats why he has stopped but we lost about 100k from his trading[.]"

81.     On February 18, 2022, Traders Global Employee A complained that during periods of price volatility customers "can make a killing with less probability of breaking the rules."  "[M]ost of these accounts the equity is returning to positive heavily and making money and its resulted in our out-goings rising almost 100%[.]" "Damn, yeah thats a problem," replied the Advisor.

82.     On June 6, 2022, Traders Global Employee A bemoaned: "i have suspended one of these traders for arbitrage and requested he send the source code of the EA ["expert advisor," i.e., an automated trading program] to unsuspend the account . . . i really need to know what they are doing so i can either ban them or [STP them]."  "hes got like 100k of pending to withdraw," wrote Traders Global Employee A, "so i need something to stop that money going out[.]"

83.     On July 15, 2022, Traders Global Employee A complained that the Advisor was not doing enough to find and eliminate profitable traders: "im pretty upset because we have so many accounts continuously trading and making huge amounts of money . . . .  [W]e have record losses but we aren't picking out those accounts that dont lose[.]"

### 2.     "Hopefully the net is massive loss"

84.     Communications between Traders Global Employee A and the Advisor reflect that Traders Global wants customers to lose.

85.     On May 4, 2022, Traders Global Employee A wrote, "very few customers of ours made money big volume but also big loss[.]"  "Hi [Traders Global Employee A]," wrote the Advisor, "thats great to hear."

86.     On May 19, 2022, Traders Global Employee A wrote, "our traders are getting slaughtered today[.]"  "[L]ike overall?," asked the Advisor, "Or a ton getting shutoff from downdraws?"  "[B]oth i think," replied Traders Global Employee A.  "[N]ice," wrote the Advisor.

87.     On June 15, 2022, Traders Global Employee A wrote: "we violated more accounts than made today.  so hopefully the net is massive loss[.]"

### 3.      "Slip them to hell"

88.      The communications between Traders Global Employee A and the Advisor show how Traders Global uses delay and slippage to limit customers' profits.  Delay and slippage are applied automatically to customer accounts through the use of "profiles" to which customers are assigned.

89.      On April 15, 2022, Traders Global Employee A identified a number of accounts using a "bot" (i.e., an automated trading program) to successfully generate profits.  Traders Global Employee A wrote to the Advisor, "I think we need another profile just for these accounts.  and just slip them to hell[.]"  The Advisor subsequently added the requested profile.

90.      On April 29, 2022, Traders Global Employee A asked the Advisor to put a particular customer on an "aggressive" profile; Traders Global Employee A wrote, "these accounts [sic] who go up so high so fast please alert us if you see them. This guy has done it twice and last time we paid him 120k . . . .  this guy if he lives, he will take out total over 250k from us he has very few losse[s.]"

91.      On May 4, 2022, Traders Global Employee A asked the Advisor to put another customer on the "aggressive" profile.  The Advisor advised Traders Global Employee A "this has been done;" Traders Global Employee A replied, "and the account is now dead :D[.]"

92.      On June 3, 2022, the Advisor identified, at Traders Global Employee A's request, certain accounts trading pursuant to short-term, high-frequency trading strategy.  "[A]s you can see," the Advisor wrote, "their running PnL is quite jagged but consistent upwards[.]"  The Advisor suggested assigning these accounts

to a profile with "a slightly less 'aggressive' slippage setting but would still impede performance." Traders Global Employee A responded, "[G]o ahead with that."

### 4.  "When these types of strategies get STP'd their performance declines"

93.  Communications between Traders Global Employee A and the Advisor reflect that Traders Global expects customer to lose money on STP.

94.  On February 21, 2022, Traders Global Employee A asked the Advisor for advice on whether to STP a particular account. "Generally speaking when these types of strategies get STP'd their performance declines as they get the market experience," wrote the Advisor. "We'd recommend keeping the account on the books for now. The new risk profile implemented should alleviate some PnL concerns." "[O]k," Traders Global Employee A responded. "[T]he downside of that, to me, is that he has been trading large sizes all this time, and getting paid for it."

95.  On May 12, 2022, Traders Global Employee A complained about a "suspicious" customer with "0 losses." The Advisor explained that the customer's trading was "valid," and that "after taking a review of some of their other trades it looks more like they're timing the market very well . . . ." "[O]k," replied Traders Global Employee A, "i will get their scaled account (it will be 100k) and we can stp it or start on aggressive and go from there but i dont know if that will stop them from being profitable[.]"

