# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| Commodity Futures Trading Commission, | ) | Plaintiff Commodity Futures |
| | ) | Trading Commission's *Ex Parte* |
| Plaintiff, | ) | Motion for Statutory Restraining |
| | ) | Order and Preliminary Injunction |
| v. | ) | Pursuant to 7 U.S.C. § 13a-1 |
| | ) | |
| Traders Global Group Inc., a New Jersey | ) | Civil Action No. _____ |
| corporation, d/b/a "My Forex Funds"; | ) | |
| Traders Global Group Inc., a Canadian | ) | |
| business organization; and Murtuza | ) | |
| Kazmi, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

TABLE OF CONTENTS

I.   SUMMARY ................................................................................................ 1

II.  JURISDICTION AND VENUE ................................................................. 3

III. DEFENDANTS ......................................................................................... 4

IV.  FACTS ...................................................................................................... 5

A.   Traders Global's Sales Pitch: "Earn as a Professional Trader" ................ 5

   1.   "You can trade Forex [and] Crypto, … as well as commodities like oil
        and metals" ............................................................................................ 6

   2.   "Low-cost entry into professional trading" .......................................... 7

   3.   "Up to 85% profit split" ........................................................................ 8

   4.   "Enforce good trading behavior" .......................................................... 9

   5.   "Your Success is Our Business" ......................................................... 10

   6.   More than A Hundred Thousand Customers from around the world
        paid Traders Gloal More than $310 million ........................................ 11

B.   Traders Global is a Fraud ......................................................................... 12

   1.   Traders Global is the counerparty to substantially
        all customer trades ............................................................................. 12

   2.   Traders Global operates in the manner of a Ponzi scheme ................. 13

      a.   Traders Global Pays Successful Customers … ................................. 13

      b.   … With Money from Other Customers ............................................. 15

   3.   Traders Global uses various devices to handicap customer trading .... 17

      a.   The drawdown rule provides a bad-faith pretext to terminate
           customer accounts ............................................................................ 17

      b.   Traders Global assesses commissions to reduce customer equity .... 17

ii

c.    Traders Global uses software to stack the odds against customers. 18

d.    Traders Global sends its most successful customers' orders to an overseas dealer knowing the customers will lose. ........................... 20

e.    Traders Global imposes an artificial spread on STP'd customer orders.......................................................................................... 21

C.    Chat Messages Reveal the Inner Workings Of Defendants' Scheme. ..... 21

1.    "I need something to stop that money going out" ................................ 22

2.    "Hopefully the net is massive loss"...................................................... 23

3.    "Slip them to hell" ............................................................................... 24

4.    "When these types of strategies get STP'd their performance declines" ............................................................................................... 25

D.    Kazmi Knew the Truth About Traders Global's Scheme ......................... 26

E.    Kazmi Uses Proceeds From the Fraud to Fund His Luxury Lifestyle .... 28

F.    Traders Global U.S. and Traders Global Canada Commingle Funds ..... 29

V.    LEGAL STANDARD.................................................................................... 30

VI.   ANALYSIS ................................................................................................... 33

A.    Defendants Kazmi and Traders Global are Violating the Act and Regulations.............................................................................................. 33

1.    Traders Global Offers to Enter Into, and Enters Into, Retail Forex and Retail Commodity Transactions. ........................................................... 33

a.    Traders Global Offers to Enter Into, and Enters Into, Retail Forex Transactions........................................................................................ 33

b.    Traders Global Offers to Enter Into, and Enters Into, Retail Commodity Transactions..................................................................... 35

2.    Defendants Defrauded Customers in Connection with Retail Forex and retail Commodity Contracts................................................................... 36

a. Defendants Made False and Misleading Statements of Material Fact...................................................................................... 38

b. Defendants Omitted Material Facts. ................................................. 40

c. Defendants Acted with Scienter....................................................... 41

3. Proposed Defendants Acted as an RFED Without Registration. ......... 41

4. Proposed Defendants Engaged in Off-Exchange Trading of Retail Commodity Contracts............................................................................. 42

5. Proposed Defendants Traders Global U.S. and Traders Global Canada Are Liable for One Another's Violation as a Common Enterprise ....... 43

6. Proposed Defendant Kazmi is Liable as a Controlling Person of Traders Global. ..................................................................................... 44

B. The Relief Sought by the CFTC is Justified and Necessary. .................... 45

1. Asset Freeze........................................................................................ 45

2. Appointment of a Temporary Receiver................................................ 46

3. Books and Records............................................................................. 46

4. Injunction............................................................................................ 47

VII. CONCLUSION ..................................................................................... 47

# TABLE OF AUTHORITES

**Cases**

*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, (10th Cir. 2003)................................ 45

*CFTC v. Am. Metals Exch. Corp.*, 693 F. Supp. 168, (D.N.J. 1988)................... passim

*CFTC v. Cartu*, No. 1:20-CV-908-RP, 2023 WL 5246360, (W.D. Tex. Aug. 15, 2023)

................................................................................................................................. 47

*CFTC v. Equity Financial Group LLC,* No. 04CV1512, 2004 WL 856456, (D.N.J. Apr. 1, 2004)................................................................................... 34, 40, 48

*CFTC v. Fin. Tree*, 542 F. Supp. 3d 992, (E.D. Cal. 2020) ......................................... 41

*CFTC v. FX Trading, LLC*, No. 2:05-CV-05722-JLL-RJ, 2005 WL 3801597, (D.N.J. Dec. 9, 2005)................................................................................... 34

*CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967, (11th Cir. 2014).......... 39, 43

*CFTC v. Kratville*, 796 F.3d 873, (8th Cir. 2015) ...................................................... 48

*CFTC v. McDonnell*, 287 F.Supp.3d 213, (E.D.N.Y. 2018)........................................ 40

*CFTC v. PMC Strategy, LLC*, 903 F. Supp. 2d 368, (W.D.N.C. 2012) ...................... 42

*CFTC v. S. Templeton Grp., Inc.,* No. CV 03 4999 (ILG), 2008 WL 5662079, (E.D.N.Y. Dec. 11, 2008)................................................................................... 38

*CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, (11th Cir. 2018) ................. 39, 41, 42, 46

*CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, (D.D.C. 2015) .................. 47

*CFTC v. Wall St. Underground, Inc.*, 281 F. Supp. 2d 1260, (D. Kan. 2003)............ 47

*CFTC v. WorldWideMarkets, Ltd.*, No. CV21-20715KMLDW, 2022 WL 3535993, (D.N.J. Aug. 18, 2022)................................................................................... 41, 42, 48

*FTC v. Am. Future Sys., Inc.*, No. 20-cv-2266, (E.D. Pa. Mar. 28, 2023).................. 51

*SEC v. Cooper*, 142 F. Supp. 3d 302, (D.N.J. 2015)......................................................45

*TC v. Crombie*, 914 F.3d 1208, (9th Cir. 2019) ..........................................................40

**Statutes**

28 U.S.C. § 1331...........................................................................................................8

28 U.S.C. § 1345...........................................................................................................8

7 U.S.C §§ 1-26............................................................................................................6

7 U.S.C. §  6b(a)(2)(A) ...............................................................................................40

7 U.S.C. §  6b(a)(2)(C) ...............................................................................................40

7 U.S.C. § 13a-1(a) ........................................................................................6, 8, 34, 35

7 U.S.C. § 13a-1(b) ....................................................................................................35

7 U.S.C. § 13a-1(e) ......................................................................................................9

7 U.S.C. § 13c(b) ....................................................................................................8, 48

7 U.S.C. § 1a(18)(xi) ..................................................................................................38

7 U.S.C. § 2(a)(1)(B) ..................................................................................................45

7 U.S.C. § 2(a)(1)(C) ..................................................................................................40

7 U.S.C. § 2(c)(2)(C) ..................................................................................................37

7 U.S.C. § 2(c)(2)(C)(iv) ............................................................................................41

7 U.S.C. § 2(c)(2)(D) ..............................................................................37, 39, 41, 46

7 U.S.C. § 6(a) ........................................................................................................7, 45, 46

7 U.S.C. § 6b(a)(2)(A) ............................................................................................7, 40

7 U.S.C. § 6b(a)(2)(C) ......................................................................................... 7, 40

## Regulations

17 C.F.R. §  5.1(m) ................................................................................................ 37

17 C.F.R. § 1.2 ...................................................................................................... 45

17 C.F.R. § 5.1(h)(1) ............................................................................................ 45

17 C.F.R. § 5.2(b)(1) ......................................................................................... 7, 40

17 C.F.R. § 5.2(b)(3) ......................................................................................... 7, 40

17 C.F.R. § 5.3(a)(6)(i) ........................................................................................... 7

17 C.F.R. pts. 1-190 ............................................................................................... 6

Federal Rule of Civil Procedure 65 ............................................................... 6, 8, 36

# I.     SUMMARY

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), the independent federal regulatory agency charged by Congress with administering and enforcing the Commodity Exchange Act ("Act"), 7 U.S.C §§ 1-26, and Commission Regulations ("Regulations"), 17 C.F.R. pts. 1-190, hereby moves the Court for an *ex parte* statutory restraining order and preliminary injunction pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), and Federal Rule of Civil Procedure 65.  Such relief is necessary to preserve the status quo pending resolution of the CFTC's claims against Defendants for fraud, registration violations, and illegal off-exchange trading.

From at least November 1, 2021, and continuing through the present ("Relevant Period"), Defendant Murtuza Kazmi and his two companies, Defendants Traders Global Group Inc., a New Jersey corporation ("Traders Global U.S."), and Traders Global Group Inc., a Canadian business organization ("Traders Global Canada") (together, "Traders Global," and with Kazmi, collectively, "Defendants"), have engaged, and are continuing to engage, in a large-scale fraud scheme involving leveraged foreign exchange ("forex") and leveraged commodity transactions with retail customers in violation of the Act and Regulations.

