# Exhibit A-15

**THIS AGREEMENT** (the "Agreement") is made on the 13th day of September 2021 (the "Effective Date").

**BETWEEN:**

(1) IS Risk Analytics Inc. a company established under the laws of the state of Delaware having its principal place of business at 519 Ada Drive Suite 201, Ada, MI 49301 ("the Licensor") and

(2) Traders Global Group Incorporated a company having its principal place of business at ▮▮▮▮▮▮ Vaughan, Ontario Canada (the "Customer")

(each a "Party" and together the "Parties")

**WHEREAS:**

(1) Licensor has developed and owns or has licensed from third parties certain computer applications that will provide functionality to the Customer;

(2) Licensor provides outsourced risk management services to assist companies like the Customer in generating revenue and managing risk; and

(3) Customer wishes to utilize the computer applications and outsourced risk management services provided by Licensor and in return will pay to Licensor the License Fees detailed in Schedule 2 to this Agreement.

NOW, THEREFORE, in consideration of the promises and covenants contained herein, the Parties agree as follows:

## 1   DEFINITIONS

1.1   In this Agreement, unless the context otherwise requires, the following expressions have the following meanings:

| | |
|---|---|
| "Client Account" | an account opened by the Customer with a client of the Customer for the purpose of trading foreign exchange and/or contracts for difference; |
| "Client Agreement" | the agreement between Customer and a Client Account that contains the terms and conditions under which the account will be operated; |
| "Bridge" | IS Risk Analytics' Nexus LS MT4 Liquidity Bridge; |
| "Intellectual Property Rights" | all vested, contingent, and future intellectual property rights including but not limited to copyrights, trademarks, service marks, design rights, patents, know-how, trade secrets, inventions, get-up, database rights and other rights in the nature of intellectual property rights (whether registered or unregistered) and any applications for the protection or registration or these rights and all renewals and extensions thereof existing in any part of the world whether now known or in the future created to which the Licensor may be entitled; |
| "License" | the license granted by the Licensor pursuant to Section 2 of this Agreement; |
| "License Fee" | the fee for the License provided under this Agreement as specified in Schedule 2; |
| "Licensed Program Materials" | the Licensed Programs and the Program Documentation; |

| | |
|---|---|
| "Licensed Programs" | the systems, applications, and computer programs of the Licensor specified in Schedule 1 and all releases and versions thereof; |
| "Program Documentation" | the operating manuals, user instructions, technical literature, and all other related materials supplied to the Customer by the Licensor for aiding the use and application of the Licensed Programs; |

## 2  GRANT OF LICENSE

2.1  Subject to the provisions in this Agreement as well as payment of all applicable License Fees for the term of such License, the Licensor grants to the Customer a personal, non-exclusive, non-transferable, non-assignable license to use the Licensed Program Materials.

2.2  The Customer shall use the Licensed Program Materials for processing their own data and the data of their introducing brokers and white label partners.

2.3  The License shall not be deemed to extend to any programs or materials of the Licensor other than the Licensed Program Materials unless specifically agreed to in writing by the Licensor.

2.4  The Customer acknowledges that it is licensed to use the Licensed Program Materials only in accordance with the express terms of this Agreement and not further or otherwise.

2.5  Customer shall not allow any third party to have access to the Licensed Program Materials without Licensor's prior written consent.

2.6  The Customer shall not and shall not permit its affiliates or any third party to translate, reverse engineer, decompile, recompile, update, or modify all or any part of the Licensed Programs.

2.7  Neither the License granted, nor any other services provided by Licensor to Customer under this Agreement are exclusive to the Customer. Nothing in this Agreement will prevent or restrict Licensor entering into similar arrangements with other persons, including competitors of the Customer.

