# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Commodity Futures Trading Commission, | ) |
| Plaintiff, | ) ) ) ) Civil Action No. 3:23-cv-11808 |
| v. | ) ) |
| Traders Global Group Inc., a New Jersey corporation, d/b/a "My Forex Funds"; Traders Global Group Inc., a Canadian business organization; and Murtuza Kazmi, | ) Judge Zahid N. Quraishi ) ) ) Plaintiff CFTC's Opposition to ) Defendants' Emergency Motion to ) Modify the *Ex Parte* SRO ) |
| Defendants. | ) ) |

i

## TABLE OF CONTENTS

I) The SRO Does Not Violate Defendants' Due Process Rights ..................... 2

II) The Scope of the Asset Freeze is Appropriate. .......................................... 5

   A) Section 6c(a) of the CEA does not limit the asset freeze to amounts required to be disgorged, or amounts "traceable" to Defendants' misconduct. ................................................................................................ 5

   B) Defendants have failed to show that the asset freeze is overbroad. .. 7

   C) The SRO Evidence Establishes That Any Assets Frozen Are Unlikely To Exceed Disgorgement. ........................................................................ 10

III) Conclusion ................................................................................................ 11

# TABLE OF AUTHORITES

## Cases

*Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, (1974) ...................... 2, 3, 4

*CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, (3d Cir. 1993)................................. 3, 6

*CFTC v. Co Petro Mktg. Grp., Inc.*, 680 F.2d 573, (9th Cir. 1982).............................. 6

*CFTC v. Fin. Tree*, No. 2:20-CV-01184-TLN-AC, 2020 WL 5995176, (E.D. Cal. Oct. 9, 2020).................................................................................................................. 8

*CFTC v. Gilbraltar Monetary Corp., Inc.*, No 04-80132-CIV, 2004 WL 7334348, (S.D. Fla. Apr. 2, 2004) ...................................................................................................... 6

*CFTC v. Levy*, 541 F.3d (11th Cir. 2008) ..................................................................... 7

*CFTC v. People's Alternative, Inc.*, No. CV 10-07013-GAF (EX), 2011 WL 13217658, (C.D. Cal. July 5, 2011) ............................................................................................. 6

*CFTC v. Tmte, Inc.*, No. 3:20-CV-2910-L, 2022 WL 1321572, (N.D. Tex. May 3, 2022)......................................................................................................................... 8

*FTC v. Real Wealth, Inc.*, No. 10-0060-CV-W-FJG, 2011 WL 3206887, (W.D. Mo. July 28, 2011)........................................................................................................... 5

*Fuentes v. Shevin*, 407 U.S. 67 (1972)......................................................................... 3

*SEC v. Bryant*, No. 4:17-CV-00336, 2017 WL 3492311, (E.D. Tex. Aug. 15, 2017) .... 3

*SEC v. Forte*, 598 F. Supp. 2d (E.D. Pa. 2009) ............................................................ 9

*SEC v. Hvizdzak Cap. Mgmt., LLC*, No. CV 20-154E, 2023 WL 202206 (W.D. Pa. Jan. 17, 2023)............................................................................................................. 9

*United States v. $129,727.00 U.S. Currency*, 129 F.3d 486, (9th Cir. 1997) ............... 3

*United States v. Any & All Radio Station Transmission Equip., Radio Frequency Power Amplifiers, Radio Frequency Test Equip. & Any Other Equip. Associated With or Used in Connection with the Transmissions Within the FM Broad. Band, Located at 9613 Madison Ave., Cleveland, Ohio, 44102*, 218 F.3d 543, (6th Cir. 2000)......................................................................................................................... 3

*United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in U.S. Currency*, 461 U.S. 555, (1983) ................................................................................ 4

## Statutes

7 U.S.C. § 13a-1(a) ................................................................................................... 1, 5

Section 6c(a) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 13a-1(a), authorizes the CFTC to seek, and a district court to enter, on an *ex parte* basis, a statutory restraining order:

1. prohibiting a defendant "from destroying, altering or disposing of, or refusing to permit authorized representatives of the Commission to inspect, when and as requested, any books and records or other documents";

2. prohibiting a defendant from "withdrawing, transferring, removing, dissipating, or disposing of any funds, assets, or other property"; and

3. appointing a "temporary receiver to administer such restraining order and to perform such other duties as the court may consider appropriate." 7 U.S.C. § 13a-1(a).

