**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Commodity Futures Trading Commission,<br><br>*Plaintiff*,<br><br>v.<br><br>Traders Global Group Inc., a New Jersey corporation, d/b/a "My Forex Funds"; Traders Global Group Inc., a Canadian business organization; and Murtuza Kazmi,<br><br>*Defendants*. | Case No.: 3:23-cv-11808<br><br><br>**<u>Oral Argument Requested</u>** |

---

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF EMERGENCY MOTION TO MODIFY *EX PARTE* STATUTORY RESTRAINING ORDER, APPOINTMENT OF TEMPORARY RECEIVER, AND OTHER EQUITABLE RELIEF**

---

Anthony J. Staltari (Attorney ID. No. 233022017)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel.: (415) 875-6600
anthonystaltari@quinnemanuel.com

Dakota Speas (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Tel.: (213) 443-3000
dakotaspeas@quinnemanuel.com

Michael Shaheen, III (*pro hac vice*)
Robert A. Zink (*pro hac vice* )
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Tel.: (202) 538-8000
michaelshaheen@quinnemanuel.com
robertzink@quinnemanuel.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................................1

II.    ARGUMENT .............................................................................................................3

    A.    No U.S. Court Has Ever Held That an Entire Business May Be Shut Down, and All of its Assets Seized, along with the Personal Assets of its Principal, for Alleged Regulatory Infractions ...........................................................3

    B.    The SRO Is Grossly Overbroad and Covers Assets That Are Not Derived from Alleged Wrongdoing ......................................................................................7

    C.    The Temporary Receiver Should Be Terminated ..................................................10

        1.    The Temporary Receiver Has Failed to Preserve Defendants' Assets .........................................................................................................11

        2.    The Temporary Receiver Has Colluded with the CFTC to Advance His Own Pecuniary Interest ....................................................................13

III.    CONCLUSION ........................................................................................................15

## <u>TABLE OF AUTHORITIES</u>

**Page**

### <u>Cases</u>

*Adelman v. CGS Sci. Corp.*,
    332 F. Supp. 137 (E.D. Pa. 1971) ...............................................................................10, 13, 14

*Calero-Toledo v. Pearson Yacht Leasing Co.*,
    416 U.S. 663 (1974)................................................................................................................3, 4, 5

*CFTC v. Aliaga*,
    No. 10-21074-CIV, 2011 WL 766271 (S.D. Fla. Feb. 25, 2011) ........................................7, 10

*CFTC v. Am. Metals Exch. Corp.*,
    991 F.2d 71 (3d Cir. 1993).......................................................................................................7, 8

*CFTC v. Fin. Tree*,
    No. 2:20-CV-01184-TLN-AC, 2020 WL 5995176 (E.D. Cal. Oct. 9, 2020)...........................9

*CFTC v. Gilbraltar Monetary Corp., Inc.*,
    No 04-80132-CIV, 2004 WL 7334348 (S.D. Fla. Apr. 2, 2004)..............................................8

*CFTC v. Levy*,
    541 F.3d 1102 (11th Cir. 2008) ................................................................................................8

*CFTC v. Next Fin. Servs. Unlimited, Inc.*,
    No. 04-80562-CIV, 2005 WL 6292467 (S.D. Fla. June 7, 2005)..............................................7

*CFTC v. People's Alternative, Inc.*,
    No. CV 10-07013 GAF (EX), 2011 WL 13217658 (C.D. Cal. July 5, 2011) ..........................8

*CFTC v. Tmte, Inc.*,
    No. 3:20-CV-2910-L, 2022 WL 1321572 (N.D. Tex. May 3, 2022) ........................................9

*F.T.C. v. On Point Glob. LLC*,
    No. 19-25046-CIV, 2020 WL 5819809 (S.D. Fla. Sept. 30, 2020)..................................10, 14

*FTC v. Real Wealth, Inc.*,
    10-CV-0060, 2011 WL 3206887 (W.D. Mo. July 28, 2011)....................................................6

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No.*
    *70 of Alameda Cnty.*,
    415 U.S. 423 (1974).................................................................................................................7

*Hill on Behalf of Republic First Bancorp Inc. v. Cohen*,
    40 F.4th 101 (3d Cir. 2022) .....................................................................................................10

