# EXHIBIT A

**Defendants' Proposed Supplemental Brief**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, *Plaintiff*, v. TRADERS GLOBAL GROUP, INC., a New Jersey corporation, d/b/a "My Forex Funds"; TRADERS GLOBAL GROUP, INC., a Canadian business organization; and MURTUZA KAZMI, *Defendants*. | Case No. 3:23-cv-11808 (ZNQ) <br><br> <u>**Oral Argument Requested**</u> |

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
EMERGENCY MOTION TO MODIFY STATUTORY RESTRAINING ORDER;
REQUEST TO RELEASE FUNDS FOR ASSET PRESERVATION, LIVING, AND
LEGAL EXPENSES**

Anthony J. Staltari (Attorney ID. No. 233022017)
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel.: (415) 875-6600
anthonystaltari@quinnemanuel.com

Dakota Speas (*pro hac vice*)
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Tel.: (213) 443-3000
dakotaspeas@quinnemanuel.com

Michael Shaheen, III (*pro hac vice*)
Robert A. Zink (*pro hac vice*)
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Tel.: (202) 538-8000
michaelshaheen@quinnemanuel.com
robertzink@quinnemanuel.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION.................................................................................................. 1

II.  PROCEDURAL POSTURE ................................................................................. 2

III. LEGAL STANDARD ........................................................................................... 3

IV.  ARGUMENT........................................................................................................ 4

    A.   The SRO Wrongfully Restrains Approximately $800,000 CAD That Has Nothing To Do With My Forex Funds Or The CFTC's Allegations ................... 4

    B.   The SRO Wrongfully Restrains The Disbursement of Funds That Are Necessary To Preserve the Receivership Estate And The *Status Quo* ................ 5

    C.   The SRO Wrongfully Restrains The Disbursement of Funds That Are Necessary To Protect The Wellbeing And Safety Of Mr. Kazmi's Family.......... 6

    D.   The SRO Is Fundamentally Unfair Because It Restrains Assets That Defendants Need to Defend Themselves ............................................................ 8

        1.   The Right To Counsel Of Choice Derives From The Due Process Clause.................................................................................................. 9

        2.   Courts Have Applied The Right To Counsel In Civil Contexts Analogous To This Regulatory-Enforcement Action............................ 10

        3.   Defendants Should be Able to Use $750,000 USD of Their Own Funds to Retain their Chosen Counsel .................................................. 13

        4.   The Court Should Release $100,000 USD To Defendants On A Monthly Basis To Pay For Ongoing Legal Defense Costs...................... 16

    E.   None of the Money Restrained By The SRO Constitutes "Customer Funds" Or "Investments"................................................................................. 17

V.   CONCLUSION.................................................................................................... 17

i

# TABLE OF AUTHORITIES

**Page**

## Cases

*Absolute Activist Value Master Fund Ltd. v. Devine*,
2015 WL 12839169 (M.D. Fla. Aug. 24, 2015).......................................................8, 13, 16

*Ashwander v. TVA*,
297 U.S. 288 (1936) (Brandeis, J., concurring) ................................................................ 10

*Bridges v. Wixon*,
326 U.S. 135 (1945)........................................................................................................... 11

*CFTC v. Am. Metals Exch. Corp.*,
991 F.2d 71 (3d Cir. 1993)................................................................................................... 3

*CFTC v. Dinar Corp.*,
2016 WL 11795525 (M.D. Ala. July 12, 2016) ............................................ 4, 12, 13, 14, 17

*CFTC v. Fin. Tree*,
2020 WL 5995176 (E.D. Cal. Oct. 9, 2020).............................................................4, 8, 13

*CFTC v. Tmte, Inc.*,
2022 WL 1321572 (N.D. Tex. May 3, 2022)....................................................................... 3

*Contreras v. Att'y Gen.*,
665 F.3d 578 (3d Cir. 2012) .............................................................................................. 11

*Davis v. Stamler*,
650 F.2d 477 (3d Cir. 1981) (Seitz, C.J.)........................................................................... 10

*Del. River Port Auth. v. Transam. Trailer Transp., Inc.*,
501 F.2d 917 (3d Cir. 1974) ................................................................................................ 6

*Freza v. Att'y Gen.*,
49 F.4th 293 (3d Cir. 2022) ............................................................................................... 11

*FTC v. Click4Support, LLC*,
No. CV 15-5777, 2015 WL 7067760 (E.D. Pa. Nov. 10, 2015).....................................14, 17

*FTC v. Next-gen, Inc.*,
No. 4:18-CV-00128-DGK, 2018 WL 8754140 (W.D. Mo. Aug. 3, 2018) ....................14, 17

*FTC v. Ragingbull.Com, LLC*,
No. CV GLR-20-3538, 2021 WL 1240876 (D. Md. Jan. 25, 2021)...............................14, 17

*FTC v. Think Achievement Corp.,*
  2007 WL 3286802 (N.D. Ind. Nov. 5, 2007)........................................................ 6

*FTC v. U.S. Mortg. Funding, Inc.,*
  No. 11-CV-80155, 2011 WL 2293377 (S.D. Fla. June 9, 2011) ......................... 14

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cty.,*
  415 U.S. 423 (1974)............................................................................................ 5

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.,*
  527 U.S. 308 (1999) (Ginsburg, J., concurring in part) ....................................... 3

*Leslie v. Att'y Gen.,*
  611 F.3d 171 (3d Cir. 2010) .............................................................................. 11

