## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

Commodity Futures Trading Commission,

                *Plaintiff*,

    v.

Traders Global Group Inc., a New Jersey corporation, d/b/a "My Forex Funds"; Traders Global Group Inc., a Canadian business organization; and Murtuza Kazmi,

             *Defendants*.

Case No.: 3:23-cv-11808

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF CFTC'S *EX PARTE* MOTION FOR STATUTORY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Anthony J. Staltari (Attorney ID. No. 233022017)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel.: (415) 875-6600
anthonystaltari@quinnemanuel.com

Dakota Speas (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Tel.: (213) 443-3000
dakotaspeas@quinnemanuel.com

Michael Shaheen, III (*pro hac vice*)
Robert A. Zink (*pro hac vice*)
Kurt Wolfe (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Tel.: (202) 538-8000
michaelshaheen@quinnemanuel.com
robertzink@quinnemanuel.com
kurtwolfe@quinnemanuel.com

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

BACKGROUND ...................................................................................................3

I.     MURTUZA KAZMI AND MY FOREX FUNDS ..........................................3

II.    MY FOREX FUNDS' BUSINESS MODEL .................................................4

     A.    My Forex Funds Is a Forex Prop Firm.................................................4

     B.    My Forex Funds Customers Pay a Registration Fee to Enroll in Its Programs .................................................................................................5

     C.    MFF Carefully Selects Customers to Trade Its Funds Externally .........5

          1.    Prohibition on Latency Arbitrage and Tick Scalping .................7

          2.    Slippage......................................................................................10

          3.    Commission ................................................................................11

III.    THE STATUTORY RESTRAINING ORDER IS UNWARRANTED AND THE TEMPORARY RECEIVER HAS NOT PRESERVED THE STATUS QUO.................12

LEGAL STANDARD...........................................................................................13

ARGUMENT ......................................................................................................13

I.     THE CFTC CANNOT ESTABLISH THAT MFF COMMITTED FRAUD ...................13

     A.    None of the Alleged False Statements Were "In Connection With" Any Relevant Contract or Transaction ........................................................13

     B.    None of the Allegedly Fraudulent Statements or Omissions Can Support a Finding of Fraud ...............................................................................16

          1.    The Statements the CFTC Alleges Were False or Misleading Were, In Fact, True ............................................................................16

              (a)    MFF's Representations About Its Funded Trading Are True........16

              (b)    MFF's Customers' Success Is Its Business ...................................17

              (c)    MFF's Statements About Its Profit Sharing Are True ...................19

              (d)    The Drawdown Limit Is Truthfully Described ..............................20

i

2.      None of the Alleged Statements Are Material ............................................21

3.      My Forex Funds Had No Duty To Disclose the Information the
        CFTC Alleges Was Fraudulently Omitted..................................................23

C.      The CFTC Has Presented No Evidence of Scienter ...............................................26

II.    THE CFTC WILL NOT BE ABLE TO PROVE THAT MY FOREX FUNDS IS
       A RETAIL FOREIGN EXCHANGE DEALER OR ENGAGED IN UNLAWFUL
       OFF EXCHANGE TRADING .........................................................................................31

III.   EVEN IF A PRELIMINARY INJUNCTION IS GRANTED, ITS SCOPE
       SHOULD BE NARROWLY TAILORED .......................................................................32

CONCLUSION...........................................................................................................................34

## **TABLE OF AUTHORITIES**

### **Cases**

*Bel-Ray Co. v. Chemrite (Pty) Ltd.*,
   181 F.3d 435 (3d Cir. 1999)................................................................................15

*CFTC v. Am. Metals Exch. Corp.*,
   693 F. Supp. 168 (D.N.J. 1988) ...........................................................................13

*CFTC v. Am. Metals Exch. Corp.*,
   991 F.2d 71 (3d Cir. 1993).................................................................................32

*CFTC v. Cifuentes*,
   No. 216CV06167ESJAD, 2018 WL 1904196 (D.N.J. Apr. 20, 2018)....................26

*CFTC v. Crombie*,
   914 F.3d 1208 (9th Cir. 2019) ...........................................................................27

*CFTC v. Equity Fin. Grp. LLC*,
   572 F.3d 150 (3d Cir. 2009)................................................................................26

*CFTC v. Escobio*,
   946 F.3d 1242 (11th Cir. 2020) .........................................................................32

*CFTC v. Hunter Wise Commodities, LLC*,
   749 F.3d 967 (11th Cir. 2014) ......................................................................13, 18

*CFTC v. Levy*,
   541 F.3d 1102 (11th Cir. 2008) .........................................................................32

*CFTC v. M25 Investments Inc.*,
   09-CV-1831, 2010 WL 769367 (N.D. Tex. Mar. 6, 2010)....................................23

*CFTC v. Next Fin. Servs. Unlimited, Inc.*,
   No. 04-80562-CIV, 2005 WL 6292467 (S.D. Fla. June 7, 2005)..........................32

*CFTC v. PMC Strategy, LLC*,
   903 F. Supp. 2d 368 (W.D.N.C. 2012) ...........................................................15, 22

*CFTC v. R.J. Fitzgerald & Co., Inc.*,
   310 F.3d 1321 (11th Cir. 2002) ..........................................................................15

*CFTC v. Rosenberg*,
   85 F. Supp. 2d 424 (D.N.J. 2000) .......................................................................21

*CFTC v. S. Tr. Metals, Inc.*,
   894 F.3d 1313 (11th Cir. 2018) .....................................................................16, 17

*CFTC v. WorldWideMarkets, Ltd.*,
   No. CV2120715KMLDW, 2022 WL 3535993 (D.N.J. Aug. 18, 2022), *motion to certify appeal denied sub nom. CFTC v. WorldWide Markets, Ltd.*, No. CV2120715KMLDW, 2022 WL 4115708 (D.N.J. Sept. 9, 2022) .........................................21

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976) ..........................................................................................26

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
   527 U.S. 308 (1999) ..........................................................................................32

*Kelly v. United States*,
   140 S. Ct. 1565 (2020) ......................................................................................26

*Lawrence v. CFTC*,
   759 F.2d 767 (9th Cir. 1985) ............................................................................27

*Liu v. SEC*,
   140 S. Ct. 1936 (2020) ......................................................................................33

*In re Ocugen, Inc. Sec. Litig.*,
   21-CV-2725, 2023 WL 2351695 (E.D. Pa. Mar. 3, 2023) ................................23

*Shaw v. United States*,
   580 U.S. 63 (2016) ............................................................................................26

*Tatum v. Legg Mason Wood Walker, Inc.*,
   83 F.3d 121 (5th Cir. 1996) ..............................................................................14

*United States v. Miller*,
   953 F.3d 1095 (9th Cir. 2020) ..........................................................................27

*Williams v. Globus Med., Inc.*,
   869 F.3d 235 (3d Cir. 2017)..........................................................................23, 24

## Statutes

7 U.S.C. § 1a(18)(A)(v) ..............................................................................................14, 15

7 U.S.C. § 2(c)(2)(C) ..............................................................................................14, 15, 31

7 U.S.C. § 2(c)(2)(D)(i), (iii) ..............................................................................................31

7 U.S.C. § 6b(a)(2)(A), (C)............................................................................................14, 26

7 U.S.C. § 13a-1 ........................................................................................................................1

7 U.S.C. § 13a-1(b) ................................................................................................................13

## **<u>Regulations</u>**

17 C.F.R. § 5.1(h)(1)..........................................................................................................31

17 C.F.R. § 5.1(m)....................................................................................................14, 15, 31

17 C.F.R. § 5.2(b)(1), (3)..................................................................................................14

Defendants Traders Global Group Inc. (New Jersey), Traders Global Group Inc. (Canada) (together "My Forex Funds" or "MFF"), and Murtuza Kazmi respectfully submit this memorandum in opposition to the *Ex Parte* Motion for Statutory Restraining Order and Preliminary Injunction Pursuant to 7 U.S.C. § 13a-1 (the "Motion") submitted by Plaintiff Commodity Futures Trading Commission ("CFTC").

## INTRODUCTION

My Forex Funds is a foreign exchange proprietary trading firm ("forex prop firm"): it makes foreign exchange and contract for difference ("CFD") trades using its own capital in an effort to earn profit. Unlike a bank or hedge fund trading their own funds, however, it does not rely on its employees to select and execute trades. Instead, MFF permits anyone who pays a registration fee to use MFF's capital, infrastructure, and software to make trades after they prove themselves to be successful traders through an evaluation process. None of MFF's customers invest any of their own money in, with, or through MFF and, other than the upfront registration fees, do not risk losing any money, nor are they liable for any losses of MFF's capital they may incur on the trading account. MFF's customers are not parties to any foreign exchange or commodity contracts. They develop strategies and execute trades on behalf of MFF using MFF's capital.

