Anthony J. Staltari (Attorney ID. No. 233022017)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel.: (415) 875-6600
anthonystaltari@quinnemanuel.com

Michael Shaheen, III (*pro hac vice*)
Robert A. Zink (*pro hac vice*)
Kurt Wolfe (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Tel.: (202) 538-8000
michaelshaheen@quinnemanuel.com
robertzink@quinnemanuel.com
kurtwolfe@quinnemanuel.com

Dakota Speas (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Tel.: (213) 443-3000
dakotaspeas@quinnemanuel.com

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Commodity Futures Trading Commission,<br><br>*Plaintiff*,<br><br>v.<br><br>Traders Global Group Inc., a New Jersey corporation, d/b/a "My Forex Funds"; Traders Global Group Inc., a Canadian business organization; and Murtuza Kazmi,<br><br>*Defendants*. | Case No.: 3:23-cv-11808<br><br>**DECLARATION OF JOSHUA DENTRINOS IN OPPOSITION TO PLAINTIFF'S *EX PARTE* MOTION FOR STATUTORY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

I, Joshua Dentrinos, declare pursuant to 28 U.S.C. § 1746 that:

1. I am the head of Risk of Traders Global Group, Inc., which does business as "My Forex Funds" ("MFF"). I have worked in the forex industry for approximately 15 years in front-end and executive positions. I reside in Greece.

2. MFF is a foreign exchange proprietary trading firm, or "forex prop firm," which permits individuals to trade MFF's capital, either in a simulated or live market account, in exchange for paying registration fees.

3. MFF is not a brokerage. MFF never invests money on behalf of its customers or takes custody of any customer investments. MFF's customers are never party to any trades on MFF's behalf.

4. MFF does not allow its customers to trade deliverable (*i.e.*, physical) products. Such trades are not possible in MFF's system. MFF's customers are permitted to trade foreign exchange contracts and contracts for difference ("CFDs.").

5. After passing MFF's "Evaluation" program (see Paragraph 11, *infra.*), MFF's customers sign independent contractor agreements before being permitted to trade under live market conditions. Traders who have "Accelerated" accounts, which allow them to trade under live market conditions without first proceeding through the Evaluation program, also have to sign independent contractor agreements prior to trading.

6. To my knowledge, MFF has cooperated with the Ontario Securities Commission and Commissione Nazionale per le Società e la Borsa (the public authority responsible for regulating the Italian financial markets) on regulatory inquiries, including responding to

information requests on various occasions. I believe MFF would have cooperated similarly with the CFTC if the CFTC had contacted MFF before it filed this lawsuit shutting down the business.

7. It is standard industry practice for forex prop firms such as MFF to collect up-front registration fees from its customers before allowing them to participate in their programs.

8. To manage risk, MFF has most of its customers trade simulated MFF capital based on simulated market conditions before it permits them to trade under live market conditions. If the customers' trades are profitable, either in a simulated or live environment, they are paid a share of the profits they generate.

9. MFF also publishes guidance to help traders develop their skills.

10. MFF uses a number of mechanisms to identify which customers should be permitted to trade using real MFF capital, while remaining customers trade using simulated MFF capital. In either circumstance, the customer's trading platform and payout are the same.

11. For example, in MFF's Evaluation program, traders must complete and pass two challenge demonstration phases, the purpose of which is to ensure that MFF's capital will be used by customers who have demonstrated their ability to trade in a responsible and profitable manner. Approximately 93% of MFF's customers register in the Evaluation program, and about 8% of MFF's customer accounts pass the two challenge phases of MFF's Evaluation program. If a customer does not pass both challenge phases, his or her account is deactivated. In addition, even after completing the two challenge phases, a majority of MFF's customers continue to trade simulated MFF capital, though they share profits as if the trades were real.

12. As another risk mitigation measure, all MFF customers must agree to abide by clearly disclosed drawdown limits, which are posted on MFF's website and other media, including YouTube and Discord posts. If traders' losses exceed the drawdown limits, their accounts are

deactivated.  Accounts that experience losses in excess of these limits are generally not profitable, and those customers are thus unsuitable to trade MFF's capital.  The imposition of drawdown limits is standard throughout the forex prop firm industry as a means to discourage reckless trading.  Many of MFF's competitors impose drawdown limits that are smaller that those imposed by MFF.

13. An additional measure MFF uses to manage risk is assessing which customers' trading practices are likely to be replicable in the live market. Accordingly, MFF implemented a number of widely understood policies and technical limitations to prevent customers from cheating its systems and generating fake profits, as well as to closely mirror real trading with MFF's liquidity provider, CDO Markets.

14. MFF uses MetaTrader to relay pricing and trade information to MFF's customers. MetaTrader is a software platform produced by MetaQuotes that allows customers to view market conditions and make real or simulated foreign exchange and CFD trades.  MetaTrader is by far the most widely used platform amongst forex prop firms.

