# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| Commodity Futures Trading Commission, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:23-cv-11808 |
| | ) | |
| v. | ) | |
| | ) | Judge Zahid N. Quraishi |
| Traders Global Group Inc., a New Jersey | ) | |
| corporation, d/b/a "My Forex Funds"; | ) | Plaintiff CFTC's Reply in Support |
| Traders Global Group Inc., a Canadian | ) | for Motion for Preliminary |
| business organization; and Murtuza | ) | Injunction |
| Kazmi, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

# TABLE OF CONTENTS

A.   Defendants' Fraud Was "In Connection" with Retail Forex and Retail Commodity Transactions. ................................................................................................... 1

B.   Traders Global is a Retail Foreign Exchange Dealer. ........................................... 3

C.   Traders Global "Internalized" Substantially All Customer Trades; The Few Trades Sent to an External Counterparty, i.e., STP'd, Lost Money ....................................................... 5

D.   Traders Global Does Not Disclose that Substantially all Customer Orders are "B-Booked." 7

E.   Trader Global's Failure to Disclose Artificial Slippage and Delay is Unjustified. ................. 9

F.   Defendants' False and Misleading Statements are Material. ................................................ 11

G.   Defendants Owe No Less Than $151 Million in Disgorgement. .......................................... 13

# TABLE OF AUTHORITES

**Cases**

*CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, (11th Cir. 2002)...................................... 9

*CFTC v. S. Tr. Metals, Inc.*, No. 1:14-CV-22739, 2016 WL 4523851, (S.D. Fla. Aug. 29, 2016)............................................................................................................. 11, 12

*Ecolab, Inc. v. Shanklin*, 23-cv-215, 2023 WL 4360286, W.D. Ky. June 20, 2023).... 13

*Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, (3d Cir. 2004)..................................... 13

*PLC Trenching Co., LLC v. Newton*, No. 11-cv-0515, 2011 WL13135653, (N.D.N.Y. Dec. 12, 2011)............................................................................................................. 13

*Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121, (5th Cir. 1996)........................ 2

**Statutes**

7 U.S.C. § 13a-1(d)(3)(B) ............................................................................................... 13

7 U.S.C. § 2(c)(2)(C)(i) .................................................................................................... 2

7 U.S.C. § 2(c)(2)(C)(vii) ................................................................................................. 2

7 U.S.C. § 2(c)(2)(D)(i) .................................................................................................... 2

7 U.S.C. § 6b(a)(2)(A) ...................................................................................................... 1

7 U.S.C. § 6b(a)(2)(C) ...................................................................................................... 1

The shocking admissions in Defendant Kazmi's deposition testimony and the declaration from Joshua Dentrinos (appended to Defendants' brief) conclusively establish the basis for the CFTC's fraud and registration claims: Traders Global is the counterparty to substantially all customer transactions, and thus loses money when customers make money.  Traders Global fails to disclose these facts to customers, and runs what amounts to a Ponzi scheme.  Defendants' legal arguments fail, and their attempts to explain away blatantly fraudulent conduct serve only to support the imposition of a preliminary injunction.

## A. Defendants' Fraud Was "In Connection" with Retail Forex and Retail Commodity Transactions.

As the CFTC detailed in its SRO motion, Defendants have committed fraud in connection with retail forex and retail commodity transactions in violation of Section 4b(a)(2)(A), (C) of the Act, 7 U.S.C. § 6b(a)(2)(A), (C) and Regulation 5.2(b)(1).  (*See* Doc. 14, CFTC's Mot. for SRO and P.I. (hereinafter, "SRO Mot.") at 43–48.)  Defendants argue that their fraud scheme does not violate Sections 4b(a)(2)(A), (C) of the Act or CFTC Regulation 5.2(b)(1) because it was not "in connection" with any retail forex or retail commodity transaction.  (Doc. 114, Defs.' Resp. to CFTC's Mot. for SRO and P.I. (hereinafter, "Opp.") at 13-15.)  Defendants claim that none of the leveraged forex and commodity trades that their customers executed qualify as retail forex or retail commodity *transactions* because none of their customers "invested" money in or with Defendants and because customers were not "exposed to any financial risk."  (*Id.* at 20.)  This is wrong.

