**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Commodity Futures Trading Commission, | |
| *Plaintiff*, | Civil Action No.: 3:23-cv-11808 |
| v. | **DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| Traders Global Group Inc., a New Jersey corporation, d/b/a "My Forex Funds"; Traders Global Group Inc., a Canadian business organization; and Murtuza Kazmi, | |
| *Defendants*. | |

Defendants Traders Global Group Inc. (a New Jersey corporation), Traders Global Group Inc. (a Canadian corporation), and Murtuza Kazmi (collectively, "Defendants") respectfully submit their proposed findings of fact and conclusions of law in connection with the Court's assessment of the *Ex Parte* Motion for Statutory Restraining Order and Preliminary Injunction Pursuant to 7 U.S.C. § 13a-1 (the "Motion") filed by plaintiff Commodity Futures Trading Commission ("CFTC"). ECF 7. For the reasons set forth below, the Court should deny the Motion and dissolve the statutory restraining order ("SRO").

## I.   BACKGROUND AND PROCEDURAL HISTORY

In or before July 2022, the CFTC initiated a covert investigation of Defendants. ECF 23-4 ¶ 4. Over the next year, the CFTC gathered documentary evidence from several third-party vendors and interviewed a single witness—a mid-level analyst at a third-party risk management and technology consulting services firm used by Defendants. *See* Nov. 6 Hr'g Tr. at 46:3–47:6, 89:2–5. The CFTC did not request to interview or seek documents or information from Defendants. *Id.* at 41:13–25. The CFTC did not interview any of Defendants' staff members. *Id.* at 53:22–54:3. And

1

the CFTC did not interview or request documents or information from any of Defendants' customers. *Id.* at 54:4–6.

On August 28, 2023, with no prior notice or engagement, the CFTC filed a complaint against Defendants alleging violations of the Commodity Exchange Act ("CEA") and moved *ex parte* for a statutory restraining order ("SRO"). ECF 1. The next day, the Honorable Robert B. Kugler of this Court granted the CFTC's *ex parte* request for an SRO freezing all of Defendants' assets, allowing inspection of records, and appointing a temporary receiver. ECF 13. The SRO was granted based on the CFTC's papers alone. *Id.* At that point, the Court did not have the benefit of hearing from Defendants, because they had not yet been served and the case was still under seal. ECF 12, 19, 20, 21. The SRO had the effect of freezing all of Mr. Kazmi's personal assets and all of the corporate defendants' assets, together totaling over $100 million. ECF 121. After the defendant companies were placed into receivership, and without assets to fund ongoing operations, dozens of their staff (none of whom have been charged) were furloughed. *See* Nov. 6 Hr'g Tr. at 23:3-6.

On September 6, 2023, the CFTC filed the instant Motion, and Defendants appeared in this case. ECF 24. On October 26, 2023, the Court granted in part and denied in part Defendants' motion to modify the SRO and ordered, over the CFTC's objection, the release of certain funds to pay Defendants' legal fees, medical expenses, and staff payroll. ECF 107. Following that ruling, the SRO remained intact in most other respects. *Id.*

Defendants filed their opposition to the instant Motion on October 31, 2023, ECF 114, and the CFTC filed a reply on November 3, 2023, ECF 123. On November 6, 2023, the Court held a hearing on the Motion (the "November 6 Hearing") and heard testimony from a single witness, CFTC Investigator Matthew Edelstein, as well as arguments from the parties.

## II.    LEGAL STANDARD

"In order to obtain a statutory preliminary injunction, the CFTC must demonstrate a prima facie case that a violation has occurred and that there is a reasonable likelihood of a future violation." *CFTC v. Sterling Trading Grp., Inc.*, 605 F. Supp. 2d 1245, 1290 (S.D. Fla. 2009); *see also CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 974 (11th Cir. 2014); *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979). The burden of proof lies with the CFTC as the movant. *See, e.g.*, *CFTC v. Notus LLC*, No. 1:22-CV-20291, 2023 WL 6196953, at *5 (S.D. Fla. Sept. 22, 2023) (describing the CFTC's burden).

Moreover, "[t]he CFTC is entitled to an asset freeze pending the resolution of an enforcement action when necessary to ensure that the assets will be available to compensate public customers or to preserve the status quo while an investigation is conducted to clarify the sources of various funds." *CFTC v. Commodity Inv. Grp., Inc.*, No. 05 CIV 5741(HB), 2006 WL 353466, at *2 (S.D.N.Y. Feb. 11, 2006) (cleaned up); *see also CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 79 (3d Cir. 1993) ("[A] freeze is designed to preserve the status quo by preventing the dissipation and diversion of assets.").

## III.   PROPOSED FINDINGS OF FACT

### A.  ELEMENTS OF CHARGED FRAUD VIOLATIONS (COUNTS ONE AND TWO)

Count One of the complaint charges Defendants with fraud in connection with retail foreign exchange ("forex") transactions in violation of CEA Regulation 5.2(b)(1) and (3), 17 C.F.R. § 5.2(b)(1), (3). Count Two charges fraud in connection with off-exchange transactions in retail forex and retail commodities in violation of Section 4b(a)(2)(A), (C) of the CEA, 7 U.S.C. § 6b(a)(2)(A), (C). As a threshold matter, the CFTC must establish that the alleged fraud was perpetrated "in connection with" a commodities transaction. *See* 17 C.F.R. § 5.2(b) (prohibiting

cheating, defrauding, or willfully deceiving any person "in connection with any retail forex transaction"); 7 U.S.C. § 6b(a)(2) (prohibiting any person from engaging in fraud "in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person").

If the CFTC can prove that qualifying commodities transactions occurred, it must then prove "the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality" in connection with those transactions. *CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1325 (11th Cir. 2018) (quoting *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002)). As to scienter, to violate either of the charged provisions, a person must act with the intent to "cheat or defraud or attempt to cheat or defraud the other person" or "willfully to deceive or attempt to deceive the other person."[1] 7 U.S.C. § 6b(a)(2)(A), (C); 17 C.F.R. § 5.2(b)(1), (3).

---

[1] It appears the CFTC confuses the applicable standard for scienter. In the section of its Motion titled "Defendants Acted with Scienter," the CFTC states that the "[d]efendants acted with scienter" and then proceeds with three declarative sentences as to what Mr. Kazmi "knows" before asserting that his scienter is imputed to the corporate defendants. ECF 23 at 41. But acting "knowingly" is not the requisite scienter here. The relevant provisions of the CEA clearly require proof that a person acted with the intent to "cheat or defraud or attempt to cheat or defraud any person" or "willfully to deceive or attempt to deceive any person." 7 U.S.C. § 6b(a)(2)(A), (C); 17 C.F.R. § 5.2(b)(1), (3). A person acts knowingly if he or she "acts voluntarily and intentionally and not because of mistake or accident or other innocent reason." Third Circuit Pattern Instructions, Criminal, Pattern Instruction No 5.02. Plainly, that is a less culpable mental state than the CFTC is required to prove here. "To act with an intent to defraud means to act knowingly and with the purpose to deceive or to cheat. An intent to defraud is ordinarily accompanied by a desire or a purpose to bring about gain or benefit to oneself or some other person, or by a desire or a purpose to cause some loss to some person." Third Circuit Pattern Instructions, Criminal, Comment to Pattern Instruction No. 6.18.1344-1 (quoting *United States v. Leahy*, 445 F.3d 634, 644 (3d Cir. 2006)); *see also United States v. Miller*, 953 F.3d 1095, 1101 (9th Cir. 2020) (intent to cheat means to "deprive [someone] of something valuable by the use of deceit or fraud"). To act willfully under the CEA means "intentionally undertaking an act that one knows to be wrongful." *CFTC v. Crombie*, 914 F.3d 1208, 1210 (9th Cir. 2019).

