**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | |
| Plaintiff, | **Civil Action No. 23-11808 (ZNQ) (TJB)** |
| v. | **OPINION** |
| TRADERS GLOBAL GROUP INC., *et al.*, | |
| Defendants. | |

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon a Motion for Statutory Restraining Order and Preliminary Injunction (the "Motion") filed by Plaintiff Commodity Futures Trading Commission ("CFTC"). ("Moving Br.", ECF No. 14.) Defendants Traders Global Group Inc., a New Jersey Corporation doing business as "My Forex Funds" (hereinafter, "MFF"), Traders Global Group, Inc., a Canadian Business Organization, and Murtuza Kazmi (collectively, "Defendants") opposed the Motion. ("Opp'n Br.", ECF No. 114.) The CFTC replied. ("Reply", ECF No. 123.) The Court conducted an evidentiary hearing on November 6, 2023.

The Court has considered the parties' submissions and the evidence and argument presented at the hearing. For the reasons set forth below, the Court will GRANT IN PART and DENY IN PART the Motion. The Court hereby makes the following findings of fact and conclusions of law pursuant to Federal Rules of Civil Procedure 52(a)(2) and 65(d)(1)(A):

## I.      <u>JURISDICTION</u>

This Court has federal question jurisdiction over this matter, 28 U.S.C. § 1331 (codifying federal question jurisdiction), as well as jurisdiction by virtue of the CFTC's status as a federal agency authorized to sue by Act of Congress, 28 U.S.C. § 1345 (U.S. as plaintiff). Moreover, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), provides that U.S. district courts shall have jurisdiction over actions brought by the CFTC for injunctive relief, or to enforce compliance with the Act or Regulations.

## II.     <u>LEGAL STANDARD FOR STATUTORY RELIEF</u>

Under Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), the CFTC may seek, and a court may enter, a preliminary injunction against a defendant who has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the Act or Regulations.  In order to obtain preliminary injunctive relief, the CFTC need only establish a *prima facie* case that defendants engaged in illegal conduct in violation of the Act.  *CFTC v. Am. Metals Exch. Corp*., 693 F. Supp. 168, 191 (D.N.J. 1988) (entering preliminary injunction).  The CFTC must also show a reasonable likelihood of future violation of the Act or Regulations.  *Id.*  The likelihood of future violations may be inferred from systematic or ongoing violations.  *Id.*  The CFTC is not required to demonstrate irreparable harm in order to obtain a statutory restraining order or preliminary injunction, as a private litigant would be.  *Id.* at 172.

The court may, at its discretion, appoint a receiver.  *Id.*  The court may also issue an asset freeze to maintain the status quo, prevent the diversion of assets, or impede defendants from benefitting from wrongdoing.  *Id.*

### III.  **FINDINGS OF FACT**

#### A.  **THE PARTIES**

Plaintiff CFTC is the independent federal regulatory agency charged by Congress with administering and enforcing the Commodity Exchange Act ("Act"), 7 U.S.C §§ 1-26, and Commission Regulations ("Regulations"), 17 C.F.R. pts. 1–190.

Defendant Traders Global Group Inc. ("Traders Global U.S.") is a New Jersey corporation with a "main business address" in Parsippany, New Jersey. (ECF No. 33-2, CFTC Ex. A-1, N.J. Dept. of Treas. Bus. Recs. Result for Traders Global.) Traders Global U.S. has never been registered with the Commission.  (ECF No. 33-38, CFTC Ex. B, Jung Certs.)

Defendant Traders Global Group Inc. ("Traders Global Canada") is a Canadian business organization with a registered office address in Vaughan, Ontario. (ECF No. 33-5, CFTC Ex. A-4, Corps. Canada Search Result for Traders Global.) Traders Global Canada has never been registered with the Commission. (ECF No. 33-38, CFTC Ex. B, Jung Certs.)

Traders Global U.S. and Traders Global Canada do business together as "My Forex Funds."  (ECF No. 42-5, Kazmi Decl. n.1.)

Defendant Murtuza Kazmi is the CEO, shareholder, and sole director of Traders Global U.S. and Traders Global Canada.  (ECF No. 33-2, CFTC Ex. A-1, N.J. Dept. of Treas. Bus. Recs. Result for Traders Global; ECF No. 33-5, CFTC Ex. A-4, Corps. Canada Search Result for Traders Global; ECF No. 42-5, Kazmi Decl. ¶ 2 ("I am the chairman and chief executive of My Forex Funds.").)

Kazmi resided in Phillipsburg, New Jersey from the start of the Relevant Period[1] through approximately May 2022.  (ECF No. 33-8, CFTC Ex. A-7, Kazmi TD Bank Acct. Statement, Nov.

---

[1] The Relevant Period is the time period "starting in at least November 2021 and continuing through the present." (Compl. ¶ 1, ECF No. 1.)

6, 2021 (showing Phillipsburg address).)  Defendant Kazmi currently resides in Ontario, Canada. (ECF No. 42-5, Kazmi Decl. ¶ 1.)

### B.     THE MY FOREX FUNDS WEBSITE

Traders Global U.S. and Traders Global Canada (together, "Traders Global"), through the website "myforexfunds.com," (the "My Forex Funds website") offered customers the opportunity to, for a fee, "earn as a professional trader" trading leveraged foreign exchange ("forex") and commodity contracts.[2]  (ECF No. 112-2, CFTC Ex. C-1 at 2 ("myforexfunds.com" landing page).) Through the website, Traders Global solicited customers to purchase one of its "programs," which Traders Global stated will "start you on your journey as a FOREX Funded Trader."  (*Id.* at 2–3.)

Traders Global offered three such programs, two of which (the "Evaluation" and "Rapid" programs) purported to require a customer to generate simulated profits during an "evaluation phase," or in a "demo account," before becoming a "funded trader" and graduating to a "live" or "funded" account.  (*See infra.*)  The third program, referred to as the "Accelerated" program, allowed customers to skip the evaluation or demo phase and proceed directly to trading "live funds." (*See infra.*)

### C.     TRADERS GLOBAL'S TRADING PROGRAMS

#### 1.     The Evaluation Program

Traders Global's most popular program was its "Evaluation" program.  (Defs.' Ex. 9, Kazmi Dep. 41:6–41:18 (testifying that ninety percent of customers purchase the Evaluation program).)

---

[2] The forex and commodity contracts available for trading by customers were listed on the My Forex Funds website, along with the leverage available for each contract.  (*See* ECF No. 112-2, CFTC Ex. C-1 at 82 ("myforexfunds.com/faq/what-are-the-available-instruments-i-can-trade/"),   86-89   "myforexfunds.com/list-of-instruments-and-contract-specifications/").)