96.  In a June 22, 2022, email with the subject line, "STP discussion," the Advisor told Traders Global Employee A: "I think we need to all subscribe to the concept that your clients will almost never have alpha. None of them will make

money on real market conditions because they are good. Some will because they are lucky."

## D.   KAZMI ACTED WITH SCIENTER

97.    Kazmi knew during the Relevant Period that Traders Global was the counterparty to substantially all customer trades.  Kazmi executed an agreement dated September 13, 2021, with the Advisor to lease servers for trading by Traders Global customers.  The agreement specified that: "Customer [defined as Traders Global] shall be the counterparty to all trades with Client Accounts [defined to mean accounts belonging to Trades Global's customers]."

98.    Kazmi knew during the Relevant Period that "profits" paid to customers were comprised almost exclusively of fees paid by other customers, and not from the proceeds of successful trading against a third party.  Kazmi was the sole signatory on Traders Global's financial accounts during the Relevant Period. Statements from those accounts do not reflect the receipt of funds that were—or could conceivably have been—profits from successful trading against a third-party "liquidity provider."  Instead, the statements reflect the receipt of fees paid by customers via credit card or digital asset commodity transactions.  The statements reflect that Traders Global distributes these funds to a smaller set of customers as purported trading profits.

99.    Kazmi knew that customers were assigned to "profiles" designed to reduce the likelihood or amount of profitable trading.  In a March 8, 2022, chat Traders Global Employee A wrote (to the Advisor): "after talking to Murtusa [sp] [Kazmi], perhaps we should just move anyone who goes above 5% profit to the

scalping group we made for more real conditions instead of STPing someone?"  "I like that," replied the Advisor.

100.   Moreover, Kazmi received daily and weekly email updates from the Advisor starting on April 18, 2022.  These emails show various statistics about customer trading that reflected—and thus apprised Kazmi of—customer trading against Traders Global as the counterparty; commissions assessed against customer accounts; and the dismal trading results from the very small number of customer accounts on STP.

101.   Kazmi thus knew that the statements set forth in paragraphs 18 through 45 above were false and misleading, or failed to disclose material information to customers.

## V.      STATUTORY AND REGULATORY VIOLATIONS

**Count I:  Fraud in Connection with Retail Forex Transactions in Violation of Regulation 5.2(b)(1) and (3), 17 C.F.R. § 5.2(b)(1), (3) (2022)**

**Against All Defendants**

102.   The allegations set forth in paragraphs 1 through 101 above are re-alleged and incorporated as if fully set forth herein.

103.   Regulation 5.2(b)(1), (3), 17 C.F.R. § 5.2(b)(1), (3) (2022), provides that it shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any "retail forex transaction," to cheat or defraud or attempt to cheat or defraud any person; or willfully to deceive or attempt to deceive any person by any means whatsoever.

104.   A "retail forex transaction" is defined by Regulation 5.1(m), 17 C.F.R. § 5.1(m) (2022), to include any account, agreement, contract, or transaction described in Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C).

105.   7 U.S.C. § 2(c)(2)(C), among other things, contains three grants which make clear that the CFTC has jurisdiction over, and that certain antifraud provisions in the Act apply to, retail forex:

a.   Pursuant to 7 U.S.C. § 2(c)(2)(C)(ii)(I), forex agreements, contracts, or transactions described in 7 U.S.C. § 2(c)(2)(C)(i) "shall be subject to" the antifraud provisions of 7 U.S.C. §§ 6b and 6o, among other Sections of the Act;

b.   Pursuant to 7 U.S.C. § 2(c)(2)(C)(iv), 7 U.S.C. § 6b "shall apply to" the forex agreements, contracts, or transactions described in 7 U.S.C. § 2(c)(2)(C)(i) "as if" they were a contract of sale of a commodity for future delivery; and

c.   Pursuant to 7 U.S.C. § 2(c)(2)(C)(vii), "[t]his Act applies to, and the Commission shall have jurisdiction over an account . . . that is offered for the purpose of trading, or that trades," forex agreements, contracts, or transactions described in 7 U.S.C. § 2(c)(2)(C)(i).