Specifically, Defendants promise customers that, in return for the payment of various fees, customers can become "professional traders," using Traders Global's money to trade leveraged forex and leveraged commodity contracts against so-called

"liquidity providers."  If a customer's trading is profitable, Traders Global will pay the customer a share of the profits.  "Your success is our business," Traders Global tell customers; "we only make money when you make money."  Defendants' sales pitch was appealing to customers, who paid Traders Global more than $310 million in fees during the Relevant Period.

Traders Global is a fraud.  In reality, customer trades are "internalized" by Traders Global and "effectively go nowhere."  Traders Global is the counterparty to substantially every customer trade, which means that when customers make money Traders Global loses money.  Traders Global in fact pays customers who trade successfully, but does so using fees Traders Global collects from customers.  In order for this business model to work, Traders Global has to pay less in so-called trading profits than it collects in fees.  Traders Global makes sure this happens by using various devices to reduce the likelihood or amount of profitable trading by customers, including the use of specialized computer software to handicap customer trading.

Defendants' fraud scheme violates Section 4b(a)(2)(A), (C) of the Act, 7 U.S.C. § 6b(a)(2)(A), (C), and Regulation 5.2(b)(1), (3), 17 C.F.R. § 5.2(b)(1), (3), which prohibit fraud in connection with leveraged retail forex or leveraged retail commodity transactions.  In addition, by acting as counterparty to its customers' trades, Traders Global violates Regulation 5.3(a)(6)(i), 17 C.F.R. § 5.3(a)(6)(i), which requires registration by dealers of retail forex contracts (referred to as "retail

foreign exchange dealers," or "RFEDs"), and Section 4(a) of the Act, 7 U.S.C. § 6(a),
which prohibits off-exchange trading in retail commodity transactions.  Defendant
Kazmi is liable for Traders Global's violations as a "controlling person" under
Section 13(b) of the Act, 7 U.S.C. § 13c(b).  Traders Global U.S. and Traders Global
Canada are liable for one another's violations by virtue of their involvement in a
common enterprise.

In the instant motion, the CFTC seeks an *ex parte* statutory restraining order
under Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), and Federal Rule of Civil
Procedure 65, freezing Defendants' assets, appointing a temporary receiver, and
requiring Defendants to permit the CFTC's inspection of Defendants' books and
records.  The CFTC also seeks entry of a preliminary injunction—prior to the
expiration of the statutory restraining order, and upon notice to Defendants—
continuing the foregoing relief enjoining Defendants from their continuing
violations of the Act and Regulations.  The statutory restraining order and
preliminary injunction are supported by evidence (appended hereto) establishing a
*prima facie* case that Defendants have violated, and are currently violating, the Act
and Regulations.

## II.    JURISDICTION AND VENUE

This Court has federal question jurisdiction over this matter, 28 U.S.C.
§ 1331 (codifying federal question jurisdiction), as well as jurisdiction by virtue of
the CFTC's status as a federal agency authorized to sue by Act of Congress,

3

28 U.S.C. § 1345 (U.S. as plaintiff). Moreover, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), provides that U.S. district courts shall have jurisdiction over actions brought by the CFTC for injunctive relief, or to enforce compliance with the Act or Regulations.

Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), provides that venue is proper in the district where the violative act or practice occurred, is occurring, or is about to occur. As set forth below, the acts and practices which form the basis for the CFTC's charges against Defendants occurred, are occurring, and will occur, among other places, in the District of New Jersey.

### III.    DEFENDANTS

Defendant **Traders Global U.S.** is a New Jersey corporation with a "main business address" in Parsippany, New Jersey. (Ex. A-1 at 1, N.J. Dept. of Treas. Bus. Recs. Result for Traders Global.) Traders Global U.S. has never been registered with the Commission. (Ex. B at 1-2, Jung Decls.)

Defendant **Traders Global Canada** is a Canadian business organization with a registered office address in Vaughan, Ontario. (Ex. A-4 at 1, Corps. Canada Search Result for Traders Global.) Traders Global Canada has never been registered with the Commission. (Ex. B at 1-2, Jung Decls.)

Defendant **Murtuza Kazmi** is CEO, shareholder, and sole director of Traders Global U.S. and Traders Global Canada. (Ex. A-1 at 1-2, N.J. Dept. of Treas. Bus. Recs. Result for Traders Global; Ex. A-4 at 2, Corps. Canada Search

4

Result for Traders Global; Ex. C-1 at 21-23, MyForexFunds ("MFF") website ("Meet

the MyForexFunds Staff – Murtza Kazmi CEO").)  Kazmi resided in Phillipsburg,

New Jersey from the start of the Relevant Period through approximately May 2022.

(Ex. A-7 at 1, Kazmi TD Bank Acct. Statement, Nov. 6, 2021 (showing Phillipsburg

address).)  In or around May 2022, Kazmi moved to Ontario, Canada, where he

currently resides.  (Ex. A-8 at 1-2 (purchase agreement for Ontario home), 18

(inserting "completion date" of May 25, 2022), 65 Richmond Hill Mortgage File.)

Kazmi has never been registered with the Commission.  (Ex. B at 5-6, Jung Decls.)

## IV.     FACTS

### A. TRADERS GLOBAL'S SALES PITCH: "EARN AS A PROFESSIONAL TRADER"

During the Relevant Period, Defendants, doing business as "My Forex

Funds," offered, and continue to offer, customers in the U.S. and around the world

the opportunity to "earn as a professional trader."  (Ex. C-1 at 2, MFF website.)

Defendants solicit customers through Traders Global's website, available at

https://myforexfunds.com, as well through social media platforms such as YouTube.

(*See, generally*, Ex. C-1, MFF website; Ex. A-3, MyForexFunds "Company Update"

YouTube video, Oct. 26, 2022.)

In return for the payment of a "registration fee," Traders Global offers

customers the opportunity to become "funded traders," i.e., traders "funded" by

Traders Global.  (Ex. C-1 at 2 ("start your journey as a Forex Funded Trader"), 5

(showing schedule for "refundable registration fee[s]"), MFF website.)  According to

Traders Global, customers can use Traders Global's money to trade forex and commodities against third-party "liquidity providers."  (*Id.* at 33 ("Our live accounts are on our own server from an institutional technology provider with multiple liquidity sources connected to it."), 34 (referring to "our liquidity providers"), 48 (same), 59 ("We are beholden to the liquidity providers"), 78 (server connected to "institutional fintech company who provides us liquidity").)

If a customer is successful in his or her trading, Traders Global will purportedly split the profits with the customer.  (*Id.* at 2 ("start trading, earn bonuses and profit-splits").)  If the customer is unsuccessful, the customer's account will be suspended.  (*Id.* at 33 (exceeding drawdown limit will "result in account suspension").)  The customer can reset or re-start his or her account and resume trading by paying an additional fee.  (*Id.* ("Account suspensions can be reset by paying account signing up cost minus 20%").)

Traders Global claims that its goal is "to find profitable, successful traders and encourage up and comers to become more consistent and profitable and form a long-term partnership."  (*Id.* at 32.)  "Your success is our business," Traders Global proclaims, "we only make money if you make money." (*Id.* at 4, 11.)

### 1. "YOU CAN TRADE FOREX [AND] CRYPTO, … AS WELL AS COMMODITIES LIKE OIL AND METALS"

Traders Global offers customers the ability to trade forex, metals, indices, cryptocurrencies, and oil.  (*Id.* at 41 ("Pick your product whether it be FOREX, Metals, CFD's or crypto …."), 59 ("you can trade FOREX, Crypto, CFD's including

index CFD's as well as commodities like oil and metals"), 82-89 (listing "instruments and contract specifications").)  As Traders Global's website makes clear, there is no trading of actual, literal forex or commodities.  Rather, the trading is of "instruments" or "contracts" that allow customers to speculate on the value of an underlying foreign currency pair or commodity.  (*Id*. at 82-92.)  This trading does not result in the physical delivery of the underlying commodity; rather, these trades are financially-settled.  (*See id*; *see also* Ex. D, Chichester Test. 39:4 to 42:1, 75:13 to 77:14.)

On its website, Traders Global touts the "leverage" available to customers.  (Ex. C-1 at 82–89 (showing leverage ratio for each contract), MFF website.)  The contracts offered by Traders Global are typically leveraged ratio at a of 1:100.  (*Id*.)  This means that when a customer buys or sells a particular contract, the customer does so for one one-hundredth of the value of the underlying foreign currency pair or commodity.

## 2.  "LOW-COST ENTRY INTO PROFESSIONAL TRADING"

In order to sign up for an account with Traders Global, a customer is required to pay a registration fee.  Registration fees range from $49 to $4,900 depending on the size and type of account the customer signs up for.  (*Id*. at 39 (fee schedule for "Evaluation" account type), 67 (fee schedule for "Accelerated" account type).)

The higher the dollar value of the account, the higher the registration fee.  A customer can pay $4,900 to trade an account worth $50,000.  (*Id*. at 67.)  A larger

7

account allows the customer to place larger trades and thus (at least in theory) generate larger profits.  On the other end of the spectrum, a customer can pay $49 to trade an account worth $5,000.  (*Id.* at 39.)  According to Traders Global's website, these lower-priced accounts offer a "low-cost entry into professional trading."  (*Id.* at 27.)

### 3.  "UP TO 85% PROFIT SPLIT"

Traders Global claims that a "funded trader" is entitled to a share of the profits from his or her successful trading. (*Id.* at 3 ("earn bonuses and profit-splits").)  The percentage of profits a customer may be entitled to depends on the type of "account" the customer signs up for.  (*See id.* at 3 (overview of account types "Rapid, "Evaluation," and "Accelerated"); *see also* 29, 39, 67 (fee schedules for each account type).)