## 3  CLIENT ACCOUNTS

3.1  The Parties acknowledge that the Customer may open Client Accounts. The following shall apply to the opening and operation of all Client Accounts:

   3.1.1  all Client Accounts shall be clients of Customer for all purposes;

   3.1.2  Customer shall be responsible for compliance with all procedures related to opening and operating Client Accounts including compliance with all applicable laws and regulatory rules;

   3.1.3  All Client Accounts shall be opened and operated on the basis of Client Agreement;

   3.1.4  Customer shall be responsible for the operation and maintenance of the accounts including all deposits and withdrawals;

   3.1.5  Customer shall be the counterparty on all trades with Client Accounts and Customer shall bear the risk of losses on the Client Accounts;

   3.1.6  all communications with Client Accounts shall be made in the name of the Customer;

   3.1.7  Customer shall grant the Licensor full and unrestricted access to the Client Account records, in particular deposit and trading history;

   3.1.8  Customer hereby authorizes the Licensor for the duration of the Agreement to do any act or thing to Client Accounts necessary to serve the purpose of this Agreement, including but not limited to closing trades, voiding trades, modification of orders, and cancellation of orders.

IS Risk Analytics-0000008754

3.2  Customer shall indemnify, defend, and hold Licensor (including Licensor's officers, employees, agents, affiliates, successors and assigns) harmless against any and all costs, claims, losses, damages, liabilities, and expenses, including legal fees, for which the Licensor may be liable in respect to any claim by a Client against the Licensor.

## 4  LIQUIDITY PROVIDER ACCOUNTS

4.1  The Parties acknowledge that the Customer may open accounts with liquidity providers ("Liquidity Provider Accounts") to transact trades in the name of the Customer with the Liquidity Provider ("Liquidity Provider Trades"). The following shall apply to the opening and operation of all Liquidity Provider Accounts:

4.1.1  Customer shall be responsible for opening all Liquidity Provider Accounts, and the Liquidity Provider Accounts shall be operated based on the agreement between the Customer and the Liquidity Provider;

4.1.2  Customer shall be responsible for funding all Liquidity Provider Accounts and for maintaining whatever equity or margin levels are required to support the trading activity in the Liquidity Provider Accounts. Licensor shall not responsible for monitoring equity or margin levels in the Liquidity Provider Accounts;

4.1.3  Customer shall be the counterparty on all trades with the Liquidity Provider in the Liquidity Provider Accounts and Customer shall bear the risk of losses on the Liquidity Provider Accounts;

4.1.4  Customer shall ensure that the Licensor has full and unrestricted access to the Liquidity Provider Account records, in particular trading history;

4.1.5  Customer hereby authorizes the Licensor for the duration of the Agreement to do any act or thing to Liquidity Provider Accounts necessary to serve the purpose of this Agreement, including but not limited to opening trades, closing trades, modification of orders, and cancellation of orders. Customer shall ensure that the Licensor has the authorization necessary to perform these actions with the Liquidity Provider on behalf of the Customer.

4.2  Customer shall indemnify, defend, and hold Licensor (including Licensor's officers, employees, agents, affiliates, successors and assigns) harmless against any and all costs, claims, losses, damages, liabilities, and expenses, including legal fees, for which the Licensor may be liable in respect to any claim by a bank or Liquidity Provider against the Licensor.

## 5  RISK MANAGEMENT

5.1  Licensor shall monitor and analyse the trading activity in the Client Accounts and make decisions regarding if and how the trading activity in a Client Account should be managed by placing Liquidity Provider Trades. Licensor shall effectuate these decisions by making changes to settings for the Client Account in the Bridge. Customer understands that changes made to settings in the Bridge may affect trade execution in the Client Accounts and also may result in an increase or decrease in the volume and profit or loss in the Liquidity Provider Accounts. Customer hereby authorizes the Licensor for the duration of this Agreement to make any changes to the Bridge or Bridge settings which the Licensor reasonably believes are necessary or appropriate.

5.2  Licensor shall communicate with the Customer regarding the decisions referenced above and provide the Customer with reporting related to the profitability of Client Accounts.