The Court's Statutory Restraining Order ("SRO") in this case (Dkt. 13) does precisely these things—no more, no less.

Nonetheless, Defendants contend that the SRO exceeds what is permitted under the CEA and the U.S. Constitution because, they believe, it: (1) deprives them of their property without due process; (2) freezes assets "without any attempt to tie certain assets to alleged misconduct;" and (3) freezes assets that are not subject to disgorgement. (*See* Doc. 42-1, §§ III.A, B, D, E (hereinafter "Defs. Mem").)[1] Each of these arguments are without merit both as a legal matter and in light of the evidence adduced by the CFTC in support of its motion for SRO.

---

[1] Defendants also argued that they should be allowed to review and dispute credit card charge-back requests that customers have made since this lawsuit revealed Defendants' fraudulent business. (*See* Defs.' Memo § III.C.) The parties continue to meet and confer on this and, at this point, the issue is not ripe for decision. Defendants also request various carveouts from frozen assets to cover potential living expenses, attorneys' fees, and employee salaries. (*See id.* §§ III.F–H.) The Court suggested that this issue remains unripe because Defendants had not engaged in a good-faith meet-and-confer with the Temporary Receiver or CFTC. Accordingly, the CFTC does not address its position on those requests in this response. It reserves the right, however, to argue its position on any carve-out should such an issue become ripe for the Court's consideration.

I)  **The SRO Does Not Violate Defendants' Due Process Rights**

First, Defendants argue that the SRO should be modified to prohibit the Temporary Receiver from seizing, i.e., taking possession of, Defendants' assets. (Defs.' Mem. at 8.)  Defendants argue that this part of the SRO is unconstitutional because the Due Process clause of the Fifth Amendment prohibits the pre-hearing seizure of Defendants' property without notice.  (*Id.*)  Defendants' argument is foreclosed by well-settled Supreme Court precedent.

In *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 679–80 (1974), the Court held that pre-hearing seizure of property without notice is constitutionally permissible where: (1) the seizure serves a significant government purpose; (2) the property seized is of a sort that could be removed to another jurisdiction, destroyed, or concealed; and (3) the seizure is initiated by the government, rather than by a self-interested private party.  Applying these principles, the *Calero-Toledo* Court found that law enforcement's seizure of a yacht containing marijuana was constitutionally permissible because the seizure served the government's interest in enforcing drug laws, the yacht was a piece of movable property, and the seizure was initiated by "commonwealth officials," rather than, e.g., private creditors.  *Id.*

The principles elucidated in *Calero-Toledo* form the constitutional basis for the Justice Department's frequent use of civil and criminal forfeiture laws.  *See, e.g., United States v. Any & All Radio Station Transmission Equip., Radio Frequency Power Amplifiers, Radio Frequency Test Equip. & Any Other Equip. Associated With or Used in Connection with the Transmissions Within the FM Broad. Band, Located*

2

*at 9613 Madison Ave., Cleveland, Ohio, 44102*, 218 F.3d 543, 550 (6th Cir. 2000) (rejecting Due Process challenge to pre-hearing, pre-notice seizure of radio broadcasting equipment); *United States v. $129,727.00 U.S. Currency*, 129 F.3d 486, 493 (9th Cir. 1997) (same, for drug money). They also form the basis for civil regulatory agencies' use of *ex parte* statutory restraining orders, like the one at bar. *See SEC v. Bryant*, No. 4:17-CV-00336, 2017 WL 3492311, at *8 (E.D. Tex. Aug. 15, 2017) (rejecting Due Process challenge to *ex parte* seizure and transfer to receiver of "extremely movable assets") (citing *Calero-Toledo*, 416 U.S. at 679)).

    The SRO entered by the Court in the instant matter satisfies the requirements of *Calero-Toledo*. First, the SRO serves the significant government purpose of preventing the dissipation or diversion of assets to which Defendants' defrauded customers may be entitled. *See CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 79 (3d Cir. 1993) (affirming district court's refusal to modify asset freeze). Second, the SRO by its terms applies to those types of property which could be moved, dissipated, or concealed, and expressly excludes real property. (Dkt. 13, SRO ¶¶ 15 (defining "assets" to include, e.g., "chattels, goods, instruments, fixtures"), 31 (excluding "real estate" from scope of turnover).) Third, the SRO—and the provisions therein which would effect a seizure—was initiated by the CFTC rather than a private or self-interested party.