*Javitch v. First Union Sec., Inc.*,
  315 F.3d 619 (6th Cir. 2003) ................................................................10

*SEC v. Bryant*,
  17-CV-0336, 2017 WL 3492311 (E.D. Tex. Aug. 15, 2017) ....................................7

*SEC v. Capital Cove Bankcorp, LLC*,
  2016 WL 6078324 (C.D. Cal. June 29, 2016) ........................................10

*SEC v. Forte*,
  598 F. Supp. 2d 689 (E.D. Pa. 2009) ........................................................9

*SEC v. Hvizdzak Cap. Mgmt., LLC*,
  No. CV 20-154E, 2023 WL 202206 (W.D. Pa. Jan. 17, 2023) ................................9

*United States v. $129,727.00 U.S. Currency*,
  129 F.3d 486 (9th Cir. 1997) ....................................................................5

*United States v. Any & All Radio Station Transmission Equip., Radio Frequency
  Power Amplifiers, Radio Frequency Test Equip. & Any Other Equip.
  Associated With or Used in Connection with the Transmissions Within the FM
  Broad. Band, Located at 9613 Madison Ave., Cleveland, Ohio, 44102*,
  218 F.3d 543 (6th Cir. 2000) ....................................................................5

*United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in U.S.
  Currency*,
  461 U.S. 555 (1983) ................................................................................6

## Statutes

7 U.S.C. § 13a-1 ........................................................................................8

I.       **INTRODUCTION**

In the world according to the Commodities Futures Trading Commission ("CFTC"), if you are suspected of regulatory missteps, you are guilty until proven innocent.  Under this perversion of our judicial system, the CFTC can obtain a court order *in secret* to shut down your *entire* business and have someone seize not only your business's assets, but also your *personal* assets, before you ever know a complaint has been filed against you.  That is what happened here, and the CFTC would have this Court believe that all of this is completely constitutional.  It is not.

In its brief, the CFTC does not cite a *single* case or statute authorizing an *ex parte* asset freeze and seizure order of such totalitarian breadth against a civil defendant accused of regulatory infractions under the Commodities and Exchange Act ("CEA").  The CFTC could find no such authority because no such authority exists.

The effects of the CFTC's overreach in this case are particularly troubling.  The statutory restraining order ("SRO") here has already shuttered Mr. Kazmi's business, left him without resources to defend himself, and jeopardized his family's wellbeing.[1]  The CFTC does not see any problem with this—whether legal or humanitarian—and argues that Defendants have waived their challenges to the SRO because they sought a reasonable extension of the hearing on the CFTC's motion for a preliminary injunction, which the CFTC initially wanted to occur just twelve days after Defendants were served with the complaint.  Every action the CFTC has taken

---

[1]   Neither the CFTC nor the Temporary Receiver have provided definitive positions on Defendants' proposal for reasonable exemptions to the SRO for living and legal expenses.  Speas Decl. ¶ 5, Ex. 1.  However, the Temporary Receiver has suggested he is not inclined to grant meaningful exemptions (*e.g.*, the mortgage for Mr. Kazmi's home) until he seizes more money.  *Id.*, Ex. 2.  In the interim, Mr. Kazmi has had to rely on the generosity of friends.  Kazmi Decl. ¶ 7.

1

in this case has displayed the CFTC's desire to stack the deck heavily in its favor, without regard to basic principles of due process.  The Court now has an opportunity to balance the playing field.

The Court also has an opportunity to eliminate a Temporary Receiver who has consistently colluded with the CFTC and has neglected his fundamental duty to preserve the value of Defendants' assets.  Since this case began, no one has caused greater dissipation of Defendants' assets than the Temporary Receiver himself.  Most egregiously, the Temporary Receiver has failed to address thousands of credit card chargeback requests pending against Defendants' accounts, and as a result, up to millions of dollars are being lost on a daily basis.  Speas Decl. ¶ 8.  Defendants' credit card processing provider, Stripe, Inc., has confirmed that no one is in a better position to address these chargebacks than Defendants' personnel who are familiar with the system and the business, yet the Temporary Receiver has refused to step aside, stubbornly insisting that he should control the chargeback review process and have the right to abort it "at any time" in his "sole discretion . . . given the limited funds currently on hand."  Speas Decl. ¶ 13 , Ex. 8.  The Temporary Receiver is not interested in preserving Defendants' assets; rather, he is singularly focused on seizing as much money as possible, only subsequently to draw from those assets in order to maximize compensation for himself and his affiliates.  *See* Speas Decl. ¶¶ 5, 17, Exs., 2, 8.