*Luis v. United States*
  578 U.S. 5 (2016) ...............................................................................8, 9, 10, 12

*Magallanes-Damian v. INS,*
  783 F.2d 931 (9th Cir. 1986) .............................................................................. 11

*Mathews v. Eldridge,*
  424 U.S. 319 (1976)............................................................................................ 9

*Patterson v. Illinois,*
  487 U.S. 285 (1988)............................................................................................ 9

*PDX N., Inc. v. Comm'r N.J. Dep't of Lab. & Workforce Dev.,*
  978 F.3d 871 (3d Cir. 2020) .............................................................................. 11

*Ponce-Leiva v. Ashcroft,*
  331 F.3d 369 (3d Cir. 2003) .............................................................................. 10

*Powell v. Alabama,*
  287 U.S. 45 (1932).............................................................................................. 9

*SEC v. Ahmed,*
  2017 WL 5515904 (D. Conn. Jan. 23, 2017) ...................................................... 5

*SEC v. Beasley,*
  2022 WL 3161829 (D. Nev. Aug. 5, 2022) ........................................................ 12

*SEC. v. Dowdell,*
  175 F. Supp. 2d 850 (W.D. Va. 2001).........................................................14, 17

*SEC v. Infinity Grp. Co.,*
  212 F.3d 180 (3d Cir. 2000) .............................................................................. 13

iii

*Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*,
364 U.S. 642 (1961)................................................................................................ 3

*Troxel v. Granville*,
530 U.S. 57 (2000)................................................................................................ 8

*Turner v. Rogers*,
564 U.S. 431 (2011)............................................................................................9, 12

*Wardius v. Oregon*,
412 U.S. 470 (1973)............................................................................................ 12

## **Other Authorities**

IRS's National Standards for Food, Clothing, and Other Items.
https://www.irs.gov/businesses/small-businesses-self-employed/national-
standards-food-clothing-and-other-items............................................................ 7

Defendants Traders Global Group Inc. (New Jersey) and Traders Global Group Inc. (Canada) (collectively, "My Forex Funds") and Mr. Murtuza Kazmi (together, "Defendants") submit this supplemental brief in support of their emergency motion to modify the statutory restraining order ("SRO").  ECF No. 42.[1]

## I.    INTRODUCTION

The Court should modify the SRO because it prevents Defendants from accessing and using assets unrelated to the alleged wrongdoing—including readily identifiable assets totaling at least $792,302.47 CAD—it makes no allowance for expenses that are necessary to preserve the value of the estate, it makes no allowance for reasonable living expenses, and it makes no allowance for attorneys' fees.  Despite good faith efforts to meet and confer with the CFTC and the Temporary Receiver on carveouts for these expenses under the SRO, the parties have been unable to reach an agreement.[2]  For these reasons, Defendants request that the SRO be modified as follows:

1. **$792,302.47 CAD**, which is the value of real-property equity that has nothing to do with My Forex Funds or the CFTC's allegations, shall be released immediately to Mr. Kazmi;

2. **$49,872.03 CAD**, which is the total of Mr. Kazmi's monthly mortgage, insurance, and security expenses, should be released ***monthly*** (and ***retroactively*** to September 1, 2023) to Mr. Kazmi in order to preserve the *status quo*;

3. **$69,835 CAD**, which is the total of balances on Mr. Kazmi's personal credit card statement, an invoice to install a home security system, and an annual insurance premium (all which accrued before the SRO began), should be released ***one time*** to Mr. Kazmi in order to preserve the *status quo*;

4. **$12,600 CAD**, which is the total of Mr. Kazmi's monthly expenses for food, groceries, medical care, toiletries, cleaning supplies, home utilities, home internet, childcare, faith-

---

[1]  Unless otherwise indicated, this brief omits from quotations and citations all internal quotation marks, alterations, footnotes, and citations.

[2]  Defendants have provided backup documentation for certain carveout requests to the Temporary Receiver and the CFTC.  Defendants can file these backup documents, or any additional documents, if the Court deems it necessary.

based schooling, personal transportation, and parental support (including cancer medication), should be released *monthly* (and *retroactively* to September 1, 2023) to Mr. Kazmi in order to protect the wellbeing and safety of his family;

5. **$117,697.32 CAD**, which is the monthly payroll for My Forex Funds' staff members (55 people), should be released *monthly* (and *retroactively* to September 1, 2023) to My Forex Funds in order to preserve the *status quo* and avoid undue hardship to My Forex Funds' staff;

6. **$100,000 USD ($136,833 CAD)**, which is the anticipated monthly legal expense that Defendants will require to defend this case, should be released to Defendants *monthly* (and *retroactively* to September 1, 2023) in order to protect the fundamental fairness of these proceedings; and

7. **$750,000 USD ($1,026,251 CAD)**, which is the value of retainer payments that a friend of Mr. Kazmi made to Quinn Emanuel as a loan to Defendants, should be released *one time* so that Defendants can repay Mr. Kazmi's friend and use their own funds to retain their chosen counsel.

In total, Defendants request a one-time release of $1,888,388.47 CAD, ongoing monthly releases of $317,002.35 CAD, and retroactive monthly payments for asset preservation, living, payroll, and legal costs to September 1, 2023 (totaling $317,002.35 CAD monthly). Defendants are asking for the Court's intervention because the CFTC obtained an *ex parte* order to freeze all of Defendants' assets and, thus far, the CFTC and Temporary Receiver have not released funds for any purpose—even for Mr. Kazmi to purchase food and medicine for his family. So far, Mr. Kazmi has relied on loans from friends, and the use of his personal credit card (without using any frozen funds to pay the balance on the card), to survive. This is not sustainable.