Nearly 95% of MFF's customers begin their MFF trading on demo accounts which simulate market conditions so that MFF can evaluate their performance to ensure that they properly manage risk, make profitable trades, and comply with the company's rules to which each customer agrees before signing up. Customers who demonstrate that they can reliably and profitably execute trades can then have their trades executed using real funds. For all of its customers—whether trading simulated or real MFF capital—My Forex Funds keeps up its end of the bargain: it *always* pays its customers for the profits they generate, whether actual or simulated.

1

Despite more than a year of investigation, the CFTC fundamentally misses the mark on MFF's business. In its Complaint and Motion, the CFTC spins a yarn of retail investors making risky foreign exchange trades, ignoring the fact that these so-called "investors" invest nothing, and the risk is all borne by MFF.  This is nothing but a tall tale that fails under even the slightest scrutiny.  The CFTC's error is unsurprising, as it spoke to none of MFF's officers, staff, or even customers before bringing this lawsuit and using an *ex parte* Statutory Restraining Order ("SRO") to functionally destroy the company, ruin Mr. Kazmi's reputation, and put the people who depend on MFF for their livelihoods out of work. It inflicted all of this irreversible harm before MFF even had notice of its supposed violations, let alone an opportunity to respond to the CFTC's allegations. This unchecked campaign must end here.

The CFTC has no likelihood of succeeding on its allegations because MFF has ***never*** solicited or accepted any investments from its customers or engaged in retail foreign exchange transactions or, indeed, ***any*** transactions with retail investors.  The transactions between MFF and its customers fall outside the scope of the Commodities Exchange Act's (CEA's) anti-fraud provisions, registration requirements, and off-exchange trading prohibitions.

But even if those provisions did apply, the CFTC's allegations are devoid of factual support.  After its year-long investigation, it relies on nothing more than a handful of cherry-picked, out-of-context quotations from MFF's website, emails, and thousands of lines of chat transcripts, tied together by speculation and repeated conclusory assertions that "Traders Global is a Fraud."  This purported evidence falls well short of the mark.  Regardless of the details of how MFF's trading and profit-sharing models work—which MFF discloses repeatedly on its website— the ground truth remains the same: MFF's customers paid a fee for the opportunity to make trades using MFF's capital in the hope of earning money if those trades were profitable.  At the end of

the day, that is exactly what happened: MFF paid out tens of millions of dollars to customers in accordance with the rules it established and that were agreed by its customers. The CFTC has not produced evidence of a single customer who said otherwise.  Delivering precisely what one promises is not fraud; it is good business.  The CFTC cannot prove otherwise.  Therefore its Motion should be denied and Defendants' assets should be and remain unfrozen with, at most, a limited freezing order for any funds that are causally tied to the alleged wrongdoing (of which Defendants do not concede there are any).

## **BACKGROUND**

### I.    **MURTUZA KAZMI AND MY FOREX FUNDS**

Mr. Kazmi did not come from wealth.  His father grew up in abject poverty, at times having little more than a single set of pants, a shirt, and tattered shoes.  After years of hard work, Mr. Kazmi's father became a pharmacist, and he spent most of his working years supporting his family in that career.  From a young age, Mr. Kazmi learned from his father the value of hard work, and the importance of taking care of one's family.

Mr. Kazmi took his father's advice to heart.  For 12 years, he worked in information technology risk and compliance at various multinational companies. During that time, he developed an interest in foreign exchange trading and became interested in the forex prop firm industry as it offered an opportunity for *all* people, not only the wealthy or the select few hired by major banks or investment firms, to develop and demonstrate their trading skills while risking none of their own capital. He founded My Forex Funds in pursuit of this mission in early 2020.  ECF 23-40 at 22.

The company did a six-month pilot program before going live to the public in July 2020. *Id.*  Mr. Kazmi is MFF's chairman and CEO, and the business is the culmination of years of his blood, sweat, and tears.  Until the CFTC succeeded in shuttering the business, MFF was a

3

resounding success and became an industry leader among many currently operating U.S. and international forex prop firms.  The proudest day of Mr. Kazmi's life was when he could tell his father, who had spent decades providing for his family, that he could retire because of MFF's success.  Mr. Kazmi has not taken his blessings for granted, and he has not hesitated to share My Forex Funds' success with the community by donating to a variety of charitable causes.

## II.     MY FOREX FUNDS' BUSINESS MODEL

### A.     My Forex Funds Is a Forex Prop Firm

My Forex Funds is a forex prop firm that allows its customers to trade MFF's capital and, if successful, take a percentage of profits made through customers' trading activities.  MFF traders do not ever invest or trade their own capital; "[i]t is our company [*i.e.* MFF's] money that is being used in all our accounts." ECF 23-40 at 79. MFF's customers do not invest any money in, with or through MFF.  MFF's "program enables traders to trade without risking their own capital." ECF 23-40 at 71.  Thus, even customers who make trades using accounts with hundreds of thousands of dollars of MFF's capital will never owe a dime to MFF for any losses their trades may incur. ECF 23-4 at 34 ("No trader at My Forex Funds is liable for any financial losses."); *id.* ("At no time will you 'owe' any money to our company as a trader.").  Likewise, customers cannot withdraw funds from the accounts they are using to trade as "those funds are considered [MFF's] invested capital."   ECF 23-40 at 34.   To memorialize this relationship, MFF's customers execute agreements to serve as independent contractors providing trading services to MFF. ECF 23-24, 23-25, 23-26. This template agreement was reviewed by the Ontario Securities Commission ("OSC") after a cooperative revision process between MFF and OSC. Speas Decl. ¶ 2, Ex. A.

MFF allows its customers to make trades with MFF's capital in foreign exchange contracts and CFDs, which include approximately 100 over-the-counter ("OTC") products such as metals,

oil, and market indices.  *See* ECF 23-40 at 87-90.  MFF does not allow, nor offer any opportunity

or system for, its customers to trade deliverable (*i.e.*, physical) products.  Dentrinos Decl. ¶ 4.

**B.      My Forex Funds Customers Pay a Registration Fee to Enroll in Its Programs**

MFF collects registration fees from its customers before they can participate in MFF's

evaluation and other trading programs.  *See, e.g.*, ECF 23-40 at 40, 56, 68.  MFF discloses to

customers that these fees are used to pay operating costs, which include, among other things, labor

costs, payouts to customers, and software licensing expenses.  ECF 23-40 at 84.  Such a registration

fee is customary and accepted practice in the forex prop firm industry.  *See, e.g.*, Speas Decl. ¶ 3;

Ex. B (Hydra Funding website homepage); Ex. C (Maven Trading website homepage).  MFF offers

three programs through which customers can access an account to trade MFF's capital:  (1) Rapid;

(2) Evaluation; or (3) Accelerated.  ECF 23-40 at 4.  Registration fees vary depending on the

program a customer elects to pursue and the amount of MFF capital that the customer wants to

trade.  For example, a customer could pay a $49 registration fee for a $5,000 Evaluation account,

(ECF 23-40 at 40), or, at the other end of the spectrum, a $4,900 fee for a $50,000 Accelerated

account.  ECF 23-40 at 68.  Approximately 93% of MFF's customers register in the Evaluation

program. Dentrinos Decl. ¶ 11.

**C.      MFF Carefully Selects Customers to Trade Its Funds Externally**

Because MFF's customers have the opportunity to trade using MFF's capital (and not the

customers' funds), MFF uses a number of mechanisms to identify which customers should be

permitted to trade using real MFF capital, while remaining customers trade using simulated MFF

capital.  Dentrinos Decl. ¶ 10.  In either circumstance, the customer's trading platform and payout

are the same.  *Id*.  MFF's website explains this to its customers up front: "Traders are rewarded for

the profits they make on simulated accounts (that is how we mitigate risk/loss) while fine tuning

their skills in the process."  Speas Decl. ¶ 5, Ex. D ("Why join My Forex Funds?" page from MFF website).