15. Like other forex prop firms, MFF has implemented a number of standard policies and technical limitations to prevent customers from exploiting MetaTrader's deficiencies and generating fake profits.  These limitations are also designed to closely mirror real trading with MFF's liquidity provider, CDO Markets.

16. For example, due to MetaTrader's technical infrastructure, the information it relays to MFF traders is subject to bandwidth latency (*i.e.*, delay) from real-time market conditions.  The latency is not consistent, however: some of MFF's customers received pricing information faster than others due to the customers' geographic location, allowing certain MFF traders to cheat the system and earn thousands of dollars in apparent profits that did not actually exist.  Due to this latency and the need for MFF to prevent exploitation of it—both because it generated illegitimate

profits that prevented MFF from accurately evaluating traders and because traders would not be able to replicate it in real market conditions—MFF explicitly prohibits trading strategies that rely on latency arbitrage or other abusive practices.  MFF described the problems created by exploitative arbitrage trading in detail on its blog and detailed the steps it takes to attempt to limit this abuse, including applying and capping "slippage."

17. Bans on abusive trading practices and the measures MFF has taken to prevent them are common industry practice among forex prop firms, all of which seek to prevent customers from reaping ill-gotten gains by exploiting technological deficiencies.

18. MFF relied on advice from iSRisk, now known as iSAM, to implement technical limitations on traders suspected of engaging in prohibited practices.  Specifically, iSRisk recommended that MFF create profiles for a small minority of customers (about 0.1% of MFF's customers overall) exhibiting abusive trading strategies.  Further, iSRisk specifically recommended that MFF implement delay on certain profiles because MFF was otherwise "providing an advantageous trading environment" that was more likely to lead to profitable trading than real-world market conditions.  Attached as **Exhibit A** is a true and correct chat log of messages between me and members of iSRisk on February 7, 2022, excerpted from the iSRisk-produced document bearing Bates number IS Risk Analytics-0000006303 ("[S]ince you're filling everything at TOB as opposed to depth, you're already providing an advantageous trading environment, particularly for more sizable orders.  Applying a slightly larger delay would even the playing ground a little.").

19. In trading parlance, slippage is the difference between the expected price of a trade and the price at which the trade is actually executed.  It can occur either when the price is volatile or when a large order is entered but the market does not have enough volume at the expected price

to maintain that price for the entire trade. MFF set parameters within MetaTrader to more closely mirror the slippage traders would experience in the live market. iSRisk assured MFF that the slippage being implemented "is natural and resembles real market execution." Attached as **Exhibit B** is a true and correct chat log of messages between me and members of iSRisk on January 19, 2022, excerpted from the iSRisk-produced document bearing Bates number IS Risk Analytics-0000006303. When iSRisk recommended implementing slippage that did *not* mirror market conditions, MFF explicitly rejected its recommendation. Attached as **Exhibit C** is a true and correct chat log of messages between me and members of iSRisk on January 31, 2022, excerpted from the iSRisk-produced document bearing Bates number IS Risk Analytics-0000006303 ("[W]e don't want to do anything too artificial that isn't replicating true market [conditions].").

20. Slippage stymies abusive strategies such as latency arbitrage and scalping, which depend on tiny price movements and rapid-fire trading, by making it more difficult to exploit large volume trades dependent on minute price differences. By observing how traders performed under parameters that included slippage, and thus more closely mirrored real-market trading with CDO Markets, MFF could more accurately assess which traders using simulated MFF capital could eventually trade profitably using real MFF capital.

21. MFF's implementation of slippage in this way was entirely consistent with standard industry practices.

22. MFF prominently discloses the commission it charges its traders on the MetaTrader platform ($3 per lot). Like other forex prop firms, MFF imposed this commission to better simulate real-world trading parameters. MFF's commissions are amongst the industry's lowest.

23. To the best of my knowledge, based on its evaluation of its customers' trading performance, MFF identified a small group of its customers whose trading with MFF's real capital

was likely to be profitable. MFF consistently transmitted approximately 1% of its customers' trades to its external liquidity provider, CDO Markets, via "straight through processing" or "STP." This trading model is known as "A-Book." Each of these trades was executed by and on behalf of Trader's Global Group Inc., the MFF corporate entity registered in Canada. MFF's U.S. entity did not execute any trades.

24. For customers not on STP, the trades they make use simulated MFF capital and are internalized in MFF's systems. This trading model is known as "B-Book."

25. This A-Book/B-Book distinction is one widely used in the forex prop firm industry that is well-publicized and known to customers. Regardless of whether a customer's account is on the A-Book or B-Book, MFF paid every customer per the terms of the program for which they registered. This common framework is reinforced by the use of similar business models throughout the forex prop firm industry.