The transactions Traders Global[1] offered to and entered into with customers qualify as retail forex or retail commodity transaction because, as set forth in the SRO Motion, they meet the requirements of 7 U.S.C. § 2(c)(2)(C)(i), (vii) and 7 U.S.C. § 2(c)(2)(D)(i).  (SRO Mot. at 33.)  Defendants do not vitiate any element of these statutory sections, but seek instead to insert new ones.  The term "investment" is not found anywhere in Rule 5.1(m) or Section 2(c)(2)(D)(i).  Section 4(b) and Regulation 5.2(b)(1) also does not require an "investment."  Nor do these provisions and rules require that a retail customer put "at risk" any sum of money in order for them to be a party to a leveraged forex or commodity transaction.[2] Defendants' argument is unsupported under the plan language of the applicable provisions of the Act and its Regulations.

Moreover, Defendants are incorrect that Traders Global's customers put no money "at risk."  Customers pay a fee for the chance to trade what Traders Global calls a "live account."  (SRO Mot. at 7-8.)  The fee can be more of less depending on the size of the account and its terms.  (*Id.*)  If the customer graduates to a "live

---

[1] All capitalized terms herein, e.g., Traders Global, STP, CDO Markets, shall have the meanings ascribed to them in the CFTC's SRO Motion.

[2] Defendants only cite one case, *Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121, 122–23 (5th Cir. 1996), to support their argument.  (Opp. at 20.)  There, a court found the "in connection" requirement was not met where an individual covered his commodity trading losses by secretly liquidating plaintiff's securities investments. The court held that plaintiff's, had no knowledge of the commodity trades, so the fraud against them did not meet the "in connection" requirement.  The facts of that case have no relevant to the facts here, and provide no support for Defendants' arguments.  Here, in contrast, entering into retail forex transactions was an integral part of Defendants' sales pitch to customers.  And customers did in fact enter into retail forex transactions—with Traders Global as their counterparty.

account," the customer gets the fee refunded, along with a percentage of any trading profits the customer achieved.  (Ex. A, Kazmi Dep. 94:7 through 95:10).  If the customer generates trading losses and violates the so-called drawdown limit, the customer loses their fee and any chance to obtain trading profits.[3]  (*See* Ex. A, Kazmi Dep. 93:17 through 94:6; *see also* SRO Mot. at 9-10.)

## B. Traders Global is a Retail Foreign Exchange Dealer.

Defendants argue that they do not operate as a Retail Foreign Exchange Dealer ("RFED") because they do not enter into, offer to enter into, or act as a counterparty to any retail forex exchange or commodity transactions with customers.  (Opp. at 31-32.)  This is wrong.

As set forth above, the transactions Defendants offer and enter into with customers are retail forex transactions.  Not only that, Traders Global is the counterparty to its customers for substantially all of these transactions.  Defendants admit that at least 99% of all customer transactions are "internalized" by Traders Global.  (*See* Ex. A, Kazmi Dep. at 50:15 through 50:20 ("Q. Do you think more or less than one percent of My Forex Funds' customers had an order sent to CDO

---

[3] In an effort to recast the transactions the customers entered into, Defendants suggest that the Ontario Securities Commission (OSC) reviewed and approved of Defendants' conduct with respect to these transactions.  (Opp. at 21.)  This argument is incredible given that the OSC issued a temporary cease trade order against Defendants Trader Global and Murtuza Kazmi on August 29, 2023 for possible breach of its laws "related to fraud, unregistered trading and the illegal distribution of securities."  *See* OSC Release, OSC issues temporary cease trade order against myforexfunds.com, available at https://www.osc.ca/en/news-events/news/osc-issues-temporary-cease-trade-order-against-myforexfundscom (last accessed November 2, 2023).

Markets? [ ] THE WITNESS: I would say it's around one percent."); *accord* Doc. 114-1, Dentrinos Decl. ¶ 23.)  When one of those customers wins, Traders Global pays them—from its own corporate assets—and refunds the customer's fee.  (Ex. A, Kazmi Dep. 70:5 through 70:11 (winning customers paid with "company's assets"), 94:7 through 95:10 (refund fee); Doc. 114-1, Dentrinos Decl. ¶ 11 ("a majority of MFF's customers continue to trade simulated MFF capital, though they share profits as if the trades are real").)  When the customer loses and violates the drawdown limit, Traders Global keeps the customer's fee.  (Ex. A, Kazmi Dep. 93:17 through 94:6.)  Moreover, Traders Global controls the "simulated" environment in which customers trade, setting the spread (the difference between bid and ask), slippage, delays, and commissions applied to customer transactions.  (SRO Mot. at 18-19; Ex. A, Kazmi Dep. at 125:4 through 126:5 (Traders Global determines spreads, commissions).)  These are the actions of a counterparty.