The complaint alleges that Defendants committed fraud through four false or misleading statements and four omissions. ECF 1 ¶ 107. Hence, to prevail on either fraud claim, the CFTC must prove that Defendants made one or more of these specific misrepresentations or omissions, that the misrepresentations or omissions were material, that Defendants acted with the intent to cheat, defraud, or willfully deceive another person, and that the misrepresentations or omissions were made in connection with commodity or retail forex transactions.

## B.  FINDINGS OF FACT AS TO THE ALLEGED VIOLATIONS

Because of the *ex parte* nature of the SRO entered on August 29, 2023, and the adversarial posture of the instant Motion, the Court now has the benefit of a more developed record than at the time the SRO was granted. In addition to the testimony of Mr. Edelstein and arguments of counsel during the November 6 Hearing, the Court has reviewed the complaint, the Motion and its exhibits, Defendants' opposition brief and its exhibits, the CFTC's reply brief and its exhibits, and the exhibits entered into evidence by Defendants during the November 6 Hearing.

Many of the core facts in this case are undisputed. The defendant companies, which operated under the trade name "My Forex Funds" ("MFF"), are a proprietary forex trading firm. ECF 114-1 ¶ 2. MFF advertised to the public that, after paying a registration fee, customers would have access to a forex trading platform in which they did not have to deposit their own funds and could use MFF's software and infrastructure. ECF 23-40 at 5. These registration fees ranged from $49 to $4,900 based on the type of account—"Rapid," "Accelerated," or "Evaluation"—and the amount of MFF's (virtual) capital the customer was permitted to use to trade. *Id.* at 28, 39, 43, 55, 67.

If a customer signed up for an Evaluation account, the customer had to pass a two-stage challenge that was designed to assess his or her ability to trade forex profitably in simulated market

conditions. *Id.* at 38–39. If the customer failed either challenge, the customer's account was deactivated (although the customer could re-enroll by paying a discounted registration fee). *Id.* at 45, 47, 48. If the customer successfully completed the Evaluation phase, the customer entered into an independent contractor agreement with MFF and was placed into another simulated trading environment. *Id.* at 45 (explaining advancement from evaluation accounts to live accounts); ECF 114-12 at 1 ("Traders are rewarded for the profits they make on simulated accounts (that is how we mitigate risk/loss) while fine tuning their skills in the process"); ECF 23-10 at 20:57-21:24 (Mr. Kazmi explaining that not all trades are sent to liquidity providers right away); *id.* at 19:27-20:29 (same). Accounts in this simulated environment were known as "live accounts" (in contrast to "demo accounts" or "evaluation accounts"). ECF 23-40 at 25, 33, 38, 45. Customers with Accelerated accounts were able to skip the Evaluation phase and proceed directly to live accounts. *Id.* at 52 Overall, only 8% of MFF's customers ever had a live account; 92% of customers never advanced past the Evaluation phase. ECF 114-1 ¶ 11.

No accounts (demo or live) were funded with customer money. *Id.* ¶ 3. Live accounts were split into so-called "A Book" and "B Book" accounts. *Id.* ¶¶ 23, 24. Customers in the B Book did not trade against external market participants with real funds. *Id.* ¶ 24. Instead, B Book customers traded in simulated market conditions, i*d.*, in accounts under MFF's name. The trading platform, known as MetaTrader, was customized by Defendants, in consultation with iS Risk Analytics, Inc. ("iS Risk"), a third party company that provided risk management and technology consulting services to MFF. *Id.* ¶¶ 14, 15, 18. If a customer traded profitably in the B Book, Defendants paid the customer—in real money—a percentage of the simulated profits as per the independent contractor agreement. *Id.* ¶ 25.

A small fraction of MFF's customers (less than 1%) who were identified by Defendants as most likely to be profitable in a real trading environment were placed into the "A Book." *Id.* ¶ 23. A Book customers' trades (using MFF's capital and trading on behalf of MFF) were transmitted to an external liquidity provider, CDO Markets, via "straight through processing" ("STP"). *Id.* Less than 100 of MFF's 24,000 live accounts (0.4%) were STPed. ECF 23-44 ¶ 16. As with B Book customers, Defendants paid A Book customers a percentage of their trading profits. ECF 114-1 ¶ 25.

The defendants never failed to pay customers—whether in the A Book or the B Book—all trading profits to which they were entitled. Nov. 6 Hr'g Tr. at 82:5–11. There are no allegations here of missing money. Nor did customers bear the risk of trading losses in either the A Book or the B Book. *Id.* at 81:10–16. Because trading in the B Book was simulated and MFF supplied the capital for all STP customer trading in the A Book, customers never invested their own money and their funds were never at risk. *See id.*; *see also* ECF 114-1 ¶ 25.

MFF customers did not have any funds on deposit with MFF, and none of customers' own money was at risk on the MFF trading platform. *Id.* ¶ 3. As such, although this point is disputed, Traders Global Group never was a counterparty to *any* of its customers (in either live or simulated accounts). *Id.* The lone witness interviewed by the CFTC in its yearlong investigation—Matthew Chichester, a senior quantitative analyst at iS Risk—confirmed this point during sworn testimony. When Mr. Chichester's testimony was taken on February 3, 2023, counsel for the CFTC asked him, "if the trade is internalized, does that mean that Traders Group Global essentially has the opposite position from the trader who executed the trade?" Mr. Chichester responded, "I would say that would be true if it was the customer's own money that they had deposited." Nov. 6 H'rg Def. Ex. 7 (Chichester Dep. Tr. dated February 3, 2023) at 48:20-49:5; *see also id.* at 69:5–69:21

("We also refer to it as being internalized, but basically the lifetime of the trade is just within the platform. It never goes to a counterparty. All the processing and stuff is just within the MetaTrader application."); Nov. 6 H'rg Def. Ex. 8 (Chichester Dep. Tr. dated October 30, 2023) at 36:8-37:3 ("[T]hese are the kind of high-level numbers of how the server performed. I believe the fact that the client funding–like, for example, you see in this statement there it shows, you know, 16 million in deposits. That was, you know, money put into the accounts by Traders Global or, you know, a balance adjustment done to the trade server by them. From my understanding, it wasn't actual client funds based on their model."); *id.* at 108:24—110:5 ("I'm not under the impression if a client had a $200,000 balance, that they had deposited $200,000. . . . The issue with the Traders Global book is those deposits held on their live server aren't actual client funds that you're trading and hedging against. It's funds put up by Traders Global.").

In practice, substantially all of Defendants' revenue came from registration fees; trading profits from STP trades placed with CDO Markets were negligible. ECF 23-44 ¶ 47. In total, Defendants generated approximately $310 million in fees from customers during the relevant period and paid out approximately $159 million to customers who traded successfully in live accounts. ECF 23-44 ¶¶ 13, 47-48.

The CFTC's investigation began in or before July 2022. ECF 23-44 at ¶ 4.[2] During the yearlong investigation, the CFTC collected and reviewed (1) bank records, (2) digital asset account records, (3) payout processing records, and (4) contracts, trade reports, and correspondence with

---

[2] During the November 6 Hearing, counsel for the CFTC asserted various privileges, including the "government informant" privilege, and declined to disclose the origin of the investigation. Nov. 6 Hr'g Tr. at 54:24—55:2. However, no informant has been referenced (even pseudonymously) in the filings. The CFTC also withdrew its initial request during the November 6 Hearing to submit *in camera* information on the origin of its investigation. *Id.* at 97:8–98:2. Of course, if there was no informant, there can be no informant privilege, and it would be inappropriate, if not disingenuous, for the CFTC to assert such a privilege here.