According to the My Forex Funds website, the Evaluation program was a "two-step process where a potential Funded trader can prove their FOREX, CFD or commodities trading skills." (ECF No. 112-2, CFTC Ex. C-1 at 38 ("myforexfunds.com/accounts/evaluation/").)  During the two-step process, a customer was required to meet certain "profit targets" in what the website suggested was a simulated trading account.  (*Id.* at 40.)  If the customer achieved the profit targets, the customer became a "funded trader" and graduated to a so-called "live account" or "funded account," as it was variously referred to.  (*Id.* at 38–39, 41.)  A customer with a "live account" received "profit-sharing" in the amount of up to 85% from the customer's trades.  (*Id.* at 41.)

The website explained: "Our Forex Funded Account Evaluation program is built for FOREX traders to prove their skills.  Semi-professional traders in need of capital to move to the next level of their career, have the opportunity to show their talent and reach their goals in a quick, two phase process and join our FOREX Prop Firm and become a funded trader."  (*Id.* at 38.)

### 2.   The "Rapid" Program

According to the My Forex Funds website, customers who purchased the "Rapid" program initially    "learn    to    trade    with    a    demo    account."    (*Id.*    at    25 (https://myforexfunds.com/accounts/rapid/).)  Once the customer achieved profits in the demo account equal to 10% of the value of the account they signed up for, the customer would receive a "live" account.[3]  (*Id.* at 33 (https://myforexfunds.com/rapid-acc/) ("funded earnings," top of page).)

According to the website, a customer who purchased the Rapid program could earn periodic "bonuses" in the amount of 12% of profits in his or her demo account.  (*Id.* at 28

---

[3] For example, if a customer signed up to trade a demo account worth $10,000, the customer must achieve $1,000 worth of trading profits in his or her demo account to receive a "live" account.

(https://myforexfunds.com/accounts/rapid/).)   The website specified that bonuses paid on demo accounts did not qualify as "profit sharing" because "you will be trading on a simulated account." (*Id.* at 33 (https://myforexfunds.com/rapid-acc/) ("profit sharing," middle of page).)   Once the customer graduated to a "live" account, however, the customer became a "funded trader" entitled to "profit-sharing" in the amount of 50% to 80% of the customer's trading profits. (*Id.*)   According to the My Forex Funds website, the purpose of the Rapid program was to "gain a three[-]month snap-shot of the trader[']s capabilities before giving them access to our live trading funds."  (*Id.* at 25 (https://myforexfunds.com/accounts/rapid/).)

### 3.   The Accelerated Program

Traders Global's "Accelerated" program had no evaluation phase or demo account. According to the My Forex Funds website, it was "built for our traders to start trading a live account from day one."  (*Id.* at 52 (https://myforexfunds.com/accounts/accelerated-program/).)  In other words, customers who purchased the Accelerated program "skip the line and jump right into trading real funds."  (*Id.*)  The website touted the Accelerated program as "suitable for profitable full-time traders who want to boost their capital immediately."  (*Id.*)

### D.   CUSTOMER FEES

Traders Global charged each customer a fee to purchase one of its three aforementioned trading programs.  (*Id.* at 5 ("myforexfunds.com" landing page).)  The amount of the fee depended on the type and size of the account the customer wished to trade.  (*See id.*)  At one end of the spectrum, a customer could pay a $99 fee to trade an Evaluation program account worth $10,000. (*See, e.g.*, *id.*)  On the other end of the spectrum, an Accelerated program account worth $50,000 would cost $4,900.  (*Id.* at 67 (https://myforexfunds.com/accounts/accelerated-program/).) If a customer failed to qualify for a "live account" in the Evaluation or Rapid programs, Traders Global terminated the customer's account and kept the customer's fee.  (*See, e.g.*, *id.* at 47

(https://myforexfunds.com/evaluation/) ("drawdown rules"); *see also* Defs.' Ex. 9, Kazmi Dep. 93:17–94:6 (customer account terminated if equity call below "drawdown limit"; fees are "company assets"); ECF No. 130, PI Hearing Tr. 117:15–117:18 ("MR. ZINK:  If – if they wash out, we keep the registration fee.").)  If the customer qualified for a "live account" and managed to trade successfully enough to earn a "profit split," Traders Global refunded the customer's fee. (*See, e.g.*, ECF No. 112-2, CFTC Ex. C-1 at 41 (https://myforexfunds.com/accounts/evaluation/ ("Get your fees back!")); *see also* Defs.' Ex. 9, Kazmi Dep. 94:7–95:10.)

### E.   THE "MARKET" AND "LIQUIDITY"

The My Forex Funds website contained references to trading in "[t]he market," or against "liquidity providers."  (*See infra*.)  The first page of the website read: "The market awaits you." (ECF No. 112-2, CFTC Ex. C-1 at 2 (https://myforexfunds.com/ landing page).)

The website elsewhere claimed: "We are not a broker. Traders Global Group is our trading server.  It is provided by an institutional fintech company who provides us liquidity.  We do not require regulation as we are a proprietary firm.  It is our company money that is being used in all of our accounts."  (*Id.* at 78 (https://myforexfunds.com/faq/is-your-broker-regulated/).)   The website stated further: "Our live accounts are on our own server from an institutional technology provider with multiple liquidity sources connected to it."  (*Id.* at 33 (https://myforexfunds.com/rapid-acc/).)

### F.   "YOUR SUCCESS IS OUR BUSINESS"

The My Forex Funds website included statements to the effect that Traders Global makes money when its customers make money, and loses money when its customers lose money.  (*See infra*.)  For example:

- "Your success is our business.  We provide forex traders with multiple product options to choose from based on your experience.  If you lose, we lose, so choose carefully the

program that fits your FOREX and Prop Firm Trading experience.  We will do the rest when it comes to support and trading conditions to ensure your success when trading Forex with a Prop Firm." (*Id.* at 4–5 (https://myforexfunds.com/ landing page).)

- "We only make money if you make money so trade how you are comfortable." (*Id.* at 54 (https://myforexfunds.com/accounts/accelerated-program/).)

- "At My Forex Funds our goal is to encourage you, the trader to remain consistent and hopefully profitable so that you can earn from your talent . . . . Our goal as a company is to find profitable, successful traders and encourage up and comers to become more consistent and profitable and form a long-term partnership." (*Id.* at 32 (https://myforexfunds.com/rapid-acc/).)