106.   Defendants cheated or defrauded, and attempted to cheat or defraud, and willfully deceived or attempted to deceive Traders Global's customers.

107.   Defendant Traders Global did this, *inter alia*, by:

a. making false and misleading statements that customers receive "live funds" to trade against third-party "liquidity providers," when in reality Traders Global is the counterparty to substantially all customer trades;

b. making false and misleading statements that Traders Global makes money when customers make money and loses money when customers lose money, and that "your success is our business," when, in reality, Traders Global loses money when customers make money, and employs various devices to reduce the likelihood or amount of profitable trading by customers;

c. making false and misleading statements that Traders Global pays a customer a percentage of his or her trading profits when in fact those payments come from fees paid by other customers;

d. making false and misleading statements that the drawdown limit is meant to "enforce good trading habits" and "lock in profits" when in fact the limit is designed to provide Traders Global with a bad-faith justification to terminate customer accounts;

e. failing to disclose that commissions are assessed by Traders Global, not a third-party liquidity provider, and are intended to reduce customer account equity;

f. failing to disclose that Traders Global uses specialized software to reduce the likelihood or amount of profitable trading by customers

through the application of "delay" and "slippage" in an electronic trading environment that Traders Global controls;

g.   failing to disclose that the very small number of customers whose orders are executed against a third-party liquidity provider (i.e., the Dealer) via STP, were expected to—and did—trade unprofitably, or less profitably than when Traders Global was counterparty to those customers; and

h.   failing to disclose that Traders Global imposes artificial spreads on prices visible to STP'd customers, resulting in the customer getting worse prices for his or her execution than Traders Global receives from the Dealer, and reducing the amount of any "profits" owed by Traders Global to the customer.

108.   Defendants made these false or misleading statements and omissions to customers in connection with retail forex transactions.

109.   Defendants did so with scienter—i.e., knowingly or recklessly.

110.   Defendants thus engaged in fraud in connection with retail forex transactions, in violation of 17 C.F.R. § 5.2(b)(1), (3).

111.   Defendants Traders Global US and Traders Global Canada operated as a common enterprise, and are therefore jointly and severally liable for one another's violations of the Act and Regulations.

112.   The false and misleading statements and omissions made by the officers, agents, or other persons acting by or on behalf of Traders Global, including

27

Kazmi, were made within the scope of each such person's agency or employment. As such, Traders Global US and Traders Global Canada are liable for each such person's false or misleading statements or omissions pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2022).

113.    Kazmi was the founder, CEO, and sole shareholder of Traders Global US and Traders Global Canada throughout the Relevant Period, and during that period possessed and exercised, directly or indirectly, the power to direct or cause the direction of the management and policies of Traders Global.  As such, Kazmi controlled Traders Global during the Relevant Period.  Kazmi did not act in good faith with respect to, or knowingly induced, directly or indirectly, the acts and omissions constituting Traders Global's violations of the Act and Regulations. Kazmi is thus liable for Traders Global's violations of the Act and Regulations committed during the Relevant Period, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

114.    Each act of cheating or defrauding, or attempting to cheat or defraud, any person, or of willfully deceiving or attempting to deceive any person by any means whatsoever, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. § 5.2(b)(1), (3).

### Count II:  Fraud in Connection with Off-Exchange Transactions in Retail Forex and Retail Commodities in Violation of Section 4b(a)(2)(A), (C) of the Act, 7 U.S.C. § 6b(a)(2)(A), (C)

### Against All Defendants

115.    The allegations set forth in paragraphs 1 through 101 above are re-alleged and incorporated as if fully set forth herein.

28

116.    Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A), (C),

provides that it shall be unlawful for any person, in or in connection with any order

to make, or the making of, any contract of sale of any commodity for future delivery

that is made, or to be made, for or on behalf of, or with, any other person, other than

on or subject to the rules of a designated contract market (i.e., off-exchange):  (A) to

cheat or defraud or attempt to cheat or defraud the other person; or (C) willfully to

deceive or attempt to deceive the other person by any means whatsoever in regard

to any order or contract or the disposition or execution of any order or contract, or in

regard to any act of agency performed, with respect to any order or contract for or

with the other person.

117.    7 U.S.C. § 2(c)(2)(C)(iv) provides that 7 U.S.C. § 6b shall apply to any

retail forex transaction as if it were a contract of sale of a commodity for future

delivery.