Some account types require a customer to generate simulated profits in a "demo" account before receiving so-called "live trading funds."  (*Id.* at 25-28 ("Rapid" account type starts traders on a "demo account before "giving them access to our live trading funds"), 38-41 ("Evaluation" account type "is a two-step process where a potential Funded trader can prove their FOREX, CFD or commodities trading skills.").)  Customers who pass the "demo phase" of these account types are entitled to so-called "profit-splits" of 12% to 85% depending on various factors such as the age of the account (with older accounts being entitled to more profits).  (*Id.* at 28

8

("You are paid 12% of all profit you make"), 41 ("Get paid up to 85% of profits you earn when you reach the funded account stage").)

Other account types allow a customer to "skip the line" and "jump right into trading real funds."  (*Id.* at 52 (describing "Accelerated" account type).)  Customers who opt for these account types are entitled to 50% of their trading profits.  (*Id.* at 55.)

### 4.  "ENFORCE GOOD TRADING BEHAVIOR"

A customer who signs up for an account is required to stay within a "drawdown limit" imposed by Traders Global.  (*Id.* at 29, 39, 68 (listing drawdown limits for each account type).)  The drawdown limit requires a customer to maintain a certain minimum level of equity in his or her trading account.  (*Id.*)

If a customer exceeds the drawdown limit, i.e., loses too much, Traders Global will "suspend" or "terminate" the customer's account.  (*Id.* at 33 (exceeding drawdown limit will "result in account suspension"), 47 (breaching drawdown will "result in a termination of your account"), 91 ("if a violation has been detected on your account, that account will be suspended and will not qualify for any future payouts").)  The customer can re-start his or her account by paying another fee.  (*Id.* at 33 ("[a]ccount suspensions can be reset by paying account signing up cost minus 20%"), 34 ("reset refresh and monthly fees"), 47 ("If you receive an account suspension, you may reset your account for program cost -10%."), 48 (listing fees to "reset" account), 95 (explaining "refresh" and "reset").)

Traders Global claims on its website that the drawdown limit exists to "enforce good trading behavior and long term profitability."  (*Id*. at 31.)  In a December 11, 2021, YouTube video, Kazmi similarly claimed that the drawdown is designed "to force traders to get into that habit of locking in some of the profits . . . ."  (Ex. A-9 at 10:30 through 11:31, Kimmel Trading "My Forex Funds FOUNDER INTERVIEW!!" YouTube video, Dec. 11, 2021.)  "If you lose all that money," Kazmi explained, "it's not only you that's losing, it's us as well right. Because we want to make you profitable so we can be profitable . . . ."  (*Id*.)

**5.   "YOUR SUCCESS IS OUR BUSINESS"**

"Your success is our business," Traders Global proclaims on its website.  (Ex. C-1 at 4, 11, MFF website.)  "[W]e only make money if you make money," Traders Global asserts; "if you grow we grow."  (*Id*. at 54, 66.)  Conversely, Traders Global claims, "[i]f you lose, we lose …."  (*Id*. at 5.)  Kazmi made similar statements in an October 26, 2022, video on Traders Global's "My Forex Funds" YouTube channel.  In the video, Kazmi explained, "it's traders that make us at the end of the day; it's traders trading that make us money . . . ."  (Ex. A-3 at 11:00 through 11:30, MyForexFunds "Company Update" YouTube video, Oct. 26, 2022.)

According to Traders Global's website, "our goal is to encourage you, the trader to remain consistent and hopefully profitable so that you can earn from your talent …."  (*Id*. at 32.) "Our goal as a company is to find profitable, successful

traders and encourage up and comers to become more consistent and profitable and form a long-term partnership." (*Id*.)

Traders Global claims that "[o]ur company is interested in assisting traders, helping them grow so that we can grow with them." (*Id*. at 12.) "We strive to provide programs, services and information that assists people interest[ed] in the FOREX, CFD's or commodities markets to become more profitable, self-sustainable and efficient when trading." (*Id*.; *see also id*. at 5 ("We will do the rest when it comes to support and trading conditions to ensure your success when trading FOREX with a Prop Firm.").)

### 6. MORE THAN A HUNDRED THOUSAND CUSTOMERS FROM AROUND THE WORLD PAID TRADERS GLOAL MORE THAN $310 MILLION.

Traders Global solicits and accepts customers from the U.S. and around the world. (*Id*. at 15, MFF website (showing 34% of "new live funded trades" are from "America"), 70 ("We accept and allow all traders from around the world to open an account with us except for traders from [, e.g.,] Afghanistan, Belarus, ….").) Traders Global solicits the general public-at-large through its website and YouTube videos, and does not limit participation to high-net worth individuals or professional investors. To the contrary, Traders Global specifically targets aspiring traders "in need of capital," and solicits customers to pay fees with a credit card. (*Id*. at 25 ("rapid" program is for "assessing the trader as they learn to trade"), 38 ("evaluation" program is for "[s]emi professional traders in need of capital"), 99-100 (credit card checkout).)

11

Traders Global's sales pitch has proven extremely appealing to customers. During the Relevant Period, more than 135,000 people signed up for accounts with Traders Global.  (Ex. E, Edelstein Decl. ¶ 11.)  These customers paid Traders Global more than $310 million in fees.  (*Id.* ¶ 47.)

## B. TRADERS GLOBAL IS A FRAUD.

Traders Global is a fraud.  In reality, Traders Global is the counterparty to substantially all customer trades.  When customers win, Traders Global loses.

When customers win, i.e., become entitled to a share of profits from their trading, Traders Global pays them.  But that money does not come from third-party "liquidity providers," as Traders Global claims.  It comes from the fees paid by customers to Traders Global.

In order for this business model to work, Traders Global has to collect more money in fees than it pays out in purported trading profits.  In order to do this, Traders Global uses various devices to reduce the likelihood or amount of successful trading by customers.  These devices include: the bad-faith application of the so-called drawdown limit; the assessment of commissions on trades that "go nowhere;" and the use of specialized computer software to handicap customer trading.

### 1. TRADERS GLOBAL IS THE COUNERPARTY TO SUBSTANTIALLY ALL CUSTOMER TRADES.

As set forth above, Traders Global claims that "funded traders" use "live trading funds" to trade against "liquidity providers."  This is false.  In reality, Traders Global is the counterparty to substantially every customer trade.  (Ex. D,

Chichester Test. 45:18 to 49:5, 67:18 to 70:20.)  When a customer places a trade, the customer does so in an electronic environment that Traders Global controls.  (*Id*.) When a customer order is executed, that trade is "internalized" by Traders Global and "effectively go[es] nowhere."  (*Id*. at 48:9 to 49:5.)

### 2.   TRADERS GLOBAL OPERATES IN THE MANNER OF A PONZI SCHEME.

The money used to pay customers comes from Traders Global's only meaningful source of revenue: fees paid by customers.  Traders Global thus operates in the manner of Ponzi scheme, paying out funds contributed by participants and claiming they are proceeds from successful trading.

#### a.   Traders Global Pays Successful Customers …

As set forth above, Traders Global promises customers a certain percentage of profits from the customer's successful trading.  During the Relevant Period, Traders Global paid approximately $159 million to customers in the form of so-called trading profits.  (Ex. E, Edelstein Decl. ¶ 48.)

A customer who generates ostensible trading profits in his or her account can request payment from Traders Global in fiat currency, e.g., U.S. Dollars, or in cryptocurrency.  (Ex. C-1, MFF website, at 102.)  Customers who request payment in fiat currency have to sign up for an account with a company called Deel, Inc. ("Deel").  (*Id*.)  Deel is a third-party payroll company that Traders Global uses to facilitate customer payments.  (Ex. C-3, Deel website, at 1, 3 (Deel allows clients to "pay contractors and direct employees on autopilot" and "automate invoices"); Ex. A-

13

29, Deel Acct. Opening Docs.; Traders Global Bank Statement, Aug. 31, 2021; Ex. A-30, Deel Acct. Opening Docs.; Traders Global Cert. of Incorp.; Ex. A-31, Deel Acct. Opening Docs.; Kazmi Passport.)  Once the customer has signed up for a Deel account, the customer must execute an "independent contractor" agreement and submit an "invoice" for payment through Deel.  (*See, e.g.*, Ex. A-23, Contractor Agreement with Customer 1; Ex. A-24, Contractor Agreement with Customer 2; Ex. A-25, Contractor Agreement with Customer 3.)  Each invoice includes the name and address of the requesting customer, along with an annotation specifying the basis for the request, e.g., "MFF accelerated payout."  (Ex. A-26, Invoice from Customer 4; Ex. A-27, Invoice from Customer 5; Ex. A-28, Invoice from Customer 3.)  Traders Global pays Deel, and Deel forwards those payments to successful customers.  (Ex. E, Edelstein Decl. ¶¶ 34-38.)  During the Relevant Period, Traders Global paid more than $92 million to Deel for distribution to "successful" customers.  (*Id*. ¶ 48; *see also id*. ¶ 38.)

Customers who request payment in cryptocurrency get their "profits" directly from Kazmi's personal cryptocurrency account at Coinbase.  (*Id*. ¶¶ 44-46; Ex. A-33, Coinbase Acct. Opening Info. (showing account belongs to Kazmi, reflecting Kazmi's email and Phillipsburg N.J. address).)  From the start of the Relevant Period through May 3, 2022 (when Coinbase closed Kazmi's account), Kazmi sent approximately $9.4 million worth of cryptocurrency payments to customers from his Coinbase account.  (Ex. E, Edelstein Decl. ¶ 45.)  Each payment record is

14

accompanied by an annotation specifying that it is a payment to a customer, e.g., "MFF – Rapid Payout" or "MFF - Accelerated Payout." (*Id.* ¶¶ 45-46)

### b. … With Money from Other Customers.

The money used to pay customers' purported trading profits comes from Traders Global's only meaningful source of revenue: customers fees. During the Relevant Period, Traders Global collected more than $310 million in customer fees. (*Id.* ¶ 47.)