5.3 Customer understands that Licensor shall make the decisions contemplated by this Section with the intent of maximizing the Customer's revenue, but the nature of markets and trading makes it impossible to predict or guarantee revenue or profits in any way. Customer understands that the combined activity in Client Accounts and Liquidity Provider Accounts in any given time period may result in a loss to the Customer. Customer further understands that historical results in no way predict or ensure future performance. Licensor does not warrant or guarantee any level of revenue or profit, or that the Customer will be profitable at all.

5.4 Customer is ultimately responsible for all decisions made regarding the management of risk and profitability in the Client Accounts and Liquidity Provider Accounts and bears the full risk of loss in both the Client Accounts and Liquidity Provider Accounts. In the event Customer disagrees with any of the decisions or changes made by the Licensor pursuant to this Section, Customer shall notify the Licensor as soon as reasonably possible and the Licensor shall make the changes requested by the Customer as soon as reasonably possible.

5.5 The services provided by Licensor to Customer under this Agreement are not exclusive to the Customer. Nothing in this Agreement will prevent or restrict Licensor from entering into similar arrangements with other persons, including competitors of the Customer.

## 6   OTHER SERVICES TO BE PROVIDED

6.1 Licensor agrees to provide complete technical support to the Customer for their continued use of the Licensed Programs.

6.2 Licensor agrees to provide Customer with training and instruction related to the use, support, and maintenance of the Licensed Programs.

6.3 If Licensor develops an updated version of the Licensed Programs while this Agreement is in effect, the Licensor shall, in a timely manner, provide the updated version of the Licensed Programs to the Customer.

## 7   TERM AND TERMINATION

7.1 This Agreement shall commence on the Effective Date and shall continue for an initial period of one year and shall renew automatically for additional one year terms on each annual anniversary of the Effective Date (the "Renewal Date"). Either Party may terminate the Agreement on the Renewal Date by providing notice in writing sixty days prior to the Renewal Date.

7.2 Licensor may terminate this Agreement immediately with written notice upon occurrence of any of the following events:

   7.2.1 Customer (a) terminates or suspends business, (b) becomes subject to a bankruptcy or insolvency proceeding, or (c) becomes insolvent, subject to the control of a trustee, or otherwise unable to pay debts as they become due; or

   7.2.2 Customer's failure to comply with any of the material terms of this Agreement, including but not limited to making all payments in full and on time, and such default has not been cured within ten days of receiving written notice of the default.

7.3 In the event of termination of this Agreement, the License shall terminate immediately and the Customer shall return to the Licensor the Licensed Program Materials and all copies of the whole or any part thereof or, if requested by the Licensor, shall destroy the same.

## 8 FEES

8.1 Customer shall pay the Licensor the License Fees detailed in Schedule 2 to this Agreement.

8.2 Licensor shall invoice Customer monthly, and any charges payable shall be paid within 10 days after receipt by the Customer of the Licensor's invoice.

8.3 The Licensor shall have the right to charge fees on overdue invoices. Overdue invoices shall be assessed an initial fee of 500 USD$. In addition, a fee of 50 US$ shall be charged each day until actual, full, and complete payment is received.

8.4 The License Fee and any other charges payable under this Agreement are exclusive of any sales, use, service, value added, withholding, or other tax of any kind which shall be payable by the Customer at the rate and in the manner prescribed by law.

8.5 All payments made to Licensor shall be made in United States Dollars ("US$").

## 9 DELIVERY, TESTING, AND ACCEPTANCE

9.1 After installation of the Licensed Programs, Customer shall supply test data to the Licensor which in the reasonable opinion of the Parties is suitable to test the functionality and performance of the Licensed Programs. Licensor and Customer shall jointly conduct acceptance tests after the installation of the Licensed Programs and provision of the test data. The Customer shall accept the Licensed Programs immediately after the Licensor has demonstrated that the Licensed Programs have correctly processed the test data.

9.2 In the event of failure of the Licensed Programs to pass the tests referred to in Section 9.1, the Licensor shall correct the errors in the Licensed Programs and notify the Customer that it is ready to repeat the tests and such test shall be repeated.