    Defendants rely on *Fuentes v. Shevin*, 407 U.S. 67 (1972), for the proposition that the Constitution requires notice and an opportunity to be heard before the government can deprive a person of property. (Defs.' Mem. at 8.) *Fuentes* does not

3

support this proposition. In *Fuentes*, the Court found unconstitutional certain state replevin statutes that allowed creditors to use state agents to seize a debtor's property without a post-seizure hearing, and upon the bare say-so of the creditor. 407 U.S. at 83–84. Hardly the situation here. In reaching its conclusion, the *Fuentes* Court specified that there are "extraordinary situations" that justify postponing notice and opportunity for a hearing. *Id*. at 90–91. The Court explained that those situations would involve circumstances where the seizure was necessary to secure an important governmental or public interest, there was need for "prompt action," and the person initiating the seizure was a "government official" acting pursuant to a statute. *Id*. It was this analysis that formed that basis for the Court's holding two years later in *Calder-Toledo,* 416 U.S. at 697-80 (quoting *Fuentes*, 407 at 91). Yet, Defendants completely ignore *Calder-Toledo*.

Defendants' constitutional objection to the SRO fails for another reason: Defendants had an opportunity to be heard, and chose to postpone the hearing. The hearing on the CFTC's motion for preliminary injunction—which seeks to continue the relief in the SRO, including the asset freeze—was originally set for September 11, 2023. (Dkt. 13.) Defendants have twice sought (and received) postponements of that hearing, which is currently scheduled for October 11, 2023. (Dkts. 25, 36.) Defendants cannot postpone a hearing on the complained-of seizure and then argue the seizure is unconstitutional for want of a hearing. *Cf. United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in U.S. Currency*, 461 U.S. 555, 562 (1983) (applying *Calero-Toledo* factors to seizure of currency; finding that 18-

4

month delay to institute forfeiture proceedings did not offend Due Process where claimant "never indicated that she desired early commencement of a civil forfeiture proceeding"); *see also FTC v. Real Wealth, Inc.*, No. 10-0060-CV-W-FJG, 2011 WL 3206887, at *2 (W.D. Mo. July 28, 2011) (rejecting Due Process challenge to *ex parte* asset freeze were "Defendants had full notice and multiple opportunities to be heard"). The Court should therefore deny Defendants' motion to modify that asset freeze, and affirm the Temporary Receiver's mandate to take possession of Defendants' assets.

## II) The Scope of the Asset Freeze is Appropriate.

Next, Defendants complain that the SRO is overly broad with respect to the assets it covers. Defendants insist that the Court may only freeze assets up to the amount the CFTC seeks in disgorgement. (Defs.' Mem. at 11–12.) They also argue that the Court may only freeze particular assets if the CFTC first presents evidence to "tie" those specific "assets to alleged misconduct." (*Id*. at 11.) These arguments fail.

### A) Section 6c(a) of the CEA does not limit the asset freeze to amounts required to be disgorged, or amounts "traceable" to Defendants' misconduct.

Contrary to Defendants' assertion, nothing limits the scope of the SRO to the amount of assets that could be disgorged, or to assets "traceable" to Defendants' fraud. Section 6c(a) of the Act explicitly provides that a court may freeze a defendant's assets to prevent the defendant from "withdrawing, transferring, removing, dissipating, or disposing of *any* funds, assets, or other property." 7 U.S.C. §13-1(a) (emphasis supplied). The statute places no limitation on the amounts or

5

provenance of funds, assets, or property that a court may freeze. Nor does it limit the freeze to assets based on the character of the relief (i.e., restitution or disgorgement) which a court may ultimately order. *See CFTC v. Gilbraltar Monetary Corp., Inc.*, No 04-80132-CIV, 2004 WL 7334348, at *5 (S.D. Fla. Apr. 2, 2004) (holding that "[f]unds must be preserved where, as here, the Commission seeks disgorgement and restitution" and finding that the "freeze also maintains the court's jurisdiction over the assets when disgorgement or restitution is ordered."). This makes good sense because, as discussed above, an asset freeze "is designed to preserve the status quo by preventing the dissipation and diversion of assets." *Am. Metals Exchange Corp.*, 991 F.2d at 78–79 (citing *CFTC v. Co Petro Mktg. Grp., Inc.*, 680 F.2d 573, 582–83 (9th Cir. 1982)); *see also, e.g., CFTC v. People's Alternative, Inc.*, No. CV 10-07013-GAF (EX), 2011 WL 13217658, at *7 (C.D. Cal. July 5, 2011) (continuing an asset freeze entered at the outset of a case because it was "necessary to ensure the preservation of funds for possible compensation to members of the public." (internal citations omitted).)