For proof of his misguided approach, the Court need look no further than the Temporary Receiver's decision to join the CFTC's recent contempt motion (ECF 48) (arguing that he should be permitted to seize millions more of Defendants' funds).  The Temporary Receiver is supposed to be a neutral party focused solely on preserving assets, yet he wastes the estate's resources

taking sides in legal disputes between Defendants and the CFTC.  The Temporary Receiver is in this for the money—not to preserve the *status quo*—and he should be terminated immediately.

II.  **ARGUMENT**

The SRO should be modified because (1) it authorizes the seizure of virtually *all* of Defendants' assets without due process, (2) it is overbroad and covers assets that are not derived from alleged wrongdoing, and (3) it installed a Temporary Receiver who has failed his basic duties.

A.  **No U.S. Court Has Ever Held That an Entire Business May Be Shut Down, and All of its Assets Seized, along with the Personal Assets of its Principal, for Alleged Regulatory Infractions**

The CFTC has offered no authority to justify the type of asset seizure it seeks in this case because no such authority exists.  Instead, the CFTC has provided the Court with a series of inapposite cases that do not answer the key question the Court is tasked to resolve:  whether the SRO here, which authorizes the freeze or seizure *of all assets* belonging to Defendants— including the *personal assets* of Mr. Kazmi—and which was granted *in secret* and *without notice or a prior hearing* on the basis of alleged *civil regulatory infractions*—violates the Due Process Clause under the Fifth Amendment.  Our fundamental constitutional values dictate that the answer is no.

The CFTC's argument rises and falls on *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663 (1974)—a case concerning law enforcement's seizure of a *boat full of marijuana*. *See* ECF. No. 72 at 5-7.  This case is inapposite on its face:  seizing material which is clearly contraband (in *Calero-Toledo*, illegal drugs) is a far cry from shutting down an entire business and seizing all of its money because it allegedly failed to comply with CFTC registration

3

requirements.  Indeed, in *Calero-Toledo*, the police's seizure was far more limited; the police

only seized the boat holding the contraband—not the entirety of the defendants' assets around

the world, as the CFTC is attempting to do here.

      In *Calero-Toledo*, The Supreme Court held that a seizure is constitutional if it "is directly

necessary to secure an important governmental or general public interest," and "there has been a

special need for very prompt action," (*id*. at 678), such as to (1) protect the public from

contaminated food and misbranded drugs, (2) to aid war efforts, or (3) to collect taxes.  *See id.* at

678-79 (collecting cases).  Of course, none of these examples warranting "very prompt action"

apply here.  Nor is there a valid concern that the assets will be "removed to another jurisdiction,

destroyed, or concealed."  *Id.* at 679.  All of Defendants' assets have been frozen pursuant to the

existing SRO, and the CFTC has advanced ***no evidence that Defendants have dissipated any of***

***these assets since the SRO was served.***  Indeed, existing asset freeze orders have rendered the

transfer of assets virtually impossible.[2]  Simply put, Defendants' financial institutions have

already locked their accounts.  Kazmi Decl. ¶ 2.  Even overseas accounts, like Confirmo—which

Defendants voluntarily disclosed—remain inaccessible to Defendants.  *Id.*  Because the SRO has

locked up all of Defendants' assets, there is no concern that the assets at issue will be moved,

concealed, or destroyed, and the CFTC's cited cases justifying *ex parte* seizures in light of that

concern are inapposite.  None of the CFTC's cited cases involved shutting down an entire

---

[2]   The Ontario Securities Commission ("OSC") issued Freeze Directions over Defendants'
Canadian assets, including (1) financial assets held by Bank of Montreal, Edward Jones, and
Canadian Imperial Bank of Commerce, (2) Defendant Kazmi's personal residence located in
Ontario, Canada, (3) Defendant Kazmi's three apartment residences located in Mississauga,
Ontario, (4) Defendant Kazmi's automobiles, and (5) a Bitbuy cryptocurrency account.  Speas
Decl. ¶ 3.  Defendant Kazmi and his wife purchased personal property in Mississauga, Ontario in
December 2017 – years before MFF was started.  Kazmi Decl. ¶ 6, Ex. 5.