## II.   PROCEDURAL POSTURE

The CFTC sought, and the Court (Kugler, J.) issued, an *ex parte*, pretrial SRO freezing all of Defendants' assets worldwide, including Mr. Kazmi's personal home and bank accounts, and appointed a temporary receiver to seize virtually all of them. *See* ECF No. 13 ¶¶ 15, 17–20, 29–30. The CFTC also moved for a preliminary injunction to extend the SRO through trial. *See id.* ¶ 42.

The SRO undisputedly freezes assets that neither derive from, nor are traceable to, Defendants' alleged wrongdoing. *See id.* ¶¶ 15, 17–20, 30. It does not distinguish assets that Mr. Kazmi received from alleged wrongdoing and from assets that he obtained from independent sources, including real-property investments unrelated to My Forex Funds. *See id.* Nor does the SRO allow any access to those concededly untainted funds for necessary expenses, including essential legal expenses. *See id.*; *see also* ECF No. 42-5 ¶¶ 5–8.

The SRO not only materially impairs the preservation of the receivership estate and the *status quo*, but also prevents Defendants from covering reasonable living expenses and paying for their chosen counsel to defend this complex and fast-paced regulatory-enforcement action.

On October 13, 2023, the Ontario Securities Commission ("OSC") consented to the Temporary Receiver "using up to USD 46,610 in funds received from TGG's bank account ending in 426062 at BMO Bank, N.A., for the purpose of taking steps to safeguard funds and assets that are subject to the Direction and at risk of being dissipated." However, this OSC release was meant to cover the cost of contractors reviewing credit card chargebacks (*see* ECF 79), and additional releases are necessary for other legitimate purposes.

## III.   LEGAL STANDARD

A pretrial asset freeze is an "extraordinary remedy," *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 340 (1999) (Ginsburg, J., concurring in part). Under the Commodity Exchange Act, the Court can impose that disfavored remedy "only over the property causally related to the [alleged] wrongdoing." *CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 78–79 (3d Cir. 1993).

When a court has imposed an asset freeze, it always retains "the discretion to unfreeze [] assets when equity requires." *CFTC v. Tmte, Inc.*, 2022 WL 1321572, at *2 (N.D. Tex. May 3, 2022); *see also Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961)

(because injunctions "require[ ] continuing supervision," courts always have "the power to modify" their terms).  This includes the discretion to unfreeze assets to allow defendants to pay for necessary living and legal expenses.  *See, e.g.*, *CFTC v. Fin. Tree*, 2020 WL 5995176, at *2 (E.D. Cal. Oct. 9, 2020); *CFTC v. Dinar Corp.*, 2016 WL 11795525, at *1 (M.D. Ala. July 12, 2016).

## IV.   ARGUMENT

### A.   The SRO Wrongfully Restrains Approximately $800,000 CAD That Has Nothing To Do With My Forex Funds Or The CFTC's Allegations

As outlined in Defendants' reply brief in support of their Emergency Motion (ECF No. 73), the SRO unjustifiably restrains readily identifiable, untainted proceeds from personal real-property investments that predate My Forex Funds and have nothing to do with the CFTC's allegations. To summarize, and without limiting Defendants right to identify additional untainted assets:

- In December 2017, Mr. Kazmi purchased a condominium in Mississauga, Ontario. ECF No. 73-18.  There is currently a mortgage balance of $347,409.16 CAD on this property.  It is a rental property and is managed by a property management company. Rental income goes toward the mortgage and maintenance of that property. The selling price of the property is currently about $700,000 CAD, based on recent market data. Mr. Kazmi's equity in the property is approximately **$352,590 CAD**.

- In December 2020, Mr. Kazmi received $196,629.75 CAD from the sale of real property in Brampton, Ontario, which was deposited into Mr. Kazmi's personal bank account at TD Bank.  ECF No. 73-14.  These proceeds were not comingled with TGG corporate funds.  They were later used to fund the purchase of another property in Richmond Hill in July 2021.  ECF No. 73-16.

- In July 2021, Mr. Kazmi sold a property in Gwillimbury, Ontario and received proceeds of $341,966.52 CAD, which were directly transferred to fund the purchase of the Richmond Hill property referenced above in July 2021.  ECF Nos. 73-15, 73-16. After it was sold in December 2021, this Richmond Hill property resulted in equity proceeds to Mr. Kazmi of **$439,712.47 CAD**.  ECF No. 73-17.  The majority of that money was used to fund the down payment on Mr. Kazmi's current primary residence, also in Richmond Hill.

The current equity on the Mississauga condominium ($352,590 CAD) and the proceeds from the sales of Mr. Kazmi's other properties ($439,712.47 CAD) do not derive from My Forex

Funds, and under *American Metals*, they cannot be restrained. Thus, the SRO should be modified immediately to permit Defendants to use, at minimum, $792,302.47 CAD for any purpose.[3] Defendants should be permitted to use these funds by withdrawing cash from existing accounts, or, in the alternative, by selling or refinancing personal real-property assets to obtain these funds.