First, as part of MFF's Evaluation program, traders are required to complete and pass two challenge demonstration phases—a process that is fully disclosed to customers before they sign up.  The purpose of the two-phase Evaluation program is to ensure that MFF's capital will be used by customers who have demonstrated their ability to trade in a responsible and profitable manner. Dentrinos Decl. ¶ 11.  Along the way, MFF offers expert guidance to assist traders in developing their skills, including through the company's blog and its My Forex Magazine, both of which are freely available and publicized on its website.  *See, e.g.*, Speas Decl. ¶ 6, Ex. E ("My Forex Funds Magazine" page from MFF website); Speas Decl. ¶ 7, Ex. F (June 2023 edition, Volume 1, of MyForexMagazine); Speas Decl. ¶ 8, Ex. G  (July 27, 2023 MFF blog post "5 Major Mistakes Forex Traders make and how to avoid them"); Speas Decl. ¶ 9, Ex. H  ("Trading Tips" page from MFF website). If a customer does not pass both challenge phases, his or her account is deactivated. Dentrinos Decl. ¶ 11.   Of customers who sign up for MFF's Evaluation program, only approximately 8% pass the first two challenge phases.  *Id.*   Even after completing the two challenge phases, a majority of MFF's customers continue to trade simulated MFF capital, though they share profits as if the trades were real. *Id.*

Second, MFF also requires that customers adhere to clearly disclosed drawdown limits to maintain their accounts.  Dentrinos Decl. ¶ 12.  The drawdown limits place a maximum cap on the amount of MFF's capital (simulated or real) that a customer can lose before his or her account is deactivated.  *Id.*  This is a common-sense measure to mitigate losses from reckless trading.  *Id.* The drawdown limit applicable to each of MFF's programs is clearly posted and included in the rules for that program, which customers have access to and explicitly agree to prior to registering

6

for an account.  ECF 23-40 at 27, 34, 54, 60, 66.  Drawdown limits are a common feature of forex prop firms, most of which offer drawdown limits that are less favorable to customers than MFF did.  Dentrinos Decl. ¶ 12.; *see, e.g.*, Speas Decl. ¶ 4, Ex. C (Maven Trading limits total drawdown to 9% for "Standard" accounts on a "2-Step Challenge" program).  For example, a Rapid program account has a five percent daily drawdown limit (*i.e.*, the account cannot lose more than five percent of its value in a single day) and a twelve percent overall drawdown limit (*i.e.*, the account cannot lose more than twelve percent of its starting value in aggregate). ECF 23-40 at 27; *see also id.* at 34, 54, 60, 66.  MFF published articles providing its customers with tips on how to trade without risking violating the drawdown limits. *See* Speas Decl. ¶ 8, Ex. G (July 27, 2023 MFF blog post providing tips to manage risk and avoid large account drawdowns).  Accounts that experience losses in excess of these limits are generally not profitable, and those customers are thus unsuitable to trade MFF's capital.  Dentrinos Decl. ¶ 12.  As the customers agreed, violations of these drawdown limits result in the customer's account being closed, as is standard across the industry.  *Id.*

Third, MFF not only evaluates a customer's trading performance based on profitability, but it also assesses which customer's trading practices are likely to be replicable in the live market. Dentrinos Decl. ¶ 13.  To this end, MFF implemented a number of widely understood policies and technical limitations to prevent customers from cheating its systems and generating fake profits. *Id.*  These limitations are also designed to closely mirror real trading with MFF's liquidity provider, CDO Markets.  *Id.*

### 1.    Prohibition on Latency Arbitrage and Tick Scalping

MFF operates its platform and allows its customers to trade on its behalf using the MetaTrader platform, a software application that is developed and sold by MetaQuotes Ltd. MetaTrader is a graphical user interface that relays pricing and trade information to MFF's

customers.  ECF 23-43 at 37:22-39:18.  MetaQuotes provides its software, MetaTrader, and services to the majority of forex exchanges and is by far the most widely used platform among forex prop firms. Dentrinos Decl. ¶ 14.  Due to MetaTrader's technical infrastructure, the information it relays to MFF traders is subject to bandwidth latency (*i.e.*, delay) from real-time market conditions. Dentrinos Decl. ¶ 16.  This latency was exacerbated by the price feed MFF's MetaTrader platform received from CDO Markets, which only updated three times per second instead of the ten times per second that MetaTrader could process.  ECF 23-15.  The latency is not consistent, however: some of MFF's customers received pricing information faster than others due to the customers' geographic location, allowing certain MFF traders to cheat the system and earn thousands of dollars in apparent profits that did not actually exist. Dentrinos Decl. ¶ 16.

Due to this latency and the need for MFF to prevent exploitation of it—both because it generated illegitimate profits that prevented MFF from accurately evaluating traders and because traders would not be able to replicate it in real market conditions—MFF prohibited trading strategies that relied on latency arbitrage or other abusive practices.  *Id*.  MFF prominently displayed this prohibition on its website in the rules for each of its programs: "Trading activities that are used to take advantage of the inefficiencies of Metatrader. Gap trading, latency arbitrage, Long short arbitrage, Reverse arbitrage, opposite account trading are all unacceptable trading methods with MyForexFunds."  ECF 23-40 at 35; *see also id*. at 46, 61. MFF also described the problems created by exploitative arbitrage trading in detail on its blog and detailed the steps it takes to attempt to limit this abuse, including applying and capping "slippage," as described in greater detail in Section II.C.2., below. Dentrinos Decl. ¶ 16; Speas Decl. ¶ 10, Ex. I (April 12, 2022 MFF blog post titled "True Market conditions, Metatrader, Arbitrage and More!" explaining: "We try to limit slippage so that our newer traders are more comfortable but also try to maintain a

healthy feed representative of true market conditions. . . . Currently, we cap our slippage on traders because the majority of traders who are trading legitimate methods don't like slippage and it occurs not so frequently, so at execution, we are comfortable taking the hit."). MFF further barred "tick scalping," another high-frequency trading strategy that relies on rapid-fire trades to take advantage of minute price changes and, potentially, exploit MetaTrader's deficiencies. *See* ECF 23-40 at 47. These bans, and other measures taken to prevent the abusive trading practices, are common industry practice among forex prop firms which seek to prevent customers from reaping ill-gotten gains by exploiting technological deficiencies. Dentrinos Decl. ¶ 17; *see, e.g.*, Speas Decl. ¶ 11, Ex. J (Maven Trading bans trading strategies that include "[t]aking advantage of the MetaTrader inefficiencies such as High Frequency Trading, Toxic Trading Order Flow, Long/Short arbitrage, reverse arbitrage, tick scalping, server execution is strictly prohibited and your challenge or funded account will be terminated including eventual profits.").

In addition to prohibiting these illegitimate trading strategies, MFF, in coordination with iSRisk (now called "iSAM"), a trading analytics firm that managed the MetaTrader platform, implemented technical limitations on traders suspected of engaging in these practices. Dentrinos Decl. ¶ 18. MFF did this, at the suggestion of iSRisk, by creating specific MetaTrader profiles for customers who exhibited abusive trading strategies. *Id.* Specifically, MFF added delay to certain profiles for customers suspected of scalping "to make sure they're not taking advantage of deficiencies with the MT4 platform and its pricing." Dentrinos Decl. ¶ 18; ECF 23-42 at 92:21-23. iSRisk specifically recommended that MFF implement delay because MFF was otherwise "providing an advantageous trading environment" that was more likely to lead to profitable trading than real-world market conditions. Dentrinos Decl. ¶ 18, Ex. A (February 7, 2022 chat message: "[S]ince you're filling everything at TOB as opposed to depth, you're already providing an

9

advantageous trading environment, particularly for more sizable orders. Applying a slightly larger delay would even the playing ground a little."). These profiles applied only to MFF customers whose trading behavior exhibited indicia of exploitative trading, who constituted approximately 0.1% of MFF's customers. Dentrinos Decl. ¶ 18.

 2. <u>Slippage</u>

In trading parlance, slippage is the difference between the expected price of a trade and the price at which the trade is actually executed. Dentrinos Decl. ¶ 19. It can occur either when the price is volatile or when a large order is entered but the market does not have enough volume at the expected price to maintain that price for the entire trade. *Id.* Because this slippage would likely occur if customers' trades were executed with CDO Markets, MFF set the parameters for certain accounts to mirror more closely those real-market trading dynamics. *Id.*; ECF 23-43 at 123:11-15 (MFF is applying slippage "to best simulate how a trade would execute."); *id.* at 125:1-3 ("[T]he intention is for the platform and internalized orders to match STP execution."). iSRisk assured MFF that the slippage being implemented "is natural and resembles real market execution." Dentrinos Decl. ¶ 19, Ex. B (January 19, 2022 chat messages between MFF and iSRisk). When iSRisk recommended implementing slippage that did ***not*** mirror market conditions, MFF explicitly rejected its recommendation. Dentrinos Decl. ¶ 19, Ex. C (January 31, 2022 chat messages between MFF and iSRisk, including message from Mr. Dentrinos stating,"[W]e don't want to do anything too artificial that isn't replicating true market [conditions].").