26. The CFTC has mischaracterized a chat conversation I had with employees of iSRisk on June 16, 2022 regarding a particular trader we suspected of cheating. In that conversation, I noted that I suspended an account for latency arbitrage—a violation of MFF's clearly stated rules—and was trying to better understand the trader's behavior. ECF 23-12 at 23, line 6873. My statement that "I really need to know what they are doing so I can either ban them or make a fight with cdo" reflects the decision I was making: if the trader's strategy were impermissible arbitrage, the account would be banned. *Id.* at line 6875. If it were not, and was a profitable, permissible strategy, MFF would STP the account, sending the trades to be executed with real MFF capital with CDO Markets, thus potentially earning money for both MFF and the customer. When, eleven minutes later, the trader's behavior abruptly changed, I noted that "he finally realized the opportunity stopped," meaning that the trader had been executing an illicit arbitrage strategy but

could no longer do so. *Id.* at 24, line 6880. My comment that "I need something to stop that money going out" referred to MFF's next decision: the customer had earned a payout of approximately $100,000 that MFF would pay unless it had strong evidence that the trader had been engaged in impermissible arbitrage. *Id.* at line 6883. Ultimately, I determined that I did not have sufficient evidence of impermissible trading to deny the payment, and I afforded the trader the benefit of the doubt and paid him the full amount.

27. The CFTC also misleadingly quotes a conversation I had with iSRisk on April 15, 2022 regarding a customer who was using a bot. Contrary to the CFTC's characterization, the bot was not "successfully generat[ing] profits," Mot. at 24; it was generating profits in the simulated B-Book environment by exploiting deficiencies in MetaTrader. Specifically, the bot exploited a cap on slippage that MFF implemented in order to provide a better simulated experience during a period of high volatility. As a result, instead of the customer's bot's trades slipping to a less favorable price (as would occur in a real-world market), the bot executed the trades at artificial prices, incurring large profits. Because the bot relied on abusing the deficiencies of MetaTrader, iSRisk and I agreed that this customer's strategy would not be successful in real market conditions and would not be profitable if STP'd. ECF 23-12 at 13, lines 4490-91. The bot's strategy also violated MFF's rules against cheating MetaTrader, so MFF removed the trader's slippage cap to kill the bot's strategy, which I colloquially described as "slip[ping] them to hell." *Id.* at 4487-88. Before doing so, however, MFF notified the bot owner of this remedy, so he incurred no losses when the change took place. MFF ultimately paid not only the bot owner, but more than two hundred other customers who had paid the bot's original owner to use it too. Attached as **Exhibit D** is a true and correct copy of an invoice confirming payment to the bot's owner, bearing Bates

number Deel_CFTC_00471698. This was consistent with MFF's practice to refund customers using illicit bots when they handed over a copy of a bot or explained how the bot worked.

28. The CFTC further mischaracterizes excerpts from my July 15, 2022 messages to iSRisk regarding my dissatisfaction with their ability to identify profitable accounts which could be STP'd. Mot. at 23. When I stated that I was "pretty upset" that accounts were "making huge amounts of money," that related directly to my frustration with iSRisk's preference to "b-book everything and hope" rather than STP'ing profitable accounts. ECF No. 23-12 at 25, line 9026. The CFTC's assertion that this statement expressed a desire "to find and eliminate profitable traders" is incorrect and ignores my reference to the "b-book everything and hope" plan. Mot. at 23. In fact, MFF regularly sought to STP profitable accounts (thus allowing both the customer and MFF to benefit), but was often met with resistance from iSRisk.

29. When MFF identified instances in which traders were negatively impacted by errors in the MetaTrader system, it quickly acted to make them whole. For example, on June 10, 2022, MetaTrader showed an erroneous, impossibly massive, momentary spike in the price of Bitcoin. As a result of this error, numerous MFF customers' trades reflected losses. But MFF actually instructed iSRisk to rectify the error and restore the trading losses to the affected customers.

30. As another example, on July 18, 2022, MFF identified a trade that was subject to slippage despite market conditions that should not have caused the trade to slip. I contacted iSRisk to assess the reasons for this slippage and specifically noted that if iSRisk was unable to identify the issue that caused the slippage, MFF would refund the customer for the effects of the slippage. Attached as **Exhibit E** is a true and correct chat log of messages between me and members of iSRisk on May 30, 2022 regarding this issue, excerpted from the iSRisk-produced document bearing Bates number IS Risk Analytics-0000006303; attached as **Exhibit F** is a true and correct

9

chat log of messages between me and members of iSRisk on July 18–19, 2022 regarding this issue, excerpted from the iSRisk-produced document bearing Bates number IS Risk Analytics-0000006303.

31. I declare under the penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct, to the best of my knowledge. Executed in ~~Athens~~, Greece on this 31st day of October, 2023.

_____
Joshua Dentrinos