Traders Global's status as a counterparty to its customers' trades is explicitly stated in the September 13, 2021, contract between Traders Global and iS Risk, the company that helps Traders Global manage its electronic trading environment.  The contract states as follows: "Customer [defined as Traders Global] shall be the counterparty to all trades with Client Accounts [defined to mean accounts belonging to Trades Global's customers]." (Doc. 14 at 34 (quoting Ex. A-15 at 2).)  The contract is signed by Defendant Kazmi.  Deposition testimony from an iS Risk employee (Matthew Chichester) is in accord:

> Q: So Traders Global is the counterparty to substantially all of its customers' trades, correct?

4

A: From my understanding, I'd say that's correct.

(Ex. B at 26:7 through 26:11.)

## C. Traders Global "Internalized" Substantially All Customer Trades; The Few Trades Sent to an External Counterparty, i.e., STP'd, Lost Money.

Defendants argue that their statements about only making money when customers make money, and providing trading capital to customers, are true. (Opp. at 16-20.)  Defendants claim that they "carefully select customers" to trade Traders Global capital, and that Defendants use various "mechanisms" (presumably slippage and delay) to identify those customers.  (*Id.* at 5, 11, 16-17.)  This is wrong.

Defendants' argument is belied by two important—and apparently undisputed—facts.  First, substantially all customer trades are "internalized" by Traders Global.  (*See* Opp. at 11-12.)  Defendants admit that no more than 1% of orders from customers with so-called "live accounts" were sent to CDO Markets. (*See* Opp. at 11 (citing Doc. 114-1, Dentrinos Dec. ¶ 23); Ex. A, Kazmi Dep. at 50:15 through 50:20.)  The remaining 99%, Defendants admit, were executed in a "simulated" environment.  (*See* Opp. at 11-12; Ex. A, Kazmi Dep. at 62:23 through 63:9 ("the orders that the contractors [i.e., customers] place, TGG's contractors place on this B book[4], it stayed within a virtual simulated environment").)  When customers got paid for profitable trading, those payments came from customer fees.

---

[4] Defendants refer to the customers who trade so-called "live accounts" in a "simulated environment" as being on the "B-book."  Customers whose orders are "externalized," i.e., sent to CDO Markets via STP, are referred to as being on the "A-book."  (Doc. 114-1, Dentrinos Decl. ¶¶ 23-24; *see also* Ex. A, Kazmi Dep. at 53:4 through 53:10 (defining "A-book"), 55:14 through 56:8 (defining "B-book").)

(SRO Mot. at 13-15; *see also* Ex. A, Kazmi Dep. at 84:2 through 84:21 ("it is fair to say that the fees made up for the company's assets and those assets were used to pay the customers 95 percent of the registration fees").)  They did not come from proceeds of trading against a third-party.  (Ex. A, Kazmi Dep. at 84:2 through 84:21 (no proceeds from third-party trading used to pay customers).)

The second important fact is that customer trading on STP'd accounts is not profitable for Traders Global.  (Ex. A, Kazmi Dep. at 70:20 through 73:17.)  In fact, customers trading on STP generated net losses for Traders Global throughout the Relevant Period.  (*Id.*; *see also* 71:24 through 72:2 ("as I said earlier, A book was not profitable so it was profitable some month it was not so overall I would say no").)  It did so almost every month.  (*See* Ex. C, Email from F. Gerwirtz, iS Risk, to M. Chichester, iS Risk, et al., Feb. 9, 2023 (showing P&L from customer trading on STP).)  Defendants had no reason to believe during the almost two-year Relevant Period that Traders Global's customers would trade profitably on STP.  iS Risk told Defendants they wouldn't.  (SRO Mot. at 26 ("I think we need to all subscribe clients will almost never have alpha. None of them will make money on real market conditions because they are good. Some will because they are lucky").)[5]  Defendants' business model is not to make money from customers trading on STP; it is to collect

---

[5] It is worth reiterating that Traders Global also defrauds customers on STP.  It does so by imposing an undisclosed markup, which causes customers to receive less favorable trade fills than Traders Global gets from CDO.  (*See* SRO Mot. at 21.) Defendants appear not to dispute this.  (*See* Opp. at 26 ("MFF had no obligation to disclose information about the technical details of its pricing feed and how that pricing information was displayed on MetaTrader for customers.").)

more in customer fees than it pays out on "profit-sharing."  During the Relevant

Period, Traders Global collected more than $310 million in customer fees.  (*Id*. at

15.)  Trader Global made no money from customer trading on STP.  (Ex. A, Kazmi

Dep. at 70:15 through 72:2, 73:5 through 73:15 (Traders Global did not withdraw

any trading profits from CDO Markets account).)