Defendants' customers. ECF 23-44 at ¶ 5(a)-(e). The CFTC also conducted internet and computer database searches for information relating to Defendants, and reviewed the corporate website and other publicly available information relating to Defendants. *Id.* at ¶ 5(g)-(h). The only witness whom the CFTC interviewed was Mr. Chichester of iS Risk. *See* Nov. 6 H'rg Def. Ex. 7 at 9:1-4. Prior to filing its complaint, the CFTC spoke with Mr. Chichester only once, on February 3, 2023. Nov. 6 Hr'g Tr. at 37:3–20. Although the declaration submitted to the Court by Mr. Edelstein in support of the CFTC's *ex parte* motion for an SRO states that the CFTC "interviewed employees of iS Risk," ECF 23-44 at ¶ 5(f), that is incorrect. In fact, the CFTC interviewed only Mr. Chichester and no other iS Risk employee(s). *See* Nov. 6 H'rg Tr. at 37:3-5. In conducting its investigation, the CFTC also did not interview Mr. Kazmi, any officers or staff members of the defendant companies, or any customers of the defendant companies. *See id.* at 36:16—37:2, 53:22–54:6. The CFTC made no effort to get the Defendants' explanation for the conduct at issue. *Id.* at 41:24-25. At the November 6 Hearing, the CFTC explained that its decision not to interview any customers prior to filing the complaint was motivated, at least in part, by concerns about exposure of the ongoing, covert investigation. *Id.* at 108:6-8. However, in the two months since the complaint was filed and the investigation became public, the CFTC still has not interviewed any customers of the defendant companies. *Id.* at 82:13–14. The CFTC's counsel also confirmed on the record that "we are aware of no pre-filing customer complaints." *Id.* at 98:7-8. As such, the CFTC lacks direct evidence of the perspective of any of Defendants' customers.

Since the filing of the SRO and the appointment of a temporary receiver, the defendant companies have ceased operations. *See generally* ECF 42-5.

The eight specific alleged misrepresentations and omissions underlying the fraud charges are detailed in Paragraph 107 of the complaint. To the extent that further fact finding is required

as to the specific alleged misrepresentations and omissions, the Court will make those findings in conjunction with its conclusions of law.

### C.  FINDINGS OF FACT REGARDING DISSIPATION OF ASSETS

All of Defendants' assets have been frozen since the entry of the SRO on August 29, 2023. ECF 13. In its *ex parte* submission in support of the SRO, the CFTC relied, in part, on Mr. Edelstein's declaration, more than half of which was devoted to an analysis of Defendants' financial accounts. ECF 23-44 at ¶¶ 20-49. According to Mr. Edelstein, during the relevant period (*i.e.*, November 2021 to the present), Defendants' accounts reflect a total of approximately $310 million in fees paid *by* customers, and a total of approximately $159 million paid *to* customers. *Id.* at ¶¶ 47-48. The delta between these two amounts is $151 million.

Mr. Edelstein included in his sworn declaration a table indicating that, with respect to a particular account at BMO Bank of Montreal (referred to as the "TGG #995 Account"), $31,550,000 had been transferred to an "unidentified Kazmi account," out of a total of $32,416,612.99 debited from the account. *Id.* at ¶ 29. In other words, according to the declaration submitted by Mr. Edelstein to the Court, 97.3% of the outgoing funds from this account went to an "unidentified" account controlled by Mr. Kazmi. Mr. Edelstein admitted during the November 6 Hearing that one purpose (among others) of this section of his declaration could have been to provide evidence of potential dissipation of assets. Nov. 6 Hr'g Tr. at 50:13-19.

But, it is now apparent that the $31,500,000 did not go to an "unidentified Kazmi account," and the CFTC knew that long before the November 6 Hearing, despite never acknowledging or disclosing the error until the November 6 Hearing. In his testimony during the November 6 Hearing, Mr. Edelstein stated that, shortly after the complaint was filed, the CFTC learned that the $31,500,000 transfer was a *lawful tax payment* by the defendants to Canadian authorities. *Id.* at

8:7-9. Mr. Edelstein testified that the CFTC had learned that fact "in the days after filing, if not –

if not the first two weeks."[3] *Id.* at 8:19-20. The Court then had the following exchange with CFTC

counsel at a sidebar:

> THE COURT: I'm trying to understand the timeline of this. You learned of this discrepancy, this mistake a week or two after the filing, and you didn't inform the Court or defense counsel.
>
> They raised it in their papers? Because if that's accurate, CFTC is going to be in a lot of trouble today. So please tell me that that's not accurate what they're implying on cross-examination.
>
> MR. BURDEN: Your Honor, I think it is correct that we --
>
> THE COURT: You learned of it and didn't tell the Court or defense counsel?
>
> MR. BURDEN: Correct, Your Honor.
>
> THE COURT: Why was that?
>
> MR. BURDEN: Because, Your Honor, we considered that it was not material to the purpose of the declaration, and it was a small mischaracterization of this transfer that doesn't relate to trading by --
>
> THE COURT: Here's the total in the chart, right? $32 million and change. The discrepancy is $31 and a half million. And you didn't find that material? Is that really what you're going to say? Because then you're going to say it out there and not on sidebar.
>
> MR. BURDEN: It is, Your Honor.
>
> THE COURT: I'll wait to hear from you later. Go back to cross-examination. You guys have a lot of explaining to do today. Get ready to do it.
>
> *Id.* at 51:11-52:12.

---

[3] Indeed, an investigator from the Ontario Securities Commission confirmed in a sworn affidavit that the "TXBAL" and "TXINS" payments Mr. Edelstein characterized as transfers to an "unidentified Kazmi account" in fact were payments for corporation tax and corporation tax installments, respectively. Nov. 6 H'rg Def. Ex. 10 (Collins Aff.) ¶ 9. This affidavit was dated September 5, 2023—*i.e.*, a day *before* the CFTC filed the instant Motion relying, in part, on Mr. Edelstein's declaration.

The Ontario Securities Commission put the CFTC on notice of Mr. Edelstein's error as early as September 5, 2023. Nov. 6 H'rg Def. Ex. 10; Nov. 6 Hr'g Tr. at 8:19-9:3. The CFTC's suggestion that the error was not timely corrected because it was "not material" is not well-taken. On September 22, 2023—weeks *after* the CFTC knew that Mr. Edelstein had mischaracterized the tax payments—it specifically relied on Mr. Edelstein's mischaracterization to argue that the SRO should continue to restrain all of Mr. Kazmi's personal assets. ECF 72 at 9 ("The evidence also shows substantial transfers from Traders Global's corporate accounts to Mr. Kazmi. ([Edelstein Decl.] ¶ 29.) For example, between December 2022 and April 2023, $31.55 million was transferred from one of Traders Global's corporate accounts in Canada to another account in Mr. Kazmi's name. *Id.* ¶ 29."). Even *after Defendants* identified the error on September 26, 2023 in their reply brief in support of their motion to modify the SRO, the CFTC still did not correct it or acknowledge it to the Court or to Defendants. The CFTC's failure to disclose or to correct Mr. Edelstein's error, and continued citation to the error even after realizing it was an error, is inexcusable.

The CFTC plainly knows how to submit a corrected declaration but inexplicably chose not to do so here. Indeed, on October 31, 2023, the CFTC submitted a revised declaration of another CFTC Investigator, Devin Malinowski, to correct "a typo" and to attach an exhibit that previously had been omitted. ECF 112 at 1. Unlike Mr. Malinowski's "typo," Mr. Edelstein's mischaracterization of $31.5 million in tax payments as payments to an "unidentified Kazmi account" is highly material to the relief the CFTC now seeks. The CFTC's failure to correct and to disclose Mr. Edelstein's error under these circumstances was egregious, and whether intentional or not, it highlights that the SRO was initially granted based on an incomplete and inaccurate record advanced by the CFTC.