Defendant Kazmi made similar statements in an October 26, 2022 video on Traders Global's "My Forex Funds" YouTube channel.  In the video, Kazmi explained, "it's traders that make us at the end of the day; it's traders trading that make us money . . . ." (ECF No. 33-4, CFTC Ex. A-3 at 11:00–11:30.)

### G.  TRADERS GLOBAL'S AGREEMENT WITH CUSTOMERS

A customer who became a "funded trader" or otherwise traded a "live account" was required to sign a "contractor agreement."  (ECF Nos. 33-24 through 33-26, CFTC Exs. A-23 through A-25.)  The contractor agreement was between Traders Global U.S. (as "client") and the customer (as "contractor").  (*See, e.g.*, ECF No. 33-25, CFTC Ex. A-24 at 1.)  It stated that the customer was to "perform" certain "specific services" for Traders Global U.S., as set forth in the "statement of work."  (*Id.*)  The statement of work for every customer was: "Trading."  (*See, e.g.*, *id.* at 21.)  Each contract was signed by Defendant Kazmi.  (*See, e.g.*, *id.* at 22.)

## H.    SUBSTANTIALLY ALL CUSTOMER TRADING WAS "INTERNALIZED" BY TRADERS GLOBAL

Although the website tells customers they will trade using "live" or "funded" accounts, almost no trades by customers with "live" or "funded" accounts were actually executed against an external counterparty.  (Defs.' Ex. 9, Kazmi Dep. 49:2–50:20 (one percent of customer orders sent to external counterparty).)  Instead, substantially all customer trading in so-called "live" accounts was "internalized" by Traders Global.  (*Id.* at 55:14–56:8 (B-book customers have "live accounts;" all customers on B-book are "internalized"); ECF No. 33-43, CFTC Ex. D, Chichester Test. 45:18–49:5 (customer trading on "live" servers is "internalized"), 67:18–70:20 (same).)  Defendants concede that these trades were executed in a "simulated environment."  (Defs.' Ex. 9, Kazmi Dep. 63:4–63:9 (B-book customers trade within a "virtual simulated environment").)[4]

During the period from November 1, 2021, through October 14, 2022, Traders Global had at least 135,000 unique customers.  (ECF No. 33-44, Edelstein Decl. ¶ 11.)  Approximately 24,000 of those customers were trading so-called "live accounts."  (*Id.* ¶ 16.)  Of those 24,000 customers, no more than 100 had a single order executed against an external counterparty.  (*Id.*)  Traders Global's general practice of "internalizing" substantially all customer trades continued through the end of the Relevant Period.  (*See* Defs.' Ex. 8, Chichester Dep. 10:2–10:23.)

## I.    CUSTOMER FEES WERE TRADERS GLOBAL'S ONLY SOURCE OF REVENUE

Traders Global's only substantial source of income during the Relevant Period was customer fees.  (Defs.' Ex. 9, Kazmi Dep. 84:2–84:21 ("it is fair to say that the fees made up [ ] the company's assets and those assets were used to pay the customers 95 percent of the registration

---

[4] *See also* ECF No. 130, PI Hearing Tr. 116:23–117:1 ("THE COURT: So what's the trading that's going on, if all the money that's being exchanged is really these initial fees that they get, right?  MR. ZINK: Simulator."), 117:10–12 ("MR. ZINK: …. They give folks the opportunity with their funny money to buy in. There's a registration fee. They go. They pass an evaluation program. They go to a simulator.").

fees").)[5]  Traders Global made no money from customers trading against external counterparties. (*Id.* at 70:20–73:17 ("A book was not profitable so it was profitable some month it was not so overall I would say no."); *see also id.* at 53:4–53:6 (defining A-book as order routed to external counterparties).)  The very small number of customers whose trading was routed to external counterparties generated net losses for Traders Global.  (*Id.* at 70:20–73:17; *see also* ECF No. 123-3, CFTC Ex. C to CFTC's Reply, Email from F. Gewirtz, iS Risk, to M. Chichester, iS Risk, et al., Feb. 9, 2023 (showing negative net "Trade PL" from customer trading "on STP").)

During the Relevant Period, Traders Global collected more than $310 million in fees from customers.  (ECF No. 33-44, Edelstein Decl. ¶ 47.)  During the Relevant Period, Traders Global paid at least $159 million to its successful customers.  (*Id.* ¶ 48.)  Traders Global made these payments using fees paid by customers, and not with the proceeds of any successful trading against external counterparties.  (Defs.' Ex. 9, Kazmi Dep. 84:2–21.)

## J.   TRADERS GLOBAL CONTROLLED THE SIMULATED ENVIRONMENT IN WHICH CUSTOMERS TRADED

Traders Global controlled various aspects of the "simulated" environment in which substantially all "live account" customers traded.  (*See infra*.)  One aspect of that control was the bid-ask spread, which is the difference between the highest bid and the lowest offer.  (Defs.' Ex. 9, Kazmi Dep. 124:2–125:15.)  Traders Global controlled this by adding a markup to the price feed, which resulted in a wider, and thus less favorable, bid-ask spread.  (*Id.*; *see also* Defs.' Ex. 8, Chichester Dep. 13:9–21:21 (Traders Global adds markups to price feed around "news events;" results in less favorable executions).)

---

[5] *See also* ECF No. 130, PI Hearing Tr. 116:18–117:21 ("THE COURT: Let me ask you this: So all the money that's really going through Traders Global, those are all through fees, correct?  MR. ZINK: Fees. It's all fees. It's all fees.").

Another aspect of the trading environment Traders Global controlled was the speed with which customer orders were executed. (Defs.' Ex. 9, Kazmi Dep. 143:12–143:16; ECF No. 33-44, CFTC Ex. E, Edelstein Decl. ¶ 14.) Traders Global controlled this by adding "delay" to customer orders, causing them to be executed some period of time after they were entered. (*Supra*.)

Traders Global also controlled the prices at which customer orders were executed. (Defs.' Ex. 9, Kazmi Dep. 142:20–25; ECF No. 33-44, CFTC Ex. E, Edelstein Decl. ¶ 14.) Traders Global controlled this by adding "slippage" to customer orders, causing certain orders to be executed at a price that was less favorable than what was displayed to the customer on the price feed. (*Supra*.) Substantially all customers with "live" accounts were subject to some form of slippage or delay. (ECF No. 33-44, CFTC Ex. E, Edelstein Decl. ¶ 14.) Certain customers, whom Traders Global purportedly believed to be engaged in trading strategies prohibited by Traders Global's terms and conditions, were subject to more delay and slippage than other customers. (ECF No. 130, PI Hearing Tr. 121:3–121:10 ("We selectively applied certain of these techniques to certain traders who we thought were screwing us over.").)