118.    Section 2(c)(2)(D)(i) and (iii) of the Act, 7 U.S.C. § 2(c)(2)(D)(i), (iii),

provides, in part, that 7 U.S.C. § 6b applies to any agreement, contract, or

transaction in any commodity that is:  (I) entered into with, or offered to (even if not

entered into with), a person that is not an ECP; and (II) entered into, or offered

(even if not entered into), on a leveraged or margined basis, or financed by the

offeror, the counterparty, or a person acting in concert with the offeror or

counterparty on a similar basis (hereinafter, "retail commodity transaction"), as if

such retail commodity transaction were a contract of sale of a commodity for future

delivery.

119.    Traders Global entered into and offered to enter into retail forex transactions and retail commodity transactions with customers.

120.    Those transactions were not executed (or offered to be executed) on an exchange.

121.    Defendants made the false and misleading statements and omissions set forth above in paragraph 105, which the CFTC realleges as if fully set forth herein.

122.    Defendants made these false or misleading statements and omissions to customers in connection with retail forex transactions and retail commodity transactions.

123.    Defendants did so with scienter, i.e., knowingly or recklessly.

124.    Defendants thus engaged in fraud in connection with retail forex transactions and retail commodity transactions in violation of 7 U.S.C. § 6b(a)(2)(A), (C).

125.    Defendants Traders Global US and Traders Global Canada operated as a common enterprise, and are therefore jointly and severally liable for one another's violations of the Act and Regulations.

126.    Defendants Traders Global US and Traders Global Canada are liable for false and misleading statements and omissions made by the officers, agents, or other persons acting by or on behalf of Traders Global, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

127.    Kazmi was the founder, CEO, and sole shareholder of Traders Global US and Traders Global Canada throughout the Relevant Period, and during that period possessed and exercised, directly or indirectly, the power to direct or cause the direction of the management and policies of Traders Global.  As such, Kazmi controlled Traders Global during the Relevant Period.  Kazmi did not act in good faith with respect to, or knowingly induced, directly or indirectly, the acts and omissions constituting Traders Global's violations of the Act and Regulations. Kazmi is thus liable for Traders Global's violations of the Act and Regulations committed during the Relevant Period, pursuant to 7 U.S.C. § 13c(b).

128.    Each act of cheating or defrauding, or attempt to cheat or defraud, another person, or willfully deceiving or attempting to deceive the other person by any means whatsoever, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. §6 b(a)(2)(A), (C) of the Act.

### Count III: Acting as an Unregistered RFED In Violation of Regulation 5.3(a)(6)(i), 17 C.F.R. § 5.3(a)(6)(i) (2022)

### Against Defendants Traders Global US and Traders Global Canada as Principals; Against Defendant Kazmi as Controlling Person

129.    The allegations set forth in paragraphs 1 through 101 above are re-alleged and incorporated as if fully set forth herein.

130.    Regulation 5.3(a)(6)(i), 17 C.F.R. § 5.3(a)(6)(i) (2022), requires a retail foreign exchange dealer (hereinafter, "RFED") to register with the Commission as an RFED.

131.   With certain exceptions not relevant here, Regulation 5.1(h)(1), 17 C.F.R. § 5.1(h)(1) (2022), defines RFED as a person that is, or that offers to be, the counterparty to a retail forex transaction.

132.   Defendants Traders Global US and Traders Global Canada, acting as a single common enterprise, were the counterparty to forex transactions with Traders Global's customers.

133.   Neither Traders Global US nor Traders Global Canada is registered with the Commission as an RFED, nor has either defendant been so registered at any time during the Relevant Period.

134.   By acting as an RFED without registration as such, Traders Global violated 17 C.F.R. § 5.3(a)(6)(i).

135.   Defendants Traders Global US and Traders Global Canada operated as a common enterprise, and are therefore jointly and severally liable for one another's violations of the Act and Regulations.