Traders Global allows customers to pay registration and other fees through using a credit card or cryptocurrency. (Ex. C-1, MFF website, at 99-100.) Customer credit card payments are processed by a company called WooCommerce, Inc. ("WooCommerce"). (Ex. C, Malinowski Decl. ¶¶ 6-7; Ex. C-2, MFF checkout source code and WordPress excerpts (showing WooCommerce "widget," explaining function of widget).) During the Relevant Period, WooCommerce deposited more than $290 million into Defendants' bank accounts. (Ex. E, Edelstein Decl. ¶ 47.) These deposits are the only significant sources of revenue in Defendants' accounts. (*See, generally*, *id.* ¶¶ 20-33 (summarizing accounts).) There is no source of income in Defendants' accounts which could conceivably constitute proceeds from profitable trading by customers against "liquidity providers." (*See id.*)

For customers who opt to pay fees using cryptocurrency, Traders Global uses a service called "Coinbase Commerce." (Ex. A-32, Coinbase Commerce Merchant Registration for My Forex Funds (listing user as "My Forex Funds," user's contact

15

email as kazmi.murtuza@gmail.com).)  Coinbase Commerce allows a user (here, Traders Global) to accept high-volume cryptocurrency payments from customers. (Ex. C-4, Coinbase Commerce website, at 1-2, 4.)  The service automatically forwards the payments to a cryptocurrency "wallet" of the user's choosing.  (*Id.* at 3 (comparing the use of "self-managed" and "Coinbase-managed" wallets to accept payments).)  From the start of the Relevant Period through November 3, 2022 (the most recent record obtained by the CFTC), Coinbase Commerce sent more than $20 million worth of cryptocurrency from Traders Global customers to a non-custodial cryptocurrency wallet[1] designated by Kazmi.  (Ex. E, Edelstein Decl. ¶ 42.)  The Coinbase Commerce records include annotations specifying the type of Traders Global trading account the customer purchased, e.g., "1 x $10,000 USD Account" or "1 x $20,000 USD Account."  (*Id.*)  These payments by Coinbase Commerce constitute the overwhelming majority of transfers to Kazmi's non-custodial wallet.[2]  (*See id.* ¶¶ 42-43.)

---

[1] A non-custodial wallet is one that Coinbase does not control, and which is not associated with any cryptocurrency exchange.  (Ex. C-4, Coinbase Commerce website, at 3.)

[2] During the Relevant Period, Kazmi's non-custodial cryptocurrency wallet received approximately $3.62 million worth of cryptocurrency transactions that have no explanatory annotation and no source discernible from publicly-available blockchain records.  (Ex. E, Edelstein Decl. ¶ 43.)  There is no basis to believe that these funds constitute proceeds from successful trading by customers against third parties.  Even assuming arguendo that the funds do constitute trading proceeds, they would represent just a small fraction of the $159 million Traders Global paid successful customers.

### 3.   TRADERS GLOBAL USES VARIOUS DEVICES TO HANDICAP CUSTOMER TRADING.

In order for Defendants' business model to work, Traders Global has to pay less in "trading profits" than it collects in fees.  In order to accomplish this, Defendants use various devices to reduce the likelihood or amount of profitable trading by customers.  Those devices are as follows.

#### a.   The drawdown rule provides a bad-faith pretext to terminate customer accounts.

Traders Global claims that the drawdown limit on customer accounts is meant to encourage responsible trading and help customers "lock in" profits.  In reality, the drawdown limit is meant to provide Traders Global with a bad-faith pretext to suspend or terminate customer accounts.  By suspending a customer's account when it falls below the drawdown limit, Traders Global vitiates the risk of subsequent profitable trading by the customer.  Moreover, customers whose accounts are suspended often pay additional fees to continue trading.  (Ex. A-10 at 4, Emails between J. Dentrinos, Traders Global, and J Sorenson, iS Risk, Aug. 2, 2022 ("We have had a very large number of violations re-purchasing today."); Ex. A-11 at 9, rows 2918 through 2926, iS Risk Chat Log ("50% of users rebuy").)  These additional fees result in more revenue for Traders Global.

#### b.   Traders Global assesses commissions to reduce customer equity.

Traders Global's website discloses that customer trades are subject to "commissions" of $3 per lot (i.e., per contract).  (Ex. C-1 at 74, MFF website.)  The

website fails to disclose that Traders Global assesses these commissions—not some "liquidity provider," as customers are led to believe.  These commissions have the effect of reducing customer account equity. (Ex. D, Chichester Test. 172:10 to 177:4.) For successful customers, this means Traders Global pays them less.  For unsuccessful customers, the commissions move their accounts closer to, and in some cases over, the drawdown limit.  (Ex. A-10 at 6, Emails between J. Dentrinos, Traders Global, and J Sorenson, iS Risk, Aug. 2, 2022 (discussing customers who "breach due to commission charges").)  During the Relevant Period, Traders Global assessed more than $7 million in commissions on trades that "effectively go nowhere."  (Ex. E, Edelstein Decl. ¶ 13.)

### c.  Traders Global uses software to stack the odds against customers.

Traders Global assures customers that it works to "ensure your success when trading forex."  The opposite is true.  Behind the scenes, Traders Global uses a specialized software program called "MetaTrader" to handicap customer trading by adding "delay" or "slippage" to customer orders.  (Ex. D, Chichester Test. 116:20 to 121:7.)

"Delay" is exactly what it sounds like.  Using the MetaTrader software, Traders Global automatically delays execution of a customer's order for a specified period of time.  (*Id*. at 116:20 to 121:7.)  This prevents a customer from taking advantage of arbitrage opportunities, or latencies in Traders Global's computer systems.  (*Id*. at 92:12 to 95:22; *see also* Ex. A-13, Emails from J. Dentrinos, Traders

Global, to J. Wilkins, et al., iS Risk, Feb. 26-27, 2022 (proposing additional delay and slippage for traders who use arbitrage).)

"Slippage" refers to the difference between a price the customer sees on his or her screen, and the price at which the customer's order is ultimately executed.  (Ex. D, Chichester Test. at 116:20 to 121:7.)  Using MetaTrader, Traders Global can increase the amount of "slippage" applied to a customer's order.  (*Id*.)  Slippage results in the customer's order being automatically executed at a worse price than what the customer expected based on the screen.  (*Id*.)

Traders Global subjects most of its customers to some amount of delay or slippage.  (*Id*. at 97:14 to 98:2; Ex. E, Edelstein Decl. ¶ 14.)  Customers whose trading generates consistent profits are subject to longer delays and more slippage than less successful customers.  (Ex. D, Chichester Test. at 123:3 to 128:12 ("I would assume that Traders Global is more concerned with some customers than others."); Ex. A-12, Emails between J. Dentrinos, Traders Global, and various iS Risk personnel, Feb. 17-18, 2022 (imposing delay and slippage on a "tiered" basis by customer order size; Ex. A-11 at 6-7, lines 2270 through 2284, iS Risk Chat Log ("Your best and quickest course of action would be to increase the delay on your default risk profile, to alleviate the PnL pressure that's coming from the accounts scalping within seconds.").)

Traders Global does not disclose to customers that it imposes delay or slippage on their orders.  (Ex. D, Chichester Test. at 98:8 to 98:13.)

19

**d. Traders Global sends its most successful customers' orders to an overseas dealer knowing the customers will lose.**

A very small number of customers manage to trade profitably despite Traders Global's attempts to handicap them. Traders Global may route some or all of these customers' orders to an off-exchange leveraged forex and commodities dealer outside the U.S. called CDO Markets Ltd. ("CDO Markets"). (*Id.* at 78:13 to 79:4, 98:15 to 99:17.) Traders Global refers to this as "STP'ing" a customer's account; "STP" stands for "straight-through processing." (*Id.*)

STP'ing a customer is very rare. Of the more than 24,000 customers with "live" accounts from the start of the Relevant Period through October 17, 2022 (the most recent records obtained by the CFTC), fewer than 100 of them had a single trade STP'd. (Ex. E, Edelstein Decl. ¶ 16.)

Traders Global does not expect customers "on STP" to trade profitably. (Ex. A-14, Email from J. Wilkins, iS Risk, to J. Dentrinos, Traders Global, June 22, 2022 ("we need to all subscribe to the concept that your clients will almost never have alpha"); Ex. A-11 at 2, rows 1487 through 1489 ("we kind of write off anything we execute [at CDO Markets] … as it never really ends well so far"), iS Risk Chat Log.) Indeed, they do not. The vast majority of customers on STP—seventy percent—do substantially worse than when they were trading (unknowingly) against Traders Global. (Ex. E, Edelstein Decl. ¶ 17; *see also* Ex. A-11 at 5, rows 1956 through 1958, iS Risk Chat Log ("Generally speaking when these types of strategies get STP'ed their performance declines as they get the market experience.").)

20

When customers lose money on STP, they lose real money that Traders Global keeps in a margin account at CDO Markets.  (Ex. A-11 at 24, rows 9050 through 9053, iS Risk Chat Log (Traders Global margin account at CDO).)  "STP'ing" nonetheless benefits Traders Global.  When a customer loses money on STP, Traders Global is protected by the drawdown limit.  Even on STP, a customer's account will automatically be suspended if losses exceed the limit.  (Ex. E, Edelstein Decl. ¶ 18.)  When a customer wins money against Traders Global, i.e., not on STP, Traders Global's potential losses are unlimited.

**e.  Traders Global imposes an artificial spread on STP'd customer orders.**

When Traders Global STPs a customer, it uses MetaTrader to impose an additional "spread" on prices visible to customers.  (Ex. D, Chichester Test. 145:10 to 145:19; *see also* Ex. E, Edelstein Decl. ¶ 19.)  This spread results in a customer seeing—and believing his or her order to be executed at—a worse price than what Traders Global got from CDO Markets.  (*Id*.)  This allows Traders Global to suspend losing STP'd accounts before they reach the drawdown limit.  If a customer manages to trade profitably on STP, the artificial spread allows Traders Global to pay the customer less than what they really earned.