9.3 In the event of failure of the Licensed Programs to pass the repeat tests referred to in Section 9.2, the Customer shall be entitled to terminate this Agreement.

9.4 Notwithstanding the above, installation of the Licensed Programs shall be deemed to be completed and the Licensed Programs shall be deemed to be accepted upon successful execution of the tests referred to above or when the Licensed Programs have been put into use, whichever is the earlier.

## 10 COPYING AND ALTERATIONS

10.1 Customer may only make so many copies of the Licensed Programs as are reasonably necessary for operational security and use. Such copies and the media on which they are stored shall be the property of the Licensor. The License shall apply to all such copies as it applies to the Licensed Programs.

10.2 Customer shall have the right to reproduce the Program Documentation solely for its own internal use.

10.3 The Parties acknowledge that the Licensed Programs are to be modified by the Licensor in order to integrate and operate with third party programs.

10.4 Customer shall not alter, translate, adapt, vary, modify, disassemble, decompile, or reverse engineer the Licensed Program Materials without the Licensor's prior written consent.

## 11 PROPRIETARY RIGHTS

11.1 The Licensed Program Materials and the Intellectual Property Rights of whatever nature in the Licensed Program Materials are and shall remain the property of the Licensor.

11.2 The Customer shall notify the Licensor immediately if the Customer becomes aware of any unauthorized use of the whole or any part of the Licensed Program Materials by any person.

IS Risk Analytics-0000008754

## 12 INTELLECTUAL PROPERTY RIGHTS

12.1 The Customer acknowledges that all Intellectual Property Rights in the Licensed Program Materials and Licensed Programs belong to the Licensor, and the Customer shall have no rights in or to the Licensed Program Materials and Licensed Programs other than the right to use it in accordance with the terms of this License.

## 13 REPRESENTATIONS AND WARRANTIES OF ISRA

13.1 ISRA hereby represents and warrants to Client that, as of the date hereof:

13.1.1 ISRA has the requisite power and authority to duly and validly conclude this Agreement and perform its duties and obligations hereunder

13.1.2 ISRA is duly organized, validly existing, and in good standing under its laws of the State of Delaware, United States of America

13.1.3 This Agreement is a valid and effective agreement and constitutes the ISRA's binding and enforceable obligations in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium, and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

13.1.4 Neither the execution of this Agreement by ISRA nor the performance of its obligations hereunder does or will:

i. violate or result in the breach of any permit or authorization granted by any applicable government authority to it, in each case, except as would not, individually or in the aggregate, be reasonably likely to be (A) material to the Client or (B) result in any criminal liability; or

ii. constitute a violation of any laws, except as would not, individually or in the aggregate, be reasonably likely to be (A) material to the Client or (B) result in any criminal liability

13.1.5 There are no actions pending against ISRA relating to this Agreement or the transactions contemplated hereby. There are no outstanding government orders that are binding on it that would prevent, hinder, or delay any part of the transactions contemplated hereby

13.2 In the event of any breach of the warranties set forth in this Agreement, the Client's sole and exclusive remedy shall be to receive direct damages not to exceed the sums paid to ISRA by Client during the one month period immediately preceding the date the alleged breach occurred.

13.3 EXCEPT AS SET FORTH IS THIS SECTION, ISRA MAKES NO EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES WITH REPECT TO THE MATERIALS AND SERVICES PROVIDED. ISRA FURNISHES THE ABOVE WARRANTIES IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

IS Risk Analytics-0000008754

## 14 REPRESENTATIONS AND WARRANTIES OF CLIENT

14.1 ISRA hereby represents and warrants to Client that, as of the date hereof:

    14.1.1 Client has the requisite power and authority to duly and validly conclude this Agreement and perform its duties and obligations hereunder

    14.1.2 Client is duly organized, validly existing, and in good standing under ithe laws of its country of organization

    14.1.3 This Agreement is a valid and effective agreement and constitutes the Client's binding and enforceable obligations in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium, and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