      Defendants' cases do not support the propositions for which they are cited. To the contrary, the support the CFTC's position. For example, Defendants cite *CFTC v. American Metals Exchange*. (*See* Defs.' Memo at 11.) In that case, the defendants made the same arguments Defendants make here: that the district court should have only frozen assets to the extent they were "reasonably related to the likely size of the final judgment." 991 F.2d at 79. The Third Circuit rejected this argument, holding that:

6

> [U]ntil the district court has had an opportunity to determine whether [Defendants'] ill-gotten gains can be quantified, it is premature to consider the propriety of the extent of the asset freeze. Because a freeze is designed to preserve the status quo by preventing the dissipation and diversion of assets, we will allow the freeze to remain in effect until the district court determines whether it can make an informed determination of the amount of unlawful proceeds retained by [Defendant], and, if it can, what that amount may approximate. The district court can then decide to maintain, remove or modify the freeze.

*Id.* (internal citations omitted).

*CFTC v. Levy*, 541 F.3d 1102 (11th Cir. 2008), also cited by Defendants, (Defs. Mem. at 11-12), refutes Defendants' claim that the CFTC must affirmatively "trace" a specific asset to Defendants' alleged wrongdoing before a court may freeze it. In *Levy*, the defendant argued that the district court should only have frozen those assets that evidence at trial showed were tied to defendant's ill-gotten gains. The Eleventh Circuit rejected that argument, holding:

> [Defendant] argues that the district court erred in freezing *all* of his assets because only his Wachovia account, No. 9985017012, contains the commissions he earned for the investments he solicited from the five testifying customers. However, until the district court has had an opportunity to quantify Levy's ill-gotten gains, it would be premature for us to rule on the scope of the asset freeze.

*Id.* at 1114 (emphasis in original).

### B) Defendants have failed to show that the asset freeze is overbroad.

While Section 6c(a) does not limit the asset freeze in the way Defendants argue, the law is clear that Defendants may at any point seek to modify the freeze with proof that some of Defendants' assets or income are attributable to sources other than their unlawful conduct, i.e., the "MyForexFunds" scheme. *See, e.g., CFTC v. Fin. Tree*, No. 2:20-CV-01184-TLN-AC, 2020 WL 5995176, at *2 (E.D. Cal.

7

Oct. 9, 2020) (agreeing to release modest funds for expenses that were "narrowly-tailored to permit [Defendant] to use only legitimate income, while safeguarding CFTC's right to object to any expenditure as unreasonable and to request any and all appropriate relief from the Court."); *CFTC v. Tmte, Inc.*, No. 3:20-CV-2910-L, 2022 WL 1321572, at *2 (N.D. Tex. May 3, 2022) (denying, without prejudice, a defendant's request to release "existing or future untainted assets" to pay attorneys' fees but finding Defendants could renew their request if they could show "what assets, if any, are 'untainted.'"). Defendants have not done this.

Instead, according to Defendants, "[t]he notion that every asset Mr. Kazmi owns derives exclusively from MFF is implausible on its face." (Mot. at 15.) In support of this, however, Defendant Kazmi only submits an affidavit claiming that he sold some real estate for $538,000 CAD before he began running MyForexFunds in 2021. (Dkt. 42-5, ¶ 5.) There are multiple problems with this affidavit. First, Defendant Kazmi provides no details about these properties he allegedly sold, including where he sold them or exactly when he sold them prior to 2021. Most problematic, however, Defendant Kazmi provides no bank records or other information to suggest that he continues to hold any money he may have earned from these properties. Given that it is now 2023, and in light of Defendant Kazmi's spending habits (*see* Doc. 33, CFTC's Mot for SRO and PI, at 28-29), it is almost certain that he spent any such money long ago.

Other than the affidavit, Defendants adduce no evidence of assets or income unrelated to the "MyForexFunds" scheme. On this basis alone, Defendants' request

8

to modify the SRO must fail. *SEC v. Hvizdzak Cap. Mgmt., LLC*, No. CV 20-154E, 2023 WL 202206 (W.D. Pa. Jan. 17, 2023) (holding that it would not release assets for expenses unless Defendant could show the assets "are not the investors' funds or are otherwise not traceable to the alleged fraud, despite carrying the burden of doing so." (internal citations omitted)); *SEC v. Forte*, 598 F. Supp. 2d 689 (E.D. Pa. 2009) (denying requests for expense carve outs because, among other things, defendant presented "no evidence that any of his frozen assets are derived from sources other than investor funds").