business or seizing all of its assets, either.  Rather, each involved a narrow seizure of a specific type of property that was clearly being used for an illegal purpose.  *Calero-Toledo.*, 416 U.S. 663 (drug boat); *United States v. Any & All Radio Station Transmission Equip., Radio Frequency Power Amplifiers, Radio Frequency Test Equip. & Any Other Equip. Associated With or Used in Connection with the Transmissions Within the FM Broad. Band, Located at 9613 Madison Ave., Cleveland, Ohio, 44102*, 218 F.3d 543 (6th Cir. 2000) (radio equipment used for unlicensed broadcasting); *United States v. $129,727.00 U.S. Currency*, 129 F.3d 486 (9th Cir. 1997) (drug money).

The CFTC has also recklessly mischaracterized transfers to and from Defendants' bank accounts before the SRO was entered.  ECF 72 at 9.  Most egregiously, the CFTC asserts, relying on a declaration from its own investigator, Matthew Edelstein, that $31,550,000 CAD was transferred to an "unidentified Kazmi account" sometime between December 2022 and April 2023.  ECF 72 at 9; ECF 23-44 (Ex. E) ¶ 29.  As the CFTC should have known, *this is demonstrably false*.  Defendants' bank records clearly show that two pre-authorized payments of $4,500,000 CAD and $27,000,000 CAD during that period were made with reference to "TXINS" and "TXBAL," respectively—common bank codes used to designate **tax payments to the Canadian government.**  Speas Decl. ¶ 23, Ex. 11.  A simple Google search would have revealed this.  To repeat:  **the CFTC misrepresented that Traders Global transferred $31.55 million CAD to Mr. Kazmi, when in reality Traders Global transferred that money to the Canadian tax authorities**.  Kazmi Decl. ¶ 8; Ex. 6.  This is just one example (albeit, a critical one) of a factual misrepresentation that the CFTC submitted to the Court when requesting its all-encompassing SRO on an *ex parte* basis.  This is exactly why our constitutional system of jurisprudence abhors the seizure of private property without adversarial testing at a prior

hearing—the Government alone cannot be expected to present an accurate narrative of relevant facts on an *ex parte* basis.  The CFTC's glaring misrepresentation about Defendants' $31.55 million payment to the Canadian tax authorities undermines its entire investigation and warrants immediate dissolution, or at least substantial modification, of the SRO.

The CFTC also argues that by seeking a reasonable extension of the hearing on the CFTC's motion for a preliminary injunction, Defendants have waived their challenges to the SRO.  Again, the CFTC fails to offer any viable legal support for its position.  In total, the scheduled hearing on the CFTC's motion for preliminary injunction has been postponed by thirty days (*i.e.*, from an original date of September 11, 2023, to the currently scheduled date of October 11, 2023).  Thirty days is a far cry from the government's 18-month delay to institute a forfeiture action over currency in *United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in U.S. Currency*, 461 U.S. 555, 562 (1983).  The CFTC's reliance on *FTC v. Real Wealth, Inc.*, 10-CV-0060, 2011 WL 3206887, at *2 (W.D. Mo. July 28, 2011), also misses the mark.  In *Real Wealth, Inc.*, the defendants had waived an affirmative defense after failing to raise it, despite having "full notice and multiple opportunities to be heard," including in responsive pleadings.  2011 WL 3206887, at *2.  Here, Defendants' first real opportunity to be heard, with the benefit of sufficient time to prepare, has not even occurred.  Defendants could not have been realistically expected to appear for a preliminary injunction hearing with a mere twelve days' notice after the CFTC had been preparing its case for over eighteen months.  Even 30 days to prepare pales in comparison to the time the CFTC has had to build its case.  Again, the CFTC's attempt to argue that a modest extension of the preliminary injunction hearing waives challenge to the SRO betrays its desire to disadvantage Defendants unfairly at every turn.

In sum, whatever concerns the CFTC may have had about Defendants dissipating assets in response to this lawsuit have now proven to be entirely without merit.[3]  And the CFTC knows this because Defendants provided the CFTC and the Temporary Receiver access to their financial accounts so that they could monitor them.  Speas Decl. ¶ 6, Exs., 3, 4.  At this stage, a limited freeze order (as opposed to the universal seizure order currently in effect) is more than enough to preserve the *status quo*, and the SRO should be modified accordingly.  *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cty.*, 415 U.S. 423, 439 (1974) (*ex parte* restraining order should be "restricted to serving [its] underlying purpose of preserving the status quo" and go no further than necessary).