B.   **The SRO Wrongfully Restrains The Disbursement of Funds That Are Necessary To Preserve the Receivership Estate And The *Status Quo***

Fundamentally, the purpose of a restraining order is to preserve the *status quo* and to prevent the diminution of assets subject to the order. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cty.*, 415 U.S. 423, 438–39 (1974); *see also SEC v. Ahmed*, 2017 WL 5515904, at *1 (D. Conn. Jan. 23, 2017) (granting release of funds to pay insurance premium to preserve existing assets and the *status quo*). The SRO cites this purpose expressly, *see, e.g.*, ECF No. 13 ¶¶ 8, 11, 30(c), and the OSC recently agreed that certain funds shall be released "to safeguard funds and assets." About 80% of the monthly expenses Mr. Kazmi personally requests are necessary to maintain the *status quo* and to preserve the value of the receivership estate—not to fund discretionary spending. Therefore, Mr. Kazmi requests monthly releases of:

- $42,565.00 CAD to pay his home mortgage;

- $7,007.03 CAD to pay for insurance; and

- $300.00 CAD per month to pay for home security.

He also requests one-time releases of:

- $25,000 CAD to pay the balance on a security system that was installed at his home;

---

[3]  As noted in Defendants' reply brief (ECF 73), the proceeds from the sales from the Brampton and Gwillimbury properties totaled about $538,000 CAD. When also taking into account the equity on the Mississauga property and the proceeds from the Richmond Hill property sold in December 2021, the untainted equity on these personal properties totals $792,302.47 CAD.

- $23,356 CAD to pay the balance on a personal credit card; and

- $21,479.00 to pay the annual premium on an investment automobile (all of which accrued before the SRO went into effect).

If the mortgage defaults, penalty interest expense, which would otherwise not accrue against the estate, will rapidly escalate. The same goes for the outstanding credit card balance. If the insurance lapses, the value of the estate could evaporate due to unexpected casualties. *See FTC v. Think Achievement Corp.*, 2007 WL 3286802, at *5 (N.D. Ind. Nov. 5, 2007) (assets in receivership must remain insured to prevent losses). Without the security system, which is subject to termination if the installation and monthly costs go unpaid, investment automobiles and other personal property could be stolen. Exposing the estate to unnecessary interest expense, uninsured casualty, and theft serves no party's interest and will reduce any potential *pro rata* recovery to alleged claimants. Payments for these expenses should therefore be released monthly going forward, and retroactively to September 1, 2023 (shortly after the SRO went into effect).

My Forex Funds also requests $117,697.32 per month (and retroactively to September 1, 2023) to pay its 55 staff members their monthly salaries. Doing so both preserves the *status quo* and avoids financial hardship to staff members who are not parties to this case. *See, e.g., Del. River Port Auth. v. Transam. Trailer Transp., Inc.*, 501 F.2d 917, 924 (3d Cir. 1974) (reversing grant of preliminary injunction because "the district court did not take into account the interests of third persons"). Of course, if this amount changes materially over time, including as a result of staff members quitting or being laid off, Defendants will request an adjustment accordingly.

### C.     The SRO Wrongfully Restrains The Disbursement of Funds That Are Necessary To Protect The Wellbeing And Safety Of Mr. Kazmi's Family

Mr. Kazmi is a family man. He did not come from wealth, but he has made a good living as an adult, and he has always taken care of his loved ones. He lives with his wife and two young sons, aged 5 and 7. He also helps to support his parents-in-law. The SRO has jeopardized the

health and safety of Mr. Kazmi's family by cutting off funds to pay for reasonable living expenses, including:

- Food, groceries, medical care, toiletries and cleaning supplies ($2,730 CAD/month);[4]

- Utilities ($2,000 CAD/month);

- Parental support, including cancer treatment for Mr. Kazmi's mother in law ($4,000 CAD/month);

- Home internet and mobile phone service ("MyRogers") ($480 CAD/month);

- Personal car operating expenses ($600 CAD/month);

- Faith-based schooling for Mr. Kazmi's children ($1,040 CAD/month); and

- Childcare for Mr. Kazmi's children ($1,750 CAD/month).

These reasonable living expenses, totaling $12,600 CAD per month, are necessary to protect the health and safety of Mr. Kazmi's family. His family needs money to eat and to cover their other basic needs, like toiletries and medical care. Winter is coming, and termination of home utilities due to non-payment presents a deadly safety hazard.[5] His parents-in-law also depend on Mr. Kazmi, including for critical cancer medication. Mr. Kazmi's family also needs money to pay for telecommunications so that they can continue to communicate with their loved ones, legal counsel, and the rest of the world. Mr. Kazmi needs funds to operate his cars so that his family can obtain groceries, take the children to school, and travel locally. Faith is important to the Kazmi family, and his children are enrolled in a faith-based school. If the children are forced to withdraw from the school due to non-payment of tuition, it will cause a serious disruption to his children's

---

[4]   This approximately allocates $22.75 CAD ($16.58 USD) for each member of Mr. Kazmi's household, per day, consistent with the IRS's National Standards for Food, Clothing, and Other Items.   https://www.irs.gov/businesses/small-businesses-self-employed/national-standards-food-clothing-and-other-items.

[5]   On an interim basis, Mr. Kazmi has paid for utilities with his personal credit card, but he is unable to pay the balance on his credit cards until assets are released for this purpose.

wellbeing and education. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000) (due process prevents "government interference" with parents' right "to control the education of their own"). The children are also emotionally attached to their caregiver and would suffer if she had to be let go.