Imposing slippage on the MetaTrader profiles of certain MFF customers also served to discourage abusive trading practices which, as described above, MFF prominently prohibited in rules available on its website. *See* ECF 23-40 at 35; *see also id* at 46, 61. MFF also published blogs describing slippage to educate and inform its users about how it works and strategies to avoid it. *See, e.g.*, Speas Decl. ¶ 10, Ex. I (April 12, 2022 MFF blog post titled "True Market conditions,

Metatrader, Arbitrage and More!"); Speas Decl. ¶ 12, Ex. K (July 15, 2022 MFF blog post titled "Slippage – how to minimize or avoid it"). Slippage would stymie abusive strategies such as latency arbitrage and scalping, which depend on tiny price movements and rapid-fire trading, by making it more difficult to exploit large volume trades dependent on minute price differences. Dentrinos Decl. ¶ 20.   By observing how traders performed under parameters that included slippage, and thus more closely mirrored real-market trading with CDO Markets, MFF could more accurately assess which traders using simulated MFF capital could eventually trade profitably using real MFF capital.  *Id*.  MFF's implementation of slippage in this way was entirely consistent with standard industry practices.  Dentrinos Decl. ¶ 21.

3. <u>Commission</u>

MFF also imposed a commission of $3 per lot on trades its customers executed.  Dentrinos Decl. ¶ 22.   This commission was plainly stated on its website: "The commission is $3 per lot on our server." ECF 23-40 at 75. The commission is also prominently displayed to customers on the MetaTrader platform.   MFF imposed this commission to better simulate real-world trading parameters, as was common in the forex prop firm industry.  Dentrinos Decl. ¶ 22.  Indeed, MFF's commissions were amongst the industry's lowest.  *Id*.; *see, e.g.*, Speas Decl. ¶  3, Ex. B (Hydra Funding imposes commissions of $7 or more per lot except for "mini" trades).

\*      \*      \*

Ultimately, based on its evaluation of its customers' trading performance, MFF identified a small group of its customers whose trading with MFF's real capital was likely to be profitable. Dentrinos Decl. ¶ 23.   MFF consistently transmitted approximately 1% of its customers' trades using MFF's capital to its external liquidity provider, CDO Markets, via "straight through processing" or "STP." *Id*.   Each of these trades was executed by and on behalf of Trader's Global Group Inc., the MFF corporate entity registered in Canada.  *Id*.  MFF's U.S. entity did not execute

any trades.  *Id*.  This trading model is known as "A-Book."  *Id*.  For customers not on STP, the trades they make use simulated MFF capital and are internalized in MFF's systems.  Dentrinos Decl. ¶ 24.  This A-Book/B-Book distinction is one widely used in the forex prop firm industry; it is well-publicized and known to customers.  Dentrinos Decl. ¶ 25;  *see., e.g.*, Speas Decl. ¶ 13, Ex. L (educational website describing "B-Book: How Forex Brokers Manage Their Risk"). Regardless of whether a customer's account is on the A-Book or B-Book, MFF paid every customer per the terms of the program for which they registered.  Dentrinos Decl. ¶ 25.

## III.   THE STATUTORY RESTRAINING ORDER IS UNWARRANTED AND THE TEMPORARY RECEIVER HAS NOT PRESERVED THE STATUS QUO

This Court granted the CFTC's *ex parte* request for an SRO on August 29, 2023.  ECF 13. That order appointed a Temporary Receiver to take possession of all of MFF's and Mr. Kazmi's property to "preserve the value of the Receivership Estate."  *Id.* at 12.  Rather than preserving the *status quo*, the overbroad SRO crippled Defendants' business before they ever had any opportunity to defend themselves.  Defendants' website has been replaced by a full-page banner from the Temporary Receiver.  Speas Decl. ¶ 15, Ex. N (MFF website as of September 26, 2023). Defendants' staff members have gone unpaid, and Defendants have lost access to resources that they could use to protect the business.  These harmful effects extend not only to MFF but also to Mr. Kazmi personally, whose assets have all been frozen, as well..

The Temporary Receiver, lacking any knowledge of Defendants' business, also inflicted harm on the Estate's assets.  Specifically, he ignored thousands of credit card chargeback requests for weeks, even after MFF's online credit card processing vendor, WooCommerce, warned the Temporary Receiver that he needed to address the chargebacks.   These delays cost the Receivership Estate millions of dollars and counting.  *See* ECF 73.

## LEGAL STANDARD

Pursuant to Section 6(c) of the Commodity Exchange Act ("CEA"), the Court can issue a permanent or temporary injunction only "[u]pon a proper showing."  7 U.S.C. § 13a-1(b).  "A prima facie case of illegality is a 'proper showing.'"  *CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 974 (11th Cir. 2014).  A prima facie case of that the Defendants have violated the CEA is also required for the CFTC to obtain a Statutory Restraining Order to preserve the *status quo* pending the resolution of this matter.  *See CFTC v. Am. Metals Exch. Corp.*, 693 F. Supp. 168, 191 (D.N.J. 1988).

## ARGUMENT

## I.   THE CFTC CANNOT ESTABLISH THAT MFF COMMITTED FRAUD

The CFTC's allegations of fraud fail at every step: The plain language of Section 4b and Regulation 5.2 do not apply to MFF's customers because they never invested any money in, with or through MFF, they never risked any of their own funds, and they never entered into any commodities, CFDs, or foreign exchange contracts or transactions themselves.  Even if those provisions did apply, the allegedly false statements were in fact true and could not have changed any customer's decision about whether to participate in MFF's programs in any event.  Far from acting with intent to deceive or defraud, MFF and Mr. Kazmi demonstrated consistent, reasonable risk management practices in good faith and designed a positive experience for MFF's customers as they worked to identify profitable traders and share in the benefits they brought.

### A.   None of the Alleged False Statements Were "In Connection With" Any Relevant Contract or Transaction

Section 4b of the CEA prohibits any person "in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with any other person" from cheating, defrauding or willfully

deceiving "the other person."  7 U.S.C. § 6b(a)(2)(A), (C).  Regulation 5.2 similarly prohibits cheating, defrauding, or willfully deceiving any person "in connection with any retail forex transaction."  17 C.F.R. § 5.2(b)(1), (3).  A "retail forex transaction" is defined to include certain foreign exchange contracts with persons other than "eligible contract participants."  *See* 17 C.F.R. § 5.1(m); 7 U.S.C. § 2(c)(2)(C).  A corporation that has total assets exceeding $10,000,000 is an "eligible contract participant."  7 U.S.C. § 1a(18)(A)(v).

Here, the facts cannot support an alleged violation of Section 4b or Regulation 5.2, or even the applicability of the CEA to Defendants' business at all.  As described above, and contrary to the CFTC's repeated misrepresentations, none of MFF's customers ever invested any money in, with, or through MFF.  *See* ECF 23-40 at 34.  No customer was ever party to any contract or agreement to buy, sell, or trade any commodities, CFDs, or foreign currencies.  Dentrinos Decl. ¶¶ 3, 4, 23.  No customer was ever exposed to any financial risk.  ECF 23-4 at 34.  MFF prominently published these facts to all customers prior to them ever choosing to participate in MFF's programs.  MFF cannot be liable for fraud "in connection with" a commodities, CFD, or foreign exchange contract with its customers because MFF's customers never intended to enter into such a contract, and they never did.  *See Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121, 122–23 (5th Cir. 1996) (allegations of fraud under Section 4b were not "in connection with" commodity transaction where plaintiffs "never intended to purchase commodities" and "were never parties to an order for the sale of a commodity").

To the extent CFDs and foreign exchange contracts existed—and most were only simulated—they were entered into solely by MFF, using its own capital, with CDO Markets. Dentrinos Decl. ¶¶ 2, 3, 23.  The CFTC does not and cannot allege that MFF defrauded CDO Markets in any way, and those are the only contracts here potentially subject to Section 4b.

14

Likewise, MFF has assets in excess of $10,000,000, *see* ECF 23-44, so it qualifies as an "eligible contract participant." 7 U.S.C. § 1a(18)(A)(v). As such, MFF's transactions did not constitute "retail forex transactions" that might be subject to Regulation 5.2. *See* 17 C.F.R. § 5.1(m); 7 U.S.C. § 2(c)(2)(C).

The fact that MFF's customers executed contracts and agreements on behalf of MFF does not make them parties to the contracts themselves. "[A]n agent of a disclosed principal, even one who negotiates and signs a contract for her principal, does not become a party to the contract. Moreover, under traditional agency principles, the only other way we understand that an agent can be bound by the terms of a contract is if she is made a party to the contract by her principal acting on her behalf with actual, implied, or apparent authority." *Bel-Ray Co. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 445 (3d Cir. 1999). Here, the customers were acting as independent contractors for and on behalf of MFF pursuant to an agreement that had been reviewed by the OSC, the relevant Canadian regulatory authority, and any contracts they entered into, or CFD or forex transactions they engaged in, pursuant to that independent contractor relationship were transactions by MFF, not the customers.

Ruling that neither Section 4b nor Regulation 5.2 apply to the relationship between MFF and its customers is entirely consistent with the purpose of the CEA, which includes "protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived." *CFTC v. PMC Strategy, LLC*, 903 F. Supp. 2d 368, 376 (W.D.N.C. 2012) (quoting *CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1329 (11th Cir. 2002)). Here, no one was asked to or did invest money in, with or through MFF. Customers paid a fee for a service that was clearly described, and they received that service, including any earnings derived from successful trades and trading activities. Because MFF's

business model falls outside the scope of the CEA, including Section 4b and Regulation 5.2, the CFTC's fraud claims necessarily fail.