### D. Traders Global Does Not Disclose that Substantially all Customer Orders are "B-Booked."

Defendants admit that they did not disclose to customers that substantially

all customer trading in so-called "live accounts" was internalized, or as Defendants

refer to it, "B-booked."  (*See* Ex. A, Kazmi Dep. at 103:12 through 103:21.)

Defendants did not disclose that the vanishingly small number of customers whose

orders were STP'd, or, as Defendants refer to it, "A-booked," generated net trading

losses.  (*Id*. 115:8 through 115:15.)  Defendants likewise did not disclose to

customers that payments for successful trading came from customer fees, Traders

Global's only meaningful source of income.  (*Id*. at 113:9 through 113:15.)

Defendants nonetheless argue that customers were apprised of Traders

Global's practice of B-booking, i.e., internalizing customer accounts.  (Opp. at 16-

19.)  In support of their arguments, Defendants point to two—and only two—

statements.

One of the statements, buried within the "FAQ" section of the "Rapid Rules"

part of the website, is as follows:

> Why join My Forex Funds?  Our program enables traders
> to trade without risking their own capital. Traders are
> rewarded for the profits they make on simulated accounts

> (that is how we mitigate risk/loss) while fine tuning their
> skills in the process.

(Opp. at 5, 6, 18, 19 (all citing Doc. 114-12, Ex. D to Speas Decl.).)  This clearly

refers to the "bonuses" that Traders Global promises to customers who trade "demo

accounts" in the try-out phase of the "Rapid" account-type.  (*See* Doc. 112.2 at 25

("My Forex Funds Rapid account program is built to reward traders for their time

while assessing the trader as they learn to trade with a demo account ….  Bonuses

are paid on a bi-weekly or monthly basis"), Ex. C-1 to SRO Mot.)  It does not apprise

customers that substantially all orders on "live accounts" are internalized by TGG,

or that so-called "profits" are drawn exclusively from customer fees.

The second statement can be found in a video interview of Defendant Kami

on a YouTube channel called "Kimmel Trading."  According to Defendants, Kazmi

"publicly[ ] detail[ed] how MFF evaluated simulated B-Book traders to determine if

they are consistently profitable."  (Opp. at 16-17.)  Kazmi did not do this.  Here's

what Kazmi said:

> [I]f they keep on making money then let's just say you know
> you you take this huge trade and you make money we pay
> you out and we see what you're doing and if you're doing
> the same thing over and over and you're getting money i
> mean if you're getting profitable yeah then we'll start
> executing because we know that whatever you're doing is
> working right so and then at the end of the day you will end
> up making us enough money that we would have covered
> you or close to it."

(Doc 23-10 at 20:56 through 21:21, Ex. A-9 to SRO Mot.)  Kazmi's barely intelligible

statement does not apprise customers that Traders Global was the counterparty to

almost all customer trades, and that the few customers on STP generated net

8

trading losses.  Moreover, the statement occurs over 65 seconds in the middle (literally) of the 42-minute video.  (*See* Opp. 16-17 (citing timestamps).)  Kazmi undermines any value in those 65 seconds by assuring customers that, "if you lose all that money it's not only you that's losing it's us as well right because we want to make you profitable."  (Doc. 23-10 at 11:22 through 11:31.)  *See CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002) ("Whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding of the information conveyed.'" (citations omitted)).

### E. Trader Global's Failure to Disclose Artificial Slippage and Delay is Unjustified.

Defendants admit that Traders Global artificially imposed slippage and delay on customer accounts.  (*See* Opp. at 7-11.)  Defendants admit as well that Traders Global failed to disclose this practice to customers.[6]  (*See id.* at 24 ("MFF has not spoken publicly about the specific technical specifications of the MetaTrader platform or the measures it takes to prevent exploitation of that platform.  Therefore, it had no obligation to disclose details of its use of delay, slippage, or other MetaTrader settings to mimic real market conditions.").)[7]

---

[6] At least we don't think they dispute it.  In a hard-to-understand passage, Defendants seem to suggest that maybe the MFF website "blog" mentioned that Traders Global was imposing slippage on customer accounts.  (Opp. at 8-9 (quoting Doc. 114-17, Ex. I to Speas Decl.).)  This is wrong; the blog claims that TGG artificially reduced—not imposed—slippage on customer accounts, and "takes the hit" on behalf of customers.  (*Id.*)