Accordingly, to the extent that the transfer of $31,500,000 to an "unidentified Kazmi account" was a factor supporting the grant of the *ex parte* SRO, the Court now assigns it no weight. The CFTC has provided scant particularized evidence that supports a finding that Defendants intend to dissipate any assets. In the Motion, the CFTC devotes only a single paragraph to why a total freeze of all Defendants' assets is necessary. That paragraph reads, in its entirety:

> An asset freeze is necessary here to preserve the status quo and maintain the court's jurisdiction over assets to which aggrieved customers may be entitled. In the absence of an asset freeze, Kazmi may—and is likely to—transfer or dissipate assets held in the US, either at banks or with payment companies like WooCommerce or Deel. Kazmi can easily transfer those assets to Canada, beyond the immediate reach of the Court. Indeed, this is where most of Defendants' assets are currently. Kazmi can also convert his assets to cryptocurrency and place them in his non-custodial wallet, which cannot be frozen or seized by any jurisdiction. Or Kazmi may simply dissipate those assets through his demonstrated propensity for profligate spending.

ECF 23 at 45-46 (citation omitted).[4]

For their part, since learning of the complaint, Defendants have appeared in the case, retained experienced counsel, fully complied with the Court's order to provide the CFTC with an accounting of Defendants' assets, ECF 121, sat for a deposition (Mr. Kazmi), and expressed an interest in resolving the case and remediating any potential disclosure issues, *see* Nov. 6 Hr'g Tr. at 113:15–19. The CFTC has not accused Mr. Kazmi of dissipating frozen assets in violation of the SRO, and if he did, the CFTC would know it because Mr. Kazmi provided the CFTC with financial account credentials and an accounting of Defendants' assets. ECF 97-2, 97-3, ECF 121. Whatever concerns the CFTC initially may have had regarding the likelihood of Defendants

---

[4] The CFTC has not actually provided evidence, and the Court is aware of none, that Mr. Kazmi actually has (or ever had) a non-custodial cryptocurrency wallet. The basis (if any) for this assertion in Mr. Edelstein's declaration is unclear.

dissipating their assets have not come to fruition. To the contrary, it appears that Defendants have abided by the asset freeze orders in good faith.

### D.  CONCLUSIONS OF LAW

#### 1.  *The CFTC Has Not Met Its Burden of Establishing that Any Violations Occurred "In Connection With" Commodities Transactions*

Section 4b of the CEA prohibits any person "in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with any other person" from cheating, defrauding or willfully deceiving "the other person." 7 U.S.C. § 6b(a)(2)(A), (C). Regulation 5.2 similarly prohibits cheating, defrauding, or willfully deceiving any person "in connection with any retail forex transaction." 17 C.F.R. § 5.2(b)(1), (3).

Here, the CFTC has not met its burden to show an alleged violation of Section 4b or Regulation 5.2, or even the applicability of the CEA to Defendants' business at all. As described above, none of MFF's customers ever invested any money in, with, or through MFF. *See* ECF 23-40 at 34. No customer was ever party to any contract or agreement to buy, sell, or trade any commodities or foreign currencies. ECF 114-1 ¶ 3. No customer was ever exposed to any financial risk. Nov. 6 Hr'g Tr. at 81:4–82:3. MFF cannot be liable for fraud "in connection with" a commodities or foreign exchange contract with its customers because MFF's customers never entered into such a contract.

In *Tatum v. Legg Mason Wood Walker, Inc.*, the Fifth Circuit found that claims against commodities brokerage firms under the CEA did not satisfy the "in connection with" requirement where a financial planner purchased commodities with investors' funds for his own account, because the investors never intended to purchase commodities and were never parties to an order for the sale of a commodity. 83 F.3d 121, 122–23 (5th Cir. 1996). The court observed that the

conduct may have given rise to a (private) common-law claim for conversion, but fraud was not perpetrated "in connection with" an order for sale of commodities on behalf of investors, as required under the CEA. *Id*. at 123.

The court in *Tatum* noted that, in interpreting the "in connection with" requirement of the Commodities Exchange Act, courts generally look to interpretations of the "in connection with" requirement of Section 10(b) of the Securities Exchange Act of 1934. *Id*. To that end, the court cited *Crummere v. Smith Barney, Harris Upham & Co., Inc.*, 624 F. Supp. 751, 755 (S.D.N.Y. 1985), which stands for the proposition that one cannot establish the "in connection with" requirement under Section 10b where the misrepresentations alleged were unrelated to any actual securities traded. *Id*.

In *Crummere*, the defendants allegedly convinced customers to turn over funds for investments *that defendants never made*. 624 F. Supp. at 753. The fact that defendants previously engaged in securities transactions was "so removed from the alleged conversion of [customer] funds, that they fail to constitute transactions 'in connection' with" the alleged fraudulent misrepresentations. *Id.* at 754. The court in *Crummere* reasoned that "[t]he fraud which [plaintiff] alleges is actually a failure to purchase or sell securities for her benefit, and courts have been careful to avoid creating federal securities claims out of such common law conversion claims against brokers." *Id.* at 755.

So, too, here. Because there were no actual commodities transactions in MFF's simulated trading environment, the CFTC simply cannot satisfy the "in connection with" requirement.

The CFTC cannot overcome this fatal jurisdictional infirmity by insisting that "customers did in fact enter into retail forex transactions—with Traders Global as their counterparty." ECF 123 at 2 n.2. Traders Global Group was not a counterparty to its customers in any transaction.

15

According to the CFTC's "guide to the language of the futures industry," a counterparty is "the opposite party in a bilateral agreement, contract, or transaction, such as a swap. In the retail foreign exchange (or Forex) context, the party to which a retail customer sends its funds." *See* https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index (last visited Nov. 9, 2023).

But MFF's customers did not send any funds to invest in forex contracts. In fact, MFF's customers did not have *any* money on deposit or at risk in MFF's simulated trading platform. (They only paid registration fees.) And MFF was not the "opposite party" to a commodities or forex agreement, contract, or transaction with its customers. Hence, the CFTC lacks jurisdiction here.

### 2. The CFTC Has Not Met Its Burden of Establishing a Prima Facie Case of a Violation

Even setting aside the jurisdictional defect, the CFTC has not met its burden of proof as to any of the eight specific alleged misrepresentations and omissions underlying the fraud charges, which are detailed in Paragraph 107 of the complaint. The CFTC cannot prove a *prima facie* case without proving at least one of these eight specific misrepresentations and omissions. It has not done so.

#### i. Alleged Misrepresentation 1

The CFTC alleges that Defendants made "false and misleading statements that customers receive 'live funds' to trade against third-party 'liquidity providers,' when in reality Traders Global is the counterparty to substantially all customer trades." ECF 1 ¶ 107(a). At its core, the CFTC's allegation is that Defendants misled B Book customers into believing they were trading real funds against third parties, whereas in fact they were in a simulation.

In response, Defendants point out that the alleged misstatement (customers receive "live funds" to trade against third-party "liquidity providers") is spliced together from multiple sources

and does not actually appear anywhere in Defendants' customer-facing materials. Defendants also assert that it is literally true that *some* customers' trades (*i.e.*, those in the A Book) were executed in Traders Global Group's name with real funds against third parties via CDO Markets. Defendants never claimed that *all* customers do so. Defendants also direct the Court's attention to various disclosures that Defendants made about the use of simulated accounts. These disclosures were made via the MFF website and on YouTube videos featuring Mr. Kazmi. ECF 23-40 at 34 ("Our live accounts are on our own server from an institutional technology provider with multiple liquidity sources connected to it ."); ECF 114-12 ("Our program enables traders to trade without risking their own capital. **Traders are rewarded for the profits they make on simulated accounts** (that is how we mitigate risk/loss) while fine tuning their skills in the process.") (emphasis added); ECF 23-10 at 19:27- 20:29 (Mr. Kazmi explaining that "not everything gets sent [to a third-party liquidity provider], obviously, because then we won't exist either if we start sending everything.").