Traders Global also controlled the amount of commissions that were assessed against customer trades on all "live accounts." (Defs.' Ex. 9, Kazmi Dep. 125:16–126:5; ECF No. 33-44, CFTC Ex. E, Edelstein Decl. ¶ 13.)

### K.   TRADERS GLOBAL'S AGREEMENT WITH IS RISK

Traders Global utilizes a third-party advisor called iS Risk Analytics, Inc. ("iS Risk") to help with the software it uses to control the electronic environment in which its customers trade. (*See* ECF No. 33-43, CFTC Ex. D, Chichester Test. 15:5–16:8, 72:21–73:12, 102:5–103:2.) An agreement between Traders Global and iS Risk dated September 13, 2021, specified as follows: "Customer [defined as Traders Global] shall be the counterparty to all trades with Client Accounts

[defined to mean accounts belonging to Traders Global's customers]."  (ECF No. 33-16, CFTC Ex. A-15 at 2 (clause 3.1.5).)   The contract is signed by Defendant Kazmi.  (*Id.* at 9.)

In a June 22, 2022, email with the subject line, "STP discussion," an iS Risk employee told Joshua Dentrinos, Traders Global's "Head of Risk and Trading": "I think we need to all subscribe to the concept that your clients will almost never have alpha.  None of them will make money on real market conditions because they are good.  Some will because they are lucky." (ECF No. 33-15, CFTC Ex. A-14, Email from J. Wilkins, iS Risk, to J. Dentrinos, Traders Global.)

## L.   DEFENDANT KAZMI KNEW THAT SUBSTANTIALLY ALL TRADES WERE INTERNALIZED, AND THAT TRADERS GLOBAL REALIZED NO REVENUE FROM CUSTOMER TRADING

Defendant Kazmi knew throughout the Relevant Period that Traders Global "internalized" substantially all customer trading on the so-called "live accounts."  (Defs.' Ex. 9, Kazmi Dep. 84:22–85:1 (Kazmi aware of B-booking most "live accounts").)  Kazmi also knew throughout the Relevant Period that the small number of customers who traded against a third-party lost money doing so.  (*See id.* at 72:12–73:17 (Kazmi aware of losses; told by others, had to send margin to external counterparty).)  Kazmi was also generally aware that Traders Global imposed slippage and delay on "live" accounts.  (*Id.* at 131:13–132:17 (Kazmi aware of artificial slippage, delay).)

## M.   TRADERS GLOBAL FAILED TO DISCLOSE FACTS TO CUSTOMERS

Defendants did not disclose to customers that substantially all trading in the so-called "live accounts" was "internalized" by Traders Global.  (*See generally* ECF No. 112-2, CFTC Ex. C-1 (My Forex Funds website); *see also* Defs.' Ex. 9, Kazmi Dep. 103:12–103:21 ("There are ways that we A and B book. We do not specify that amount that is being done.").)  Defendants also did

not disclose that customer trading in the "live accounts" occurred in a "simulated" environment controlled by Traders Global.  (ECF No. 130, PI Hearing Tr. 128:1–19[6].)

Defendants did not disclose to customers that the "profit sharing" payments came from fees paid by other customers, and not from the proceeds of successful trading against third parties. (*See generally* ECF No. 112-2, CFTC Ex. C-1 (My Forex Funds website); *see also* Defs.' Ex. 9, Kazmi Dep. 113:9–15.)  Defendants also did not disclose that when customers made money through these payments, Traders Global lost money.  (*See generally* ECF No. 112-2, CFTC Ex. C-1 (My Forex Funds website).)

Defendants did not disclose to customers that slippage or delay that they may have experienced was imposed by Traders Global.  (*See generally id.*; *see also* Defs.' Ex. 9, Kazmi Dep. 137:3–8.)  Defendants did not disclose to customers that commissions assessed against their accounts were assessed by Traders Global.  (*See generally* ECF No. 112-2, CFTC Ex. C-1 (My Forex Funds website).)

## IV.  <u>CONCLUSIONS OF LAW</u>

### A.  RETAIL FOREX TRANSACTIONS

The CFTC has made a *prima facie* showing that Traders Global offered or entered into retail forex transactions within the meaning of Section 2(c)(2)(C)(i) of the Act.  A "retail forex transaction" is defined in Regulation 5.1(m), 17 C.F.R. § 5.1(m), to include any account,

---

[6] "THE COURT: I just want to make sure I'm clear on this.  You're saying that the traders believe that the money they're managing is coming from fees paid by other customers?

MR. ZINK: There's no way the traders actually believe that. Right?

THE COURT: So they don't know that. That is not the money —

MR. ZINK: I didn't know that. I don't think they know that. I don't think that most of them know they're going into a simulator, except for the evaluation program.  So a couple things.  So in the training program, it's clear that you're in a simulator. Right? Once you pass out of it, you go to book B, which is a simulator. If I am them, I think what the problem is, if we didn't tell anybody you're in a simulator, you use the words 'live trading.' Our point is, like, we never said in connection with book B you're live trading. But my – I get it. We'll just disclose it."

agreement, contract, or transaction described in Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C).

Section 2(c)(2)(C)(i) provides that the Commission shall have jurisdiction over any agreement, contract, or transaction in foreign currency that is, in relevant part: (a) offered to, or entered into with, a person that is not an eligible contract participant ("ECP")[7]; and (b) offered or entered into on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert therewith.

The CFTC has made a *prima facie* showing that Traders Global's customers are not ECPs. Rather, they are retail customers. Traders Global solicits members of the general public via its website. Traders Global's website includes no requirement that a customer be an ECP in order to purchase one of its "programs" or trade. Traders Global specifically solicits aspiring traders "in need of capital." *See CFTC v. S. Templeton Grp., Inc.*, Civ. No. 03-4999, 2008 WL 5662079, at *2 (E.D.N.Y. Dec. 11, 2008) (entering summary judgment for CFTC on fraud in connection with retail forex transaction claim where defendant "marketed [its] managed foreign currency trading accounts to . . . unsophisticated retail customers").