136.   Defendants Traders Global US and Traders Global Canada are liable for the acts of their officers, agents, or other persons acting by or on behalf of Traders Global, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

137.   Kazmi was the founder, CEO, and sole shareholder of Traders Global US and Traders Global Canada throughout the Relevant Period, and during that period possessed and exercised, directly or indirectly, the power to direct or cause the direction of the management and policies of Traders Global.  As such, Kazmi controlled Traders Global during the Relevant Period.  Kazmi did not act in good

faith with respect to, or knowingly induced, directly or indirectly, the acts and omissions constituting Traders Global's violations of the Act and Regulations. Kazmi is thus liable for Traders Global's violations of the Act and Regulations committed during the Relevant Period, pursuant to 7 U.S.C. § 13c(b).

138.   Each instance of acting as a counterparty in a retail forex transaction, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. § 5.3(a)(6)(i).

### Count IV: Acting as an Unregistered RFED Associated Person In Violation of Section 2(c)(2)(C)(iii)(I)(aa), 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa), and Regulation 5.3(a)(6)(ii), 17 C.F.R. § 5.3(a)(6)(ii) (2022)

### Against All Defendants

139.   The allegations set forth in paragraphs 1 through 101 above are re-alleged and incorporated as if fully set forth herein.

140.   7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) prohibits a person from soliciting or accepting orders in retail forex transactions, unless registered in such capacity as the Commission by regulation shall determine.

141.   Regulation 5.3(a)(6)(ii), 17 C.F.R. § 5.3(a)(6)(ii) (2022), requires any associated person of a RFED to register with the Commission as an associated person of an RFED.

142.   Regulation 5.1(h)(2), 17 C.F.R. § 5.1(h)(2) (2022), defines an associated person of an RFED as any natural person associated with an RFED as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves the

solicitation or acceptance of retail forex customer's orders or the supervision of any person or persons so engaged.

143.   Defendant Kazmi, via the Traders Global website, in YouTube videos, and elsewhere, solicited retail forex orders from Trader Global's customers.

144.   Kazmi is an officer of Traders Global.

145.   Kazmi is not, and has never been, registered with the Commission as an associated person of an RFED.

146.   By acting as associated persons of an RFED without registration as such Kazmi violated 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) and 17 C.F.R. § 5.3(a)(6)(ii).

147.   Defendants Traders Global US and Traders Global Canada are liable for Kazmi's failure to register as an AP, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

148.   Defendants Traders Global US and Traders Global Canada operated as a common enterprise, and are therefore jointly and severally liable for one another's violations of the Act and Regulations.

149.   Kazmi was the founder, CEO, and sole shareholder of Traders Global US and Traders Global Canada throughout the Relevant Period, and during that period possessed and exercised, directly or indirectly, the power to direct or cause the direction of the management and policies of Traders Global.  As such, Kazmi controlled Traders Global during the Relevant Period.  Kazmi did not act in good faith with respect to, or knowingly induced, directly or indirectly, the acts and omissions constituting Traders Global's violations of the Act and Regulations.

Kazmi is thus liable for Traders Global's violations of the Act and Regulations committed during the Relevant Period, pursuant to 7 U.S.C. § 13c(b).

150.    Each instance of soliciting or accepting orders in a retail forex transaction, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violations of 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) and 17 C.F.R. § 5.3(a)(6)(ii).

## Count V: Off-Exchange Retail Commodity Transactions in Violation of Section 4(a) of the Act, 7 U.S.C. § 6(a)

### Against All Defendants

151.    The allegations set forth in paragraphs 1 through 101 above are re-alleged and incorporated as if fully set forth herein.

152.    Under Section 4(a) of the Act, 7 U.S.C. § 6(a), it shall be unlawful , subject to certain exceptions not applicable here, for any person to enter into, to execute, to confirm the execution of, or to conduct any office or business anywhere in the United States, for the purpose of soliciting or accepting any order for, or otherwise dealing in, any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery unless, *inter alia*:  (a) such transaction is conducted on or subject to the rules of a board of trade which has been designated or registered by the Commission as a contract market or derivatives transaction execution facility for such commodity; and (b) such contract is executed or consummated by or through a contract market.

153.    Section 2(c)(2)(D)(i), (iii) of the Act, 7 U.S.C. § 2(c)(2)(D)(i), (iii), provides, in part, and with certain exceptions not relevant here, that Section 4(a) of

the Act shall apply to any agreement, contract, or transaction in any commodity that is:  (I) entered into with, or offered to (even if not entered into with), a person that is not an ECP; and (II) entered into, or offered (even if not entered into), on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis—i.e., a "retail commodity transaction"—as if such retail commodity transaction were a contract of sale of a commodity for future delivery.