## C.  CHAT MESSAGES REVEAL THE INNER WORKINGS OF DEFENDANTS' SCHEME.

Traders Global utilizes a third-party advisor called iS Risk Analytics, Inc. ("iS Risk") to help with the software it uses to control the electronic environment in which customers trade.  (*See, generally*, Ex. D, Chichester Test., *see also id*. at 15:5

to 16:8, 72:21 to 73:12, 102:5 to 103:2.)  iS Risk helps Traders Global use the MetaTrader software to add delay and slippage to customer orders.  iS Risk also helps Traders Global STP the very small number of customers whose orders are sent to CDO Markets.

Joshua M. Dentrinos is the primary point-person for communications between Traders Global and iS Risk.  (*See, generally*, Ex. A-11, iS Risk Chat Log.) Dentrinos, who may reside on the Greek island of Kefalonia, is the "Head of Risk and Trading" at Traders Global.  (Ex. A-11 at 10-11, rows 2952 through 2958 (Dentrinos has a "stake" in Traders Global), and 3314 through 3316 (Kefalonia), iS Risk Chat; Ex. A-22 at 3, J. Dentrinos Contractor Agreement ("scope of work" listed as "risk management").)  Email and chat communications between Dentrinos and iS Risk reveal the inner workings of Defendants' fraudulent scheme.

### 1.   "I NEED SOMETHING TO STOP THAT MONEY GOING OUT"

The communications between Dentrinos and iS Risk show that Traders Global loses money when customers make money.

On January 31, 2022, Dentrinos lamented to an iS Risk employee that a particular customer account "appears to be some how beating our system with arb [arbitrage] . . . ."  Dentrinos complained: "if the strategy works for a month, we will lose more than a million dollars.  although his latest account broke the rules thats why he has stopped but we lost about 100k from his trading[.]"  (Ex. A-11 at 1, rows 1174 through 1184, iS Risk Chat Log.)

22

On February 18, 2022, Dentrinos complained to an iS Risk employee that during periods of price volatility customers "can make a killing with less probability of breaking the rules."  "[M]ost of these accounts the equity is returning to positive heavily and making money and its resulted in our out-goings rising almost 100%[.]"  "Damn, yeah thats a problem," replied one iS Risk employee.  (*Id.* at 4, rows 1913 through 1918.)

On June 6, 2022, Dentrinos bemoaned to iS Risk: "i have suspended one of these traders for arbitrage and requested he send the source code of the EA ["expert advisor," i.e., an automated trading program] to unsuspend the account . . . i really need to know what they are doing so i can either ban them or [STP them]."  "hes got like 100k of pending to withdraw," wrote Dentrinos, "so i need something to stop that money going out[.]"  (*Id.* at 22-23, rows 6873 through 6883.)

On July 15, 2022, Dentrinos complained to iS Risk that it was not doing enough to find and eliminate profitable traders: "im pretty upset because we have so many accounts continuously trading and making huge amounts of money . . . . [W]e have record losses but we aren't picking out those accounts that dont lose[.]" (*Id.* at 24, rows 9026 through 9027.)

## 2.   "HOPEFULLY THE NET IS MASSIVE LOSS"

Communications between Dentrinos and iS Risk reflect that Traders Global wants its customers to lose.

23

On May 4, 2022, Dentrinos wrote, "very few customers of ours made money big volume but also big loss[.]"  "Hi Josh," wrote an iS Risk employee, "thats great to hear."  (*Id*. at 15, rows 5119 through 5120.)

On May 19, 2022, Dentrinos wrote, "our traders are getting slaughtered today[.]"  "[L]ike overall?," asked an iS Risk employee, "Or a ton getting shutoff from downdraws?"  "[B]oth i think," replied Dentrinos.  "[N]ice," wrote the iS Risk employee.  (*Id*. at 17, rows 5560 through 5563.)

On June 15, 2022, Dentrinos wrote: "we violated more accounts than made today.  so hopefully the net is massive loss[.]"  (*Id*. at 21, rows 6777 through 6778.)

### 3.  "SLIP THEM TO HELL"

The communications between Dentrinos and iS Risk illustrate how Traders Global uses delay and slippage to limit the likelihood or amount of profitable trading by customers.  Delay and slippage are applied automatically to customer accounts through "profiles" to which groups of customers are assigned.  (*See* Ex. D, Chichester Test. 116:20 to 121:7; *see also* Ex. E, Edelstein Decl. ¶ 14.)

On April 15, 2022, Dentrinos identified a number of accounts that were using a "bot" (i.e., an automated trading program) to successfully generate profits.  Dentrinos wrote to iS Risk, "I think we need another profile just for these accounts and just slip them to hell[.]"  iS Risk subsequently added the requested profile.  (Ex. A-11 at 12, rows 4469 through 4491, iS Risk Chat Log.)

24

On April 29, 2022, Dentrinos asked iS Risk to put a particular customer on an "aggressive" profile; Dentrinos wrote, "these accounts [sic] who go up so high so fast please alert us if you see them.  This guy has done it twice and last time we paid him 120k . . . .  this guy if he lives, he will take out total over 250k from us he has very few losse[s.]"  (*Id.* at 13-14, rows 4951 through 4956.)

On May 4, 2022, Dentrinos asked iS Risk to put another customer on the "aggressive" profile.  An iS Risk employee advised Dentrinos "this has been done;" Dentrinos replied, "and the account is now dead :D[.]"  (*Id.* at 18, rows 5688 through 5693.)

On June 3, 2022, iS Risk identified, at Dentrinos's request, certain accounts trading pursuant to a short-term, high-frequency trading strategy.  "[A]s you can see," iS Risk wrote, "their running PnL is quite jagged but consistent upwards[.]"  iS Risk suggested assigning these accounts to a profile with "a slightly less 'aggressive' slippage setting but [that] would still impede performance."  Dentrinos responded, "[G]o ahead with that.  (Id. at 19-20, rows 5962 through 5975, 6009 through 6010.)

### 4.  "WHEN THESE TYPES OF STRATEGIES GET STP'D THEIR PERFORMANCE DECLINES"

Communications between Dentrinos and iS Risk reflect that Traders Global expects customers on STP to lose.

On February 21, 2022, Dentrinos asked iS Risk for advice on whether to STP a particular customer.  "Generally speaking when these types of strategies get STP'd their performance declines as they get the market experience," wrote an iS

Risk employee.  "We'd recommend keeping the account on the books for now.  The new risk profile implemented should alleviate some PnL concerns."  "[O]k," Dentrinos responded.  "[T]he downside of that, to me, is that he has been trading large sizes all this time, and getting paid for it."  (*Id*. at 5, rows 1956 through 1960.)

On May 12, 2022, Dentrinos complained about a "suspicious" customer with "0 losses."  An iS Risk employee explained that the customer's trading was "valid," and that "after taking a review of some of their other trades it looks more like they're timing the market very well . . . ."  "[O]k," replied Dentrinos, "i will get their scaled account (it will be 100k) and we can stp it or start on aggressive and go from there but i dont know if that will stop them from being profitable[.]"  (*Id*. at 16, rows 5242 through 5247.)

In a June 22, 2022, email with the subject line, "STP discussion," an iS Risk employee told Dentrinos: "I think we need to all subscribe to the concept that your clients will almost never have alpha.  None of them will make money on real market conditions because they are good. Some will because they are lucky."  (Ex. A-14, Email from J. Wilkins, iS Risk, to J. Dentrinos, Traders Global, June 22, 2022.)

### D. KAZMI KNEW THE TRUTH ABOUT TRADERS GLOBAL'S SCHEME

Kazmi knows that Traders Global is the counterparty to substantially all customer trades.  Kazmi knows this from the contract he executed with iS Risk for "outsourced risk management services."  The contract, dated September 13, 2021, states that: "Customer [defined as Traders Global] shall be the counterparty to all

26

trades with Client Accounts [defined to mean accounts belonging to Trades Global's customers]."  (Ex. A-15 at 2, Agreement between iS Risk and Traders Global (clause 3.1.5).)

Kazmi knows that payments to successful customers come from customer fees, and not from trading against "liquidity providers."  Kazmi knows this because he is the sole signatory to, and controlling person for, his and Traders Global's bank and cryptocurrency-related accounts.  (Ex. A-2, TD Bank Cert. re Beneficial Owners of Traders Global U.S.; Ex. A-34, Traders Global U.S. Cert. of Account Resolution for BMO Harris; Ex. A-6 at 4, TD Bank Group Cust. Info. Inquiry re Traders Global Canada; Ex. A-5, BMO Bank of Montreal Acct. Opening Docs. for Traders Global Canada; Ex. A-32, Coinbase Commerce Merchant Registration for My Forex Funds; Ex. A-33, Coinbase Acct. Opening Info.)  As set forth above, these accounts reflect the receipt of more than $310 million in customer fees, and the payment of more than $159 million to customers in purported trading profits.  (Ex. E, Edelstein Decl. ¶¶ 47-48.)  The customer fees are the only substantial source of revenue for the accounts, and there is no revenue that could conceivably constitute proceeds from customer trading against "liquidity providers."

Because Kazmi knows that Traders Global is the counterparty to customers trades, Kazmi necessarily understands that the "drawdown limits" are not meant to

benefit the customer.  For the same reason, Kazmi knows that "commissions" on customer trades are assessed by Traders Global.[3]

Kazmi knows that customers who trade profitably are moved to computerized "profiles" designed to inhibit their trading.  This is reflected in communications between Dentrinos and iS Risk.  In a March 8, 2022, chat Dentrinos writes to iS Risk: "after talking to Murtusa [sp] [Kazmi], perhaps we should just move anyone who goes above 5% profit to the scalping group we made for more real conditions instead of STPing someone?"  "I like that," replied an iS Risk employee.  (Ex. A-11 at 8, rows 2566 through 2567, iS Risk Chat Log.)