    14.1.4 Neither the execution of this Agreement by Client nor the performance of its obligations hereunder does or will:

        i. violate or result in the breach of any permit or authorization granted by any applicable government authority to it, in each case, except as would not, individually or in the aggregate, be reasonably likely to be (A) material to ISRA or (B) result in any criminal liability; or

        ii. constitute a violation of any laws, except as would not, individually or in the aggregate, be reasonably likely to be (A) material to ISRA or (B) result in any criminal liability

    14.1.5 There are no actions pending against Client relating to this Agreement or the transactions contemplated hereby. There are no outstanding government orders that are binding on it that would prevent, hinder, or delay any part of the transactions contemplated hereby.

14.2 Client on a continuing basis, warrants to the other Party that it is an "Eligible Contract Participant" or "ECP" as defined in Section 1a (18) of the Commodity Exchange Act.

14.3 Client on a continuing basis, warrants to the other Party that it is a qualified eligible person as defined in the Commodity Futures Trading Commission ("CFTC") rule 4.7.

## 15 LIMITATION OF LIABILITY AND INDEMNIFICATION

15.1 In no event shall Licensor, its parents, affiliates, employees, officers, directors or agents be liable to Customer for any indirect, incidental, special, punitive, or consequential losses or damages, including but not limited to lost profits, lost revenues, or lost wages arising out of or in connection with this Agreement or the use of the Licensed Programs however caused and under any theory of liability, even if the Licensor was advised of the possibility of such damages.

15.2 Notwithstanding any other provision of this Agreement, Licensor's liability arising out of this Agreement, whether under contract law, tort law, warranty or otherwise shall be limited to direct damages not to exceed the sums paid by the Customer to the Licensor during the one month period immediately preceding the date the alleged liability arose.

15.3 Customer agrees to indemnify, defend and hold Licensor (including Licensor's officers, employees, agents, affiliates, successors and assigns) harmless from and against any and all damages, liabilities, losses, costs and expenses resulting from any third party claim, suit, action, investigation or proceeding brought against Licensor, including costs in connection with the defense thereof (including, but not limited to, reasonable attorneys' fees), arising out of or in connection with: (i) the use or operation of the Licensed Program Materials by the Customer, its employees, agents, or independent contractors; (ii) the Customer's breach of its representations or warrants in this Agreement; (iii) any fraud, willful misconduct or negligence of the Customer, or any of its affiliates, directors, officers, employees or agents in connection with the performance of their respective obligations under this Agreement or (iv) any violation of any applicable law or regulation by the Customer.

IS Risk Analytics-0000008754

## 16  CONFIDENTIAL INFORMATION

16.1  For the purposes of this Agreement, "Confidential Information" shall mean any and all information disclosed by either Party (the "Disclosing Party") to the other Party (the "Receiving Party") not generally known by the public, including but not limited to the Licensed Program Materials and Intellectual Property Rights of either Party. The Receiving Party agrees that it will not use any Confidential Information except as expressly permitted under this Agreement. The Receiving Party shall use the same degree of care to protect the Confidential Information as it uses to protect its own confidential information of like nature, but in no circumstances with less than reasonable care.

16.2  Under no circumstances may either Party disclose any pricing or business terms related specifically to this Agreement, or any negotiations thereof, to any third party including, but not limited to, competitors, industry analysts, press, or media.

## 17  GENERAL PROVISIONS

17.1  *Entire Agreement.* This Agreement, including all Schedules and Attachments, contains the entire agreement between the Parties and supersedes any previous understanding and agreements between them. There are no representations, agreements, arrangements, or understandings, oral or written, between the parties to this Agreement relating to the subject matter of this Agreement that are not fully expressed in this Agreement.

17.2  *Amendment.* The terms and conditions of this Agreement may not be changed except by an amendment in writing signed by both Parties.