Moreover, and contrary to Defendants' assertion, it is "plausible" that any asset Defendant Kazmi owns today derived from his role as CEO and sole shareholder of the corporate Defendants and, more specifically, from the fees that Defendants fraudulently took from customers. The CFTC's SRO motion appends evidence showing that a large portion of the $310 million in customer fees were paid directly into the personal accounts of Defendant Kazmi. (*See* Doc. 33, CFTC's Mot for SRO and PI; Doc. 33-4, Aff. of M. Edelstein). For example, between November 1, 2021 through December 13, 2022, WooCommerce—the vendor that processed customer fees for MyForexFunds—deposited over $107 million into a personal account in Defendant Kazmi's name. (Aff. of M. Edelstein ¶ 22.) The evidence also shows substantial transfers from Traders Global's corporate accounts to Defendant Kazmi. (*Id.* ¶ 29.) For example, between December 2022 and April 2023, $31.55 million was transferred from one of Traders Global's corporate accounts in Canada to another account in Defendant Kazmi's name. *Id.* ¶ 29. Defendants' motion does

9

not even acknowledge this evidence showing the source of Defendant Kazmi's assets.

### C) The SRO Evidence Establishes That Any Assets Frozen Are Unlikely To Exceed Disgorgement.

Defendants also suggests that the asset freeze here is too broad because the total value of assets will exceed any potential equitable remedies in this case. There is no reason to believe this is true.

The CFTC's SRO Motion and supporting documents detail that the Defendants fraudulently took more than $310 million in fees from customers during the relevant period. (*See* Doc. 33-44, Ex. E to Motion for SRO and PI ¶¶ 11, 47.) Out of that amount, Defendants then paid some customers a total of $159 million. *Id.* ¶ 48. Accordingly, even a conservative estimate of Defendants' ill-gotten gains would be at least $151 million (the difference between $310 million and $159 million).

Defendants have failed to adduce any evidence—or even assert—that their total assets exceed that number. Because Defendants know what assets they have, the SRO requires a full accounting of Defendants' assets as well as access to books and records. Despite the CFTC and Temporary Receiver repeatedly requesting this information, Defendants have not provided it. (*See* Dkt. 48, Mot. for Contempt at 8–12.) Instead, they have provided, in drips and drabs, an incomplete list of some of their accounts with no indication whether there are more. (*Id.*)

Defendants suggest that the SRO is overly broad for the additional reason that it purports to freeze future assets. (Defs.' Memo at 12.) But Defendants'

10

concern with this assumes that any assets Defendants may receive in the future are necessarily unrelated to their fraud. It is not reasonable to assume that. To the contrary, bank records show that Defendants have transferred large sums of money to third parties, including potentially relatives. (*See, e.g.,* Aff. of M. Edelstein ¶ 22 ($120,000 payment to "Wajiha Kazmi";¶ 24 ($353,685 payment to "Rizwan Kazmi")). Further, there remains the real risk that Defendants have other assets not currently known to the CFTC that Defendants could try to draw from and claim are "newly acquired." To the extent Defendants acquires assets or income in the future which is innocently obtained, Defendants can request modification of the stay.

**III)    Conclusion**

For the foregoing reasons, the SRO the Court entered here is constitutionally permissible and proper under the CEA and the law. It is also appropriately tailored in light of the evidence the CFTC has submitted in this case. The Court should deny Defendants' motion to modify the SRO on any of these bases. Further, the Court should also deny Defendants' Motion to the extent it seeks a theoretical carve out for living expenses, legal fees, or anything else. Such a request is not ripe for the Court's consideration.

| | |
|---|---|
| September 22, 2023 | s/ Ashley J. Burden |
| | Commodity Futures Trading Commission |
| | Plaintiff |
| | 77 West Jackson Blvd., Suite 800 |
| | Chicago, IL 60604 |

Ashley J. Burden
Senior Trial Attorney
Division of Enforcement
Office: (312) 596-0693
Cell: (312) 995-0779
aburden@cftc.gov

Katherine S. Paulson
Trial Attorney
Division of Enforcement
Office: (312) 554-4559
kpaulson@cft.gov

Elizabeth M. Streit
Chief Trial Attorney
Division of Enforcement
Office: (312) 596-0537
estreit@cftc.gov

12