B.    **The SRO Is Grossly Overbroad and Covers Assets That Are Not Derived from Alleged Wrongdoing**

The CFTC does not dispute that a pre-judgment asset freeze is only warranted "when the freeze bears *a sufficient nexus* to both the merits of the action and *the particular property sought*."  *CFTC v. Next Fin. Servs. Unlimited, Inc.*, No. 04-80562-CIV, 2005 WL 6292467, at *12 (S.D. Fla. June 7, 2005) (collecting cases) (emphases added); *see CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 78–79 (3d Cir. 1993) ("[A] court may exercise its equitable power only over the property causally related to the wrongdoing.") (cleaned up); *CFTC v. Aliaga*, No. 10-21074-CIV, 2011 WL 766271, at *2 (S.D. Fla. Feb. 25, 2011) ("The propriety of the Statutory Restraining Order hinges on whether the CFTC has made sufficient allegations in its Complaint to establish a nexus between the assets held by CMA Global and the Defendants' alleged

---

[3]  In *SEC v. Bryant*, 17-CV-0336, 2017 WL 3492311, at *8 (E.D. Tex. Aug. 15, 2017) (cited by the CFTC), the receiver moved to expand the receivership only after the defendants dissipated assets in excess of $7 million.  *Bryant*, 2017 WL 3492311, at * 2.  Unlike in *Bryant*, there is not a shred of evidence here suggesting Defendants have dissipated assets in violation of the SRO.

misconduct."). That basic principle notwithstanding, the CFTC stubbornly argues that *all* of Defendants' assets, including personal assets of Mr. Kazmi that have nothing to do with MFF or the conduct alleged by the CFTC, should be restrained. This facially exceeds the scope of injunctive relief authorized under Section 6c(a) of the Commodities and Exchange Act (7 U.S.C. § 13a-1).

The CFTC does not dispute that the SRO cannot extend to assets which could be used to pay civil monetary penalties. However, the CFTC argues that the SRO can extend beyond assets that could be used to remediate allegedly ill-gotten gains (*i.e.*, disgorgement) and also include assets that could be drawn upon to penalize Defendants. The authorities it cites do not support this proposition. *CFTC v. Gilbraltar Monetary Corp., Inc.*, No 04-80132-CIV, 2004 WL 7334348, at *5 (S.D. Fla. Apr. 2, 2004) did not even address the scope of the freeze order at issue. As noted in *CFTC v. People's Alternative, Inc.*, No. CV 10-07013 GAF (EX), 2011 WL 13217658, at *7 (C.D. Cal. July 5, 2011) (cited by Plaintiff), an order entering a default judgment, "the court may, in its sound discretion, appoint a receiver and order ancillary relief in the form of an accounting, disgorgement of profits, ***freezing assets***, and maintenance of the status quo," but it did not hold that a freeze order may extend beyond allegedly disgorgable assets. *See also CFTC v. Levy*, 541 F.3d 1102, 1114 (11th Cir. 2008) ("[A] district court may freeze a defendant's assets to ensure the adequacy of a disgorgement remedy."). Restitution, *i.e.*, an award of damages in the amount of losses to alleged claimants, would qualify as a penalty assessment that cannot justifying expanding a freeze order. *See CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 78 (3d Cir. 1993). On the other hand, disgorgement simply prevents a defendant from profiting from alleged wrongs. *Id.* A freeze order narrowly tailored to allegedly

disgorgable assets is only appropriate, of course, where there is a proper showing that it is necessary to prevent dissipation—a concern totally absent here.