In sum, to withhold reasonable living expenses from Mr. Kazmi's family on the basis of unproven allegations is inhumane, and as a matter of equity, Mr. Kazmi should be permitted to pay for monthly expenses to protect and to provide for his family. *See, e.g.*, *Fin. Tree*, 2020 WL 5995176, at *2 (modifying preliminary injunction to permit defendant to pay for reasonable living expenses and legal fees); *Absolute Activist Value Master Fund Ltd. v. Devine*, 2015 WL 12839169, at *2 (M.D. Fla. Aug. 24, 2015) (permitting defendant to liquidate untainted real property assets and releasing $2,335,219.57 from defendant's accounts to pay for attorneys' fees and living expenses).

### D. The SRO Is Fundamentally Unfair Because It Restrains Assets That Defendants Need to Defend Themselves

The Constitution does not permit a pretrial freeze of untainted assets when doing so interferes with defendants' ability to pay for necessary legal expenses. In *Luis v. United States*, the Supreme Court held that "pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment." 578 U.S. 5, 10 (2016) (plurality op.); *accord id.* at 24 (Thomas, J., concurring in the judgment). There (as here) the SRO undisputedly froze not just assets "obtained as a result of" the alleged wrongdoing but also assets "untainted" by that conduct, which "belong[ ] to the defendant, pure and simple." *Id.* at 8, 12. Because the SRO deprived the defendant of "the ability to use [lawfully obtained] funds" to "pay for her chosen attorney," it violated her right to counsel of choice. *Id.* at 12, 18; *see id.* at 35 (Thomas, J., concurring in the judgment) ("The asset freeze here is not merely an incidental burden on the right to counsel of choice; it targets a defendant's assets, which are necessary to exercise that right[.]");

*see also Powell v. Alabama*, 287 U.S. 45, 53 (1932) ("[A] defendant should be afforded a fair opportunity to secure counsel of his own choice.").

*Luis* focused on "the difference between what is yours and what is mine." *Id.* at 16. Before trial, when the government has yet to prove its allegations, untainted assets remain in defendants' sole possession. *Id.* at 16–17. Because the government has no legal interest in, or entitlement to, those untainted assets, it cannot seize them to secure potential future forfeiture if it prevails at trial. *Id.* As Justice Thomas explained in his concurrence, the Constitution "does not permit the Government's bare expectancy of forfeiture to void" defendants' right to "a fair opportunity to secure counsel of their choice." *Id.* at 34–35.

These same principles prevent courts from freezing before trial untainted assets that regulatory-enforcement defendants need for legal expenses. *Luis* was a criminal case and thus directly implicated the Sixth Amendment right to counsel, which applies to "all criminal prosecutions." U.S. Const. amend. VI. The constitutional principles articulated in *Luis* also apply in regulatory-enforcement actions like this one through the Due Process Clause. As a result, a pretrial SRO like the one at issue here violates the Fifth Amendment to the extent that it freezes untainted assets that a regulatory-enforcement defendant needs to pay for legal expenses.

### 1. The Right To Counsel Of Choice Derives From The Due Process Clause

The right to counsel of choice derives not just from the Sixth Amendment, but also the Fifth, which applies in civil actions like this one when the government threatens a defendant's property. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). As the *Luis* plurality noted, the right to counsel of choice "is a fundamental constituent of due process of law." 578 U.S. at 18–19. The Supreme Court also has held that the "dictates of due process" may require a right to counsel "to make a civil proceeding" that threatens liberty or property "fundamentally fair," as the Fifth Amendment requires. *Turner v. Rogers*, 564 U.S. 431, 444–45 (2011); *see Patterson v. Illinois*,

9

487 U.S. 285, 297 (1988) ("While our cases have recognized a difference between the Fifth Amendment and Sixth Amendment rights to counsel, and the policies behind these constitutional guarantees, we have never suggested that one right is superior or greater than the other."). The Third Circuit has likewise held that the "right to counsel of one's choice also derives from the due process clause," which requires "a fair or reasonable opportunity to obtain particular counsel" and prevents "arbitrary action prohibiting the effective use of such counsel." *Davis v. Stamler*, 650 F.2d 477, 480 (3d Cir. 1981) (Seitz, C.J.).

Nothing in the *Luis* plurality or concurring opinions rejected the notion that the decision's constitutional principles also may apply in Fifth Amendment contexts like this regulatory-enforcement action. Indeed, the question presented in *Luis* covered both the Fifth and Sixth Amendments, 578 U.S. at 10, which confirms that pretrial freezes of untainted assets are commonly understood to implicate both Amendments. While the Court in *Luis* ultimately based its holding on the Sixth Amendment, *id.* at 10, 24, its decision to resolve that criminal case on narrower grounds without reaching the Fifth Amendment reflects basic principles of constitutional avoidance and judicial restraint, rather than a desire to foreclose those issues entirely, *see, e.g.*, *Ashwander v. TVA*, 297 U.S. 288, 346–347 (1936) (Brandeis, J., concurring).