**B.    None of the Allegedly Fraudulent Statements or Omissions Can Support a Finding of Fraud**

Beyond its jurisdictional overreach, the CFTC's allegations fail for the simple reason that MFF has not engaged in fraud, so the CFTC necessarily cannot prove its case.  To succeed on its claims of fraud under Section 4b(a)(2)(A), (C) and Regulation 5.2(b)(1), the CFTC must prove "(1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality." *CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1325 (11th Cir. 2018).  The CFTC alleges that Defendants made four misrepresentations and four deceptive omissions. Compl. ¶ 107.  None of these allegations satisfies *any* of the elements.

1.    <u>The Statements the CFTC Alleges Were False or Misleading Were, In Fact, True</u>

(a)    *MFF's Representations About Its Funded Trading Are True*

First, the CFTC alleges that "Defendants claim that 'funded traders' use Traders Global's 'live trading funds' to trade against 'liquidity providers.'" Mot. at 38 (citing ECF 23-40 at 3, 34-35).  In reality, this Frankenstein monster of spliced quotations does not exist on any of the pages the CFTC cites.  Nor has MFF ever made this statement, on its website or otherwise.  What MFF *does* state is that "Our live accounts are on our own server from an institutional technology provider with multiple liquidity sources connected to it."  ECF 23-40 at 34.  That is true.  MFF nowhere represents that all trades will be executed against those liquidity providers.  Quite the opposite: MFF affirmatively notifies customers that it uses simulated accounts and assures them that they will receive profit sharing payouts even on demo accounts.  *See* Speas Decl. ¶ 5, Ex. D ("Why join My Forex Funds?" page from MFF website).  Mr. Kazmi further explained this publicly, detailing how MFF evaluates simulated B-Book traders to determine if they are

consistently profitable.  If B-Book traders prove themselves, "then we will start executing, because we know that whatever you're doing is working."  ECF 23-10 at 20:57-21:24; *see also id.* at 19:27-20:29 ("[N]ot everything gets sent [to a third-party liquidity provider], obviously, because then we won't exist either if we start sending everything.").  The CFTC thus cannot prove that the "common understanding of the information conveyed" was in any way false or misleading.  *See S. Tr. Metals*, 894 F.3d at 1325.

### (b)  *MFF's Customers' Success Is Its Business*

Second, the CFTC takes two quotations from MFF's website out of context to allege that MFF misleads customers about its business model.  One such quotation, "Your success is our business," is described as MFF's "motto" and, in context, immediately precedes MFF's description of its efforts to improve traders' skills: "Our company is interested in assisting traders, helping them grow so that we can grow with them."  ECF 23-40 at 12.  This description of MFF's business is entirely accurate: it exists to evaluate traders, cultivate profitable trading skills, and then identify profitable traders so that both MFF and the traders can make money.  ECF 23-40 at 32 ("At My Forex Funds, our goal is to encourage you, the trader, to remain consistent and profitable so that you can earn from your talent."); *id.* ("Our goal as a company is to find profitable, successful traders and encourage up and comers to become more consistent and profitable and to form a long-term partnership.").  Mr. Kazmi has re-affirmed the importance of developing traders: "Hearing how MFF has … assisted in [traders'] career progression is always inspirational."  ECF 23-40 at 22.  To this end, MFF regularly makes blog posts with trading tips and publishes an online magazine to guide and develop traders. *See* Speas Decl. ¶ 6, Ex. E ("My Forex Funds Magazine" page from MFF website); Speas Decl. ¶ 7, Ex. F (June 2023 edition, Volume 1, of MyForexMagazine); Speas Decl. ¶ 9, Ex. H ("Trading Tips" page from MFF website).

The other quotation, "we only make money if you make money," appears exactly once on MFF's website in the context of describing the lack of minimum trading volume requirements for MFF's "Accelerated" program,[1] which allows traders to skip the evaluation process and start trading immediately based on live market conditions.  ECF 23-40 at 54.  Thus, when taken in context, this statement is not misleading at all.

Nor could these statements mislead any reasonable customer.  All of the relevant facts about MFF's business model are fully disclosed and track common features in the world of forex prop firms.  Its fees are widely publicized.  *See, e.g.*, ECF 23-40 at 40, 68.  Customers are informed that they receive rewards for their profits on simulated accounts.  *See* Speas Decl. ¶ 5, Ex. D ("Why join My Forex Funds?" page from MFF website).   And as discussed below, to the extent MFF does not disclose all of the technical details of its MetaTrader profiles and other software settings, it has no obligation to disclose such basic anti-cheating measures, which the reasonable trader would expect.  Moreover, despite the CFTC's attempt to cast MFF's use of these profiles as widespread, in reality, the profiles were applied to approximately 0.1% of MFF customers, who had exhibited trading behavior that raised concerns about cheating.  Dentrinos Decl. ¶¶ 13, 18.  Only in the CFTC's unsubstantiated imagination are such measures indicative of MFF "work[ing] behind the scenes to make customers lose."  Mot. at 39.

The CFTC's lone cited case does not support its position that these statements are fraudulent.  In *Hunter Wise Commodities*, the defendants were affirmatively representing to investors that they were investing in physical precious metals, including storing the metals in depositories on the investors' behalf, but were actually investing only in margined precious metal trading positions. *CFTC v. Hunter Wise Commodities, LLC,* 749 F.3d 967, 981 (11th Cir. 2014).

---

[1]  Less than four percent of MFF's customers participate in this program.

Unlike in *Hunter Wise Commodities*, in which the "nature of the transaction" was fundamentally different from what the defendants were representing, MFF customers receive exactly what MFF tells them they will receive: the opportunity to trade real or simulated MFF capital, and to attempt to earn a share of profits, in exchange for registration fees.  No fraud can follow from MFF's truthful representations.

(c)     *MFF's Statements About Its Profit Sharing Are True*

Third, the CFTC provides no support for its assertion that MFF misled customers about the source of the funds used for payouts to customers by referring to the payouts as profit sharing.  *See* Mot. at 38; Compl. ¶ 107(c).  Although MFF uses language such as "profit split" when describing its payouts to customers, (ECF 23-40 at 6), its website also clearly informed customers that they would be "rewarded for the profits they make on simulated accounts."  Speas Decl. ¶ 5, Ex. D ("Why join My Forex Funds?" page from MFF website).   MFF further uses the word "profit" in contexts that expressly refer only to simulated accounts and thus could never achieve any real profit.  *See, e.g.*, ECF 23-40 at 41, 46.  The "common understanding" of these statements taken in their entirety—not the cherry-picked quoted phrases the CFTC takes out of context—is that MFF pays customers based on a percentage of the profits reflected in their real or simulated trading accounts, ***not*** that the funds for the payouts came directly from the proceeds of profitable trades.  This common understanding is reinforced by the consistent use of the same business model throughout the forex prop firm industry.  *See, e.g.*, Speas Decl. ¶ 14, Ex. M (Billions Club website describing profit share from virtual accounts). No reasonable consumer would be misled by the allegedly false statements.

This common understanding aligned precisely with what MFF did.  Indeed, the CFTC correctly notes that MFF paid out over $159 million in shared profits to its customers (ECF 23-44 ¶ 48), and admits that "Defendants pay money to successful customers."  Mot. at 38.  In other

words, MFF does exactly what it tells its customers it does.  And MFF's customers agreed: of hundreds of thousands of customers, only a handful ever voiced any dissatisfaction with the company's services, and, notably, the CFTC has produced ***no*** evidence of any customer complaints in support of its baseless claim that these customers were the victims of fraud.

(d)   <em>The Drawdown Limit Is Truthfully Described</em>

Fourth, the CFTC's allegation that MFF misrepresents the purpose of the drawdown limit is contradicted by the evidence.  The drawdown limit is clearly communicated to all of MFF's customers on its website.  *See, e.g.*, ECF 23-40 at 27, 34, 54, 60, 66.  The limit is intended to provide customers with an incentive to lock in profits earned from trading MFF's capital (real or simulated) in order to cultivate trading behaviors that are more likely to be profitable in the long-term.  Customers who violate the drawdown limit—and, thus, whose trading has led to a significant loss—have their accounts closed because they are unlikely to be good candidates and unlikely to become profitable traders with MFF's capital.  Dentrinos Decl. ¶ 12.  Lacking any evidence to refute this, the CFTC instead resorts to rank speculation that the drawdown limits are "a pretext to suspend customer accounts."  Mot. at 39.  To the contrary, the drawdown limits are sensible measures to prevent reckless trading.  Dentrinos Decl. ¶ 12.  Not only are they clearly disclosed by MFF on its website and in various other media including YouTube and Discord posts, but they are standard throughout the industry. *Id*.  In fact, MFF's drawdown limits are significantly more favorable to its customers than those of other forex prop firms. *Id*; *see, e.g.*, Speas Decl. ¶ 4, Ex. C (Maven Trading limits total drawdown to 9%); Speas Decl. ¶ 16, Ex. O (SurgeTrader imposes 8% drawdown limit).  The CFTC's unsupported speculation to the contrary cannot satisfy its burden of establishing that MFF violated the CEA.