[7] Defendants do not dispute slippage and delay generally disadvantage customer trading.  (*See id.* at 9 (iS Risk recommended delay "because MFF was otherwise 'providing an advantageous trading environment'"), 11 ("Slippage would stymie

Defendants offer two excuses for artificially imposing slippage and delay on customer accounts.  First, Defendants argue that artificial slippage and delay are meant to "mimic" real trading, in order to assist Traders Global in identifying customers to profitably STP.  (Opp. at 7, 10-11.)  If true, this would not vitiate any element of the CFTC's fraud claims.  It isn't true, though.  Slippage and delay were applied selectively by Traders Global to different customers, and at different times.  Customers who made more money trading against Traders Global, i.e., on the B-book, got more slippage and delay.  (SRO Mot. at 19, 24-25.)  This does not "mimic" real trading.  (*See* Ex. B, Chichester Dep. at 139:3 through 140:10.)  It hardly bears mentioning that no one at Traders Global (or iS Risk) used any analytics to determine whether the slippage or delay accurately mimics real trading.  (Ex. A, Kazmi Dep. at 100:10 through 100:19; Ex. B, Chichester Dep. at 138:6 through 138:13, 141:9 through 141:16.)

Defendants' second excuse for imposing undisclosed, artificial delay on customers is that some of those customers engaged in what Defendants deemed "abusive trading strategies."  (Opp. at 7-10, 18.)  If the customers were trading in violation of Traders Global's terms and conditions, Traders Global should have terminated the customers' accounts.  Not secretly assigned them to a "profile" with slippage and delay designed to reduce the profitability of their trading.  Moreover, the strategies deemed "abusive" by Traders Global—like "arbitrage"—are ones that

---

abusive strategies such as latency arbitrage and scalping, which depend on tiny price movements and rapid-fire trading ….").)

make money (at Traders Global's expense).  (SRO Mot. at 22-24.)  According to

Defendants, these so-called abusive traders comprised no more than 0.1% of

customers.  (Opp. at 10, 18.)  Yet substantially all Traders Global customers were

subject to some form of artificial slippage or delay during the Relevant Period.  (*See*

SRO Mot. at 19; *see also* Ex. B, Chichester Dep. at 25:16 through 27:10 ("VWAP"

slippage applied to all B-book customer accounts).)

## F.  Defendants' False and Misleading Statements are Material.

Defendants argue that none of their false or misleading statements are

material because successful customers get paid on internalized, or B-book trades.

(Opp. at 21-22.)  This is wrong.

A reasonable customer would find it important that Traders Global's entire

value proposition—a customer can become a "professional trader" using Traders

Global's capital to trade against "liquidity providers" in the "market"—is false.[8]  A

---

[8] *Cf. CFTC v. S. Tr. Metals, Inc.*, No. 1:14-CV-22739, 2016 WL 4523851, at *11 (S.D.
Fla. Aug. 29, 2016) ("Defendants obtained customers' funds through false
pretenses—by telling customers their money would be used to purchase physical
metals held in depositories. The fact that Defendants' customers' positions would
have declined regardless of whether Defendants purchased physical silver (as they
had promised to do) or derivatives contracts (as they actually did) is of no
moment."), *affd in part, vacated in part, remanded*, 880 F.3d 1252 (11th Cir. 2018),
*opinion vacated and superseded on denial of reh'g*, 894 F.3d 1313 (11th Cir. 2018),
*and aff'd in part, vacated in part, remanded*, 894 F.3d 1313 (11th Cir. 2018), *and
aff'd in part, vacated in part, remanded*, 880 F.3d 1252 (11th Cir. 2018), *and
opinion vacated and superseded on denial of reh'g*, 894 F.3d 1313 (11th Cir. 2018),
*and aff'd in part, vacated in part, remanded*, 894 F.3d 1313 (11th Cir. 2018); *see
also CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 981 (11th Cir. 2014)
(affirming court's finding that defendants' misrepresentation that customers owned
physical metals when no physical metals existed and defendants offset exposure
with off-exchange derivatives was material; "a reasonable investor would consider

reasonable customer would find it important that Traders Global is the counterparty to, and thus adverse to the customer on, substantially all trades. A reasonable customer would find it important that Traders Global does not make money when customers make money; rather, it loses money. A reasonable customer would find it important that any "profit-sharing" the customers gets is from fees paid by other traders, in a manner similar to a Ponzi scheme. A reasonable customer would find it important that the small number of customers who trade on STP lose money. And finally, a reasonable customer would find it important that Traders Global controls the electronic environment in which they trade, and artificially imposes slippage and delay on customer trading.[9]

---

representations about the nature of the transaction "important in deciding whether to make an investment").