The Court acknowledges that MFF's disclosures indicated that at least certain customers trading on "live accounts" were actually operating in a simulator. Those disclosures, however, could have been clearer, and a customer in the B Book may or may not have understood from those disclosures that he or she was actually in a simulation. Indeed, counsel for Defendants conceded as much. *See* Nov. 6 Hr'g Tr. at 128:9-11.

Still, that is not to say a reasonable customer would have *cared*, that is, that the information would have been material. There is no dispute that Defendants paid customers all profits to which the customers were entitled, *see* Nov. 6 Hr'g Tr. at 82:5-11, and a reasonable customer might not have cared whether those profits were derived from simulated trading or real-world trading. The CFTC has presented no evidence to the contrary, and perplexingly had not interviewed a single

17

customer to support this crucial point prior to the November 6 Hearing. Indeed, counsel for the CFTC appeared to concede the point: "I don't know what a customer declaration could have added here. And these customers, I don't see a reason why they would know or why they would understand that they were defrauded, if they see that there are trades that have made them money." *Id.* at 108:10-14.

The Court agrees. Because the CFTC has not interviewed any customers or obtained any customer declarations or comparable evidence, the CFTC has not presented *prima facie* evidence showing that this information would have been material. The CFTC apparently decided not to interview traders before filing its complaint in order to protect a covert investigation, but that same concern no longer exists and, in any event, one consequence of the CFTC's strategic decision is that the CFTC now lacks evidence of materiality. Of course, it was the CFTC's decision to seek an injunction at this early stage, and the CFTC bears the burden of proof. The CFTC cannot prove a *prima facie* case without competent evidence of materiality. There is none here.

Moreover, while the disclosures concerning the simulated nature of B Book trading were not clear, their very existence cuts against a finding of scienter. That is, it is difficult to square Mr. Kazmi's public statement on YouTube that "not everything gets sent [to a third party liquidity provider," ECF 23-10 at 19:27- 20:29, with the notion that he acted with the intent to deceive customers about the use of a simulator in the B Book. The related website disclosure that "[t]raders are rewarded for the profits they make on simulated accounts" also indicates that Defendants were not intentionally or willfully misleading customers about the use of simulated accounts, or why they were used ("that is how we mitigate risk/loss"). While Defendants' disclosures could have been explained more prominently and more clearly, the fact that they exist at all militates against a finding of intent to defraud, cheat, or willfully deceive.

### ii. *Alleged Misrepresentation 2*

Next, the CFTC alleges Defendants misrepresented that "your success is our business" and that MFF "makes money when customers make money and loses money when customers lose money." ECF 1 ¶ 107(b). According to the CFTC, "Traders Global loses money when customers make money, and employs various devices to reduce the likelihood or amount of profitable trading by customers." *Id.*

But as Defendants point out, both of the alleged misstatements are literally true, albeit for the very small number of customers whose orders were STPed. When STP trades were profitable, both customers and Defendants made money. Similarly, when STP trades lost money, Defendants lost money. And since it was Defendants' stated goal to identify the most profitable traders (*i.e.*, those who ultimately went into the A Book), their statement that MFF that "makes money when customers make money and loses money when customers lose money" is both literally true for at least some of Defendants' customers and fairly describes Defendants' business model.

Defendants made numerous disclosures in the MFF website contextualizing their representations. "Your success is our business" is followed by the following statements: "We provide forex traders with multiple product options to choose from based on your experience. If you lose, we lose, so choose carefully the program that fits your FOREX and Prop Firm trading experience." ECF 23-40 at 5. On another page containing the "Your Success is Our Business" slogan, Defendants explained: "Our company is interested in assisting traders, helping them grow so that we can grow with them. We strive to provide programs, services and information that assists people interested in the FOREX, CFD's or commodities markets to become more profitable, self-sustainable and efficient when trading." *Id.* at 11. And in a list of rules on the website, Defendants elaborated: "At My Forex Funds our goal is to encourage you, the trader to remain consistent and

hopefully profitable so that you can earn from your talent. . . . Our goal as a company is to find profitable, successful traders and encourage up and comers to become more consistent and profitable and form a long-term partnership." *Id.* at 32.

The allegation that Defendants used "devices to reduce the likelihood of profitable trading to customers," ECF 1 ¶ 107(b), appears to relate to features in the simulated trading environment (such as "slippage" and "delay," which are discussed below) that were designed to mimic actual market conditions. But trades in the simulated environment were not "real" in any meaningful sense. The balances reflected in the MetaTrader platform were book entries. There was no money at risk. Thus, if a customer "lost money" in the simulated environment, *no one* lost any real money.

Nevertheless, consistent with Defendants' representations, if customers *made money* in the simulated or live trading environment, Defendants did, in fact, reward those customers with real dollars. Indeed, Defendants paid successful customers over $151 million in trading profits during the relevant period. And Defendants *wanted* customers to make money in the realistic simulator. Defendants' business model was dependent on traders pursuing and achieving success. If everyone failed or had no chance to succeed, MFF surely would have gone out of business. In that sense, the phrases "Your Success Is Our Business" and "if you lose, we lose" are true statements. Every failed trader represented a lost opportunity for Defendants to share in their success and build their business.

### iii.    Alleged Misrepresentation 3

The CFTC also alleges that Defendants misrepresented that "Traders Global pays a customer a percentage of his or her trading profits when in fact those payments come from fees paid by other customers." ECF ¶ 107(c).

Again, this representation is literally true. If a customer *made money* in the simulated or live trading environment, Defendants paid the customer a reward calculated as a percentage of his or her simulated trading profits. As explained above, the balances reflected in MetaTrader were book entries. There were no customer funds on the platform and no funds at risk in the market. Nevertheless, customers were rewarded for profitable trades.

Defendants concede that the lion's share of revenues derived from customer registration fees, and that pool of money was used to pay customers who traded profitably on simulated accounts. Defendants, however, point out that this was no secret. To the contrary, Defendants explicitly informed customers: "Our program enables traders to trade without risking their own capital. Traders are rewarded for the profits they make on simulated accounts (that is how we mitigate risk/loss) while fine tuning their skills in the process." ECF 114-12 at 1. Profit payouts on "simulated accounts" (*i.e.*, in the B Book) clearly were not coming from real-market trades, and any reasonable trader who read this disclosure would have understood as much. There simply is no misrepresentation here.

And more fundamentally, the CFTC has not provided evidence that customers would have cared *where* the profit sharing payouts were coming from as long as they were paid for generating successful trades. As noted above, all customers were paid for making successful trades on simulated accounts or otherwise, and the CFTC offers no evidence to the contrary. Thus, the CFTC has not carried its burden to show that Defendants fraudulently misrepresented that they would pay customers a percentage of their trading profits, and that this misrepresentation was material.

### iv.   *Alleged Misrepresentation 4*

In addition, the CFTC alleges that Defendants made "false and misleading statements that the drawdown limit is meant to 'enforce good trading habits' and 'lock in profits' when in fact the

limit is designed to provide Traders Global with a bad-faith justification to terminate customer accounts." ECF ¶ 107(d).