The CFTC has made a *prima facie* showing that Traders Global enters into transactions in foreign currency with its customers on a leveraged basis.[8] Traders Global pays customers when they win, and retains their fees when they lose. Traders Global determines the bid-ask spread on the price feed visible to customers, imposes slippage and delay on the execution of customer orders, and assesses commissions against customers. Traders Global is thus a counterparty to

---

[7] An ECP is defined in Section 1a(18)(xi) of the Act, 7 U.S.C. § 1a(18)(xi), to include an individual with amounts invested on a discretionary basis, the aggregate of which is in excess of: (a) $10 million; or (b) $5 million, if the person enters into the agreement, contract, or transaction as a hedge.

[8] The leverage, 1:100 for most foreign currency trading pairs, is specifically referred to on the My Forex Funds website.

substantially all of its customers' "live account" trades.  Traders Global's status as a counterparty is memorialized in Traders Global's contract with iS Risk.

Defendants argue that Traders Global did not enter into any "transaction" with its customers because no customer "invested" money in an account with Traders Global, and there was no "risk of loss."  Neither "investment" nor "risk" is a required element under Section 2(c)(2)(C) of the Act.  Still, Traders Global customers did in fact risk their fee, which Traders Global would refund or retain depending on the customer's trading performance.

Defendants argue that there were no "transactions" because substantially all customer trading took place in a "simulated environment."  The environment may have been simulated, but the trading was real.  Customers placed orders, and Traders Global took the other side of them.  When customers won, they were paid.  When customers lost, their accounts were terminated and Traders Global kept their fees.

## B.    RETAIL COMMODITY TRANSACTIONS

The CFTC has also made a *prima facie* showing that Traders Global offered to enter into, and entered into, retail commodity transactions with customers.  Section 2(c)(2)(D)(i) of the Act, 7 U.S.C. § 2(c)(2)(D)(i), provides that the Commission shall have jurisdiction over any agreement, contract, or transaction in any commodity that is: (a) entered into with, or offered to (even if not entered into with), a retail customer; and (b) entered into, or offered (even if not entered into), on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis.  These are referred to in the Act as "retail commodity transactions."  7 U.S.C. § 2(c)(2)(D).

The My Forex Funds website offered trading in leveraged commodity contracts, including precious metals, digital asset commodities, broad-based stock indices, and oil.  Traders Global entered into retail commodity transactions with customers because, as set forth in the previous

section, Traders Global is the counterparty to substantially all customer trading in the "live accounts."

### C.    RFED REGISTRATION

Counts III and IV in the CFTC's Complaint charge Defendants with acting as an unregistered retail foreign exchange dealer or associated person.  A retail foreign exchange dealer, or "RFED," is a person that is, or offers to be, the counterparty to a retail forex transaction. 17 C.F.R. § 5.1(h)(1).  Regulation 5.3(a)(6)(i), 17 C.F.R. § 5.3(a)(6)(i), requires a person acting in the capacity of an RFED to register with the Commission as such.

The CFTC has presented a *prima facie* case that Traders Global acted in the capacity of an RFED by entering into retail forex transactions with its "live account" customers as a counterparty. Traders Global is not registered with the Commission in any capacity, and is therefore in violation of Regulation 5.3(a)(6)(i) and (ii).

### D.    OFF-EXCHANGE TRADING

Count V in the CFTC's Complaint charges Defendants with engaging in impermissible off-exchange retail commodity transactions.  Section 4(a) of the Act, 7 U.S.C. § 6(a), provides that it shall be unlawful for any person to enter into, execute, confirm the execution of, or conduct any office or business anywhere in the United States, for the purpose of soliciting or accepting any order for, or otherwise dealing in, any transaction in, or in connection with, a retail commodity transaction unless such transaction is conducted, executed, or consummated on, or subject to, the rules of a board of trade which has been designated or registered by the Commission as a contract

16

market or derivatives transaction execution facility for such commodity.[9]  In other words, retail

commodity transactions are required to be executed on an exchange registered with the CFTC.

Traders Global entered into, executed, and otherwise dealt in retail commodity transactions with

its "live account" customers as a counterparty.  These transactions were not executed on any

CFTC-registered exchange, but were "internalized" by Traders Global.  The CFTC has thus

presented a *prima facie* case that Traders Global violated Section 4(a) of the Act.

### E.      FRAUD

Counts I and II in the CFTC's Complaint charge Defendants with fraud in connection with

retail forex and retail commodity transactions in violation of Section 4(b)(2)(A) and (C) of the Act,

7 U.S.C. § 6b(a)(2)(A) and (C), and Regulation 5.2(b)(1), (3), 17 C.F.R. § 5.2(b)(1) and (3).  The

Court finds that the CFTC has met its *prima facie* burden as to Counts I and II.

Sections 4(b)(A) and (C) make it unlawful for any person, in or in connection with any

order to make, or the making of, any contract of sale of any retail forex or retail commodity

transaction to cheat or defraud or attempt to cheat or defraud the other person; or willfully deceive

or attempt to deceive the other person by any means whatsoever.  *See* 7 U.S.C. §§ 6b(a)(2)(A),

(C); *see also* 7 U.S.C. §§ 2(c)(2)(C)(iv), (D)(iii) (extending 7 U.S.C. § 6b's prohibitions to retail

forex and retail commodity transactions, respectively).  Regulations 5.2(b)(1) and 5.2(b)(3)

prohibit the same fraudulent conduct just as to retail forex transactions.  *See* 17 C.F.R. § 5.2(b)(1),

(3).

To begin, as set forth above, the Court finds that the CFTC has made a *prima facie* showing

that Traders Global offered to enter into and entered into leveraged retail forex and retail

---

[9] Section 4(a) of the Act, 7 U.S.C. § 6(a), by its terms, applies to "a contract for the purchase or sale of a commodity for future delivery," i.e., a futures contract. Section 2(c)(2)(D)(iii) of the Act, 7 U.S.C. § 2(c)(2)(D)(iii), provides that Section 4(a) shall apply to any retail commodity transaction as if it were a futures contract.

commodity transactions with its customers.  Therefore, the question that remains is whether the CFTC has met its *prima facie* burden to show that Defendants engaged in fraud in connection with those transactions.  To establish a claim for fraud under Section 4b(a)(2)(A), (C) or Regulation 5.2(b)(1), (3), the CFTC must show: (1) the making of a misrepresentation, misleading statement, or deceptive omission; (2) materiality; and (3) scienter.  *See Am. Metals Exch. Corp*., 693 F. Supp. at 194; *see also CFTC v. R.J. Fitzgerald & Co*., 310 F.3d 1321, 1328–29 (11th Cir. 2002) (same); *CFTC v. Ramkishun*, Civ. No. 23-120, 2023 WL 7001012, at *2 (E.D.N.Y. Sept. 12, 2023).