154.    Traders Global entered into and offered to enter into retail commodity transactions with customers.  Those transactions were not executed (or offered to be executed) on an exchange; rather, they were executed against Traders Global as the counterparty, or, in the case of the very few customers "on STP," against a non-U.S. counterparty—i.e., the Dealer, and not on an exchange.

155.    Those retail commodity transactions were entered into, or offered, on a leveraged or margined basis, typically at a leverage ratio of 1:100, per Traders Global's website.

156.    Traders Global thus entered into, executed, and confirmed the execution of off-exchange retail commodity transactions in violation of 7 U.S.C. § 6(a).

157.    Defendants Traders Global US and Traders Global Canada are liable for the acts of their officers, agents, or other persons acting by or on behalf of Traders Global, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

158.    Kazmi was the founder, CEO, and sole shareholder of Traders Global US and Traders Global Canada throughout the Relevant Period, and during that period possessed and exercised, directly or indirectly, the power to direct or cause the direction of the management and policies of Traders Global.  As such, Kazmi controlled Traders Global during the Relevant Period.  Kazmi did not act in good faith with respect to, or knowingly induced, directly or indirectly, the acts and omissions constituting Traders Global's violations of the Act and Regulations. Kazmi is thus liable for Traders Global's violations of the Act and Regulations committed during the Relevant Period, pursuant to 7 U.S.C. § 13c(b).

159.    Each act of entering into, executing, confirming the execution of, or conducting any office or business anywhere in the United States, for the purpose of soliciting or accepting any order for, or otherwise dealing in, any retail commodity transaction, or in connection with a retail commodity transaction including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6(a).

## VI.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.    Find that Defendants Traders Global US, Traders Global Canada, and Kazmi violated Sections 2(c)(2)(C)(iii)(I)(aa), 4b(a)(2)(A) and (C), and 4(a) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(aa), 6b(a)(2)(A), (C), 6(a); and Regulations 5.2(b)(1) and

(3), and 5.3(a)(6)(i) and (ii), 17 C.F.R. §§ 5.2(b)(1), (3), 5.3(a)(6)(i)–(ii) (2022).

B.    Enter an order of permanent injunction enjoining Defendants, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in paragraphs 1 through 99, in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(aa); 6b(a)(2)(A), (C); 7 U.S.C. § 6(a); and 17 C.F.R. §§ 5.2(b)(1), (3), and 5.3(a)(6)(i)-(ii).

C.    Enter an order of permanent injunction restraining and enjoining Defendants, their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

     1)    Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

     2)    Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2022)), for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

     3)    Having any commodity interests traded on any Defendant's behalf;

     4)    Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in

any account involving commodity interests;

5)      Soliciting, receiving, or accepting any funds from any person for
the purpose of purchasing or selling of any commodity interests;

6)      Applying for registration or claiming exemption from
registration with the CFTC in any capacity, and engaging in any
activity requiring such registration or exemption from
registration with the CFTC except as provided for in Regulation
4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022); and

7)      Acting as a principal (as that term is defined in Regulation
3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent, or any other officer or
employee of any person registered, exempted from registration,
or required to be registered with the CFTC except as provided
for in 17 C.F.R. § 4.14(a)(9).

D.      Enter an order directing Defendants as well as any third-party
transferee and/or successors thereof, to disgorge, pursuant to such procedure as the
Court may order, all benefits received including, but not limited to, salaries,
commissions, loans, fees, revenues, and trading profits derived, directly or
indirectly, from acts or practices which constitute violations of the Act and
Regulations as described herein, including pre-judgment and post-judgment
interest;

E.      Enter an order requiring Defendants, as well as any successors thereof,
to make full restitution to every person who has sustained losses proximately

caused by the violations described herein, including pre-judgment and post-judgment interest;

F.   Enter an order directing Defendants to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599–600, see 17 C.F.R. § 143.8, for each violation of the Act and Regulations, as described herein;

G.   Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2); and

H.   Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

s/ Ashley J. Burden
Senior Trial Attorney
Division of Enforcement
Commodity Futures Trading Commission
77 West Jackson Blvd.
Suite 800
Chicago, IL 60604
Office:  (312) 596-0693
Cell:     (312) 995-0779
aburden@cftc.gov