### E.  KAZMI USES PROCEEDS FROM THE FRAUD TO FUND HIS LUXURY LIFESTYLE

Kazmi uses proceeds from the Traders Global fraud to fund his luxury lifestyle, purchasing high-end real estate and multiple supercars.

In April 2022, Kazmi purchased a 12.6 million CAD estate in Richmond Hill, Ontario.  (Ex. A-8 at 1 (purchase agreement for Ontario home), 65 Richmond Hill Mortgage File.)  In June 2022, Kazmi paid approximately $1.1 million for a five-bedroom home in Somerset, New Jersey.  (Ex. A-35, Cancelled Check for Somerset Deposit; Ex. A-36, Cancelled Check for Somerset Balance.)

---

[3] Kazmi gets daily email updates from iS Risk showing him the amount of commissions charged to customers.  (*See, e.g.*, Ex. A-16, Email from iS Risk Reports to M. Kazmi, Apr. 18, 2022 (showing $82,536.69 in commission charges to customers).)

In April 2022, Kazmi paid $1.6 million for a Lamborghini Ultimae Coupe. (*Compare* Ex. A-17 at 1-2, Wire Payment to "Rm Auctions Inc" for "Auction Ultimae Coupe", *with* Ex. A-18, RM Auctions Webpage re Lamborghini Ultimae Coupe.)  In December 2022, Kazmi bough a Bugatti racecar for $3.3 million.  (*Compare* Ex. A-19 at 2, Traders Global Canada BMO Acct. Statement, Dec. 30, 2022 (outgoing payment to "RM Auctions, Inc."), *with* Ex. A-20, RM Auctions Webpage re Bugatti.)

On April 25, 2023, Kazmi paid $433,500 to "VistaJet," a private jet charter company.  (Ex. A-21 at 3, Traders Global Canada BMO Acct. Statement, Apr. 28, 2023.)

## F. TRADERS GLOBAL U.S. AND TRADERS GLOBAL CANADA COMMINGLE FUNDS

Traders Global U.S. and Traders Global Canada transfer money back and forth between their respective accounts.  During the Relevant Period, Traders Global U.S. transferred $14 million to accounts in the name of Traders Global Canada.  (Ex. E, Edelstein Decl. ¶ 49.)  During the same period, Traders Global Canada transferred just under $63 million to an account in the name of Traders Global U.S.  (*Id*.)

Traders Global U.S. and Traders Global Canada accounts are used interchangeably to receive fees that customers paid via WooCommerce, which paid

more than $86 million to Traders Global U.S. during the Relevant Period, and approximately $100 million to Traders Global Canada.[4]  (*Id.* ¶¶ 24, 33, 28.)

Traders Global U.S. and Traders Global Canada accounts are used interchangeably to pay Defendants' business expenses.  During the Relevant Period, Traders Global U.S. paid more than $144 million to Deel and $104,000 to MetaQuotes, the company that licenses the MetaTrader software.  (*Id.* ¶¶ 24, 28, 33; Ex. D., *see also* Ex. D, Chichester Test. 37:22 to 38:14 (MetaQuotes owns MetaTrader).)  Traders Global Canada paid more than $4.2 million to Deel and more than $260,000 to MetaQuotes.  (Ex. E, Edelstein Decl. ¶¶ 24, 28, 33.)

## V.      LEGAL STANDARD

Under Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), the CFTC may seek, and a court may enter, a statutory restraining order or preliminary injunction against a defendant who has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the Act or Regulations.[5]  A statutory restraining order may be issued on an *ex parte* basis, and may:

---

[4] The rest went to Kazmi personally.  (Ex. E, Edelstein Decl. ¶ 22.)

[5] *See, e.g., CFTC v. FX Trading, LLC*, No. 2:05-CV-05722-JLL-RJ, 2005 WL 3801597, at *1 (D.N.J. Dec. 9, 2005) (entering ex parte restraining order against defendant); *CFTC v. Equity Financial Group LLC,* No. 04CV1512, 2004 WL 856456, at *2 (D.N.J. Apr. 1, 2004) (same).

(1) prohibit any person from destroying, altering or disposing of, or refusing to permit Commission staff to inspect, when and as requested, any books and records or other documents;

(2) prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets, or other property, i.e., an "asset freeze;" and

(3) appoint a temporary receiver to administer such restraining order and perform such other duties as the court may consider appropriate.[6]

A preliminary injunction issued under 7 U.S.C. § 13a-1(a) may, in addition to the foregoing, enjoin the defendant's violative acts or practices, or "enforce [the defendant's] compliance" with the Act or Regulations.

To obtain a statutory restraining order or preliminary injunction, the CFTC must establish a *prima facie* case that the defendant has engaged, is engaging, or is about to engage in conduct that violates the Act or Regulations. *CFTC v. Am. Metals Exch. Corp.*, 693 F. Supp. 168, 191 (D.N.J. 1988) (granting CFTC's motion for preliminary injunction). For a preliminary injunction, the CFTC must also show that the defendant is reasonably likely to engage in future violations of the Act or Regulations. *Id.* A reasonable likelihood of future violations can be inferred from

---

[6] Such statutory restraining order or preliminary injunction shall be granted without bond.  7 U.S.C. § 13a-1(b).

past violations, if such violations are systematic or continuous.   *Id*.  It can also be inferred from the fact that the defendant's violations are ongoing.  *CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 74 n.3 (3d Cir. 1993) (affirming summary judgment in favor of CFTC).

Hearsay materials and evidence other than live testimony are properly considered by the Court in statutory restraining order or preliminary injunction proceedings.  *Am. Metals*, 693 F. Supp. at 173.  The CFTC is not required to demonstrate irreparable harm in order to obtain a statutory restraining order or preliminary injunction, as a private litigant would be.  *Id*.

A statutory restraining order or preliminary injunction sought or obtained by the CFTC is otherwise subject to Federal Rule of Civil Procedure 65, which governs restraining orders and injunctions generally.  Rule 65(b)(2), specifies that the duration of an *ex parte* temporary restraining order shall not exceed fourteen days, unless for "good cause shown" it is extended another fourteen days, or by agreement of the defendant for some longer period.

If the defendant does not agree to an extension, the court must hold a hearing on the CFTC's motion for preliminary injunction.  A hearing on such motion must be set "at the earliest possible time, taking precedence over all other matters except hearings on older matters of the same character."  Fed. R. Civ. Proc., R. 65(b)(3).  A preliminary injunction may be issued only upon notice to the defendant.  *Id*., R. 65(a)(1).

32

# VI.    ANALYSIS

## A. DEFENDANTS KAZMI AND TRADERS GLOBAL ARE VIOLATING THE ACT AND REGULATIONS

### 1. TRADERS GLOBAL OFFERS TO ENTER INTO, AND ENTERS INTO, RETAIL FOREX AND RETAIL COMMODITY TRANSACTIONS.

The CFTC's claims against Defendants arise from the CFTC's jurisdiction over retail forex and retail commodity transactions, as set forth in Sections 2(c)(2)(C) and 2(c)(2)(D) of the Act, 7 U.S.C. § 2(c)(2)(C), (D), respectively.  As a threshold matter, therefore, the CFTC must establish that Traders Global offers to enter into, or enters into, retail forex and retail commodity transactions.  It does.

#### a. Traders Global Offers to Enter Into, and Enters Into, Retail Forex Transactions.

A "retail forex transaction" is defined in Regulation 5.1(m), 17 C.F.R. § 5.1(m), to include any account, agreement, contract, or transaction described in Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C).  Section 2(c)(2)(C)(i) provides that the Commission shall have jurisdiction over any agreement, contract, or transaction in foreign currency that is: (a) offered to, or entered into with, a person that is not an ECP; and (b) offered or entered into on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert therewith.[7]

---

[7] Section 2(c)(2)(C)(viii), 7 U.S.C. § 2(c)(2)(C)(vii), provides further that the Commission shall have jurisdiction over "an account" offered for the purpose of trading, or that trades, any agreement, contract, or transaction in foreign currency that is offered to, or entered into with a non-ECP on a leveraged or margined basis. Traders Global offers that too.

The transactions Traders Global offers to customers, and for which Traders Global acts as counterparty, i.e., enters into with customers, qualify as retail forex transactions under Regulation 5.1(m).  First, the transactions are expressly agreements, contracts, or transactions in forex.  Traders Global's website specifically offers trading in EUR/USD, EUR/GBP, among many other foreign currency pairs.  (Ex. C-1 at 82-89, MFF website.)

Second, Traders Global offers or enters into these forex transactions with customers who are non-ECPs, i.e., retail customers.  An ECP is defined in Section 1a(18)(xi) of the Act, 7 U.S.C. § 1a(18)(xi), to include an individual with amounts invested on a discretionary basis, the aggregate of which is in excess of: (a) $10 million; or (b) $5 million, if the person enters into the agreement, contract, or transaction as a hedge.  Traders Global offers forex transactions to, and enters into them with, members of the general public via its website.  Traders Global's website includes no requirement that a customer be an ECP in order to participate.  To the contrary, Trades Global specifically solicits aspiring traders "in need of capital." (Ex. C-1 at 38, MFF website.)  *See CFTC v. S. Templeton Grp., Inc.,* No. CV 03 4999 (ILG), 2008 WL 5662079, at *2 (E.D.N.Y. Dec. 11, 2008) (entering summary judgment for CFTC on Section 4b(a) claim where defendant "marketed [its] managed foreign currency trading accounts to . . . unsophisticated retail customers").

34

Finally, Traders Global offers forex transactions to, and enters into them with, retail customers on a leveraged or margined basis.  Traders Global touts this leverage on its website, advertising leverage of 1:100 for most forex trading pairs. (Ex. C-1 at 82-89, MFF website.)  *See CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 976 (11th Cir. 2014) ("[L]everaging refers generally to the ability to control high-value amounts of a commodity or a security with a comparatively small value of capital, known as the margin." (citing CFTC Glossary)).