17.3  *Assignment.* This Agreement shall be binding upon and shall inure to the benefit of all Parties hereto, their personal and legal representatives, guardians, successors and assigns, to the extent the assignment is permitted by the provisions of this Agreement.  Customer may not assign any of its rights or delegate any of its duties under this Agreement, whether by operation of law or otherwise, without the prior express written consent of the Licensor.

17.4  *Waiver.* No failure or delay by either Party in exercising any right or remedy under this agreement shall operate or be deemed as a waiver of any such right or remedy.

17.5  *Severability.* In the event that any part of this Agreement is held illegal, invalid, or otherwise unenforceable, the balance of the Agreement shall not be affected and shall continue in full force and effect.

17.6  *Independent Entities.* The Parties to this Agreement are independent entities. Neither Party shall be deemed to be an employee, agent, partner, or legal representative of the other Party solely as a result of this Agreement. Neither Party shall have any right or authority to create any obligation or responsibility on behalf of the other Party.

17.7  *Survival.* The respective rights and obligations in sections 12, 13, 14, 15 and 16 of this Agreement, in addition to any payment obligations incurred pursuant to this Agreement, shall survive the termination of this Agreement.

17.8 *Notice.* Except as otherwise provided in this Agreement, all notices permitted or required by this Agreement shall be in writing and shall be delivered in person or sent by email, fax, or prepaid courier directly to the intended party at the following addresses, respectively:

Licensor:    IS Risk Analytics Inc.
             519 Ada Drive Suite 201
             Ada, MI 49301
             Attn. Jeff Wilkins, Managing Director

Customer:    Traders Global Group Incorporated
             [redacted]
             Vaughan, Ontario Canada

17.9 *Applicable Law.* This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan.

17.10 *Force Majeure.* Except for Customer's obligations to make payment hereunder, neither Party will be deemed to be in breach of this Agreement, or be entitled to damages or credits pursuant to this Agreement, for any failure or delay in performance caused by reasons beyond its reasonable control, caused by the other party or by an act of God, war, civil disturbance, court order, labor dispute, or other cause beyond its reasonable control, including without limitation failures or fluctuations in power, heat, light, air conditioning or telecommunications equipment.

PURSUANT TO AN EXEMPTION FROM THE COMMODITY FUTURES TRADING COMMISSION IN CONNECTION WITH ACCOUNTS OF QUALIFIED ELIGIBLE PERSONS, THIS DOCUMENT IS NOT REQUIRED TO BE, AND HAS NOT BEEN, FILED WITH THE COMMISSION. THE COMMODITY FUTURES TRADING COMMISSION DOES NOT PASS UPON THE MERITS OF PARTICIPATING IN A TRADING PROGRAM OR UPON THE ADEQUACY OR ACCURACY OF COMMODITY TRADING ADVISOR DISCLOSURE. CONSEQUENTLY, THE COMMODITY FUTURES TRADING COMMISSION HAS NOT REVIEWED OR APPROVED THIS TRADING PROGRAM OR THIS BROCHURE OR ACCOUNT DOCUMENT.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date set forth above.

| IS Risk Analytics Inc. | Traders Global Group Incorporated |
|---|---|
| By  *(signed)* | By  *(signed)* |
| Name  Jeff Wilkins | Name  Murtuza Kazmi |
| Title  Managing Director | Title  CEO |

## Schedule 1

### LICENSED PROGRAMS

1. ISRA MT4 Liquidity Bridge
2. ISRA MT5 Liquidity Bridge

## Schedule 2

### FEES

| | | |
|---|---|---|
| 1 | **Risk Management Services** | 12,500 US$ per month for months 1-3 |
| | | 25,000 US$ per month for months 4 and beyond |
| 2 | **MT4 Hosting Services** | 3,500 US$ per month |
| 3 | **MT5 Hosting Services** | 3,500 US$ per month |

FOIA Confidential Treatment Requested by IS Risk Analytics, Inc.

IS Risk Analytics-0000008754