The CFTC acknowledges the overbreadth of the SRO inasmuch it extends to *every* asset owned by Defendants around the world, regardless of provenance, even though it is clear that exemptions should be made for assets derived from sources unrelated to alleged wrongdoing. *CFTC v. Fin. Tree*, No. 2:20-CV-01184-TLN-AC, 2020 WL 5995176, at *2 (E.D. Cal. Oct. 9, 2020) (cited by Plaintiff); *CFTC v. Tmte, Inc.*, No. 3:20-CV-2910-L, 2022 WL 1321572, at *5 (N.D. Tex. May 3, 2022) ("[T]he CFTC is not permitted to freeze assets unrelated to its investigation.") (cited by Plaintiff). The gross overreach of the SRO's asset freeze and seizure is evidenced by its inclusion of funds jointly received by Mr. Kazmi and his wife for the sale of personal property completely unrelated to MFF. Kazmi Decl. ¶ 4. For example, Mr. Kazmi sold personal real estate in Brampton, Ontario on December 15, 2020 and another personal property in East Gwillimbury, Ontario on July 5, 2021, yielding approximately $538,000 CAD. *Id.* ¶ 5, Exs. 1, 2. The $538,000 CAD Mr. Kazmi acquired through these transactions had nothing to do with MFF. *Id.* After these sales, the proceeds were put toward subsequent real property purchases for the personal use of Mr. Kazmi and his family. *Id.,* Exs. 3, 4. The CFTC does not, and cannot establish that the proceeds from sales of Mr. Kazmi's personal houses, which have nothing to do with the alleged misconduct, should remain frozen. The CFTC's cited cases, where no such evidence of unaffected assets was provided, are inapposite. *SEC v. Hvizdzak Cap. Mgmt., LLC*, No. CV 20-154E, 2023 WL 202206, at *2 (W.D. Pa. Jan. 17, 2023); *SEC v. Forte*, 598 F. Supp. 2d 689, 693 (E.D. Pa. 2009).

A series of conclusory allegations, back of the envelope calculations, and citations to approximately $473,000 in transfers to family members do not create any nexus to the alleged

conduct.  *See e.g.*, ECF. No. 72 at 10-11.  Because the CFTC lacks any such nexus it attempts to shift its burden of proof on to Defendants.  *Id.*  As noted at the outset, the CFTC advocates for a world where one is guilty until proven innocent; however, the CFTC cannot escape the reality that our judicial system requires the CFTC to establish this nexus in the first instance rather than Defendants having to prove the opposite.  *Aliaga*, 2011 WL 766271, at *2.

The Court should modify the SRO to correct the CFTC's overreach and unfreeze all assets unrelated to the alleged misconduct.  At minimum, the SRO should be modified to unfreeze $538,000 CAD that Mr. Kazmi obtained from the sales of personal houses which have nothing to do with MFF.

 C. <u>**The Temporary Receiver Should Be Terminated**</u>

It is axiomatic that a temporary receiver must preserve the value of the receivership estate.  *Hill on Behalf of Republic First Bancorp Inc. v. Cohen,* 40 F.4th 101, 110 (3d Cir. 2022); *SEC v. Capital Cove Bankcorp, LLC*, 2016 WL 6078324 at * 5 (C.D. Cal. June 29, 2016) (the goal of the receiver is to preserve the receivership estate "as best they can"); *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 626 (6th Cir. 2003) (a receiver takes charge of assets for the purpose of conserving them).  The freezing of assets under control of a receiver should not be granted where it would result in a risk of substantial harm to the defendant; nor should it be granted where it would greatly interfere with the operation of a defendant's business.  *Adelman v. CGS Sci. Corp.*, 332 F. Supp. 137, 147 (E.D. Pa. 1971).  Ultimately, a receiver's duty is to act neutrally on behalf of the Court—not on behalf of any party, including the Government.  *F.T.C. v. On Point Glob. LLC*, No. 19-25046-CIV, 2020 WL 5819809, at *2 (S.D. Fla. Sept. 30, 2020).

Here, the freeze orders currently in effect, while overbroad, have preserved the *status quo*.  The Temporary Receiver, on the other hand, has undermined this fundamental purpose by

10

continuously dissipating assets of the estate, both by racking up unnecessary fees and by failing to take timely and necessary action to prevent ongoing losses to the estate, including chargeback losses.  Despite hours of telephone calls and pages of emails exchanged to discuss the ongoing chargeback crisis, the parties have not agreed upon a workable solution.  Speas Decl. ¶¶ 7–19, Exs. 5, 6, 7, 8, 9, 10.  The Temporary Receiver's consistent, overriding focus on collecting cash, while colluding with the CFTC to ensure the overbroad SRO remains in place, has evinced a lack of neutrality that renders him unfit to continue in this role.