### 2. Courts Have Applied The Right To Counsel In Civil Contexts Analogous To This Regulatory-Enforcement Action

The Third Circuit and other courts have relied on the Fifth Amendment to apply the right to counsel to regulatory enforcement proceedings like this action, in which the CFTC has accused Mr. Kazmi of orchestrating a fraudulent "ponzi scheme." ECF No. 1 ¶¶ 3–4, 50. The most notable of these extensions is in the immigration context. Because "deportation proceedings are not criminal prosecutions," "there is no Sixth Amendment right to counsel in deportation hearings." *Ponce-Leiva v. Ashcroft*, 331 F.3d 369, 374 (3d Cir. 2003). Even so, the "Due Process Clause of

the Fifth Amendment guarantees noncitizens the right to effective assistance of counsel in removal proceedings." *Freza v. Att'y Gen.*, 49 F.4th 293, 298 (3d Cir. 2022); *see Magallanes-Damian v. INS*, 783 F.2d 931, 933 (9th Cir. 1986) ("[A]ny right a[n alien] may have to counsel is grounded in the fifth amendment guarantee of due process."). This civil "right to counsel" derives from "the due process right to a fundamentally fair hearing." *Leslie v. Att'y Gen.*, 611 F.3d 171, 180–81 (3d Cir. 2010). The Third Circuit and other courts of appeals have thus "held that the Due Process Clause guarantees an alien a right to assistance of counsel that is sufficiently effective to prevent removal proceedings from being fundamentally unfair." *Contreras v. Att'y Gen.*, 665 F.3d 578, 584 & n.3 (3d Cir. 2012).

The same constitutional concerns exist here. A government-obtained order denying Defendants the right to use their lawfully obtained property to pay for legal expenses to defend this complex action will render the proceedings fundamentally unfair, thereby depriving Defendants of due process. As the Supreme Court stressed long ago in the analogous immigration context, "[t]hough deportation is not technically a criminal proceeding, it visits great hardship on the individual"—thus, "[m]eticulous care must be exercised lest the procedure by which he is deprived of [ ] liberty not meet the essential standards of fairness." *Bridges v. Wixon*, 326 U.S. 135, 154 (1945). So too here.

Regulatory-enforcement proceedings like this action implicate particularly severe consequences, up to the permanent shutdown of an entire business. This underscores the need for a due-process right for Defendants to retain their chosen counsel without the government's unwarranted pretrial interference. Defendants here face a wide range of potential penalties, including fines, seizures, and disgorgement of potentially *hundreds of millions of dollars*. *See* ECF No. 1 at 39–40; *see also PDX N., Inc. v. Comm'r N.J. Dep't of Lab. & Workforce Dev.*, 978 F.3d 871, 884 (3d Cir. 2020) ("a civil enforcement action" may be "quasi-criminal in nature"

depending on, among other factors, the nature of the potential penalties that the government can impose).  Moreover, the CFTC obtained an asset freeze broad enough to encompass lawfully obtained assets—based solely on unproven allegations and legal arguments presented under seal and *ex parte*.

Due process prevents the government from obtaining such an unfair tactical advantage.  *See Wardius v. Oregon*, 412 U.S. 470, 474 (1973) (Due Process Clause "speak[s] to the balance of forces between the accused and his accuser").  In *Turner*, the Supreme Court held that the Fifth Amendment may require a limited right to counsel in a civil proceeding based on the factors set out in *Mathews*:  "(1) the nature of the private interest that will be affected, (2) the comparative risk of an erroneous deprivation … with and without additional or substitute procedural safeguards, and (3) the nature and magnitude of any countervailing interest in not providing additional or substitute procedural requirements."  *Turner*, 564 U.S. at 444–45.  Here, these factors support a *limited* due-process right—consistent with the principles set out in *Luis*—for Defendants to use their lawfully obtained assets to retain their chosen counsel.  *See Luis*, 578 U.S. at 17–22 (explaining why the balance of interests favors allowing defendants to use untainted assets for legal expenses).  The stakes and potential penalties in this regulatory-enforcement action are considerable; Defendants need capable counsel to defend this complex, fast-moving case; and there is a risk that lesser or underfunded counsel will not afford Defendants a fair chance to protect their business and property from government overreach.

Thus, courts have thus held—in regulatory-enforcement actions like this one—that "*Luis*'s holding" supports "modifying" an SRO to allow defendants access to lawfully obtained frozen funds for legal expenses.  *Dinar Corp.*, 2016 WL 11795525, at *1; *see also, e.g.*, *SEC v. Beasley*, 2022 WL 3161829, at *3–5 (D. Nev. Aug. 5, 2022) (allowing defendant to identify untainted assets

needed to retain counsel because "the more common approach is to allow access to some portion of th[e frozen] assets to be used for specific needs of the defendant"). In *Dinar*, the court relied on *Luis* when unfreezing an initial pool of funds that the defendants needed to pay their chosen counsel, while also allowing the defendants to "petition the court" to unfreeze additional assets "without providing a sworn statement of the derivation of the assets sought to be unfrozen." 2016 WL 11795525, at *1. The court denied the CFTC's motion for reconsideration of that order, "again reject[ing] th[e] argument" that "assets should not be unfrozen to allow [d]efendants funds for attorneys' fees until after sufficient assets are seized" to secure forfeiture. *Id.* These cases track Third Circuit precedent permitting regulatory-enforcement defendants to use untainted assets to pay for legal expenses. *See, e.g.*, *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 197 (3d Cir. 2000) (district court "prudent[ly]" unfroze assets under *American Metals*, *supra*, to permit defendants to "raise funds to pay for legal services").