20

2.      None of the Alleged Statements Are Material

Moreover, the CFTC not only fails to identify a single false or misleading statement, it also offers no evidence to support its summary assertions that the statements, even if false or misleading, were material. "A statement or omission is material if 'a reasonable investor would consider it important in deciding whether to make an investment.'" *CFTC v. WorldWideMarkets, Ltd.*, No. CV2120715KMLDW, 2022 WL 3535993, at *13 (D.N.J. Aug. 18, 2022), *motion to certify appeal denied sub nom. CFTC v. WorldWide Markets, Ltd.*, No. CV2120715KMLDW, 2022 WL 4115708 (D.N.J. Sept. 9, 2022) (quoting *CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 447 (D.N.J. 2000)).

First, and further revealing the CFTC's gross overreach, none of the statements could possibly have been "important in deciding whether to make an investment." *Id.* None of MFF's customers made ***any*** investment, or were solicited to make any investment in, with or through MFF. MFF customers pay a registration fee to participate in its programs, but all funds (real or simulated) used in the trading accounts belong to MFF, not the customers. *See, e.g.*, ECF 23-40 at 34 ("Keep in mind that you will not be allowed to withdraw the capital on this account, as that will be funded by our firm, and those funds are considered our invested capital."). Customers are, in fact, prohibited from "add[ing] or decreas[ing] any funds from your account;" indeed, MFF's system does not even have a function that would make this possible. ECF 23-40 at 33. Customers are also not "liable for any financial losses" as a result of trading losses in their accounts. *Id.* at 34. No customer's relationship with MFF has any indicia of being an "investment," so no statement can plausibly be said to be "important in deciding whether to make an investment." *WorldWideMarkets, Ltd.*, 2022 WL 3535993, at *13.

Second, even setting aside that fundamental defect in the CFTC's allegations, none of its allegations of materiality survive even the most basic logical scrutiny. The CFTC offers no reason

21

to believe that any customer would make a decision based on the precise nature of the trading taking place and whether that trading was real or simulated.  Nor does the CFTC offer any reason to believe that a customer would make a different decision about whether to participate in MFF's programs based on the flow of funds for the payouts they expected to receive.  Customers participate in MFF's programs because they believe—correctly—that they will have the opportunity to receive payouts if they can execute profitable trades.

Similarly, customers considering drawdown limits when deciding whether to participate in MFF's programs have full access to all information about those limits.  *See, e.g.*, ECF 23-40 at 27, 34, 54, 60, 66.  Even if there were some secondary motivation behind the drawdown limits (which there was not), such a motivation does not change the parameters of the relationship between MFF and its customers.  And those parameters, not subjective motivations, are what inform any reasonable customers' decision about whether to participate in the program.

Case law does not save the CFTC's deficient case.  In *PMC Strategy, LLC*, the sole case the CFTC cites in support of its claim that any of these statements were material, the defendants misrepresented or omitted that "the Defendants were not experienced traders, that their personal forex trading was unsuccessful, that PMC consistently put more than two percent of pool participant funds at risk, and that any purported profits on investment were being paid using other PMC pool participants' money as part of a Ponzi scheme."  *CFTC v. PMC Strategy, LLC*, 903 F. Supp. 2d 368, 379 (W.D.N.C. 2012).  Here, although the CFTC flippantly asserts that MFF "operates in the manner of a Ponzi scheme," Mot. at 13, that assertion is belied by the simple facts.  In a Ponzi scheme, early investors are paid out using later investors' money (*i.e.*, money that still rightfully belongs to the later investors at the time it is paid out).  Here, by contrast, MFF pays its customers using its own funds—no "investor money" is ever received, let alone used.  The

registration fees MFF receives from its customers become its property as soon as they are paid. This is in stark contrast to a bank or investment brokerage that takes custody of customer funds and invests them. MFF has every right to pay profits to B-Book traders using the funds that it rightfully owns and lawfully obtained. The source of those funds—whether from live market profits or cash held by MFF—is immaterial to any customer's decision whether to participate in the programs because all customers are paid as agreed in any event. At all times, MFF had the capacity to pay all of its liabilities, including customer payouts, using its own funds.

### 3.   My Forex Funds Had No Duty To Disclose the Information the CFTC Alleges Was Fraudulently Omitted

Section 10(b) of the Securities Exchange Act, which "provide[s] appropriate guidance for fraud claims under Section 6b of the CEA, *CFTC v. M25 Investments Inc.*, 09-CV-1831, 2010 WL 769367, at *2 n.1 (N.D. Tex. Mar. 6, 2010), "do[es] not create an affirmative duty to disclose any and all material information." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017). But "[o]nce a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make the disclosure misleading." *Id.* This means that "a plaintiff must show that the defendant made a statement that was *misleading* as to a *material* fact." *In re Ocugen, Inc. Sec. Litig.*, 21-CV-2725, 2023 WL 2351695, at *7 (E.D. Pa. Mar. 3, 2023) (emphasis in original). An omitted fact is material if "there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc.*, 485 U.S. at 231-32 (citation omitted). To determine materiality of an omitted fact, courts evaluate whether a defendant "sufficiently disclosed facts and information that would render the alleged misrepresentations not misleading." *Fan*, 927 F.3d at 716-17 (finding that statements alleged to be fraudulently misleading were "rendered immaterial given the pertinent disclosures.").

Here, the CFTC alleges that MFF committed fraud by omitting four items of information: (1) that commissions are assessed by MFF and by a third party, (Mot at 40); (2) that MFF implements slippage and delay for certain customers' accounts, (Compl. ¶ 107(f)); (3) that MFF expects customers whose trades are sent to CDO Markets to lose money, (Mot. at 40); and (4) that MFF "imposes artificial spreads" on prices visible to customers whose trades are sent to CDO Markets. *Id.* None of these allegations can establish a *prima facie* case of fraud by material omission.

First, contrary to the CFTC's bald assertion that "customers are led to believe" that commissions are charged by a third party, (Mot. at 40), MFF's website expressly states that "The commission is $3 per lot on our server, Traders Global Group." ECF 23-40 at 75. Even if this statement could be somehow interpreted to omit the fact that MFF (*i.e.*, Traders Global Group) was charging the commission, the source of the commission is immaterial to the customers' decision making. Each customer knows, before paying any fee to MFF, that he or she will be charged a $3 commission per lot while trading. That trader's profits—and, thus, potential payout—are identical whether that commission is charged by MFF or some third party. More detailed information regarding the commission is therefore immaterial, and MFF had no obligation to disclose it.

Second, while MFF clearly disclosed that abusive trading practices like latency arbitrage and tick scalping are prohibited, MFF has not spoken publicly about the specific technical specifications of the MetaTrader platform or the measures it takes to prevent exploitation of that platform. Therefore, it had no obligation to disclose details of its use of delay, slippage, or other MetaTrader settings to mimic real market conditions. *See Williams*, 869 F.3d at 241. MFF's lack of duty to disclose this information is further confirmed by the information's immateriality.

Slippage is an inherent part of any trading system that exists because of market volatility and the possibility that the available volume of a specific contract at a certain price may be insufficient to cover an entire order at that price.  No disclosure of a fundamental aspect of a trading system could affect any reasonable customer's decision making.  Likewise, delay was used to protect the MetaTrader platform's deficiencies and in turn MFF's capital from cheaters.  Knowing that the displayed price was, in reality, delayed by a tiny fraction of a second, would not "significantly alter[] the 'total mix' of information made available" to a customer choosing to participate in MFF's programs. *Basic Inc.*, 485 U.S. at 231-32

Third, the CFTC's cited out-of-context evidence does not support its fabricated claim that MFF expected its customers to fail when it sent their trades to CDO Markets instead of maintaining them internally.  At most, the cherry-picked quotes from an email and six lines from a chat transcript hundreds of pages long, support the proposition that, as of the date of those messages (at the latest, mid-2022), STP traders had not been profitable.  Mot. at 20 (citing ECF 23-12 at 3, 6; ECF 15); Dentrinos Decl. ¶ 26.  Moreover, MFF did not publicize its expectations about whether or when customers would make profitable trades, so it had no obligation to specifically disclose any expectations it had with respect to customers whose trades it sent to CDO Markets. Nor would such expectations be material to any customer, who would make the decision to participate in MFF's programs based on whether *he or she* expected to make money by participating in the program.  All pertinent information for that decision—including the amount of the fee, the types of trades that could be executed, the size of accounts, and the leverage—were fully disclosed.  *See, e.g.*, ECF 23-40 at 30, 87-90; Speas Decl. ¶ 10, Ex. I (April 12, 2022 MFF blog post titled "True Market Conditions"); Speas Decl. ¶ 12, Ex. K (July 15, 2022 MFF blog post titled "Slippage –

how to minimize or avoid it").  MFF's subjective expectation would have no bearing on this decision.