[9] Defendants argue that the CFTC has failed to demonstrate scienter. (Opp. at 26-30.) Defendants' argument, though, is based on the idea that they did not make any false or misleading statement. (*See id.*) As set forth above, they did. Defendants do not attempt to rebut the evidence in the SRO Motion that Defendant Kazmi and Dentrinos knew, e.g. that Traders Global "internalized" substantially all customer trades, and paid profitable traders using revenue from fees. (*See* SRO Mot. at 26-28.) Defendant Kazmi admitted that he was aware of those things throughout the Relevant Period. (Ex. A, Kazmi Dep. at 84:22 through 85:1 (Kazmi aware of B-booking most "live accounts"), 131:13 through 132:17 (Kazmi aware of artificial slippage, delay).) Dentrinos attempts to explain away his chats with iS Risk (*see, e.g.*, SRO Mot. at 22-26 ("slip them to hell") in a self-serving declaration appended to Defendants' brief. (Doc. 114-1.) The court should disregard this declaration. Defendants have declined to make Mr. Dentrinos available for cross-examination at the forthcoming preliminary injunction hearing, and Mr. Dentrinos resides in Greece, beyond the scope of a Rule 45 subpoena. (*See* Doc. 114-1, Dentrinos Decl. ¶ 1; Ex. D, Email from K. Wolfe, Counsel for Defs., to A. Burden, Counsel for CFTC, Nov. 1, 2023  *See, e.g., Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 719 (3d Cir. 2004) (holding that in the context of a preliminary injunction motion, "[d]istrict courts must exercise their discretion in weighing all the attendant factors ... to assess whether, and to what extent, affidavits or other hearsay materials are appropriate given the character and objectives of the ... proceeding," and that

**G. Defendants Owe No Less Than $151 Million in Disgorgement.**

Defendants argue that disgorgement, and thus the scope of the asset freeze, cannot exceed $10 million because that is the amount paid by customers who traded "live" accounts.  (Opp. at 32-33.)  Defendants cite no evidence for the $10 million figure; the Court should therefore disregard it.  Moreover, Defendants misapprehend the nature of disgorgement.  Under 7 U.S.C. § 13a-1(d)(3)(B), disgorgement is assessed in the amount of gains received in connection with a violation of the Act.  Defendants violated the Act by, *inter alia*, making false and misleading statements to customers—all customers, not just the ones with "live" accounts.  Accordingly, the CFTC seeks disgorgement in an amount no less than $151 million—$310 million in fees, less the more than $159 million Traders Global paid to successful customers.  (*See* SRO Mot. at 12-13.)

For the foregoing reasons, the CFTC respectfully requests that its motion for a preliminary injunction be granted.

---

"[t]he weight to which such materials are entitled may of course vary greatly depending on the facts and circumstances of a given case"); *Ecolab, Inc. v. Shanklin*, 23-cv-215, 2023 WL 4360286, at *17, W.D. Ky. June 20, 2023) (giving little weight to defendant's declarations in opposition to a preliminary injunction motion because the "witnesses were not subject to the rigor of cross examination and full discovery on" the assertions made in declarations); *PLC Trenching Co., LLC v. Newton*, No. 11-cv-0515, 2011 WL13135653, at *5 (N.D.N.Y. Dec. 12, 2011) (same)

November 3, 2023                    s/ Ashley J. Burden
                                   Commodity Futures Trading Commission
                                   Plaintiff
                                   77 West Jackson Blvd., Suite 800
                                   Chicago, IL 60604

                                   Ashley J. Burden
                                   Senior Trial Attorney
                                   Division of Enforcement
                                   Office: (312) 596-0693
                                   Cell: (312) 995-0779
                                   aburden@cftc.gov

                                   Katherine S. Paulson
                                   Trial Attorney
                                   Division of Enforcement
                                   Office: (312) 554-4559
                                   kpaulson@cft.gov

                                   Elizabeth M. Streit
                                   Chief Trial Attorney
                                   Division of Enforcement
                                   Office: (312) 596-0537
                                   estreit@cftc.gov