There is no dispute that Defendants disclosed across the MFF website that customers were required to adhere to drawdown limits in order to remain in good standing. *See, e.g.*, ECF 23-40 at 26 (disclosing drawdown limits for Rapid accounts), 33 (same), 40 (same for Evaluation accounts), 47 (same), 53 (same for Accelerated accounts), 54 (same), 59 (same), 65 (same), 66 (same); *see also id.* at 91 (explaining that rule violations would result in account suspension and prevent future payouts). Defendants submitted a declaration from MFF's Head of Risk, Joshua Dentrinos (who has not been charged), explaining that drawdown limits are standard industry measures that proprietary trading firms, like MFF, use drawdown limits to mitigate risk and discourage traders from trading recklessly with company capital. ECF 114-1 ¶ 12. Because none of MFF's traders are party to any trades and never put their own funds at risk (the funds are either simulated or belong to Defendants), there would be a perverse incentive to make large, risky trades in the absence of a drawdown limit. The drawdown limits encourage traders to make more conservative, sensible trading decisions, both to limit Defendants' downside exposure (with respect to A Book trades) and to assess more accurately the performance and consistency of customers over time. *Id.*

This alleged misrepresentation essentially rests on the CFTC's characterization of the drawdown limits as being made in "bad faith." But the CFTC offers little more than supposition to rebut the good faith explanations Defendants advance for the drawdown limits. Because Defendants disclosed that customer accounts would be suspended for breaching the drawdown limits and explained that these mechanisms were meant to "enforce good trading habits," the CFTC has not shown that Defendants' statements were false or made with ill intent.

22

### v.  *Alleged Omission 1*

The CFTC alleges that Defendants "fail[ed] to disclose that commissions are assessed by Traders Global, not a third-party liquidity provider, and are intended to reduce customer account equity." ECF 1 ¶ 107(f). But MFF's website clearly disclosed a commission of "$3 per lot on our server, Traders Global Group," ECF 23-40 at 75, and Mr. Edelstein agreed on cross-examination the "commission was fully disclosed on the company's website," Nov. 6 Hr'g Tr. at 57:11-13. Furthermore, Defendants have produced evidence that similar commissions were common in the industry and that the imposition of the commission here thus was designed "to better simulate real-world trading parameters." ECF 114-1 ¶ 22. The proffered explanation is at least as plausible as the contrary one urged, with scant evidentiary support, by the CFTC in its Motion. ECF 23 at 17-18. Nor does the record support a finding that the language of the disclosure was so deficient or opaque as to conceal from customers that the commissions were assessed by Defendants and not a third party. And given the absence of any customer testimony (or similar evidence) on this (or any) point, the Court cannot conclude on this record that *who* received the commissions would have been material to customers in any event.

### vi.  *Alleged Omission 2*

The CFTC alleges that Defendants "fail[ed] to disclose that Traders Global uses specialized software to reduce the likelihood or amount of profitable trading by customers through the application of 'delay' and 'slippage' in an electronic trading environment that Traders Global controls." ECF 1 ¶ 107(f). There is no dispute that the MetaTrader software deployed by Defendants in the B Book included delay and slippage functions.[5] The former automatically

---

[5] The slippage and delay functions did not exist for STP customers. Nov. 6 H'rg Def. Ex. 7 (Chichester Dep. Tr. dated February 3, 2023) at 118:15-22.

delayed execution of a customer's order for a matter of milliseconds. The slippage function executed a customer's order at a price worse, or better, than the available price in the simulated market (*i.e.*, the "top of book" price).

Defendants explain that these functions were necessary to mimic actual market conditions in the simulated B Book, and to deter cheaters from engaging in various prohibited arbitrage strategies. The Court notes that the sole witness interviewed by the CFTC prior to filing the complaint, Mr. Chichester, supports Defendants' proffered, non-nefarious explanation. For instance, Mr. Chichester testified that the delay function was intended to prevent traders from "taking advantage" of the system settings, Dep Nov. 6 H'rg Def. Ex. 7 at 93:21—94:5, and that the slippage function was designed to mimic true market conditions, *id.* at 123:3-15. He also testified that the delay function would not necessarily harm customers: "I would say with the delay there's also perhaps equal possibility they get a better price too. It's not asymmetric that way. It's just, yeah, an inherent delay to the fill. So, yeah, I would say it goes both ways." *Id.* at 127:7-11. Mr. Kazmi corroborated that same innocent explanation in his own deposition, testifying that Defendants had not ever "deliberately created settings in the simulated environment that are designed to make it harder for traders to make money." Dep Nov. 6 H'rg Def. Ex. 9 (Rough Kazmi Dep. Tr.) at 200:8-12. And even Mr. Edelstein agreed on cross-examination that, in his declaration, he was "not implying that there was anything wrong with applying slippage." Nov. 6 Hr'g Tr. at 60:6-9.

It is unsurprising that, on this point at least, there is convergence between Mr. Chichester and Mr. Kazmi, as the documentary evidence shows that it was iS Risk that recommended the delay and slippage settings to the defendants. ECF 114-2 at 2:41:09 ("[S]ince you're filling everything at [Top of Book] as opposed to depth, you're already providing an advantageous trading

environment, particularly for more sizable orders. [ . . .] Applying a slightly larger delay would even the playing ground a little."); ECF 114-4 at 4:44:17 ("You could also consider implementing a staggered dize slippage risk profile to reduce PnL further on the accounts."). Given that the sole witness interviewed by the CFTC before filing the complaint provided a non-nefarious explanation for these functions (which was not disclosed in the CFTC's request for an SRO or in the complaint, *see* Nov. 6 Hr'g Tr. at 44:1-6), and the documentary evidence supports that explanation, it is far from clear why this allegation was included in the complaint.

In any event, even assuming the Defendants had a duty to disclose these technical aspects of their software configuration, the record evidence does not support a finding of either scienter or materiality as to this alleged omission.

### vii.   *Alleged Omission 3*

The CFTC alleges that Defendants "fail[ed] to disclose that the very small number of customers whose orders are executed against a third-party liquidity provider . . . via STP, were expected to—and did—trade unprofitably, or less profitably than when Traders Global was counterparty to those customers." ECF 1 ¶ 107(g). In support, Mr. Edelstein's declaration states that "[m]ore than 70% of [STP] customers made less money or went from being profitable to unprofitable after being switched [from the B Book] to STP." ECF 23-44 ¶ 17. And the CFTC points to several e-communications involving Mr. Dentrinos that, the CFTC claims, show that Defendants did not expect STP customers to trade profitably.[6] In response, Defendants have submitted a declaration from Mr. Dentrinos in which he explains that the relevant e-communications have been taken out of context. ECF 114-1 ¶¶ 26–28. The Court need not decide

---

[6] Neither the complaint nor the CFTC's other filings cite any comparable e-communications involving Mr. Kazmi.

whose interpretation of these e-communications to credit, because in any event, Defendants did disclose that most traders with live accounts are unprofitable: "Most traders who pass the evaluation quickly fail on their live account. Be one of the few and not the many." ECF 23-40 at 45. During his cross-examination, Mr. Edelstein agreed that the "the company disclosed that most live traders fail." Nov. 6 Hr'g Tr. at 74:8-10, Thus, even assuming for argument's sake that Defendants had a duty to say *anything* about the projected failure rates of STP customers, the record does not support a finding that their disclosure was inadequate, that any deficiency in the disclosure was material to customers (none of whom have been interviewed), or that any omission was made with scienter.