1.    False and Misleading Statements, and Deceptive Omissions

The Court finds that the CFTC has made a *prima facie* showing that Defendants made misrepresentations, misleading statements and deceptive omissions.  Whether a party has made a misrepresentation, misleading statement or omission "depends on the overall message and common understanding of the information conveyed."  *See R.J. Fitzgerald & Co*., 310 F.3d at 1328–29.  Traders Global, through the My Forex Funds website, in Defendant Kazmi's YouTube video, and through the "contractor agreements with customers," conveyed the overall message that customers with so-called "live accounts" were trading Traders Global's capital against third parties, i.e., "liquidity providers," in the "market," and that profits from such trading would be split between Traders Global and the customer.  Traders Global assured customers that it only made money when customers made money, that it lost money when customers lost money, and that its interests were generally aligned with customers.

The record supports that these statements were false and misleading.  Almost no customers with "live accounts" trade against third-parties or in a "market" using Traders Global capital.  Rather, these customers trade against Traders Global in an electronic environment that Traders Global controls.  Delay and slippage experienced by customers are in fact imposed behind the scenes by Traders Global.  Traders Global sets the bid-ask spread, and assessed commissions

18

against customer accounts.  When customers with "live accounts" made money trading, Traders Global paid the customer out of fees it collected from other customers.  Defendants did not disclose these facts to customers.

    2. <u>Materiality</u>

  The Court also finds that the CFTC has made a *prima facie* showing of materiality.  A fact is material if a person would view it as "having significantly altered the total mix of information made available."  *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988) (setting out standard for materiality under § 10(b) of the Securities Exchange Act) (internal quotation marks omitted).  Put differently, "[a] fact is material if a reasonable person would view the information as important in making a trading decision-in other words, as including facts significantly altering the total mix of information already in his possession."  *CFTC v. Int'l Berkshire Grp. Holdings, Inc*., Civ. No. 05-61588, 2006 WL 3716390, at *8 (S.D. Fla. Nov. 3, 2006).

  The record evidence supports that the misrepresentations and omissions are material because they go to the fundamental nature of the relationship between Traders Global and its customers, and the nature of the trading offered to customers.  In deciding whether to purchase one of Traders Global's programs, a reasonable customer would likely find it important that Traders Global's interests are actually adverse to customers on substantially all "live account" trades.  Specifically, a reasonable customer would likely find it important that: (1) he or she would not be executing trades for Traders Global but, instead, Traders Global is the counterparty; (2) Traders Global actually lost money when the customer made money; and (3) any purported "profits" Traders Global promised to pay a customer for successful trading actually came from fees that other customers paid Traders Global.  *Cf. Am. Metals Exch. Corp*., 693 F. Supp. at 194 (holding that material facts include information such as "the persons with whom [one] deals" and "the handling of the account").  Similarly, and particularly given that their interests were adverse,

a reasonable customer would likely find it important that Traders Global controlled the environment in which the customer executed trades, setting the bid-ask spread, and imposing delay and slippage, as well as commissions, on customers' trades.  Defendants conceded at argument that none of these facts were disclosed to Traders Global customers.

Defendants argue that their false or misleading statements are immaterial because Defendants' "simulated" trading environment "mimicked" the real market.  This argument is belied by the fact that slippage and delay were applied selectively by Traders Global to customer accounts.  Moreover, the fact that Traders Global, not market forces, determined the slippage and delay is something a reasonable customer would have wanted to know.

Defendants also argue that their misstatements and omissions were immaterial because Traders Global paid customers who traded profitably on "live accounts."  Many customers, however, did not receive payments.  Further, whether they get paid or not, a reasonable customer would want to know that Traders Global is adverse to them on substantially every trade, imposing slippage and delay, controlling the spread, and assessing commissions.  *See Ramkishun*, 2023 WL 7001012, at *2–3 (a fact can qualify as material regardless of whether it would cause a particular customer's "action or inaction").

### 3.   Scienter

The CFTC has also made a *prima facie* showing of scienter.  To establish scienter, the CFTC must show "that the defendants lacked 'a genuine belief that the information disclosed was accurate and complete in all material respects.'"  *SEC v. Antar*, 15 F. Supp. 2d 477, 529 (D.N.J. 1998) (quoting *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1244 (3d Cir. 1989)); *see also Am. Metals Exch. Corp.*, 693 F. Supp. at 194 (holding scienter requires evidence "that defendants acted deliberately and with knowledge of the fraudulent nature of the false statements or omissions").  To establish a corporation's scienter, "the mental state of an officer acting on the

20

corporation's behalf may be imputed to it." *SEC v. Cooper*, 142 F. Supp. 3d 302, 313 (D.N.J. 2015). In addition, pursuant to 7 U.S.C. § 2(a)(1)(B), an agent's acts may be imputed to a principal.

Here, the record supports that Defendant Kazmi knew that substantially all customer trades on the live account were "internalized" and not sent to third-parties; that the purported "profits" that it paid to customers came from customer fees, not from trading profits; and that Traders Global lost money when a customer traded successfully. The record also supports that Defendant Kazmi knew that Traders Global imposed slippage and delay on its own customers' trading.

Defendants argue that Kazmi's intent was not to defraud customers, but to identify "rockstar" traders who could be successful against external counterparties. Scienter does not require "that defendants acted with an evil motive or an intent to injure." *Am. Metals Exch. Corp.*, 693 F. Supp. at 194. It requires only that "the defendants lacked 'a genuine belief that the information disclosed was accurate and complete in all material respects.'" *Antar*, 15 F. Supp. 2d at 529. The CFTC has made a *prima facie* showing that this was the case here. Moreover, Defendant Kazmi's professed intent is undermined by the fact that the very small number of customers whose trades executed against third parties lost money trading.

Overall, the Court finds that the CFTC has met its *prima facie* burden to show scienter as to Defendant Kazmi, based on his own knowledge, and his relationship to Mr. Dentrinos and iSRisk. And, as the sole executive of Traders Global, Defendant Kazmi's scienter may be imputed to the corporate Defendants.[10]

---

[10] Traders Global U.S. and Traders Global Canada operate as a "common enterprise" and are therefore liable for each other's violations of the Act and Regulations. (ECF No. 42-5, Kazmi Decl. n.1.); *CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 38–39 (D.D.C. 2015) (entering summary judgment for CFTC on common enterprise liability).