> **b.  Traders Global Offers to Enter Into, and Enters Into, Retail Commodity Transactions.**

Section 2(c)(2)(D)(i) of the Act, 7 U.S.C. § 2(c)(2)(D)(i), provides that the Commission shall have jurisdiction over any agreement, contract, or transaction in any commodity that is:  (a) entered into with, or offered to (even if not entered into with), with a retail customer; and (b) entered into, or offered (even if not entered into), on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis. These are referred to in the Act as "retail commodity transactions."  7 U.S.C. § 2(c)(2)(D).

The non-forex transactions Traders Global offers to, and enters into with, customers qualify as retail commodity transactions within the meaning of 7 U.S.C. § 2(c)(2)(D)(i).  First, they involve commodities.  The transactions involve trading on contracts based on the value of commodities, including precious metals, digital asset commodities, broad-based stock indices, and oil.  (Ex. C-1 at 82-89, MFF website.)

35

*See, e.g.*, *CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1324-1328 (11th Cir. 2018)
(affirming judgment for CFTC in retail commodity case involving previous metals);
*CFTC v. McDonnell*, 287 F.Supp.3d 213, 228 (E.D.N.Y. 2018) ("Virtual currencies
can be regulated by CFTC as a commodity."); *CFTC v. Equity Fin. Grp. LLC*, 572
F.3d 150, 155 (3d Cir. 2009) (noting that commodity futures contracts over which
the CFTC has jurisdiction include "contracts of sale for future delivery of 'a group or
index of securities'" (quoting 7 U.S.C. § 2(a)(1)(C))); *CFTC v. Crombie*, 914 F.3d
1208, 1210 n.2 (9th Cir. 2019) (characterizing crude oil as a "commodity").  Traders
Global offers to enter into, and enters into, commodity contracts with retail
customers, and did so on a leveraged or margined basis.

### 2. DEFENDANTS DEFRAUDED CUSTOMERS IN CONNECTION WITH RETAIL FOREX AND RETAIL COMMODITY CONTRACTS.

The Act and Regulations prohibit fraud in connection with retail forex or
retail commodity transactions.  Section 4b(a)(2)(A), (C) of the Act, 7 U.S.C.
§ 6b(a)(2)(A), (C), provides that it shall be unlawful for any person, in or in
connection with any order to make, or the making of, any contract of sale of any
retail forex or retail commodity transaction: (a) to cheat or defraud or attempt to
cheat or defraud the other person; or (b) willfully to deceive or attempt to deceive

the other person by any means whatsoever.[8]  Regulation 5.2(b)(1), (3), 17 C.F.R. §

5.2(b)(1), (3), says the same thing, but just for retail forex transactions.

The elements of fraud under Section 4b(a)(2)(A), (C) and Regulation 5.2(b)(1),

(3) are as follows: (1) the making of a misrepresentation, misleading statement, or a

deceptive omission; (2) materiality; and (3) scienter.[9]  *See S. Tr. Metals*, 894 F.3d at

1325 (affirming judgment for CFTC on fraud claims under Section 4b(a)); *CFTC v.*

*Fin. Tree*, 542 F. Supp. 3d 992, 1000 (E.D. Cal. 2020) (granting CFTC motion for

preliminary injunction on fraud claims under Section 4b(a) and Regulation 5.2(b));

*see also CFTC v. WorldWideMarkets, Ltd*., No. CV21-20715KMLDW, 2022 WL

3535993, at *13 (D.N.J. Aug. 18, 2022) (denying motion to dismiss fraud claims

under Section 4b(a)).

Whether a misrepresentation has been made depends on the "overall

message" and the "common understanding of the information conveyed."  *S. Tr.*

*Metals*, 894 F.3d at 1325.  A material fact is one that a reasonable person would

---

[8] By its terms, Section 4b(a)(2)(A), (C) of the Act, 7 U.S.C. § 6b(a)(2)(A), (C),
prohibits fraud "in or in connection with any order to make, or the making of, any
contract of sale of any commodity for future delivery," i.e., futures.  However,
Sections 2(c)(2)(C)(iv) and 2(c)(2)(D)(iii) of the Act extend Section 4b's prohibition
against fraud to retail forex and retail commodity contracts, respectively.  They do
this by specifying that Section 4b shall apply to retail forex and retail commodity
transactions "as if the agreement, contract or transaction were a contract for sale of
a commodity for future delivery."  7 U.S.C. § 2(c)(2)(C)(iv), (D)(iii).

[9] The CFTC is not required to demonstrate "reliance," as a private litigant would be.
*S. Tr. Metals*, 894 F.3d at 1325.

find important in deciding whether to make an investment.  *Id.* at 1327;

*WorldWideMarkets*, 2022 WL 3535993, at *13.  A defendant acts with scienter if he

or she intended to defraud, manipulate, or deceive, or if the defendant's conduct was

reckless, i.e., involved "highly unreasonable omissions or misrepresentations" such

that the danger of misleading customers is either known to the defendant or so

obvious the defendant must have been aware of it.  *See S. Tr. Metals*, 894 F.3d at

1327; *see also WorldWideMarkets*, 2022 WL 3535993, at *13.

>    **a.  Defendants Made False and Misleading Statements of Material Fact.**

Defendants make numerous affirmatively false and misleading statements to

customers via the MFF website and in YouTube videos.  They fall into three groups.

First, Defendants claim that "funded traders" use Traders Global's "live

trading funds" to trade against "liquidity providers."  (Ex. C-1 at, e.g., 2, 33-34, MFF

Website.)  When a customer makes money trading, the customer is entitled to

receive a percentage of the profits.  (*Id.* at, e.g., 3.)  This is false.  In reality, Traders

Global is the counterparty to substantially every customer trade.  (Ex. D,

Chichester Test. 45:18 to 49:5, 67:18 to 70:20.)  Defendants pay money to successful

customers, but that money does not come from trading.  It comes from fees paid by

other customers, in a manner similar to a Ponzi scheme.  (*See supra* III.B.2.)  A

reasonable customer would want to know this.  *Cf. CFTC v. PMC Strategy, LLC*,

903 F. Supp. 2d 368, 379 (W.D.N.C. 2012) (holding that defendants'

misrepresentations in Ponzi scheme were material because, *inter alia*, a customer

would find it important that "any purported profits on investment were being paid using other [ ] pool participants' money").

Second, Defendants tell customers that "Your success is our business," and "we only make money if you make money."  (Ex. C-1 at, e.g., 4, 54, MFF website.) Traders Global loses money when customers make money.  Traders Global's business is based not on customer "success" but on using various devices, e.g., "delay" and "slippage," to reduce the likelihood or amount of successful trading by customers, i.e., to "stop that money going out."  (*See supra* III.B.3.)  A reasonable customer would want to know that Traders Global's interests are adverse to those of the customers, and that Traders Global works behind the scenes to make customers lose.  *Cf. Hunter Wise Commodities*, 749 F.3d at 981 ("a reasonable investor would consider representations about the nature of the transaction important in deciding whether to make an investment").

Third, Defendants claim that the drawdown limits applied to customer accounts are meant to "enforce good trading habits" and "lock in profits."  (Ex. A-9 at 10:30 through 11:31, Kimmel Trading "My Forex Funds FOUNDER INTERVIEW!!" YouTube video, Dec. 11, 2021.)  This is untrue.  The drawdown limits are meant to provide Defendants with a pretext to suspend customer accounts, vitiate the risk of having to pay any "trading profits" later on, and obtain additional fees from customers who want to continue trading.  This is something a reasonable customer would want to know.

### b. Defendants Omitted Material Facts.

Defendants omitted material facts that, by virtue of their omission, make otherwise true statements misleading.  Defendants' omissions can be divided into three groups.

First, Defendants' website discloses that customer trades are subject to commission charges.  Defendants fail to disclose, however, that Traders Global charges the commissions and not some third-party, as customers are led to believe. (*See supra* III.B.3.b.)  A reasonable customer would want to know that the so-called commissions are really electronic book entries Traders Global makes to reduce account equity.

Second, Defendants claim that customers with "live" accounts trade against third-party liquidity providers.  This is false for substantially all customers.  For a very small number of customers—the customers "on STP"—this is true.  Defendants fail to disclose, however, that it STPs customers to offload the risk of having to pay successful customers—not to make money from customers' profitable trading.  (*See supra* III.B.3.d.)  Defendants expect customers to lose on STP, and they do.  A reasonable customer would find these facts to be material.

Third, Defendants fail to disclose that Trades Global imposes artificial spreads on prices visible to STP'd customers in order to make the customer believe their trading lost more or made less than it really did.  (*See supra* III.B.3.e.)  This is something a reasonable customer would want to know.

### c. Defendants Acted with Scienter.

Defendants acted with scienter in making the foregoing misstatements and omissions. Kazmi knows that Traders Global is the counterparty to substantially all customer trades, and that Traders Global loses money when customers make money. (*See supra* III.D.) Kazmi knows that funds paid to successful customers are not profits from trading against a third-party liquidity provider, but rather fees paid by other customers. (*Id.*) Kazmi knows that the commissions are book entries imposed by Traders Global, and that customers are assigned to computerized "profiles" to inhibit their trading. (*Id.*) Kazmi's scienter is imputed to Traders Global by virtue of his status as its principal. *See SEC v. Cooper*, 142 F. Supp. 3d 302, 313 (D.N.J. 2015) ("To establish a corporation's scienter, the mental state of an officer acting on the corporation's behalf may be imputed to it." (citing *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106–07 (10th Cir. 2003)). The scienter evidenced in "Risk Manager" Joshua Dentrinos's communications with iS Risk is likewise imputed to Traders Global. (*See* supra III.D.) 7 U.S.C. § 2(a)(1)(B) (imposing liability upon principals for the acts of agents); 17 C.F.R. § 1.2 (same).