> 1.   The Temporary Receiver Has Failed to Preserve Defendants' Assets

It has been nearly four weeks since the Temporary Receiver was appointed, yet he has taken no action to address thousands of chargeback requests against Defendants' accounts that have been initiated in response to the CFTC's complaint.  Speas Decl. ¶ 7.  The Temporary Receiver tries to explain away his dereliction by blaming Defendants for not providing access to Stripe, the credit card processing company, yet the Temporary Receiver fails to inform the Court that Defendants have been frozen out of the Stripe account since the SRO went into effect. Kazmi Decl. ¶ 3; Speas Decl. ¶ 9.  The Temporary Receiver has known that for weeks, and he also knows that the impending chargeback requests could cause the receivership estate to lose millions of dollars if they go unaddressed.  Speas Decl. ¶¶ 8, 9.  Representatives from WooCommerce and Stripe informed the Temporary Receiver accordingly weeks ago.  *Id.* ¶ 8. Contrary to the Temporary Receiver's suggestion, Stripe is not the entity which provides the interface to dispute chargebacks, WooCommerce is.  *Id.* ¶ 10.  WooCommerce has been offering to assist the Temporary Receiver with addressing chargebacks for weeks, yet the Temporary Receiver still has not handled the problem, as millions of dollars float away.  *Id.* ¶ 11.  Not until counsel for Defendants sent the Temporary Receiver a letter on September 15, 2023 demanding

immediate action in response to the chargebacks did the Temporary Receiver obtain access to the chargeback portal, even though access was offered much earlier.  *Id.* ¶ 12, Exs. 6, 7.  Still, no progress has been made to review and to dispute the chargebacks.  *Id.* ¶ 13.  While counsel for the Temporary Receiver and for Defendants have continued to confer in good faith on this issue, the delay in reaching a workable solution is the fault of the Temporary Receiver (and the CFTC's overbroad SRO), not Defendants.  *Id.* ¶¶ 4, 14.

On September 22, 2023, the Temporary Receiver received a message from Stripe confirming what Defendants have been saying all along:  no one is in a better position to address the chargebacks than Defendants' personnel, given that they are familiar with the chargeback dispute process and have the necessary information at their fingertips.  *Id.* ¶ 16, Ex. 9.  This critical piece of information is notably absent from the Temporary Receiver's brief in opposition to Defendants' motion to modify the SRO, even though he received it before the opposition was filed.  *Id.*  ¶ 17. Only after the Temporary Receiver filed his opposition brief did he agree that Defendants' contractors should be involved in reviewing the chargebacks, albeit with a number of unreasonable, impractical caveats proposed in collusion with the CFTC.  *Id.*, Ex. 8.  Despite the Temporary Receiver more recently paying lip service to the reality that this issue needs to be addressed immediately, he continues to stand stubbornly in the way of the chargeback remediation process as millions of dollars are unjustly lost.  *Id.* ¶ 18.  The Temporary Receiver is not equipped to manage this issue (his counsel has admitted that he is not familiar with supervising chargeback disputes), and if he continues to exercise control over the entirety of

12

Defendants' assets, he will irreparably harm their business and cause substantial losses to the estate.[4]  Speas Decl. ¶ 18.

The Temporary Receiver should be removed immediately because he is directly responsible for a depletion of Defendants' assets that would not otherwise be occurring but for his involvement in this case.  *See Adelman*, 332 F. Supp. at 147 (receiver should not be given full control of a business if he would irreparably harm the value of Defendants' assets).  His failure to timely address the pending chargebacks has already caused the estate to lose up to millions of dollars.  Speas Decl. ¶ 21.   Had Defendants been left in control of their business during this litigation, they would have been able to address the chargebacks without delay.  Moreover, had the Temporary Receiver never been appointed, significant fees (yet to be billed) by the Temporary Receiver, his law firm, and other consultants he has hired could have been avoided.  None of the Temporary Receiver's meddling in Defendants' business is necessary to preserve the *status quo*, and this charade should be put to an end before further damage is done.