In sum, the thrust of *Luis*'s central holding—that the government cannot constitutionally seize before trial untainted assets that a defendant needs to pay his legal expenses—applies equally in Fifth and Sixth Amendment contexts, including this regulatory-enforcement action. The Court should modify the SRO to permit Defendants to "engage in constitutionally-protected activity"—specifically, the expenditure of their own funds to retain counsel. *See Fin. Tree*, 2020 WL 5995176, at *2 (modifying SRO to permit defendant access to untainted funds for legal expenses).

### 3. Defendants Should be Able to Use $750,000 USD of Their Own Funds to Retain their Chosen Counsel

Defendants should be granted attorneys' fees as a matter of due process, per *Luis*. Alternatively, this Court should grant Defendants an allowance of funds to pay for legal defense on an equitable basis, especially to prepare for the upcoming preliminary injunction hearing. *See, e.g.*, *Absolute Activist*, 2015 WL 12839169, at *2 (permitting defendant to liquidate real property

assets and releasing $2,335,219.57 to pay for attorneys' fees and living expenses); *see also FTC v. Ragingbull.Com, LLC*, No. CV GLR-20-3538, 2021 WL 1240876, at *1 (D. Md. Jan. 25, 2021) (releasing assets to pay for attorneys' fees because "fairness requires the release of such funds for [defendants] preparation for the upcoming preliminary injunction hearing"); *FTC v. Next-gen, Inc.*, No. 4:18-CV-00128-DGK, 2018 WL 8754140, at *2 (W.D. Mo. Aug. 3, 2018) (allowing disbursement of over $400,000 in frozen funds to defendants' attorneys because the "equities dictate allowing Defendants' to pay attorney fees through the preliminary injunction stage"); *see id.* at *1 ("District courts have found that the equities weight in favor of unfreezing a defendant's assets to pay attorney's fees through the preliminary injunction stage.") (collecting cases); *Dinar Corp*, 2016 WL 814893, at *6 (allowing release of $280,000 in attorneys' fees without affidavit detailing source of funds); *FTC v. Click4Support, LLC*, No. CV 15-5777, 2015 WL 7067760, at *7 (E.D. Pa. Nov. 10, 2015) (lifting asset freeze on the personal bank accounts of individual defendants in order to cover their living expenses and attorneys' fees; *FTC v. U.S. Mortg. Funding, Inc.*, No. 11-CV-80155, 2011 WL 2293377, at *2 (S.D. Fla. June 9, 2011) (allowing release of attorneys' fees because a court "cannot assume the wrongdoing before judgment in order to remove the defendants' ability to defend themselves."); *SEC. v. Dowdell*, 175 F. Supp. 2d 850, 856 (W.D. Va. 2001) (allowing for release of reasonable attorneys' fees because the court "d[id] not believe it could achieve a fair result at the preliminary injunction hearing were it to deny defendants the ability to retain counsel" in the "complex legal matter").

This is a complex, rapidly moving civil enforcement action in which the CFTC obtained an order shutting down, on an *ex parte* basis, the entirety of Defendants' business, freezing all of Defendants' assets, and appointing a temporary receiver take control of everything, while destroying the lives of innocent third parties, such as dozens of My Forex Funds staff members, in the process.

The CFTC has accused Defendants of orchestrating a massive fraud and has demanded that Defendants be permanently enjoined from operating their business, disgorge all profits earned therefrom, and to pay civil monetary penalties, among other relief. The well-being of My Forex Funds' staff members and Mr. Kazmi's family is on the line, as well as the existence of My Forex Funds itself and Mr. Kazmi's livelihood.

While the CFTC has had the benefit of preparing its case for well over a year, Defendants did not know it existed until just about seven weeks ago, when Mr. Kazmi was personally served at his doorstep. In the past seven weeks, 98 documents have been filed on the Court's docket, constituting about 2,500 pages, including the CFTC's complaint, the CFTC's *ex parte* motion for the SRO and preliminary injunction, the CFTC's *ex parte* motion for expedited discovery, Defendants' emergency motion to modify the SRO, the CFTC's and the Temporary Receiver's joint motion for an order to show cause why Defendants should not be held in contempt, a motion to intervene brought by one of Defendants' credit card processing vendors, and motions from the Temporary Receiver requesting various relief. On top of that, since the case began, Defendants have received hundreds of emails from the Temporary Receiver and the CFTC, many of which demand immediate responses from Defendants. Defendants have in turn sent hundreds of emails to the Temporary Receiver and the CFTC in the same time frame. In addition, defense counsel have attended numerous calls with the Temporary Receiver, the CFTC, and/or third parties and their counsel to discuss an array of issues in this case. The CFTC also intends to take Defendants' depositions and the depositions of at least three third parties. This necessitated Defendants filing a motion for a protective order to limit appropriately the scope of Defendants' depositions. Simultaneously, defense counsel has communicated regularly with Mr. Kazmi and co-counsel in order to respond to the endless stream of requests from the Temporary Receiver, to provide

information pursuant to the SRO, to analyze the law and evidence regarding the CFTC's allegations, and to prepare for the hearing on the CFTC's motion for a preliminary injunction. After the preliminary injunction hearing, there will continue to be a steady stream of legal costs in order to respond to the Complaint, to conduct discovery, to address additional pretrial motions, and ultimately, to try the case.

For all of these reasons, this case has and will require an especially high volume of attorney time to defend. For similar reasons, the engagement of experienced trial counsel is paramount.