Fourth, MFF had no obligation to disclose information about the technical details of its pricing feed and how that pricing information was displayed on MetaTrader for customers.  MFF set parameters within MetaTrader to more closely mirror the slippage traders would experience in the live market.  Dentrinos Decl. ¶ 19.  A customer's trading strategies and profits, and his or her decision to participate in the program, would be unaffected by additional technical information about the prices fed to MFF and then displayed on MetaTrader.

### C.    The CFTC Has Presented No Evidence of Scienter

Lastly, the CFTC has utterly failed to present a *prima facie* case that any of the Defendants acted with the scienter necessary to support a fraud allegation.  Scienter is an "intent to deceive, manipulate, or defraud." *CFTC v. Equity Fin. Grp. LLC*, 572 F.3d 150, 159 (3d Cir. 2009) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976)).  To satisfy this element, the CFTC must show that Defendants intended to make material false statements for the purpose of defrauding investors.  *See CFTC v. Cifuentes*, No. 216CV06167ESJAD, 2018 WL 1904196, at *2 (D.N.J. Apr. 20, 2018); *Tradewale LLC*, 2023 WL 3250272, at *5.  Section 4b codifies this: to be liable, Defendants must have acted "to cheat or defraud" or "willfully to deceive" investors. 7 U.S.C. § 6b(a)(2)(A), (C).

Judicial interpretations of each of those terms reveal how far the CFTC falls from possibly being able to meet its burden.  "Cheat" and "defraud" are both words that courts, including the Supreme Court and multiple Circuit Courts of Appeal, have held require an intent to use falsity to wrongfully obtain property from another for one's own benefit.  *See, e.g.*, *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) ("defraud" required that target of deception be obtaining property); *Shaw v. United States*, 580 U.S. 63, 72 (2016) (scheme to defraud "must be one to deceive the

[victim] and deprive it of something of value"); *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020).  An act done "willfully" must similarly be done with understanding of the act's wrongfulness: "a person acts 'willfully' if she 'intentionally does an act which is prohibited.'" *CFTC v. Crombie*, 914 F.3d 1208, 1213 (9th Cir. 2019) (quoting *Lawrence v. CFTC*, 759 F.2d 767, 773 (9th Cir. 1985)).  The evidence, which establishes that MFF and Mr. Kazmi acted consistently with good faith and in an effort to be fair toward MFF's customers, cannot establish any of the required elements of the CFTC's claims.

As a preliminary matter, the CFTC's allegations again fail definitionally: MFF customers were not "investors," so no statements to them could possibly have been made for the purpose of defrauding investors.

But the deficiencies in the CFTC's case do not stop there. To the extent it offers any evidence of scienter, the CFTC relies on misleadingly cherry-picked quotations taken entirely out of context to show that MFF and Mr. Kazmi acted with scienter.  Each of these mischaracterizations highlights the CFTC's failure, despite more than a year of investigation, to speak to key witnesses, including *any* officer or staff member of MFF, let alone any of the parties to the communications that it is now twisting to condemn MFF.  Notably, even out-of-context, the CFTC fails to present any statements that Mr. Kazmi made that it can even allege were made with the intent to cheat, defraud or deceive anyone.  Three examples show how utterly the CFTC's efforts to establish bad faith fail.

First, the CFTC excerpts a chat conversation MFF's Joshua Dentrinos had with iSRisk on June 16, 2022 regarding a trader who both Mr. Dentrinos and iSRisk were attempting to assess. Mot. at 23.  In that conversation, Mr. Dentrinos notes that he suspended an account because the trader was engaging in latency arbitrage—a violation of MFF's clearly stated rules—and Mr.

Dentrinos was trying to better understand the trader's behavior.  ECF 23-12 at 23, line 6873.  Mr. Dentrinos' statement that "I really need to know what they are doing so I can either ban them or make a fight with cdo" reflects the decision he was making: if the trader's strategy was impermissible arbitrage, the account would be banned.  *Id.* at line 6875; Dentrinos Decl. ¶ 26.  If it was not, and was a profitable, permissible strategy, MFF would STP the account, sending the trades to be executed with real MFF capital with CDO Markets, thus potentially earning money for both MFF and the customer.  Dentrinos Decl. ¶ 26.  When, eleven minutes later, the trader's behavior abruptly changed, Mr. Dentrinos noted that "he finally realized the opportunity stopped," suggesting that he had been executing an illicit arbitrage strategy but could no longer do so.  ECF 23-12 at 24, line 6880; Dentrinos Decl. ¶ 26.  Mr. Dentrinos' comment that "I need something to stop that money going out" referred to MFF's next decision: the customer had earned a payout of approximately $100,000 that MFF would pay unless it had strong evidence that the trader had been engaged in impermissible arbitrage.  ECF 23-12 at 24, line 6883; Dentrinos Decl. ¶ 26.  Ultimately, MFF afforded the trader the benefit of the doubt and paid him the full amount.  Dentrinos Decl. ¶ 26.

Second, the CFTC misleadingly quotes a conversation Mr. Dentrinos had with iSRisk on April 15, 2022 regarding a customer who was using a bot.  Contrary to the CFTC's characterization, the bot was not "successfully generat[ing] profits," Mot. at 24, it was generating profits in the simulated B-Book environment by exploiting deficiencies in MetaTrader.  Dentrinos Decl. ¶ 27.  Specifically, the bot exploited a cap on slippage that MFF implemented in order to provide a better simulated experience during a period of high volatility.  *Id.*  As a result, instead of the customer's bot's trades slipping to a less favorable price (as would occur in a real-world market), the bot executed the trades at artificial prices, incurring large profits.  *Id.*  Because the bot

relied on abusing the deficiencies of MetaTrader, Mr. Dentrinos and iSRisk agreed that this customer's strategy would not be successful in real market conditions and would not be profitable if STP'd.  ECF 23-12 at 13, lines 4490-91; Dentrinos Decl. ¶ 27.  The bot's strategy also violated MFF's rules against cheating MetaTrader, so MFF removed the trader's slippage cap to kill the bot's strategy, which Mr. Dentrinos colloquially described as "slip[ping] them to hell."  ECF 23-12 at 13, lines 4487-88; Dentrinos Decl. ¶ 27.  Before doing so, however, MFF notified the bot owner of this remedy, so he incurred no losses when the change took place.  Dentrinos Decl. ¶ 27.  MFF ultimately paid not only the bot owner, but more than two hundred other customers who had paid the bot's original owner to use it too.  *Id.*; *see id.*, Ex. D (invoice confirming payment to bot owner).

Third, the CFTC mischaracterizes excerpts of Mr. Dentrinos' July 15, 2022 messages to iSRisk regarding his dissatisfaction with their ability to identify profitable accounts which could be STP'd.  Mot. at 23.  Mr. Dentrinos' statement that he was "pretty upset" that accounts were "making huge amounts of money" related directly to his frustration with iSRisk's preference to "b-book everything and hope" rather than STP'ing profitable accounts.  ECF 23-12 at 25, line 9026; Dentrinos Decl. ¶ 28.  The CFTC's assertion that this statement expressed a desire "to find and eliminate profitable traders" is pure conjecture based on its decision to ignore (and misleadingly omit) Mr. Dentrinos' reference to the "b-book everything and hope" plan.  Mot. at 23; Dentrinos Decl. ¶ 28.  In fact, MFF regularly sought to STP profitable accounts (thus allowing both the customer and MFF to benefit), but was often met with resistance from iSRisk.  Dentrinos Decl. ¶ 28.

Additional evidence further confirms that MFF and its officers and staff, including Mr. Kazmi, consistently acted in good faith.  For example, on June 10, 2022, MetaTrader showed an

29

erroneous, impossibly massive, momentary spike in the price of Bitcoin.  Dentrinos Decl. ¶ 29.

As a result of this error, numerous MFF customers lost money on trades, an outcome that the CFTC

alleges—based on nothing but speculation and its own insistence on seeing ill-will where none

existed—MFF desired.  *Id*.  But MFF actually instructed iSRisk to rectify the error and restore the

trading losses to the affected customers.  *Id*.