### viii.   Alleged Omission 4

The CFTC alleges that Defendants "fail[ed] to disclose that Traders Global imposes artificial spreads on prices visible to STP'd customers, resulting in the customer getting worse prices for his or her execution than Traders Global receives from the Dealer [*i.e.*, CDO Markets], and reducing the amount of any 'profits' owed by Traders Global to the customer." ECF 1 ¶ 107(h). There does not appear to be any dispute that Defendants imposed a markup and that the markup was not disclosed. Accordingly, the Court must determine whether there was a duty to disclose the markup, whether the omission was made with scienter, and whether it was material. As a threshold matter, the Court observes that any omission with respect to a markup imposed on STP customers affected a fraction of Defendants' customers (a maximum of 100 customers) and, even then, would have had only a *de minimis* effect, if any, on the rewards that profitable traders might have earned. Mr. Edelstein confirmed during his testimony in the November 6 Hearing that the potential profits to Defendants from these markups would have been small. Nov. 6 Hr'g Tr. at 80:24—81:2. That undisputed fact not only constrains the amount of assets that may be frozen in connection with this

alleged omission (since it is not necessary to freeze more than reasonably can be expected for disgorgement or restitution associated with an alleged violation), but also corroborates Defendants' contention that the markups were imposed for technical risk-mitigation reasons and not to unfairly maximize Defendants' profits at the expense of traders (since the associated profits were miniscule). The Court finds that the CFTC has not carried its burden of proving that a disclosure was required, or that Defendants acted with scienter in not disclosing the markups. The Court notes that, even if it reached a different conclusion, any asset freeze tethered to this specific omission would be correspondingly small.

### 3. The CFTC Has Not Met Its Burden of Proving a Reasonable Likelihood of Future Violations

Even if the CFTC could meet its burden of proving a *prima facie* case of a past violation (and it has not), it has not shown a reasonable likelihood of a future violation. "The ultimate test for an injunction is whether the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future. This test entails weighing the following six factors: the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations. A court need not make a finding on every factor." *S. Tr. Metals, Inc.*, 894 F.3d at 1328 (cleaned up).

Although proving a reasonable likelihood of future violations is one of two necessary elements to obtain a preliminary injunction, the CFTC has given this element short shrift. In its Motion, the CFTC asserts, without elaboration, that "[a] reasonable likelihood of future violations can be inferred from the systematic, continuous, and deliberate nature of Defendants' violation." ECF 23 at 47. The Court disagrees with this barebones assertion. Considering the first of the

relevant factors, the alleged conduct at issue here is not so egregious as the CFTC contends. No customer money was ever at risk, no customer was ever denied profits to which the customer was entitled, and no money is missing at the end of the day. The second factor does cut in favor of the CFTC: the alleged conduct was persistent over the relevant period. But the remaining factors favor Defendants. There is scant evidence, if any, of scienter. The Court credits the sincerity of Defendants' assurances, made through counsel, against future violations. And in any event, it appears to be undisputed that the defendant companies are no longer operational. Hence, it stands to reason they no longer pose a risk of violating the CEA. Moreover, and relatedly, counsel for Defendants represented at the November 6 Hearing that Defendants are prepared to resolve this case and make appropriate corrective disclosures if the companies resume operations. *See* Nov. 6 Hr'g Tr. at 113:15-19. Accordingly, after weighing these factors, the Court cannot find that the CFTC has shown a reasonable likelihood of a future violation.

4. *The CFTC Has Not Met Its Burden of Proving the Necessity of a Total Asset Freeze*

The CFTC has asserted that, "[i]n the absence of an asset freeze, Kazmi may—and is likely to—transfer or dissipate assets held in the US," that he can "easily transfer those assets to Canada, beyond the immediate reach of the Court," and that he can also "convert his assets to cryptocurrency and place them in his non-custodial wallet, which cannot be frozen or seized by any jurisdiction." ECF 23 at 46. But neither the CFTC's conclusory assertion that an asset freeze is needed nor its speculation about what Defendants might do is *evidence* on which the Court can rely. As an initial matter, the CFTC has presented no direct evidence that Mr. Kazmi maintains a so-called "non-custodial" (*i.e.*, anonymized) cryptocurrency wallet. Other than the fact that Mr. Kazmi resides outside the United States and has used cryptocurrency (a common enough phenomenon), the CFTC has offered no facts that differentiate Defendants in this case from any

28

other case. A defendant's foreign residence and his use of cryptocurrency cannot be sufficient, on their own, to justify a complete asset freeze. Nor do the CFTC's recent precedents, even against foreign-resident defendants in cryptocurrency cases, support an asset freeze on that basis alone. Mr. Edelstein's gross misrepresentation that Mr. Kazmi had transferred over $30 million from MFF to himself, when in reality those transfers were lawful tax payments from MFF to the Canadian authorities, and the CFTC's continued reliance on that erroneous fact even after the CFTC knew it was false, makes the Court highly skeptical of the CFTC's remaining evidence (if any) supporting its total asset freeze request.

The CFTC has not pointed the Court to competent *evidence* that corroborates its concerns about the risk of dissipation of assets (indicating there is no such evidence). To the contrary, since learning of the complaint, Defendants have taken substantial steps that are inconsistent with an intent to dissipate assets. These steps include appearing in the case, retaining experienced counsel, complying with the Court's order to provide the CFTC with an accounting of assets, Mr. Kazmi sitting for a deposition, and expressing an interest in resolving the case and remediating any potential disclosure issues.

Even setting aside these issues, the CFTC, as the movant, bears the burden of proving not only that an asset freeze is "necessary," *Commodity Inv. Grp., Inc.*, 2006 WL 353466, at *2, but also that its scope is tailored to permissible purposes, such as "ensur[ing] that the assets will be available to compensate public customers," *id.* To be sure, the CFTC has statutory authority to pursue restitution and disgorgement. *See* 7 U.S.C. § 13a-1(d)(3). But a causal connection between a defendant's violation and a victim's losses or the defendant's gains is required. By its terms, the statute permits restitution only "to persons who have sustained losses proximately caused by such violation (in the amount of such losses)." *Id.* "[P]roximate cause necessarily encompasses *cause*

*in fact*, requiring proof of 'but-for' causation." *S. Tr. Metals, Inc.*, 894 F.3d at 1329. The CFTC also must prove "but-for" causation to obtain disgorgement. *See SEC v. Teo*, 746 F.3d 90, 107 (3d Cir. 2014) ("[T]he SEC must . . . prove but-for causation to assert a reasonable approximation of illegal profits."); *see also id.* at 103 ("Since disgorgement primarily serves to prevent unjust enrichment, the court may exercise its equitable power only over property that is causally related to the wrongdoing." (quotations omitted)).

Here, the CFTC seeks to freeze *all* of Defendants' assets—over $100 million. ECF 121. But even assuming the CFTC could establish a *prima facie* violation of law, it has not come close to establishing that every dollar is traceable to any such violation and, hence, must be frozen in anticipation of a future restitution or disgorgement order. For instance, even if the Court were to conclude that, despite not interviewing any of Defendants' customers, the CFTC had made a sufficient *prima facie* showing of materiality, it has not made even a preliminary showing of but-for causation necessary to award restitution ultimately to any particular customer. That is not to say the CFTC must, at this early juncture, be able to prove but-for causation for every customer in order to freeze any funds, but the current gulf between the restitution amount the CFTC can prove today ($0) and what it seeks to freeze (over $100 million) is simply too great to pass muster based on the evidence marshalled to date. The same is true of the claimed need to freeze assets in anticipation of eventual disgorgement. This is especially true because it is undisputed that 92% of Defendants' customers never made it past "demo accounts" in the Evaluation phase, *i.e.,* they never had "live accounts" in either the B Book or the A Book. Since it also appears to be undisputed that customers in the Evaluation phase knew they were in a simulator, there is no reason to suppose that *all* of Defendants' assets would need to be frozen to permit possible disgorgement down the road.