### F.     CONTROLLING PERSON LAIBLITY FOR DEFENDANT KAZMI

Under Section 13(b) of the Act, 7 U.S.C. § 13c(b), any person who, directly or indirectly, controls any person (or company) is liable for the controlled person's violation of the Act or Regulations if the controlling person did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violation.  *CFTC v. Equity Fin. Grp. LLC*, 572 F.3d 150, 150 (3d Cir. 2009) (affirming judgment for CFTC after bench trial).  A controlling person "knowingly induced" a violation if the person had actual or constructive knowledge of the core activities that make up the violation at issue and allowed them to continue.  *CFTC v. Kratville*, 796 F.3d 873, 894–95 (8th Cir. 2015) (affirming summary judgment for CFTC).

Kazmi had general control over Traders Global, by virtue of his position as CEO, shareholder, and sole director of both Traders Global U.S. and Traders Global Canada.  The same facts which support the CFTC's *prima facie* case of scienter support the inference that Defendant Kazmi "knowingly induced" Traders Global's violations.

### G.     LIKELIHOOD OF FUTURE VIOLATIONS

The CFTC has demonstrated a likelihood of future violations by Defendants that justifies preliminary injunctive relief.  Defendants' conduct was ongoing and systematic.  Courts hold that "[t]he likelihood of future violations may be inferred from past infractions based upon consideration of the totality of the circumstances to determine if the past infraction was an isolated occurrence as opposed to an indication of a systematic and continuous pattern of wrongdoing." *Am. Metals Exch. Corp.*, 693 F. Supp. at 191 (citing *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979); *see also CFTC v. Tradewale LLC*, Civ. No. 21-17776, 2023 WL 3250272, at *7 (D.N.J. May 4, 2023) (holding that "[f]uture violations of the Act or Regulations 'may be inferred, or even presumed, from past unlawful conduct, and the absence of proof to the contrary'") (quoting *Am. Metals Exch. Corp.*, 693 F. Supp. at 171).

During the almost two-year Relevant Period, Defendants continuously engaged in fraud in connection with retail forex and retail commodity transactions through Traders Global, acted as an RFED without registration, and executed off-exchange retail commodity transactions.  Traders Global successfully solicited at least 135,000 customers, and acted as counterparty to at least 24,000 customers in retail forex or retail commodity transactions.  In the absence of preliminary injunctive relief, Defendants are likely to resume their conduct.

**V.    RELIEF**

The Motion seeks four forms of relief: (1) a preliminary injunction against future violations of the CEA, (2) an asset freeze, (3) the appointment of a receiver, and (4) the inspection of books. (ECF 23 at 45-47.)

### A.    PRELIMINARY INJUNCTION AGAINST FUTURE VIOLATIONS

On the basis of the foregoing, the Court will enter an order enjoining Defendants, and any person acting in active concert or participation with Defendants, from engaging in the conduct described above, *i.e.*, soliciting customers for participation in the My Forex Funds programs, or acting as counterparty to customers in retail forex or retail commodity transactions as Traders Global has done with respect to customers trading "live accounts."

A preliminary injunction is appropriate where, as here, the CFTC has made a *prima facie* case that Defendants have engaged in fraud, particularly with respect to retail customers.  The sheer scope of Defendants' unregistered RFED, and off-exchange retail commodity trading, business compels the conclusion that preliminary injunctive relief is required.

### B.    ASSET FREEZE

All of Defendants' assets have been frozen since the entry of the SRO on August 29, 2023. (ECF No. 13.)  In its *ex parte* submission in support of the SRO, the CFTC relied, in part, on Mr. Edelstein's declaration, more than half of which was devoted to an analysis of Defendants'

financial accounts.  (ECF No. 33-44, CFTC Ex. E, Edelstein Decl. ¶¶ 20–49.)  According to Mr. Edelstein, during the Relevant Period, Defendants' accounts reflected a total of approximately $310 million in fees paid *by* customers, and a total of approximately $159 million paid *to* customers.  (*Id.* ¶¶ 47–48.) The difference between these two amounts is $151 million.

Mr. Edelstein included in his sworn declaration a table indicating that, with respect to a particular account at BMO Bank of Montreal (referred to as the "TGG #995 Account"), $31,550,000 had been transferred to an "unidentified Kazmi account," out of a total of $32,416,612.99 debited from the account. (*Id.* ¶ 29.)  In other words, according to the declaration submitted by Mr. Edelstein to the Court, 97.3% of the outgoing funds from this account went to an "unidentified" account controlled by Mr. Kazmi.  Mr. Edelstein admitted during the November 6 PI Hearing that one purpose (among others) of this section of his declaration could have been to provide evidence of potential dissipation of assets.  (ECF No. 130, PI Hearing Tr. 50:13–19.)

In his testimony during the November 6 Hearing, however, Mr. Edelstein stated that shortly after the complaint was filed, the CFTC learned that the $31,550,000 transfer was a lawful tax payment by the defendants to Canadian authorities.  (*Id.* at 8:7–9.)  Mr. Edelstein testified that the CFTC had learned that fact "in the days after filing, if not – if not the first two weeks."[11]  (*Id.* at 8:19–20.)  The Court then had the following exchange with CFTC counsel at a sidebar:

> THE COURT: I'm trying to understand the timeline of this. You learned of this discrepancy, this mistake a week or two after the filing, and you didn't inform the Court or defense counsel.
>
> They raised it in their papers? Because if that's accurate, CFTC is going to be in a lot of trouble today. So please tell me that that's not accurate what they're implying on cross-examination.

---

[11] Indeed, an investigator from the Ontario Securities Commission confirmed in a sworn affidavit that the "TXBAL" and "TXINS" payments Mr. Edelstein characterized as transfers to an "unidentified Kazmi account" in fact were payments for corporation tax and corporation tax installments, respectively.  (Nov. 6 H'rg Def. Ex. 10 (Collins Aff.)) ¶ 9.

MR. BURDEN: Your Honor, I think it is correct that we --

THE COURT: You learned of it and didn't tell the Court or defense counsel?

MR. BURDEN: Correct, Your Honor.

THE COURT: Why was that?

MR. BURDEN: Because, Your Honor, we considered that it was not material to the purpose of the declaration, and it was a small mischaracterization of this transfer that doesn't relate to trading by–

THE COURT: Here's the total in the chart, right? $32 million and change. The discrepancy is $31 and a half million. And you didn't find that material? Is that really what you're going to say? Because then you're going to say it out there and not on sidebar.

MR. BURDEN: It is, Your Honor.

THE COURT: I'll wait to hear from you later. Go back to cross-examination. You guys have a lot of explaining to do today. Get ready to do it.

*Id.* at 51:11–52:12.