### 3. PROPOSED DEFENDANTS ACTED AS AN RFED WITHOUT REGISTRATION.

An "RFED" is a person that is, or offers to be, the counterparty to a retail forex transaction. 17 C.F.R. § 5.1(h)(1). Traders Global acted in the capacity of an RFED by offering to enter into, and entering into, retail forex transactions with customers as a counterparty. Traders Global is thus an RFED. Regulation

5.3(a)(6)(i), 17 C.F.R. § 5.3(a)(6)(i), requires a person acting in the capacity of an RFED to register with the Commission as such.  Traders Global has never been registered as an RFED (Ex. B at 1-2, Jung Decl.), and is therefore in violation of the Regulation.

### 4.  PROPOSED DEFENDANTS ENGAGED IN OFF-EXCHANGE TRADING OF RETAIL COMMODITY CONTRACTS.

Section 4(a) of the Act, 7 U.S.C. § 6(a), provides that it shall be unlawful for any person to enter into, execute, confirm the execution of, or conduct any office or business anywhere in the United States, for the purpose of soliciting or accepting any order for, or otherwise dealing in, any transaction in, or in connection with, a retail commodity transaction unless such transaction is conducted, executed, or consummated on, or subject to, the rules of a board of trade which has been designated or registered by the Commission as a contract market or derivatives transaction execution facility for such commodity.[10]  In other words, retail commodity transactions are required to be execute on an exchange registered with the CFTC.

Traders Global entered into, executed, and otherwise dealt in retail commodity transactions.  It did so directly with customers, and not on any exchange

------

[10] Section 4(a) of the Act, 7 U.S.C. § 6(a), by its terms, applies to "a contract for the purchase or sale of a commodity for future delivery," i.e., a futures contract.  Section 2(c)(2)(D)(iii) of the Act, 7 U.S.C. § 2(c)(2)(D)(iii), provides that Section 4(a) shall apply to any retail commodity transaction as if it were a futures contract.

registered with the CFTC.  (Ex. E, Edelstein Decl. ¶¶ 6-7.)  *See S. Tr. Metals*, 894

F.3d at 1325 (affirming summary judgment for CFTC on Section 4(a) claim where

defendant offered retail commodity transactions, and transactions did not occur on

registered exchange).  Traders Global thus violated Section 4(a) of the Act.

### 5. PROPOSED DEFENDANTS TRADERS GLOBAL U.S. AND TRADERS GLOBAL CANADA ARE LIABLE FOR ONE ANOTHER'S VIOLATION AS A COMMON ENTERPRISE

Where one or more corporate entities operate in a "common enterprise," each

may be held liable for the deceptive acts and practices of the other.  *CFTC v. Wall*

*St. Underground, Inc.*, 281 F. Supp. 2d 1260, 1271 (D. Kan. 2003).[11]  In determining

whether business entities operate as a common enterprise, courts look to whether

the entities, *inter alia,*  (1) maintain officers and employees in common; (2) operate

under common control; (3) share a "common purpose"; and (4) commingle funds, as

well as whether corporate formalities are observed, and whether the companies

conduct business at arm's length.  *CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp.

3d 29, 38–39 (D.D.C. 2015) (entering summary judgment for CFTC); *CFTC v. Cartu*,

No. 1:20-CV-908-RP, 2023 WL 5246360, at *9 (W.D. Tex. Aug. 15, 2023) (denying

motion to dismiss).

Traders Global U.S. and Traders Global Canada operate as a common

enterprise.  Both entities are owned and controlled by Kazmi.  (*See supra* III.)

---

[11] *modified sub nom*. No. CIV.A. 03-2193-CM, 2004 WL 1900588 (D. Kan. June 24, 2004), *and aff'd and remanded on other grounds*, 128 F. App'x 726 (10th Cir. 2005)

Traders Global U.S. and Traders Global Canada share a common purpose in Defendants' fraud scheme.  Traders Global U.S. and Traders Global Canada share and co-mingle funds, transferring tens of millions of dollars freely between accounts.  (*See supra* III.F.)  Defendants use accounts in the name of Traders Global U.S. and Traders Global Canada interchangeably to accept customer fees and pay business expenses for the enterprise.  (*Id.*)

### 6.  PROPOSED DEFENDANT KAZMI IS LIABLE AS A CONTROLLING PERSON OF TRADERS GLOBAL.

Under Section 13(b) of the Act, 7 U.S.C. § 13c(b), any person who, directly or indirectly, controls any person (or company) is liable for the controlled person's violation of the Act or Regulations if the controlling person did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violation. *CFTC v. Equity Fin. Grp. LLC*, 572 F.3d 150, 150 (3d Cir. 2009) (affirming judgment for CFTC after bench trial).  In order to be deemed a controlling person under Section 13(b), the person must actually have exercised general control over the entity principally liable.  *WorldWideMarkets*, 2022 WL 3535993, at *16 (denying motion to dismiss in relevant part).  The person must also have possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, even if such power was not exercised.  *Id.*  A controlling person "knowingly induced" a violation if the person had actual or constructive knowledge of the core activities that make up the violation at issue and allowed

them to continue.  *CFTC v. Kratville*, 796 F.3d 873, 894-95 (8th Cir. 2015) (affirming summary judgment for CFTC).

Kazmi had general control over Traders Global, by virtue of his position as CEO, shareholder, and sole director of both Traders Global U.S. and Traders Global Canada.  (*See supra* II.)  Kazmi had the ability to—and did—exercise control over Traders Global's acts in violation of the Act and Regulations.  The false and misleading statements that form the basis for the CFTC's fraud charges were made by Kazmi personally in YouTube videos, or on Traders Global's website which Kazmi as CEO had the power to control.  (*See, generally*, Ex. C-1, MFF website; Ex. A-3, MyForexFunds "Company Update" YouTube video, Oct. 26, 2022.)  The offering of retail forex and retail commodity transactions which form the basis for the CFTC's charges under Regulation 5.3 and Section 4(a) of the Act was likewise effected through the website.  The addition of slippage and delay to customer orders was effected via the MetraTrader software with the help of iS Risk, both of which Kazmi paid for.  (Ex. E, Edelstein Decl. ¶¶ 24, 28, 33.)  Kazmi's "knowing inducement" is supported by the same facts which demonstrate his scienter.  (*See supra* III.D.)

## B. THE RELIEF SOUGHT BY THE CFTC IS JUSTIFIED AND NECESSARY.

### 1. ASSET FREEZE

An asset freeze is necessary here to preserve the status quo and maintain the court's jurisdiction over assets to which aggrieved customers may be entitled.  *See*

*Am. Metals Exch.*, 991 F.2d at 79; *Am. Metals Exch.*, 693 F. Supp. at 195-96.  In the absence of an asset freeze, Kazmi may—and is likely to—transfer or dissipate assets held in the US, either at banks or with payment companies like WooCommerce or Deel.  Kazmi can easily transfer those assets to Canada, beyond the immediate reach of the Court.  Indeed, this is where most of Defendants' assets are currently.  (Ex. E, Edelstein Decl. ¶ 28.)  Kazmi can also convert his assets to cryptocurrency and place them in his non-custodial wallet, which cannot be frozen or seized by any jurisdiction.  Or Kazmi may simply dissipate those assets through his demonstrated propensity for profligate spending.

### 2.  APPOINTMENT OF A TEMPORARY RECEIVER

The appointment of a temporary receiver likely will be necessary to effectuate the asset freeze by asserting control over Defendants' accounts.  *Am. Metals Exch.*, 693 F. Supp. at 172.  The CFTC respectfully submits, based on recommendations from other agencies, that the following attorney would be an appropriate candidate for appointment as a temporary receiver:

> Anthony Sodono, III
> McManimon, Scotland & Baumann, LLC
> 75 Livingston Avenue, 2nd Floor
> Roseland, NJ  07068

### 3.  BOOKS AND RECORDS

An order requiring Defendants to inspect, when and as requested, any books or records is necessary for the CFTC to obtain documents before Defendants can destroy them, as well as to establish the extent and magnitude of Defendants'

46

violations of the Act and Regulations.  In particular, the CFTC seeks to use "books and records" authority to obtain additional financial records from third-parties and to compel Defendants to instruct various electronic communications storage providers, such as Microsoft, Discord, Meta, TikTok, LinkedIn, and similar providers of cloud-based document services to produce electronic communications from Defendants' accounts.  *See, e.g., FTC v. Am. Future Sys., Inc.*, No. 20-cv-2266, at *2 (E.D. Pa. Mar. 28, 2023) (adopted as modified in *FTC v. Am. Future Sys., Inc.*, 20-cv-2266, 2023 WL 3559319 (E.D. Pa. May 17, 2023)).

### 4.  INJUNCTION

Defendants' conduct is ongoing, and is likely to continue if not enjoined by the Court.  A reasonable likelihood of future violations can be inferred from the systematic, continuous, and deliberate nature of Defendants' violations.  *See Am. Metals Exch.*, 991 F.2d at 73, n.3; Am. *Metals Exch.*, 693 F. Supp. at 172.  This reasonable likelihood of future violations justifies a preliminary injunction.

## VII.  CONCLUSION

For the foregoing reasons, the CFTC respectfully requests that the Court enter a statutory restraining order against Defendants freezing Defendants' assets, requiring Defendants to submit books and records as requested by the CFTC, and appointing a temporary receiver.  The CFTC request further that the Court set a hearing on the CFTC's requested preliminary injunction no fourteen days after entry of the statutory restraining order.

August 28, 2023

s/ Ashley J. Burden
Senior Trial Attorney
Division of Enforcement
Commodity Futures Trading Commission
77 West Jackson Blvd.
Suite 800
Chicago, IL 60604
Office:  (312) 596-0693
Cell:    (312) 995-0779
aburden@cftc.gov