        2.      <u>The Temporary Receiver Has Colluded with the CFTC to Advance His Own Pecuniary Interest</u>

Since the outset of this case, the Temporary Receiver has been laser-focused on collecting as much money as possible, regardless of constitutional and statutory restraints on his authority.  Getting cash into his own law firm's bank account[5] is so critical to the Temporary

---

[4]   Currently, millions of dollars in chargeback losses are pending, and with each passing day that they go unaddressed, they will be automatically granted and siphoned from the estate, regardless of their merit.  Speas Decl. ¶ 20.

[5]   At the outset of this case, the Temporary Receiver's counsel represented that the Temporary Receiver intended to store money collected from the estate in a general trust account owned by the Temporary Receiver's law firm.  Speas Decl. ¶ 22.  When pressed by defense counsel whether this is where the Temporary Receiver is keeping the money he has seized so far, the Temporary Receiver's counsel refused to answer the question.  *Id.*, Ex. 10.

Receiver that he elected to argue to this Court, with the CFTC, that he should be permitted to seize all of Defendants' assets without delay.  ECF 48.  The motivation for Temporary Receiver's bias in favor of the CFTC is clear:  he wants as much money as possible, as soon as possible, so that he and his law firm can draw as many fees as possible from the receivership estate.  The fact that the Temporary Receiver ***moved to appoint his own law firm, of which he is a member***, to counsel him on this receivership shows that the continued existence of the receivership is a major source of personal income for him.  ECF 27.[6]  It is no wonder then that he has prioritized the collection of cash from Defendants above mitigating ongoing losses to the estate.

Court-ordered receiverships are not meant to be cash cows for those who find themselves in the potentially lucrative positions of managing them.  To the contrary, the Court' receiver is supposed to be a neutral custodian of assets who prevents the estate from losing more money than it otherwise would have lost absent the receivership.  *On Point Glob*, 2020 WL 5819809, at *2; *see also Adelman*, 332 F. Supp. at 147 (receiver should not be installed if conflict of interest impedes his ability to conserve assets of the estate).  Because the Temporary Receiver's involvement in this case has caused Defendants' assets to be depleted at a greater rate than they otherwise would have had Defendants remained in control of their own business while this litigation is pending, and because the Temporary Receiver has demonstrated a clear bias in favor of the CFTC to keep the SRO as expansive as possible, he should be dismissed from this case.

---

[6]   When the Temporary Receiver first moved to appoint his own law firm as his counsel on September 7, 2023, the deleterious impact of his pecuniary interest on the receivership had not yet materialized.  ECF 27.  Since then, it has become clear that the Temporary Receiver is taking litigation positions designed to maximize his own personal income and that this conflict of interest has undermined his neutrality.  ECF 48.

III.   **<u>CONCLUSION</u>**

For the foregoing reasons, the Court should grant Defendants' motion to modify the

SRO.

Dated:  September 26, 2023                    Respectfully submitted,

                                        By  */s/  Anthony J. Staltari*
                                            Anthony J. Staltari (Attorney ID. No. 233022017)
                                            QUINN EMANUEL URQUHART &
                                            SULLIVAN, LLP
                                            51 Madison Avenue, 22nd Floor
                                            New York, NY 10010
                                            Tel.: (415) 875-6600
                                            anthonystaltari@quinnemanuel.com

                                            Michael Shaheen, III (*pro hac vice*)
                                            Robert A. Zink (*pro hac vice*)
                                            QUINN EMANUEL URQUHART &
                                            SULLIVAN, LLP
                                            1300 I Street, NW, Suite 900
                                            Washington, D.C. 20005
                                            Tel.: (202) 538-8000
                                            michaelshaheen@quinnemanuel.com
                                            robertzink@quinnemanuel.com

                                            Dakota Speas (*pro hac vice*)
                                            QUINN EMANUEL URQUHART &
                                            SULLIVAN, LLP
                                            865 S. Figueroa St., 10th Floor
                                            Los Angeles, CA 90017
                                            Tel.: (213) 443-3000
                                            dakotaspeas@quinnemanuel.com

                                            *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

ANTHONY J. STALTARI, hereby certifies pursuant to 28 U.S.C. 1746 that on this date, I filed the aforementioned document with the CM/ECF system for the U.S. District Court for the District of New Jersey, thereby effectuating service upon all counsel of record via electronic means.

I certify under the penalty of perjury that the foregoing statements are true and correct. Executed in New York, New York on this 26th day of September.

*/s/  Anthony J. Staltari*
Anthony J. Staltari