Defendants elected to engage Quinn Emanuel to defend against the CFTC's allegations because it is experienced in complex civil litigation. Defendants should not be prohibited from using their own money to retain Quinn Emanuel. While a personal friend of Mr. Kazmi already paid the firm $750,000 USD to cover Quinn Emanuel's retainer, he did so as a loan to Mr. Kazmi—not as a gift.[6] These funds remain frozen in trust by Quinn Emanuel in light of the existing SRO. To ensure that Defendants are represented by experienced counsel who can defend them in this complex regulatory enforcement action, they should be granted a one-time disbursement of $750,000 USD ($1,026,251 CAD) to cover the cost of Quinn Emanuel's retainer. *See, e.g.*, *Absolute Activist*, 2015 WL 12839169, at *2. Otherwise, these proceedings will devolve into a mockery of justice in which Defendants have no real ability to defend themselves.

4.     **The Court Should Release $100,000 USD To Defendants On A Monthly Basis To Pay For Ongoing Legal Defense Costs**

As stated above, legal costs will continue to mount as Defendants make their case not only at the preliminary injunction hearing, but beyond, as well. Therefore, Defendants request

---

[6] At the time Mr. Kazmi's friend executed an affidavit regarding the retainer, he had only provided $500,000 to Quinn Emanuel. He has since provided Quinn Emanuel another $250,000, as a loan to Mr. Kazmi, like before.

$100,000 USD ($136,833 CAD) in legal fees, monthly, to pay for continuing legal expenses. *See, e.g.*, *Ragingbull.Com*, 2021 WL 1240876, at *1; *Next-gen, Inc.*, 2018 WL 8754140, at *2; *Dinar Corp*, 2016 WL 814893, at *6; *Click4Support, LLC*, 2015 WL 7067760, at *7; *Dowdell*, 175 F. Supp. 2d at 856. This is a conservative estimate, and in reality, actual costs will very likely exceed this amount.

> **E.     None of the Money Restrained By The SRO Constitutes "Customer Funds" Or "Investments"**

The CFTC has suggested that the assets frozen by the SRO belong to My Forex Funds' customers. This is false. It is undisputed that My Forex Funds does not accept deposits from any customers and is not a custodian of customer investments. Rather, My Forex Funds accepts registration fees from customers which they pay to participate in My Forex Funds' trader evaluation programs. Once a customer pays a registration fee, that money belongs to My Forex Funds. These fees are entry costs—not investments. This basic fact is well-known to virtually everyone in the "prop firm" industry, but apparently lost on the CFTC. This is in stark contrast to a brokerage which invests and trades funds on behalf of its customers. My Forex Funds is not asking to use funds held on account for customers for any purpose because it does not hold *any* customer funds. Rather, Defendants are asking to use their own funds to preserve the *status quo* (including by continuing to pay the salaries of innocent third parties), to pay for reasonable living expenses, and to pay for necessary attorneys' fees. Therefore, the concept of freezing so-called "customer funds" or "investor funds" is inapposite and underscores the overreach of the SRO.

## V.     CONCLUSION

In sum, the Court should modify the SRO to release to Mr. Kazmi $792,302.47 CAD in lawfully obtained assets which have nothing to do with My Forex Funds, $49,872.03 CAD monthly to preserve the *status quo*, $69,835 CAD one time to preserve the *status quo*, and $12,600 CAD

monthly to protect the wellbeing and safety of Mr. Kazmi's family.  Further, $117,697.32 CAD monthly should be released to My Forex Funds to pay the company's staff members and to preserve the *status quo*.  Moreover, Defendants should be permitted to use $100,000 USD ($136,833 CAD) for monthly legal expenses and $750,000 USD ($1,026,251 CAD) to fund Quinn Emanuel's retainer.  Retroactive payments to September 1, 2023 should also be provided for monthly asset preservation, living, legal, and payroll expenses that have already accrued (totaling $317,002.35 CAD per month).

Dated:  October 19, 2023                                 Respectfully submitted,


By:  */s/ Anthony J. Staltari*
       Anthony J. Staltari
       (Attorney ID. No. 233022017)
       QUINN EMANUEL URQUHART
         & SULLIVAN, LLP
       51 Madison Avenue, 22nd Floor
       New York, NY 10010
       Tel.: (415) 875-6600
       anthonystaltari@quinnemanuel.com

       Michael Shaheen, III (*pro hac vice*)
       Robert A. Zink (*pro hac vice*)
       QUINN EMANUEL URQUHART
         & SULLIVAN, LLP
       1300 I Street, NW, Suite 900
       Washington, D.C. 20005
       Tel.: (202) 538-8000
       michaelshaheen@quinnemanuel.com
       robertzink@quinnemanuel.com

       Dakota Speas (*pro hac vice*)
       QUINN EMANUEL URQUHART
         & SULLIVAN, LLP
       865 S. Figueroa St., 10th Floor
       Los Angeles, CA 90017
       Tel.: (213) 443-3000
       dakotaspeas@quinnemanuel.com

       *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I, Anthony J. Staltari, hereby certify pursuant to 28 U.S.C. § 1746 that on this date, I filed the foregoing document with the CM/ECF system for the U.S. District Court for the District of New Jersey, thereby effecting service on all counsel of record via electronic means.

I certify under the penalty of perjury that the foregoing statements are true and correct.

Dated:  October 19, 2023           */s/ Anthony J. Staltari*
       New York, NY                Anthony J. Staltari
                                           *Attorney for Defendants*