   As another example, on July 18, 2022, MFF identified a trade that was subject to slippage

despite market conditions that should not have caused the trade to slip.  Dentrinos Decl. ¶ 30.  Mr.

Dentrinos contacted iSRisk to assess the reasons for this slippage and specifically noted that if

iSRisk was unable to identify the issue that caused the slippage, MFF would refund the customer

for the effects of the slippage. *Id*.; Ex. F (July 19, 2022 message from Mr. Dentrinos stating, "any

ideas? or i will just refundi t [sic]"); *see also id*., Ex. E (May 30, 2022 message from Mr. Dentrinos

to iSRisk reflecting that MFF will refund customers who were negatively impacted by an error in

the pricing feed).

   Lastly, even when MFF identified customers who were cheating and exploiting its system,

including through the practices that MFF clearly and publicly prohibited, it did not simply close

those customers' accounts despite having the right to do so under the terms to which the customer

agreed.  Instead, MFF offered the customer a refund if the customer either sent it a copy of the bot

that conducted the exploitative trading or described to MFF what specifically the customer had

been doing. Dentrinos Decl. ¶ 27.

   MFF has also consistently cooperated with regulatory inquiries from the OSC, including

by responding to information requests on multiple occasions, and the Commissione Nazionale per

le Società e la Borsa (the public authority responsible for regulating the Italian financial markets).

Dentrinos Decl. ¶ 6.  MFF would have cooperated similarly with the CFTC if it had deigned to

30

contact anyone at MFF before moving secretly to shut down its entire business. *Id.* Engaging in good faith discussions with regulators illustrates the efforts Mr. Kazmi and MFF made to do right by their customers and to abide by applicable laws.

*      *      *

Taken together, the record confirms that, far from acting with the intent to deceive or defraud, MFF and Mr. Kazmi were taking reasonable measures to protect their company from cheaters while also doing right by their customers, including by affording the benefit of every doubt to customers suspected of prohibited behavior. None of the CFTC's so-called misrepresentations or omissions reflect any scheme to defraud, no matter how hard the CFTC wishes they did. Truthful statements, made in the good faith operations of a business, are perfectly legal.

## II. THE CFTC WILL NOT BE ABLE TO PROVE THAT MY FOREX FUNDS IS A RETAIL FOREIGN EXCHANGE DEALER OR ENGAGED IN UNLAWFUL OFF EXCHANGE TRADING

"Retail foreign exchange dealer means any person that is, or that offers to be, the counterparty to a retail forex transaction." 17 C.F.R. § 5.1(h)(1). A "retail forex transaction" is defined to include certain foreign exchange contracts with persons other than "eligible contract participants." *See* 17 C.F.R. § 5.1(m); 7 U.S.C. § 2(c)(2)(C). Similarly, an off-exchange agreement, contract, or transaction in any commodity is only unlawful if it is "entered into with, or offered to … a person that is not an eligible contract participant." 7 U.S.C. § 2(c)(2)(D)(i), (iii) (establishing parameters for applicability of Section 4(a) of the CEA, 7 U.S.C. § 6(a)).

For the reasons described above, MFF did not enter into, offer to enter into, or serve as a counterparty to any transaction with any person who was not an eligible contract participant. MFF's customers were not parties to any commodities or foreign exchange transactions on MFF's behalf; they signed independent contractor agreements before being permitted to trade under

31

market conditions using MFF's capital.  Dentrinos Decl. ¶¶ 4, 5.  Because the only commodities or foreign exchange contracts MFF entered were between itself, an eligible contract participant, and CDO Markets, another eligible contract participant, those transactions neither render MFF a Retail Foreign Exchange Dealer nor constitute unlawful off-exchange trading.

## III.    EVEN IF A PRELIMINARY INJUNCTION IS GRANTED, ITS SCOPE SHOULD BE NARROWLY TAILORED

A pretrial asset freeze is an "extraordinary remedy," *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 340 (1999) (Ginsburg, J., concurring in part). Under the CEA, "a court may exercise its equitable power only over the property causally related to the wrongdoing." *CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 78–79 (3d Cir. 1993) (cleaned up). Therefore, a claim for equitable relief "will only warrant imposition of a pre-judgment asset freeze when the freeze bears a sufficient nexus to both the merits of the action and the particular property sought." *CFTC v. Next Fin. Servs. Unlimited, Inc.*, No. 04-80562-CIV, 2005 WL 6292467, at *12 (S.D. Fla. June 7, 2005). A court may "freeze a defendant's assets to ensure the adequacy of a disgorgement remedy," *CFTC v. Levy*, 541 F.3d 1102, 1114 (11th Cir. 2008), but not civil monetary penalties or restitution. *See CFTC v. Escobio*, 946 F.3d 1242, 1254 (11th Cir. 2020).

Under these principles, the Court should deny the CFTC's motion for a preliminary injunction as being unnecessary to preserving Defendants' assets.  As detailed in Defendants' briefing on their Motion to Modify the Statutory Restraining Order, ECF 42-1, 73, 99-1, far from preserving Defendants' assets, an order restricting Defendants' use of their assets has caused, and will continue to cause, harm to those assets by preventing Defendants from using MFF's resources to ensure that the assets are properly protected (*e.g.*, to address chargebacks, to pay trade creditors, and to pay for insurance).  Thus, Defendants' assets should be, and should remain unfrozen during the pendency of this litigation.

Even if the Court determines that some injunction is appropriate, however, that order should be limited to freezing any funds causally linked to the alleged wrongdoing such that they may be subject to disgorgement (of which Defendants maintain there are none). Such disgorgement amount, if any, should be no more than $10,370,878.10, which represents the gross profits MFF earned from traders in the live trading environment who did not qualify for payment.[2] Such traders comprise, at most, only 6% of all MFF accounts over time. No receiver is necessary or appropriate to implement such a limited freezing order, with which Defendants will continue to fully comply.

Any injunction should also apply only to the MFF corporate entities and not to Mr. Kazmi personally, who is not alleged to have made any fraudulent representations and who is a Defendant in this litigation solely on the theory that he is a control person for the other Defendants.  Freezing Mr. Kazmi's personal assets, including those necessary to care for his family, is not appropriate or necessary to safeguard assets for any future disgorgement remedy.

The Court should further limit any injunction by permitting reasonable allowances, on an ongoing basis, to pay Defendants' innocent staff members, asset-preservation expenses, the living expenses of Mr. Kazmi and his family, and Defendants' legal fees to permit them to litigate this case.  *See* ECF 99-1.  These reasonable carve outs are justified as a matter of equity and will not impact Defendants' ability to pay an adverse judgment.

---

[2] This figure is the absolute most that could be subject to disgorgement.  Defendants reserve all rights to present evidence of legitimate business expenses that must be considered before determining the amount of allegedly ill-gotten gains subject to disgorgement. *Cf. Liu v. SEC*, 140 S. Ct. 1936, 1946, (2020) (limiting disgorgement available in Securities and Exchange Commission enforcement actions to net profits).

## CONCLUSION

For the foregoing reasons, the CFTC's *Ex Parte* Motion for Statutory Restraining Order

and Preliminary Injunction should be denied.

Dated: October 31, 2023                              **Respectfully Submitted,**

                                        __/s/ Anthony J. Staltari_____
                                        QUINN EMANUEL URQUHART &  SULLIVAN
                                        LLP

                                        Anthony J. Staltari (Attorney ID No. 233022017)
                                        51 Madison Avenue, 22nd Floor
                                        New York, NY 10010
                                        Tel: (415) 875-6600
                                        anthonystaltari@quinnemanuel.com

                                        Michael Shaheen, III (*pro hac vice*)
                                        Robert A. Zink (*pro hac vice*)
                                        Kurt Wolfe (*pro hac vice*)
                                        QUINN EMANUEL URQUHART & SULLIVAN,
                                        LLP
                                        1300 I Street, NW, Suite 900
                                        Washington, D.C. 20005
                                        Tel.: (202) 538-8000
                                        michaelshaheen@quinnemanuel.com
                                        robertzink@quinnemanuel.com
                                        kurtwolfe@quinnemanuel.com

                                        Dakota Speas (*pro hac vice*)
                                        QUINN EMANUEL URQUHART & SULLIVAN,
                                        LLP
                                        865 S. Figueroa St., 10th Floor
                                        Los Angeles, CA 90017
                                        Tel.: (213) 443-3000
                                        dakotaspeas@quinnemanuel.com

                                        *Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

ANTHONY J. STALTARI, hereby certifies pursuant to 28 U.S.C. § 1746 that on this date, I filed the aforementioned document with the CM/ECF system for the U.S. District Court for the District of New Jersey, thereby effectuating service upon all counsel of record via electronic means.

I certify under the penalty of perjury that the foregoing statements are true and correct. Executed in New York, New York on this 31st day of October.

_/s/ Anthony J. Staltari_____
Anthony J. Staltari