Further, given that there is no evidence that Defendants have attempted to dissipate their assets or destroy evidence after entry of the SRO—as the CFTC suggested they would—there is no need for a receiver to continue to manage Defendants' assets. When the Court asked the CFTC at the November 6 Hearing whether a receiver should remain involved in this case, the CFTC was unable to articulate specific reasons. *See* Nov. 6 Hr'g Tr. at 144:15—145:16, 147:22—148:17. The Court cannot think of any good reasons, either, especially given the costs associated with receiverships. The Temporary Receiver, Anthony Sodono III, is hereby dismissed with the Court's thanks. Mr. Sodono and his agents are not authorized to charge the receivership estate for any actions that they take from this date forward. Mr. Sodono and his agents are also ordered to return all of Defendants' assets, including cash, account passwords, and non-public documents, to Defendants no later than 5 business days after the entry of this order. Mr. Sodono shall also return control of the My Forex Funds website to Defendants and remove the "Temporary Receiver" banner he installed. To the extent Defendants need to continue to address pending chargebacks (*see* ECF 79), they are permitted to do so and to use their own assets for that purpose.

### E. THE REGISTRATION CHARGES

Thus far, the Court has addressed the fraud charges in Counts One and Two of the complaint. The complaint also alleges violation of the registration provisions of the CEA. There is no dispute that Defendants did not register with the CFTC, although Defendants contend there was no obligation for them to do so.

During the November 6 Hearing, counsel for Defendants represented that he was unaware of any precedent for the CFTC seeking a preliminary injunction and total asset freeze solely for alleged registration violations. *See* Nov. 6 Hr'g Tr. at 100:1-12. When asked, counsel for the CFTC could not readily identify any such case (although he speculated that one such case might be cited

in the CFTC's Motion). *Id.* at 100:15-22. Nevertheless, counsel for the CFTC stated that the CFTC would persist in seeking an injunction and total asset freeze solely for the alleged registration violations. *Id.* at 99:18-23.[7] Given the apparent dearth of precedent, the Court questions whether this position was endorsed by CFTC leadership. Counsel for the CFTC has not even pointed the Court to a prior registration-only enforcement action where the *resolution* included restitution or disgorgement. If these equitable remedies are never pursued as part of a resolution in registration cases, the Court perceives no basis (and certainly no need) to order an anticipatory freeze now.

There are legitimate questions as to whether Defendants were, in fact, required to register. For the reasons set forth in Section D.1, *supra*, the Court concludes that the CFTC has not met its burden of establishing that any violations occurred "in connection with" commodities transactions. That same jurisdictional defect is fatal to the CFTC's ability to show, at this stage, a registration violation.

This issue potentially has far-reaching consequences for the forex trading industry (and perhaps beyond, given the prevalence of simulations in contexts ranging from stock trading to fantasy football). And it is far from clear why the Court should issue a permanent injunction and a total asset freeze based solely on alleged registration violations, especially since the CFTC has not shown, even preliminarily, a causal connection between the alleged registration violations and either victim losses or unlawful gains to Defendants. Indeed, as the Eleventh Circuit has recognized, "a fraudster's failure to observe registration requirements does not necessarily cause his victim's loss." *S. Tr. Metals, Inc.*, 894 F.3d at 1331.

---

[7] In seeking to distinguish two other cases in which the CFTC did not seek similar injunctive relief, counsel for the CFTC indicated that those cases involved negotiated, pre-filing resolutions. *See* Nov. 6 Hr'g Tr. at 101:10-19. But this is a circular explanation, since Defendants' point is precisely that they were not even approached pre-charge and given a similar opportunity to settle.

### F.  CONCLUSION AND ORDER

The Motion seeks four species of relief: (1) an asset freeze, (2) the appointment of a receiver, (3) the inspection of books and records, and (4) an injunction against future violations of the CEA. ECF 23 at 45-47.

The Court will not order an asset freeze at this time. As the Third Circuit has recognized, "a freeze is designed to preserve the status quo by preventing the dissipation and diversion of assets." *Am. Metals Exch. Corp.*, 991 F.2d at 79. The CFTC has not met its burden of proof that there is a meaningful risk here that Defendants will dissipate their assets. In fact, Defendants' responsible behavior since learning of the complaint indicates the opposite. Nor has the CFTC made any meaningful effort to tie, through competent evidence, the vast amount they seek to freeze today to the scope of any possible restitution or disgorgement order that may be entered in the future. Likewise, as set forth above, the Court perceives no ongoing need for a receiver.

Nor will the Court issue an injunction, since the CFTC has not shown a reasonable likelihood of a future violation.

Finally, the Court declines to order the inspection of Defendants' books and records. The CFTC has tied the purported need for this relief to a concern that Defendants will destroy relevant evidence. ECF 23 at 46. Given Defendants' conduct since the complaint was filed, the Court perceives no meaningful risk of spoliation. The orderly process of civil discovery should proceed as set forth in the Federal Rules of Civil Procedure.

### G.  ALTERNATE ORDER REGARDING ASSET FREEZE

For the reasons set forth above, Defendants urge the Court to deny the CFTC's Motion in full. However, as previewed for the Court during the November 6 Hearing, *see* Nov. 6 Hr'g Tr. at 150:12-17, if the Court is inclined to grant the Motion in part and freeze any amount of Defendants'

assets before trial, Defendants assert it should be limited, at most, to the profits Defendants earned from customers trading on live accounts (*i.e.*, B Book and A Book customers), which is approximately $12,080,000.

While Defendants do not concede that any of their assets are subject to disgorgement, the crux of the CFTC's allegations center on whether the defendant companies were "the counterparty to substantially all customer trades." ECF 1 ¶ 3. This allegation—while founded on the false premise that Defendants' customers were party to any trades with the defendant companies—only has salience in the context of live accounts. Of Defendants' customers, 92% never advanced out of "demo accounts" and into either the B Book or the A Book. ECF 114-1 ¶ 11. The CFTC does not contend in its complaint that customers who never moved beyond demo accounts were misled to believe that they were trading real money against third parties. Rather, the gravamen of the CFTC's complaint is that Defendants failed to disclose to B Book customers that they were in a simulator, not trading in the real market. It appears to be undisputed that customers with demo accounts knew they were in a simulator to evaluate their trading prowess.

As such, and in the absence of allegations and supporting evidence concerning material misrepresentations to the 92% of customers who never progressed beyond demo accounts, it is appropriate to limit the amount of any asset freeze to, at the very most, Defendants' profits associated with the 8% of customers who had "live accounts" in either the B Book or the A Book. The evidence presented to the Court is that Defendants generated approximately $310 million in fees from *all* customers (the 92% with demo accounts and the 8% with live accounts) during the relevant period and paid out approximately $159 million to customers who traded successfully. ECF 23-44 ¶¶ 13, 47-48. The delta is $151 million. It is reasonable to conclude that approximately 8% of that amount, or $12,080,000, is associated with the live accounts. Although the Court has

not concluded that this amount is subject to disgorgement ultimately, this is the amount the Court will order frozen at this stage.

Only $12,080,000 of the corporate defendants' assets shall remain frozen pending trial. There is no need to freeze Mr. Kazmi's personal assets, as the corporate assets are sufficient to cover this amount. Because Defendants are represented by experienced counsel, the Court trusts that no receiver is necessary to effectuate the Court's order. Within 5 business days of entry of this order, Mr. Kazmi shall submit an affidavit outlining the steps he has taken to ensure that $12,080,000 of Defendants' corporate assets remain frozen pending further order of this Court. Failure to keep these assets frozen will expose Defendants to sanctions, contempt, an expanded freeze order, or the reinstitution of a receiver. The balance of the SRO is dissolved, and Defendants' remaining assets shall be unfrozen and returned to Defendants with 5 business days' of entry of this order.