On September 22, 2023—weeks after the CFTC knew that Mr. Edelstein had mischaracterized the tax payments—it specifically relied on Mr. Edelstein's mischaracterization to argue that the SRO should continue to restrain all of Mr. Kazmi's personal assets.  (ECF No. 72 at 9 ("The evidence also shows substantial transfers from Traders Global's corporate accounts to Defendant Kazmi. ([Edelstein Decl.] ¶ 29.) For example, between December 2022 and April 2023, $31.55 million was transferred from one of Traders Global's corporate accounts in Canada to another account in Mr. Kazmi's name. *Id.* ¶ 29.").)  The CFTC's failure to disclose or to correct Mr. Edelstein's error, and continued citation to the error even after realizing it was an error, is troubling at best.[12]

---

[12] The record reflects that CFTC knows how to submit a corrected declaration.  On October 31, 2023, the CFTC submitted a revised declaration of another CFTC Investigator, Devin Malinowski, to correct a typo and to attach an exhibit that previously had been omitted.  (ECF Nos. 112, 112-1.)

Accordingly, to the extent that the transfer of $31,550,000 to an "unidentified Kazmi account" was a factor supporting the grant of the *ex parte* SRO, the Court now assigns it no weight. The CFTC has provided scant particularized evidence that supports a finding that Defendants intend to dissipate any assets.  In the Motion, the CFTC devotes only a single paragraph to why a total freeze of all Defendants' assets is necessary. That paragraph reads, in its entirety:

> An asset freeze is necessary here to preserve the status quo and maintain the court's jurisdiction over assets to which aggrieved customers may be entitled. In the absence of an asset freeze, Kazmi may—and is likely to—transfer or dissipate assets held in the US, either at banks or with payment companies like WooCommerce or Deel. Kazmi can easily transfer those assets to Canada, beyond the immediate reach of the Court. Indeed, this is where most of Defendants' assets are currently. Kazmi can also convert his assets to cryptocurrency and place them in his non-custodial wallet, which cannot be frozen or seized by any jurisdiction. Or Kazmi may simply dissipate those assets through his demonstrated propensity for profligate spending.

(ECF No. 14 at 45–46 (citations omitted).)[13]

Since the entry of the SRO, Defendants have appeared in the case, retained experienced counsel, complied with the Court's order to provide the CFTC with an accounting of Defendants' assets (ECF No. 121), produced Defendant Kazmi for deposition, and expressed an interest in resolving the case and remediating any potential disclosure issues, *see* ECF No. 130, PI Hearing Tr. 113:15–19.  Whatever concerns the CFTC initially may have had regarding the likelihood of Defendants dissipating their assets appear to have been substantially reduced.

In the alternative to a total rollback of the asset freeze, Defendants assert it should be limited, at most, to the profits Defendants earned from customers trading on live accounts (*i.e.*, B Book and A Book customers), which is approximately $12,080,000.

---

[13] The CFTC has not actually provided evidence, and the Court is aware of none, that Mr. Kazmi actually has (or ever had) a non-custodial cryptocurrency wallet. The basis (if any) for this assertion in Mr. Edelstein's declaration is unclear.

The crux of the CFTC's allegations center on whether the defendant companies were "the counterparty to substantially all customer trades." (Compl., ECF No. 1 at ¶ 3.) This allegation applies most clearly to the context of live accounts. It is not disputed that, of Defendants' customers, 92% never advanced out of "demo accounts" and into either the B Book or the A Book. (ECF No. 114-1, Dentrinos Decl. ¶ 11.) The gravamen of the CFTC's complaint is that Defendants failed to disclose to B Book customers that they were in a simulator, not trading in the real market.

The Court therefore finds that it is appropriate to limit the amount of an asset freeze to Defendants' profits associated with the 8% of customers who had "live accounts" in either the B Book or the A Book. The evidence presented to the Court is that Defendants generated approximately $310 million in fees from *all* customers (the 92% with demo accounts and the 8% with live accounts) during the relevant period and paid out approximately $159 million to customers who traded successfully. (ECF No. 33-44, CFTC Ex. E, Edelstein Decl. ¶¶ 13, 47–48.) The difference is $151 million. Defendants posit that approximately 8% of that amount, or $12,080,000, is associated with the live accounts. Although the Court has not concluded that this is the amount that may be subject to disgorgement ultimately, this is the amount the Court will order frozen at this stage.[14]

Accordingly, $12,080,000 of the corporate defendants' assets shall remain frozen pending trial. The Court finds no need to freeze Mr. Kazmi's personal assets, given that it appears the corporate assets are sufficient to cover this amount. Therefore, within 5 business days of entry of this order, Mr. Kazmi shall submit an affidavit outlining the steps he has taken to ensure that $12,080,000 of Defendants' corporate assets remain frozen pending further order of this Court.

---

[14] Notably, the Court is mindful that, as set forth above, customers paid different registration fees depending on the type of account they sought and the trading limit on that account. It is entirely likely that A book and B Book customers—those who had experienced some apparent success—skewed towards choosing the types of accounts that required higher registration fees.

Failure to keep these assets frozen will expose Defendants to sanctions, contempt, or an expanded freeze order. The balance of the asset freeze of the SRO is dissolved. Defendants' remaining assets shall be unfrozen and returned to Defendants with 5 business days of entry of this order.

### C.    APPOINTMENT OF A RECEIVER AND INSPECTION OF BOOKS

Likewise, given that the frozen assets may be set aside and that Defendants are represented by experienced counsel, the Court trusts that no receiver is necessary to effectuate the Court's order. Failure to comply with the Order will expose Defendants to the re-appointment of a receiver. Moreover, the Court declines to continue the order for the inspection of Defendants' books and records. The CFTC sought this relief out of concern that Defendants will destroy relevant evidence. (ECF No. 14 at 46–47.) Given Defendants' conduct since the complaint was filed, the Court perceives no meaningful risk of spoliation. The orderly process of civil discovery should proceed as set forth in the Federal Rules of Civil Procedure and the Local Civil Rules.

Finally, in light of the counsel's remarks during the November 6 hearing, the Court will instruct the parties to meet and confer (with assistance from the Special Master as appropriate) regarding suitable disclosure language that might be added to the My Forex Funds website to alleviate the CFTC's concerns regarding misleading or omitted information.

## VI.    <u>CONCLUSION</u>

For the reasons stated above, the Court will GRANT IN PART and DENY IN PART the Motion for Preliminary Injunction. An appropriate Order will follow.


Date: **November 14, 2023**

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**
